## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RYAN NOAH SHAPIRO; JEFFREY STEIN; NATIONAL SECURITY COUNSELORS; TRUTHOUT, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, <br><br> *Defendant*. | Civil Action No. 13-555 (RDM) |

## <u>MEMORANDUM OPINION</u>

The Freedom of Information Act ("FOIA" or the "Act"), 5 U.S.C. § 552 *et seq*., was enacted to promote transparency and accountability in how the federal government discharges its numerous and far-ranging responsibilities. This case raises a variety of questions relating to how FOIA applies to the Federal Bureau of Investigation's ("FBI") discharge of one of those duties— its responsibility to comply with FOIA itself. This is, in short, a case about how the FBI applies FOIA to FOIA.

Plaintiffs are several nonprofit organizations and journalists who filed multiple FOIA requests with the FBI seeking the processing documents associated with dozens of prior FOIA requests that they or others had submitted. The FBI produced some responsive documents, but redacted or withheld pages from those documents, and issued categorical denials in response to many of the plaintiffs' requests, refusing to produce any responsive documents at all. Most broadly, the agency declined to produce *any* of the processing records routinely generated in responding to FOIA requests submitted in the last 25 years for material contained in investigative

1

files.  The FBI explained that producing these records might allow a savvy FOIA requester to identify the rare cases where the FBI has exercised its discretion to issue a "none-found" response to a FOIA request for records that are "excludable" under FOIA, and thus would risk the implicit disclosure of highly sensitive information relating to ongoing investigations, confidential informants, and classified national security matters.  *See* 5 U.S.C. § 552(b)(7)(E), (c).  The agency also broadly declined to provide *any* "case evaluation forms," which are forms used to track and evaluate the performance of FBI employees engaged in processing FOIA requests.  In the FBI's view, these forms are exempt from disclosure because they relate "solely to the internal personnel rules and practices of [the] agency."  *Id.* § 552(b)(2).  In addition to these categorical denials, the FBI declined to produce a number of records responsive to individual requests, relying on a host of other, more specific grounds.

The plaintiffs filed this action to compel the FBI to produce the withheld material.  They challenge the adequacy of the FBI's searches and many, although not all, of the grounds asserted by the agency to withhold responsive records.  They also bring a facial challenge to the FBI's policy of declining to provide any processing records for FOIA requests made within the last 25 years that sought material from FBI investigative files.  The FBI has now moved for summary judgment, and the plaintiffs have cross-moved for partial summary judgment.  For the reasons detailed below, the Court will **GRANT** the plaintiffs' motion for partial summary judgment in part and **DENY** it in part; it will, for the same reasons, **GRANT** the FBI's motion for summary judgment in part and **DENY** it in part.

# I. BACKGROUND

## A. Statutory Framework

The Freedom of Information Act is premised on the notion that an informed citizenry is "vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The Act embodies "a general philosophy of full agency disclosure." *U.S. Dep't of Defense v. FLRA*, 510 U.S. 487, 494 (1994) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360–61 (1976)). It thus mandates that an agency disclose records upon request, unless they fall within one of nine exemptions. "These exemptions are 'explicitly made exclusive' and must be 'narrowly construed.'" *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973), and *FBI v. Abramson*, 456 U.S. 615, 630 (1982)).

At issue here are four of the nine exemptions. Exemption 2 "shields from compelled disclosure documents 'related solely to the internal personnel rules and practices of an agency.'" *Id.* (quoting 5 U.S.C. § 552(b)(2)). Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). It exempts "those documents, and only those documents, normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975)). Exemption 6 protects information about individuals in "personnel and medical files and similar files" when its disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Finally, Exemption 7 shields from disclosure "records or information compiled for law enforcement purposes, but only to the extent that" release of the records would disclose one of six kinds of sensitive information. *Id.* § 552(b)(7). Two of the six are relevant here: Exemption 7(C), which applies whenever disclosure

"could reasonably be expected to constitute an unwarranted invasion of personal privacy," *id.* § 552(b)(7)(C), and Exemption 7(E), which applies whenever release of the information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law," *id.* § 552(b)(7)(E).

Also at issue here are FOIA's three "exclusions." These statutory provisions authorize law enforcement agencies, under unusual circumstances, to "treat [responsive] records as not subject to the requirements of [FOIA]," *see id.* § 552(c)(1)–(3), and accordingly to deny that any such records exist. *See ACLU of Michigan v. FBI*, 734 F.3d 460, 469–72 (6th Cir. 2013).[1] A law enforcement agency may rely on an exclusion only if a request is made for records that (1) implicate an ongoing criminal investigation if "there is reason (i) to believe that the subject of the investigation . . . is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(c)(1); (2) concern an undisclosed informant, *id.* § 552(c)(2); or (3) "pertain[] to foreign intelligence or counterintelligence, or international terrorism," if the records are maintained by the FBI and are classified, *id.* § 552(c)(3).

## B. FBI FOIA Procedures

This case concerns various documents that the FBI creates while processing FOIA requests. The division of the FBI that is responsible for processing FOIA requests is known as

---

[1] The D.C. Circuit has never authoritatively stated that an agency may issue a "none-found" response rather than a *Glomar* response (in which an agency refuses to confirm or deny whether responsive documents exist) if an exclusion applies. *See Benavides v. DEA*, 976 F.2d 751, 753 (D.C. Cir. 1992) (per curiam) (declining to "authoritatively construe[]" § 552(c)). But those "[c]ourts that have dealt with § 552(c) exclusions have generally approved of the FBI's standard practice" of issuing a "none-found" response, *see ACLU of Michigan*, 734 F.3d at 471, and the plaintiffs do not challenge the practice here, *see* Dkt. 27 at 37 n.21.

the Record/Information Dissemination Section ("RIDS").  *See* Dkt. 21-3 at 1–2 (Hardy Decl. ¶¶

1–3).  According to a declaration submitted by the director of RIDS, David M. Hardy, RIDS

analysts primarily rely on two database systems to conduct searches of records that might be

responsive to FOIA requests.  *Id.* at 14–16 (Hardy Decl. ¶¶ 53–57).  The FBI's Freedom of

Information and Privacy Act Document Processing System ("FDPS") is the primary database.

*Id.* at 14 (Hardy Decl. ¶ 53).  FDPS is a "request management system" that RIDS employees use

to "track FOIA/Privacy Act requests, referrals, appeals, and litigations."  *Id.* (Hardy Decl. ¶ 54).

"Within FDPS, an electronic file is created for each FOIA/Privacy Act request" that contains

"copies of pertinent correspondence," including the request and the FBI's response letter;

"processing-related documents," including search slips; and "multiple versions" (i.e., the original

version and a redacted version) "of the records processed in response to" the FOIA request.  *Id.*

at 14–15 (Hardy Decl. ¶ 55).  "FDPS also includes a 'notes' section in which additional

processing-related information may be included."  *Id.*

    The second database is the FBI's Central Records System ("CRS").  *Id.* at 15 (Hardy

Decl. ¶ 56).  The CRS contains "administrative, applicant, criminal, personnel, and other files

compiled for law enforcement purposes."  *Id.*  According to Hardy, "[a]lthough the CRS is

primarily designed to serve as an investigative tool, the FBI searches the CRS for documents that

are potentially responsive to FOIA/Privacy Act requests[] when it determines that responsive

records are likely to be maintained in the CRS."  *Id.*  In other words, RIDS employees search the

CRS for records that may be responsive to FOIA requests; they document the results of those

searches, and other efforts, in FDPS.

    As described below, Plaintiffs submitted various FOIA requests to obtain documents that

the FBI had *previously* created in processing *earlier* FOIA requests—some submitted by

Plaintiffs themselves and some submitted by other requesters.  Although Plaintiffs stated generally that they sought "all records" that documented the FBI's efforts to respond to the prior FOIA requests, *see, e.g.*, Dkt. 21-4 at 3 (Hardy Decl., Ex. A), this case centers on three types of processing records: search slips, case processing notes, and case evaluation forms.

*Search slips* are records that document the efforts of RIDS analysts to search for files responsive to FOIA requests.  Plaintiffs have provided the following example of a search slip, which they presumably obtained before the FBI adopted its categorical policy of denying access to these records:

Dkt. 27-13 at 44 (Pls.' Mot. Summ. J., Ex. M).  Although the exact format of the search slips the

FBI creates has varied over time, most search slips contain, at the very least, cross-references to

the CRS files searched by the RIDS analysts, *see* Dkt. 21-3 at 21–22 (Hardy Decl. ¶ 70), and the

dates on which those files were searched.

    *FDPS case processing notes* also document the efforts of RIDS analysts to process FOIA

requests.  The plaintiffs have provided the following example of a page of case processing notes:



Dkt. 27-5 at 26 (Pls.' Mot. Summ. J., Ex. E).  The primary difference between the FDPS case

processing notes and the search slips is that the notes contain "employee-generated notations . . .

[that] may contain the same information as . . . search slips but are often far more detailed." Dkt. 21-3 at 23 (Hardy Decl. ¶ 72). That is, while the search slips that correspond to a given FOIA request may contain cross-references to the relevant CRS files, the processing notes may explain why a particular record contained in those files could not be located, or why it could not be provided to a requester. *See id.* (Hardy Decl. ¶¶ 72–73).

Finally, *case evaluation forms* are records that are "maintained in RIDS administrative personnel files for purposes of tracking and evaluating the performance of employees who process FOIA and Privacy Act requests." *Id.* at 19 (Hardy Decl. ¶ 66). The plaintiffs have provided the following example of both sides of a case evaluation form, which, again, they presumably obtained before the FBI adopted its current policy:

```
┌─────────────────────────────────────────────────────────────────┐
│                      WORK PROCESSING UNIT                          │
│                         Correction List                           │
└─────────────────────────────────────────────────────────────────┘
```

**Analysis of Request**
1.      ☐Not true subject matter  (M)
2.      ☐Not perfected/unperfected
3.      ☐Failed to recognize fee waiver
4.      ☐Expedition process failure
5.      ☐Failure to recognize request for ELSUR
6.      ☐Cataloging request incorrectly

**Improper Search**
7.      ☐Check RTS
8.          ☐Preprocessed Case
9.          ☐Rearting Room
10.         ☐Provided Duplicate Request
11.     ☐Database(s)
12.         ☐ARC Manual (shared responsibility)
13.         ☐ACS
14.         ☐Field Office manual (shared responsibility)
15.         ☐SharePoint
16.         ☐DNA/CODIS Database
17.         ☐ELSUR
18.     ☐Other _____ Missed Ident  (M)

**Collection/Scope/Analysis of Responsive Documents**
19.     ☐Did not ensure records are responsive (M)
20.     ☐Did not include exclusion (M)
21.     ☐Failed to ensure pending or closed file (M)
22.     ☐Failed to recognize negotiation
23.     ☐Missed TS or other sensitive info (M)
24.     ☐Failed to import correct info into the request
25.     ☐Failed to ACL look proper security measures

**Communications**
25.     ☐Did not include appropriate correspondence
26.         ☐Grammatically incorrect/misspelling(s) of outgoing communications
27.         ☐ Failed to date letter
28.     ☐Did not enter appropriate informative notes in FDPS
29.     ☐Failed to consult with other divisions/FO's/or other agencies if required
30.     ☐Failed to consult in-house to resolve issues if required

**Organizing Work**
31.     ☐Did not effectively move cases through queues
32.     ☐Failed to prioritize work and multi-task

**Print queues/final work product**
33.     ☐Reviews no case letter for errors
34.         ☐Page Count error
35.         ☐Address error
36.         ☐Obvious errors, other _____

**(M) = Major Error**

Dkt. 27-6 at 1–2 (Pls.' Mot. Summ. J., Ex. F).  The case evaluation forms contain some
information about the databases that the RIDS analyst tasked with processing a particular FOIA
request relied on in processing it, *see id.* at 2, but the forms focus on the performance of the
analyst rather than the substance of the request.

**C. Plaintiffs' FOIA Requests**

This action arises from the denial of several different FOIA requests brought by several different plaintiffs.  For the sake of clarity, the Court sets out the administrative history of each request, or set of requests, separately.

1. *NSC's First Request (No. 1156218-000)*[2]

Plaintiff National Security Counselors ("NSC") is a nonprofit organization incorporated in Virginia.  Dkt. 1 at 2 (Compl. ¶ 5); *see also Nat'l Sec. Counselors v. CIA*, No. 14-5171, 2016 WL 191904, at *2–3 (D.C. Cir. Jan. 15, 2016).  On October 26, 2010, NSC submitted a FOIA request to the FBI via e-mail seeking "all [FBI] records" regarding seven previous FOIA requests "that contain remarks, comments, notes, explanations, etc.[,] made by FBI personnel or contractors about the processing of these requests."  Dkt. 21-4 at 3 (Hardy Decl., Ex. A).  NSC specified that it was seeking

> any analysts' notes made during the processing of the requests, any standard worksheets (including Work Process Unit Case Evaluation Forms) completed by FBI personnel or contractors, any justifications for exemption invocations or other supporting documentation provided to the Appeals Authority, and any correspondence referencing the requests, including tasking orders, emails, referral memos, and coordination documentation.

*Id.*  The FBI replied on December 6, 2010.  Dkt. 21-4 at 8 (Hardy Decl., Ex. B).  It indicated that it had reviewed eight pages of records and released all eight, withholding some information on the basis of Exemptions 2, 6, and 7(C).  *Id.*  The pages the FBI released were "printout[s] of the

---

[2]  The FBI initially treated NSC's single request for documents as a single FOIA request and assigned it a single request number (No. 1156218-000).  On remand, however, the FBI treated the NSC's request as six separate requests, and assigned it six separate request numbers, each derived from the prior FOIA request regarding which NSC sought records.  *See* Dkt. 21-4 at 32 (Hardy Decl., Ex. G).  The distinction is not material to the resolution of NSC's claims.

'Notes' field of the FBI processing database for each of the requests in question." *See id.* at 12 (Hardy Decl., Ex. C).

NSC appealed the adequacy of the FBI's search. *Id.* It stated that it believed the FBI's response had been incomplete, given that the documents released "did not reflect the complete histories of six of the requests." *Id.* NSC specified that it "did not receive *any* of the Work Processing Unit's Case Evaluation Forms that are typically completed for FOIA requests." *Id.* at 13 (emphasis in original). The Justice Department's Office of Information Policy ("OIP"), which adjudicates appeals regarding FOIA requests submitted to Justice Department components, "remand[ed] [NSC's] request for a further search for records" on June 24, 2011. *Id.* at 17 (Hardy Decl., Ex. E). On remand, the FBI released "the exact same records" for six of the seven case files, this time withholding information only on the basis of Exemption 6. *Id.* at 32 (Hardy Decl., Ex. G); *see also id.* at 19–30 (Hardy Decl., Ex. F). The FBI did not release any records for the seventh case file, and NSC does not challenge its failure to do so in this action.

On November 4, 2011, NSC again appealed the adequacy of the FBI's search. *Id.* at 32 (Hardy Decl., Ex. G). NSC's executive director, Kel McClanahan, wrote:

> I can point directly to the documents that are missing. When the [Records and Management Division] performs a search, it fills out an "FBI RMD FOIPA Search Slip," and the person doing the search writes a memo back . . . . However, no such documents were released in this request, despite the fact that they would be clearly responsive.

*Id.* On January 20, 2012, OIP again remanded the request for further review. *Id.* at 41 (Hardy Decl., Ex. I). But it simultaneously "affirm[ed], on modified grounds, the FBI's action." *Id.* Specifically, OIP wrote:

> To the extent that you are seeking search slips associated with the processing of the above-referenced requests, please be advised that this information is protected from disclosure under the FOIA pursuant to [Exemption 7(E)]. This provision concerns records or information compiled for law enforcement purposes the

release of which would disclose techniques and procedures for law enforcement investigations or prosecutions. Because any such records responsive to your request would be categorically exempt from disclosure, the FBI properly asserted Exemption 7(E) and was not required to conduct a search for such records.

*Id.*

   2. *NSC's Second Request (No. 1174832-000)*

On October 5, 2011, while it was appealing the FBI's second production of records in its first request, NSC submitted another FOIA request to the FBI. Dkt. 21-4 at 44 (Hardy Decl., Ex. J). NSC sought "all [FBI] records" relating to twelve previous FOIA requests "that contain remarks, comments, notes, explanations, etc.[,] made by FBI personnel or contractors about the processing of these requests." *Id.* at 45. Specifically, NSC explained that it sought "[a]ny and all" of the following documents: "analysts' notes made during the processing of the requests," "pages and fields from [the FBI]'s case tracking system," "records pertaining to the searches performed," "worksheets (including Work Process Unit Case Evaluation Forms) completed by FBI personnel or contractors," and "correspondence referencing the requests." *Id.* None of the twelve previous FOIA requests had been submitted by NSC; each request had been submitted by someone else and had ultimately been the subject of FOIA litigation. *See Id.* at 58 (Hardy Decl., Ex. M).

The FBI replied on October 31, 2011. *Id.* at 52 (Hardy Decl., Ex. L). It released six partially redacted pages, all documenting the FBI's processing of one of the twelve previous FOIA requests. *Id.* at 53. The FBI indicated that the other eleven FOIA requests "pertain[ed] to third parties" and therefore "c[ould ]not be released absent express authorization and consent of the third parties, proof that the subjects . . . [we]re deceased, or a clear demonstration that the public interest in disclosure outweighs the personal privacy interest." *Id.* The subject of the one FOIA request for which the FBI did provide processing records was deceased. *Id.* The FBI

explained that disclosure of the records—absent consent, proof of death, or proof that disclosure would be in the public interest—"would be in violation of the Privacy Act." *Id.* The FBI added that the records "may also b[e] exempt from disclosure pursuant to" Exemptions 6 and 7(C). *Id.*

NSC appealed. *Id.* at 56 (Hardy Decl., Ex. M). It argued that the Privacy Act did not apply to a FOIA request, and that the requested records were not exempt under Exemption 6, because "[t]he information in these records is publicly available in the [FBI's declarations] in the court cases which arose from these requests." *Id.* at 58. NSC's request, it explained, was simply "a request for the raw material used in the crafting of those declarations." *Id.* In response, OIP "affirm[ed], on partly modified grounds, the FBI's action on [NSC's] request." *Id.* at 62 (Hardy Decl., Ex. O). It explained that the requested documents were properly withheld because they were exempt under Exemptions 6, 7(C), and 7(E). *Id.*

3. *Stein's First Request (No. 1174507-000)*

Plaintiff Jeff Stein is an "investigative reporter of long standing, specializing in U.S. intelligence, defense, and foreign policy." Dkt. 21-4 at 67 (Hardy Decl., Ex. P). Represented by NSC, he submitted a FOIA request to the FBI on September 28, 2011, seeking "all information pertaining to the searches conducted by the [FBI] which were used, referenced, or relied upon" in the declarations submitted by the FBI in six FOIA actions.[3] *Id.* at 66. The FBI replied on October 4, 2011. *Id.* at 72 (Hardy Decl., Ex. Q). It released no records, relying on the same ground it had cited in denying NSC's similar request for third-party records. *Id.* It stated that,

---

[3] *Rimmer v. Holder*, No. 10-1106, 2011 WL 4431828 (M.D. Tenn. Sept. 22, 2011), *aff'd*, 700 F.3d 246 (6th Cir. 2012); *Negley v. FBI*, 825 F. Supp. 2d 63 (D.D.C. 2011), *aff'd*, No. 11-5296, 2012 WL 1155734 (D.C. Cir. Mar. 28, 2012); *Marshall v. FBI*, 802 F. Supp. 2d 125 (D.D.C. 2011); *Calle v. FBI*, No. 10-2362, 2011 WL 3820577 (N.D. Tex. Aug. 5, 2011); *Davis v. FBI*, 770 F. Supp. 2d 93 (D.D.C. 2011); *Hodge v. FBI*, 764 F. Supp. 2d 134 (D.D.C. 2011), *aff'd*, 703 F.3d 575 (D.C. Cir. 2013).

because the original FOIA requests for which Stein had requested processing documents "pertain[ed] to third parties," they "c[ould ]not be released absent express authorization and consent of the third parties, proof that the subjects . . . [we]re deceased, or a clear demonstration that the public interest in disclosure outweighs the personal privacy interest." *Id.*

Stein appealed on October 6, 2011. *Id.* at 76 (Hardy Decl., Ex. R). As it had in adjudicating NSC's appeal, OIP "affirm[ed], on modified grounds, the FBI's action." *Id.* at 80 (Hardy Decl., Ex. T). It explained that "[t]he FBI properly withheld this information in full because it is protected from disclosure" under Exemption 7(E). *Id.*

4. *Stein's Second Request (No. 1182250-000)*

On November 10, 2011, Stein (again represented by NSC) submitted a second FOIA request to the FBI. Dkt. 21-4 at 83 (Hardy Decl., Ex. U). He requested "all information pertaining to the searches conducted by the [FBI] which was used, referenced, or relied upon" in the declarations submitted by the FBI in two additional FOIA actions.[4] *Id.* The FBI assigned Stein two "request numbers," one corresponding to each action for which Stein had requested documents. *See id.* at 88–89 (Hardy Decl., Ex. V). On May 31, 2012, the FBI responded to the first of the two requests (No. 1182250-000). *Id.* at 91 (Hardy Decl., Ex. W). It stated that it had reviewed 194 pages of documents and released 33 pages with withholdings. *Id.* It justified its withholdings on the basis of Exemptions 1, 6, 7(C), and 7(E). *Id.* Because the cost of producing the documents fell beneath the FBI's regulatory threshold for assessing fees, the FBI provided the documents at no cost. *Id.* at 92.

---

[4] *McGehee v. U.S. Dep't of Justice*, 800 F. Supp. 2d 220 (D.D.C. 2011); *Rosenfeld v. U.S. Dep't of Justice*, No. 07-3240, 2010 WL 3448517 (N.D. Cal. Sept. 1, 2010).

Stein appealed "all of the FBI's withholdings." *Id.* at 98 (Hardy Decl., Ex. Y). On September 27, 2012, OIP "affirm[ed] the FBI's action." Dkt. 21-5 at 6 (Hardy Decl., Ex. CC). It explained that the FBI's withholdings were appropriate because the information was protected from disclosure under Exemptions 1, 6, 7(C), and 7(E). *Id.* at 6–7.

### 5. *Stein's Third Request (No. 1182251-000)*

On March 27, 2012, the FBI responded to what it had treated as the second of Stein's two November 2011 requests (No. 1182251-000). Dkt. 21-5 at 11 (Hardy Decl., Ex. EE). It stated that it had located 694 pages potentially responsive to Stein's request. *Id.* But it notified him that he would be required to be a processing fee of either $59.40, for the cost of duplicating the records, or $20, for the cost of producing two CDs with the records. *Id.* Stein appealed. Dkt. 21-5 at 13 (Hardy Decl., Ex. FF). He argued that the $20 estimate was driven solely by the FBI's "blanket policy of placing only 500 pages on a CD (since he is entitled to one CD free of charge)." *Id.* at 14. In response, OIP affirmed the FBI's action, concluding that the fee estimate was reasonable in light of the circumstances. *Id.* at 20 (Hardy Decl., Ex. HH). The FBI ultimately closed Stein's request administratively on the basis of his failure to pay fees. Dkt. 21-3 at 17 (Hardy Decl. ¶ 61).

### 6. *Truthout's Request (No. 1196979-000)*

Plaintiff Truthout.org ("Truthout") is "an online news publication that publishes news and commentary." Dkt. 21-5 at 22 (Hardy Decl., Ex. II). On January 24, 2012, Truthout's deputy managing editor, Jason Leopold, submitted a FOIA request on Truthout's behalf for "the FBI FOIA analyst processing notes related to" an earlier FOIA request that he had submitted. *Id.* Specifically, Leopold requested "copies of all FBI records" related to the earlier request "that contain remarks, comments, notes, explanations, etc.[,] made by FBI personnel or contractors."

*Id.*  The FBI replied on August 17, 2012.  *Id.* at 36 (Hardy Decl., Ex. KK).  It stated that "[t]he material [Truthout] requested [was] located in a file which is exempt from disclosure" pursuant to Exemption 5.  *Id.*  FBI official David Hardy explained:

> In applying this exemption, I have determined that the records responsive to your request are predecisional records; that there is a pending agency decision relevant to these responsive records; and that release of the information contained in these responsive records could reasonably be expected to interfere with that decision.

*Id.*

Truthout, now represented by NSC, appealed.  *Id.* at 41 (Hardy Decl., Ex. LL).  OIP failed to respond to the appeal within the 20-day statutory deadline, 5 U.S.C. § 552(a)(6)(A)(ii), and Truthout filed suit.  On March 7, 2013, OIP closed Truthout's appeal administratively on the ground that it was now before this Court.  Dkt. 21-5 at 45 (Hardy Decl., Ex. NN).

7.  *Shapiro's Request*

Plaintiff Ryan Noah Shapiro is a doctoral candidate at the Massachusetts Institute of Technology who studies "the history, theory, and practice of the Freedom of Information and Privacy Acts."  Dkt. 21-5 at 53–54 (Hardy Decl., Ex. OO).  On February 10, 2012, Shapiro submitted a FOIA request to the FBI seeking "any and all records associated with the administrative case files for" 71 separate FOIA requests that he had previously submitted to the FBI.  *Id.* at 47–49.  He noted that his request "specifically include[d], but [was] not limited to, any and all search slips, administrative processing notes, and case evaluation forms (even if the case evaluation forms are located in the FOIA specialists' personnel files)."  *Id.* at 47.  The FBI failed to respond within the 20-day statutory deadline, 5 U.S.C. § 552(a)(6)(A)(i), and Shapiro filed this suit rather than appeal.

The FBI replied on April 29, 2013.  *Id.* at 69 (Hardy Decl., Ex. QQ).  It released no

records.  *Id.*  It explained that "[t]he material [Shapiro] requested contain[ed] information

derived from one or more investigative file(s) and [was] being withheld pursuant to" Exemption

7(E).  *Id.*  It sent Shapiro a second letter on December 13, 2013, about the case evaluation forms

he had requested.  *Id.* at 72 (Hardy Decl., Ex. RR).  The FBI explained that it had located

"approximately 19 case evaluation forms" responsive to his request, but that it was withholding

them in full under Exemptions 2 and 6.  *Id.*  Because this suit was already pending, Shapiro did

not appeal.

**D.  Procedural History**

NSC, Stein, Truthout, and Shapiro originally brought suit in November 2012 to challenge

the FBI's responses to these FOIA requests and several others.  *See* Complaint (Dkt. 1), *Shapiro*

*v. U.S. Dep't of Justice*, 969 F. Supp. 2d 18 (D.D.C. 2013) (No. 12-1883).  As originally filed,

Plaintiffs' action "involve[d] thirteen claims brought by four separate plaintiffs . . . regarding

twenty separate" requests under FOIA and the Privacy Act.  *Shapiro*, No. 12-1883, slip op. at 1

(D.D.C. April 17, 2013) (Dkt. 28).  Accordingly, on April 17, 2013, the Court granted the

Department of Justice's motion to sever the claims, retaining one fully briefed claim and

ordering the remaining counts of the plaintiffs' complaint dismissed unless they were "refiled in

appropriate separate actions."  *Id.*, slip op. at 7.

One week later, plaintiffs refiled five of the severed claims in a new complaint, thereby

initiating this action.  Dkt. 1.  The Court issued an order directing the plaintiffs to show cause

why the first four counts of the complaint should not be severed or dismissed.  Dkt. 8.  The case

was then reassigned to another judge, who discharged the order to show cause on September 19,

2013, concluding that "the interest of judicial economy weigh[ed] against severance."  *Shapiro v.*

*Dep't of Justice*, No. 13-555, 2013 WL 5287615, at *1 (D.D.C. Sept. 19, 2013).  Specifically, the

Court explained, "the government does not contest that the FBI's search slip policy is implicated

in each of Counts One through Four, and it appears that legal questions relating to that alleged

policy are likely to predominate over other issues in the case." *Id.*  The case was again

reassigned in November 2014.

The matter is now before the Court on the parties' cross-motions for summary judgment.

Dkts. 21, 28.

## II.  LEGAL STANDARD

FOIA cases are typically resolved on motions for summary judgment under Federal Rule

of Civil Procedure 56.  *See, e.g.*, *Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175

(D.D.C. 2011).  To prevail on a summary judgment motion, the moving party must demonstrate

that there are no genuine issues of material fact and that he or she is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In a

FOIA action, the agency may meet its burden by submitting "relatively detailed and non-

conclusory" affidavits or declarations, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C.

Cir. 1991) (quotation marks and citation omitted), and an index of the information withheld,

*Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973); *Summers v. Dep't of Justice*, 140 F.3d

1077, 1080 (D.C. Cir. 1998).  An agency "is entitled to summary judgment if no material facts

are in dispute and if it demonstrates 'that each document that falls within the class requested

either has been produced . . . or is wholly exempt from the [FOIA's] section requirements."

*Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (quoting

*Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)).  The Court reviews the agency's decision

*de novo*, and the agency bears the burden of sustaining its action.  5 U.S.C. § 552(a)(4)(B).

## III. DISCUSSION

Plaintiffs challenge the FBI's decision to withhold the processing records that are at the heart of this action—search slips, FDPS case processing notes, and case evaluation forms—as inconsistent with FOIA's "general philosophy of full agency disclosure." *Dep't of Defense*, 510 U.S. at 494. They argue that the FBI's withholdings cannot be sustained, either as a categorical matter or on a case-by-case basis. The FBI defends its withholdings on multiple grounds. It argues that all search slips and processing notes generated in the past 25 years in response to FOIA requests directed at investigative files are protected from disclosure under Exemption 7(E) and that the case evaluation forms are, in general, protected under Exemptions 2 and 6. The FBI also argues that it properly withheld records from NSC and Stein because their requests were for information about third parties and that it properly withheld records from Truthout because its request implicated an ongoing investigation. It finally argues that, considered individually, each of the withholdings in the records it provided in response to Stein's second request was justified; that its searches in response to NSC's first request for records and Stein's second request were adequate; and that it properly denied Stein's third request on the basis of his failure to pay fees.

The Court first considers the two categorical policies that the FBI concedes it has adopted in responding to FOIA requests for case processing notes: (1) the withholding of search slips and FDPS case processing notes under Exemption 7(E), and (2) the withholding of case evaluation forms under Exemptions 2 and 6. The Court then considers the remaining issues plaintiff-by-plaintiff and request-by-request.

## A. Categorical Policies

The plaintiffs challenge the FBI's policies of categorically withholding documents associated with its processing of FOIA requests.[5]  The FBI concedes that it has adopted two such policies: it has adopted a policy of "deny[ing] access to processing records related to FOIA/Privacy Act requests related to criminal investigative, national security, counterintelligence, or foreign intelligence information pursuant to Exemption 7(E)," Dkt. 21-3 at 25 (Hardy Decl. ¶ 75); and a policy of denying access to case evaluation forms pursuant to Exemptions 2 and 6, Dkt. 31 at 14.  It relied on these categorical policies in withholding documents from NSC, Stein, and Shapiro.  *See* Dkt. 21-4 at 41 (Hardy Decl., Ex. I); *id.* at 62 (Hardy Decl., Ex. O); *id.* at 80 (Hardy Decl., Ex. T); Dkt. 21-5 at 69 (Hardy Decl., Ex. QQ); *id.* at 72 (Hardy Decl., Ex. RR).  Although the FBI did not deny Truthout's request on either of these bases, it now justifies its denial of Truthout's request in part on the basis of the first of these policies.  *See* Dkt. 21-3 at 23–25 (Hardy Decl. ¶¶ 72–75).[6]

---

[5]  The plaintiffs initially charged the FBI with issuing a so-called "no number, no list" response: that is, a response that "acknowledges the existence of documents responsive to the request, but neither numbers nor identifies them by title or description."  *New York Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 105 (2d Cir. 2014); *see also Nat'l Sec. Counselors v. CIA*, 898 F. Supp. 2d 233, 284 (D.D.C. 2012).  Before this Court, the FBI has "clarif[ied]" the number of records that it withheld.  *See* Dkt. 31 at 13–14; Dkt. 31-1 at 11 (Second Hardy Decl. ¶ 25).

[6]  The agency bears the burden of identifying "the specific statutory exemption relied upon" in withholding records and must "demonstrate that the exemption applies to the documents in question."  *Jordan v. U.S. Dep't of Justice*, 591 F.2d 753, 779 (D.C. Cir. 1978) (en banc).  Although the FBI did not rely on its categorical policies in denying Truthout's request at the administrative level, the D.C. Circuit has long implied that an agency may invoke a FOIA exemption for the first time before the district court—but not "for the first time in the appellate court."  *Id.*; *see also Maydak v. Dep't of Justice*, 218 F.3d 760, 764 (D.C. Cir. 2000) (explaining that an agency "must assert all exemptions at the same time, in the original district court proceedings").  In any event, because this Court concludes that the FOIA exemptions that the FBI raised for the first time here in responding to Truthout's request do not support the FBI's withholdings, *see infra* pp. 21–32, the FBI's failure to assert these exemptions at the administrative level is inconsequential.

The Court addresses each of these policies in turn.

1. *Withholding of Search Slips and Processing Notes*

Plaintiffs contend that the FBI has unlawfully withheld both search slips and FDPS case processing notes on the basis of Exemption 7(E).  Exemption 7(E) permits an agency to withhold "records or information compiled for law enforcement purposes" if the production of such records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  *See* 5 U.S.C. § 552(b)(7)(E).  Agencies "must meet the threshold requirements of Exemption 7"—primarily the requirement that the records were "compiled for law enforcement purposes"—"before they may withhold requested documents on the basis of any of its subparts."  *Pratt v. Webster*, 673 F.2d 408, 416 (D.C. Cir. 1982); *see also Pub. Employees for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico* ("*PEER*"), 740 F.3d 195, 202 (D.C. Cir. 2014).

The FBI characterizes its nondisclosure policy as arising under Exemption 7(E), but the basis for the policy is somewhat more complex.  As the Hardy Declaration explains, the search slips and processing notes sought by the plaintiffs and other requesters "contain specific, detailed information about the existence, extent, and nature of the FBI's interest in an individual."  Dkt. 21-3 at 23 (Hardy Decl. ¶ 73).  The search slips and notes, the FBI explains, may refer to files on individuals that would be exempt from withholding under a specific FOIA exemption, and that in fact were withheld from the original requester.  *Id.* (Hardy Decl. ¶ 72).  But, more importantly, they may also contain references to files that are *excludable* under FOIA—that is, files whose very existence the FBI is permitted to deny.  *Id.* (Hardy Decl. ¶ 73); *see* 5 U.S.C. § 552(c).

21

Indeed, the FBI points out, the search slips may contain references to files that *were excluded* from its response to the original requester—that is, files that the FBI told the requester did not exist.  Requests for search slips therefore put the FBI in a difficult position.  The FBI cannot plausibly deny that the search slip exists—because search slips are created as a matter of course in responding to FOIA requests—but it argues that it also cannot release the search slip, as the search slip would reveal the existence of the file that the FBI told the requester did not exist.  And, for similar reasons, the FBI cannot release a redacted version of the search slip; even if the redaction would tell the requester nothing about the underlying file, the FBI argues, the existence of the redaction would "tip off" the requester that *some* file existed, contradicting the FBI's prior assertion that no responsive records existed.  Likewise, the FBI argues that it cannot withhold the entire search slip under one of the exemptions, because the withholding itself would 'tip off' the requester that the search slip must refer to a file that he or she had previously been told did not exist.

The FBI highlights the dilemma it faces with the following hypothetical.  "[A]ssume that a requester sought processing records for 50 different FOIA requests, 49 of which contained no excludable information but one of which reflected an on-going investigation subject to exclusion under 5 U.S.C. § 552(c)(1)."  Dkt. 21-3 at 25 (Hardy Decl. ¶ 74).  "If the FBI released the administrative processing records for the 49 requests but denied access to (or issued a 'no records' response) in response to the remaining request, this could signal the existence and use of an exclusion by the FBI."  *Id.*  Accordingly, the FBI explains, *any* response that it might make to a request for a search slip that documents the existence of excluded files would "allow subjects to circumvent the law by placing them on notice that they are the subject of an ongoing investigation about which they were previously unaware; by confirming or compromising the

informant status of individuals; or by alerting of the existence of classified investigations related to the subject." *Id.* The FBI argues that the only option available to it is to withhold all search slips and processing notes that it has created in responding to FOIA requests for investigative files in the last 25 years. *Id.* (Hardy Decl. ¶ 75); *see also* Dkt. 31-1 at 9 (Second Hardy Decl. ¶ 20).

The Court does not doubt that the problem the FBI describes is a serious one. Congress specifically authorized law enforcement agencies to treat certain records as "not subject to the requirements of" FOIA. 5 U.S.C. § 552(c)(1)–(3). Responding to requests for search slips and processing notes might undermine the FBI's ability to exercise that authority by enabling sophisticated requesters to infer the existence of those records. The question before the Court, however, is not the existence or the gravity of the problem facing the FBI, but whether the solution the FBI has adopted is consistent with FOIA. Although the question is a difficult one, the Court concludes that the FBI's proposed reading of the statute cannot be squared with its text or the governing precedent.

First, although the FBI argues that its policy is necessary to protect its ability to exercise the FOIA exclusions, it does not maintain that the exclusions themselves authorize its policy of withholding processing records. Dkt. 31 at 20. Nor could it. The first exclusion applies only to records subject to Exemption 7(A) (*i.e.*, records "compiled for law enforcement purposes," the disclosure of which "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A)), and it applies only in a criminal investigation if "there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings," *id.* § 552(c)(1). The second exclusion applies only to "informant

records maintained by a criminal law enforcement agency under an informant's name or personal identifier," and only unless and until "the informant's status as an informant has been officially confirmed." *Id.* § 552(c)(2). The final exclusion applies only to classified FBI records "pertaining to foreign intelligence or counterintelligence, or international terrorism," and it applies only "as long as the existence of the records remains classified information." *Id.* § 552(c)(3). These narrowly defined exclusions relate to sensitive matters of law enforcement and national security. They have nothing to do with the day-to-day administration of FOIA itself.

To be sure, a particular search slip might, on a rare occasion, replicate excludable records and thus also fall within one of the FOIA exclusions, in full or in part. *Cf. Abramson*, 456 U.S. at 625 (construing Exemption 7 "to protect that part of an otherwise non-exempt compilation which essentially reproduces and is substantially the equivalent of all or part of an earlier record made for law enforcement uses"). But the overwhelming majority of FBI processing documents are not excludable under any reasonable construction of Section 552(c). As the FBI acknowledges, the Section 552(c) exclusions are rarely applicable in principle and are even more rarely applied in practice. In the words of the Justice Department's own guide to FOIA, the exclusions are "a novel mechanism for protecting certain especially sensitive law enforcement matters," and are employed only in "exceptional circumstances." U.S. Dep't of Justice, *Guide to the Freedom of Information Act: Exclusions* 1 (last updated Mar. 5, 2014), http://1.usa.gov/1S9kIZF. In the most recent fiscal year, the Justice Department invoked an exclusion only 145 times—or in 0.23% of the over 60,000 requests that it processed. *See* U.S. Dep't of Justice, *2015 Chief FOIA Officer Report* 26–28 (Mar. 2015), http://1.usa.gov/1JoJunf.

The FBI's sweeping policy of withholding all search slips for investigative records, as a result, cannot be justified based on the plain terms of Section 552(c).

Second, although the FBI characterizes its policy as arising under Exemption 7(E) rather than directly under Section 552(c), that exemption does not authorize the policy either. As a threshold matter, Exemption 7 can be invoked only to withhold "records or information compiled for law enforcement purposes." 5 U.S.C. § 552(b)(7); *see also PEER*, 740 F.3d at 202. The search slips are not themselves "records . . . compiled for law enforcement purposes"; they are records compiled for the purpose of responding to FOIA requests. *See* Dkt. 21-3 at 23 (Hardy Decl. ¶ 72) (explaining that search slips and FDPS case notes "are employee-generated notations located within the FBI's processing system used to document the action taken on FOIA/Privacy Act requests received by the FBI"). The FBI acknowledges as much, arguing only that "the underlying FBI CRS records" that are referenced and recompiled in the search slips were "compiled for a law enforcement purpose." *Id.* at 21–22 (Hardy Decl. ¶ 70). But the FBI is not seeking to withhold specific law enforcement information compiled in the search slips on the basis of Exemption 7(E); it is seeking to withhold *all* of the search slips in their *entirety* on the basis of Exemption 7(E).

Under well-established law, "an agency cannot justify withholding an entire document simply by showing that it contains some exempt material," *Stolt-Nielsen Transp. Group Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) (quoting *Mead Data Ctr., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)), and the FBI does not claim that it would be impossible or unreasonable to segregate the law enforcement information that would be subject to Exemption 7 from any remaining material, *cf. Vaughn*, 484 F.2d at 825 ("[T]he agency may not sweep a document under a general allegation of exemption . . . ."). Moreover, even if—in a

case in which the FBI denied that responsive records existed—the existence of a search slip might constitute the substantial "equivalent" of a record compiled for law enforcement purposes, *see Abramson*, 456 U.S. at 625, that would at most bring that particular search slip within the ambit of Exemption 7.  In the absence of a showing that *all* of the withheld search slips in their *entirety* constitute records "complied for law enforcement purposes," the FBI's categorical reliance on Exemption 7 fails at the threshold.

Even if the FBI could demonstrate that it would be unreasonable to require it to segregate the material that would fall within the scope of Exemption 7 from the material that would not, it is doubtful that the harm produced by disclosure of the search slips would sound in Exemption 7(E).  Documents can be withheld under Exemption 7(E) only where their production "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  But the FBI does not point to any "technique," "procedure," or "guideline" that disclosure of the search slips might illuminate.  *See Allard K. Lowenstein Int'l Human Rights Project v. DHS*, 626 F.3d 678, 682 (2d Cir. 2010) ("The term 'guidelines' . . . generally refers in the context of Exemption 7(E) to resource allocation" whereas "[t]he phrase 'techniques and procedures' . . . refers to how law enforcement officials go about investigating a crime."); *see also Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (upholding FBI's invocation of Exemption 7(E) to withhold "details about procedures used during the forensic examination of a computer" on the ground that these were "undoubtedly 'techniques' or 'procedures' used for 'law enforcement investigations'"); *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009) (upholding use of Exemption 7(E) to withhold IRS settlement guidelines on the ground that disclosure "could encourage decisions to

violate the law or evade punishment").  The FBI argues that disclosure of the search slips could reveal its use of Section 552(c) exclusions in individual cases.  But the FBI's exercise of its statutory authority to exclude documents from FOIA's reach is not the kind of "technique" or "procedure" to which Exemption 7(E) refers.  The legislative history of Exemption 7(E) makes clear that it was intended to authorize agencies to withhold only techniques and procedures not "already well known to the public."  *See* H.R. Rep. 93-1380 at 12 (1975); *see also Malloy v. U.S. Dep't of Justice*, 457 F. Supp. 543, 545 (D.D.C. 1978).  That is, the purpose of Exemption 7(E) is to prevent the public from learning about the existence of confidential law enforcement techniques, not to prevent it from learning about the use of already-disclosed law enforcement techniques.  It is thus implausible that the disclosure of the FBI's use of Section 552(c) exclusions—although in some instances harmful—would be harmful in a way that would bring the search slips within Exemption 7(E)'s grant of authority.

The real question, therefore, is not whether records created in processing FOIA requests for documents contained in investigative files are protected categorically by Section 552(c) or Exemption 7(E), but whether the Court should recognize a judicial gloss on FOIA, as the courts did when they first recognized the now-established *Glomar* doctrine.  *See* Dkt. 21-1 at 13.  The *Glomar* doctrine, which permits an agency where appropriate to "refus[e] to confirm or deny its possession of responsive documents," originated under circumstances similar to those present here, where "merely acknowledging the existence of responsive records would itself 'cause harm cognizable under [a] FOIA exception'" or exclusion.  *People for the Ethical Treatment of Animals v. NIH* ("*PETA*"), 745 F.3d 535, 540 (D.C. Cir. 2014) (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)); *see Phillippi v. CIA*, 546 F.2d 1009, 1011–12 (D.C. Cir. 1976).  As with the FBI's search-slip policy, moreover, the *Glomar* doctrine is not "described in the statute"

or its legislative history.  Nathan Freed Wessler, Note, *"[We] Can Neither Confirm Nor Deny The Existence or Nonexistence of Records Responsive to Your Request": Reforming the Glomar Response Under FOIA*, 85 N.Y.U. L. Rev. 1381, 1388 (2010).  Instead, it is "a judicial construct . . . that flows from" the purpose of the FOIA exemptions "rather than their express language." *ACLU v. CIA*, 710 F.3d 422, 431 (D.C. Cir. 2013).  Despite these similarities with the *Glomar* doctrine, however, the Court concludes that the FBI's present policy goes well beyond what the courts have previously permitted and that it cannot be sustained on the basis of the text of FOIA or existing precedent.

Although FOIA does not expressly authorize the use of the *Glomar* response, the doctrine is not without statutory moorings.  As the D.C. Circuit observed in the case that gave rise to the *Glomar* doctrine, requiring an agency to confirm or to deny the existence of records subject to a FOIA exemption can, at times, be the equivalent of requiring that the agency confirm or deny the underlying facts that are themselves protected by the exemption.  *Phillippi*, 546 F.2d at 1011–12.  For instance, because individuals have a "'substantial' privacy interest . . . 'in ensuring that their relationship to [law enforcement] investigations remains secret,'" *PETA*, 745 F.3d at 541 (quoting *Roth v. Dep't of Justice*, 642 F.3d 1161, 1174 (D.C. Cir. 2011)), a law enforcement agency may refuse to confirm or to deny the existence of law enforcement records regarding an individual on the ground that the fact of the records' existence is itself protected by a FOIA exemption.  In other words, if the agency can withhold access to responsive records under FOIA, it stands to reason that it should also be able to refuse to confirm or deny the existence of records when it is necessary to protect precisely the same information.  This is true even if the records *do not* exist; the important question is whether the fact of the records' existence "falls within a FOIA exemption."  *Wolf*, 473 F.3d at 374; *see also PETA*, 745 F.3d at 540; *Roth*, 642 F.3d at

1178.  This principle operates as an important limitation on the use of the *Glomar* response: it is proper for an agency to refuse to confirm or deny the existence of records only "if the particular FOIA exemption at issue would itself preclude the acknowledgement of such documents."  *EPIC v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012).

In none of the *Glomar* cases, however, has the D.C. Circuit permitted an agency to withhold—or to decline to confirm or to deny the existence of—any record or information that is *not* itself protected by a FOIA exemption or exclusion.  When the *Glomar* doctrine is properly invoked, one of two things holds true: either a protected record exists or no record exists.  Either way, the requester is not denied access to any *unprotected* records.  Indeed, to the Court's knowledge, the doctrine has never been used to preclude the production or disclosure of concededly *unprotected* records, even when such a response might have been useful to guard records or information that *were* protected.  To do so would violate the statutory command that FOIA "does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in" the Act.  5 U.S.C. § 552(d).  *See also Rose*, 425 U.S. at 361 ("[D]isclosure, not secrecy, is the dominant objective of the Act."); *Mink*, 410 U.S. at 79; *Vaughn*, 484 F.2d at 823.

It is true that in related contexts courts have permitted agencies to withhold documents that, considered separately, might not be sufficiently sensitive to permit an agency to invoke Exemptions 1 or 7(A), but would meet that threshold when considered together with other documents or information.  *See, e.g.*, *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice* ("*CNSS*"), 331 F.3d 918, 928–29 (D.C. Cir. 2003); *Abbotts v. Nuclear Regulatory Comm'n*, 766 F.2d 604, 608 (D.C. Cir. 1985).  But these cases are different in kind from the present one.  In these cases, the central question was whether the agency could analyze the applicability of FOIA

exemptions (and specifically, the consequences of disclosure) in light of other available or

potentially available records or information, rather than on a document-by-document basis. *See*

*CNSS*, 331 F.3d at 924, 926 (rejecting the district court's conclusion that Exemption 7(A)

"requires an individualized assessment of disclosure"). In permitting agencies to employ a

"mosaic" analysis when considering the consequences of disclosure, however, the D.C. Circuit

did not authorize agencies to withhold documents that are not protected by FOIA. It simply

made clear that the question whether certain documents are protected by FOIA need not be

assessed on a document-by-document basis—at least when the operative question is what

consequences will flow from disclosure. Here, by contrast, the FBI is not arguing that all of the

search slips are exempt or excludable under FOIA when considered in light of other records or

information; indeed, it concedes that the vast majority of them are not protected at all. The FBI

is not making a "mosaic" claim, nor could it. It is only arguing that by withholding all search

slips, even those *not* protected by FOIA, it can amass a haystack in which to hide the search slips

that *are* protected.

The FBI thus asks the Court to recognize a new doctrine—akin to the *Glomar* and mosaic

doctrines, but far more expansive in scope—that would permit it to withhold an entire category

of otherwise unprotected records in order to further the purpose of the FOIA exclusions. In

practice, this would mean withholding hundreds of unprotected processing records for every

document that might permit a sophisticated FOIA requester to infer the existence of protected

information. Although the *Glomar* doctrine may constitute a gloss on FOIA's text, it does not

lead to results fundamentally at odds with the statute. The FBI's present policy does. The

statute *requires* the production of records unless one of the exemptions or exclusions shields the

particular records at issue. *See Milner*, 562 U.S. at 565. These statutory exemptions and

exclusions are "explicitly made exclusive." *Mink*, 410 U.S. at 79. But the FBI's present policy would permit it to deny access to a large number of records that are neither exempt nor excluded. For this reason, the policy—unlike the *Glomar* and mosaic doctrines—cannot be reconciled with the statute.

The only remaining question is whether the policy goals embodied in the exclusions— which the FBI contends can be promoted only by categorically denying access to all processing records created in the last 25 years—provides a sufficient basis to overcome these textual and precedential hurdles. It is true that some opinions applying the *Glomar* doctrine have stated in sweeping terms that an agency "may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under a[] FOIA exception." *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982); *see also PETA*, 745 F.3d at 540; *Wolf*, 473 F.3d at 374. But, as explained above, in none of these cases was the agency attempting to withhold records that were *not* exempt or excluded by FOIA in order avoid "harm cognizable under a[] FOIA exception." *Gardels*, 689 F.2d at 1103. In each of these cases, the agency was permitted to withhold the fact of the records' existence (or non-existence) only because the records (if they existed) would have been exempt under FOIA. The possible presence of "harm cognizable under a[] FOIA exception" does not, standing alone, permit the Court to extend FOIA to documents that do not fall within an exemption or exclusion.

Recent Supreme Court precedent emphasizes this point and counsels against permitting even substantial policy considerations to trump the plain language of FOIA. In *Milner v. Department of the Navy*, 562 U.S. 562, a FOIA requester sought data from the Department of the Navy relating to the safe storage of explosives and, among other things, the effects of hypothetical explosions. Invoking Exemption 2, the Navy declined to provide the requested

data, "stating that disclosure would threaten the security of the base and surrounding community." *Id.* at 568. The D.C. Circuit had previously interpreted Exemption 2, which applies to records "related solely to the internal personnel rules and practices of an agency," 5 U.S.C. § 552(b)(2), to apply to records dealing with "pay, pensions, vacations, hours of work, lunch hours, parking" and the like ("Low 2") and also to "predominantly internal" records the disclosure of which might "significantly risk[] circumvention of agency regulations or statutes" ("High 2"). *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051, 1056–57, 1074 (D.C. Cir. 1981) (en banc). The *Milner* Court, however, rejected the availability of the "High 2" exemption, concluding that "the plain meaning" of the exemption's text required a narrower reading. 562 U.S. at 580. In reaching this conclusion, the Court acknowledged the "strength" of the policy considerations behind the Navy's reading of Exemption 2, and the strong interest in protecting the data at issue. *Id.* But the Court nonetheless concluded that the government's interpretation could not be sustained, *id.*; *see also id.* at 581 ("All we hold today is that Congress has not enacted the FOIA exemption the government desires."), and that, to the extent that other exemptions did not cover records whose release "would threaten the Nation's vital interests, the Government may of course seek relief from Congress," *id.* at 581.

The same is true here. There may be compelling reasons to authorize the FBI to withhold search slips and similar processing records. But FOIA itself does not do so, and the FBI cannot act on the basis of an exemption or exclusion that Congress has not provided. Accordingly, the FBI's motion for summary judgment with respect to the withholding of search slips and FDPS processing notes is **DENIED**, and the plaintiffs' motion is **GRANTED**. The Court will set a status conference to address the timing and substance of an Order implementing this decision, as well as the appropriate remedy.

2. *Withholding of Case Evaluation Forms*

The plaintiffs also challenge the FBI's policy of withholding case evaluation forms under Exemptions 2 and 6.  The FBI uses case evaluation forms to track and evaluate the performance of RIDS analysts who process FOIA and Privacy Act requests.  The forms contain fields that describe the request itself (e.g., "Routine," "Medium," or "Complex").  *See* Dkt. 27-6 at 1 (Pls.' Mot. Summ. J., Ex. F).  They contain fields that describe the analyst's performance (e.g., "Unacceptable," "Satisfactory," or "Error Free").  *Id.*  And they contain a 'correction list,' which includes specific errors made by the analyst in responding to the request (e.g., "Failed to recognize fee waiver.").  *See id.* at 2.  The FBI argues that the case evaluation forms are exempt from disclosure under Exemptions 2 and 6.  Specifically, it argues that the analysts' names can be withheld under Exemption 6, which shields private personnel information, and the remainder of the forms can be withheld under Exemption 2, which shields information related solely to an agency's "personnel rules and practices."

The plaintiffs concede that the analysts' names can be withheld under Exemption 6.  That exemption protects information about individuals held in "personnel and medical files" when its disclosure "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  It is well established within this circuit that Exemption 6 protects the names of agency employees on evaluation forms, as well as any other information that would identify individual employees.  *See Ripskis v. HUD*, 746 F.2d 1, 4 (D.C. Cir. 1984) (per curiam) (finding "Exemption 6 applicable to the names and other identifying information on HUD's employee evaluation forms"); *see also Fed. Labor Relations Auth. v. U.S. Dep't of Commerce*, 962 F.2d 1055, 1060 (D.C. Cir. 1992) ("As in *Ripskis*, . . . we do not believe that the public interest served by release of identifying information overcomes the substantial invasion of privacy that would

result.").  The Court therefore has no difficulty concluding that the FBI appropriately relied on

Exemption 6 in withholding the names of individual analysts on the case evaluation forms.

Whether the FBI can rely on Exemption 2 to withhold the remainder of the evaluation

forms is a closer question.  Exemption 2 shields from disclosure material "related solely to the

internal personnel rules and practices of an agency."  5 U.S.C. § 552(b)(2); *Milner*, 562 U.S. at

564.  The interpretive history of Exemption 2 is not a model of clarity.  *See Elliott v. U.S. Dep't*

*of Agriculture*, 596 F.3d 842, 845 (D.C. Cir. 2010) ("The courts have devoted thousands of pages

of the Federal Reporter to the explication of these twelve words . . . .").  The confusion stems in

large part from the "seemingly contradictory interpretations of the exemption expressed in the

House and Senate Reports" that accompanied FOIA.  *Id.*; *see also Milner*, 562 U.S. at 573–74.

The Senate report construed Exemption 2 to cover material that courts later described as "Low

2," explaining that the phrase "rules and practices of an agency" referred primarily to "rules as to

personnel's use of parking facilities or regulation of lunch hours, statements of policy as to sick

leave, and the like."  S. Rep. No. 89-813, at 8 (1965).  The House report, in contrast, interpreted

the exemption to *exclude* material about "employee relations and working conditions and routine

administrative procedures," but to include more substantive documents, such as "[o]perating

rules, guidelines, and manuals of procedure for Government investigators or examiners," H.R.

Rep. 89-1497, at 10 (1966)—material later known as "High 2."

The conflict between these interpretations of Exemption 2 persisted for four decades.  In

the Supreme Court's first extended discussion of the exemption, in *Department of Air Force v.*

*Rose*, 425 U.S. 352, the Court embraced what lower courts had labeled "Low 2," citing the

Senate report with approval and stating that "the general thrust of the exemption [was] simply to

relieve agencies of the burden of assembling and maintaining for public inspection matter in

which the public could not reasonably be expected to have an interest." *Id.* at 369–370.  In *Rose*, the Court considered whether the U.S. Air Force Academy could withhold summaries of disciplinary proceedings on the basis of Exemption 2.  The Court rejected the Academy's argument that the summaries were exempt from disclosure, explaining that because they shed light on the operation of the Academy's disciplinary system, a matter of "significant public interest," they did not "concern only routine matters," as was required to invoke the exemption. *Id.*  Quoting the Second Circuit's decision below with approval, the Court explained that the public interest in the summaries "differentiate[s] [them] from matters of daily routine like working hours, which, in the words of Exemption Two, do relate '[*s*]*olely* to the internal personnel rules and practices of an agency.'"  *Id.* at 369 (quoting *Rose v. Dep't of Air Force*, 495 F.2d 261, 265 (2d Cir. 1974) (emphasis in original)).  Understanding "High 2" to apply, if at all, only when "necessary to prevent the circumvention of agency regulations," the Court declined to "consider . . . the applicability of Exemption 2 in such circumstances," since *Rose* was not "a case where knowledge of administrative procedures might help outsiders to circumvent regulations or standards."  *Id.* at 364 (internal quotation marks omitted).

Whether Exemption 2 extended to "High 2" documents remained uncertain until 2011. In 1981, the D.C. Circuit held that Exemption 2 did extend to such documents, *see Crooker*, 670 F.2d at 1074, *overruled by Milner*, 562 U.S. 562, and over the ensuing decades many other circuits (and federal agencies) adopted the D.C. Circuit's interpretation of Exemption 2— namely, that it was "actually two exemptions wrapped in one," *Elliott*, 596 F.3d at 847.  The Supreme Court's 2011 decision in *Milner* finally resolved the tension between the two legislative reports.  It explained that courts had paid insufficient attention to the text of the exemption, which plainly limited an agency's authority to withhold documents under FOIA to material

related to its "personnel rules and practices," that is, "its rules and practices dealing with employee relations or human resources." *Milner*, 562 U.S. at 570.  Such an interpretation, the Court explained, "makes clear that Low 2 is all of 2 (and that High 2 is not 2 at all)." *Id.* at 571.

As the Court acknowledged, *Milner* "upset[] three decades of agency practice." *See id.* at 580.  After *Milner*, it is clear that only material "related solely to the internal personnel rules and practices of an agency" can be withheld under Exemption 2.  5 U.S.C. § 552(b)(2).  What is less clear after *Milner* is exactly what material qualifies.  *Milner* focused on the word "personnel." *See Milner*, 562 U.S. at 569 ("The key word in that dozen—the one that most clearly marks the provision's boundaries—is 'personnel.'").  The Court observed in a footnote that records must also "'relate solely'—meaning, as usual, 'exclusively or only,' [*Random House Dictionary* 1354 (1966)]—to the agency's 'personnel rules and practices'" to be withheld.  *Id.* at 570 n.4.  But it did not flesh out what those statutory requirements might mean, nor how its earlier decision in *Rose* might illuminate them.

The present dispute turns in large part on the relationship between *Milner* and *Rose*.  The plaintiffs argue that the case evaluation forms are essentially analogous to the summaries found in *Rose* to lie outside of Exemption 2.  The plaintiffs argue that the evaluation forms illuminate the ways in which the FBI responds to FOIA requests (and evaluates the efforts of the individual analysts who do so) and thus are documents of "significant public interest," like the summaries in *Rose*.  *See Rose*, 425 U.S. at 369.  Accordingly, the plaintiffs suggest, the evaluation forms fall outside Exemption 2 as a categorical matter, because under *Rose* Exemption 2 only applies to documents "in which the public could not reasonably be expected to have an interest."  *Id.* at 369–370.  The FBI, in turn, latches onto language in *Milner* that it claims shows the forms fall neatly within the ambit of Exemption 2:  The forms, it argues, relate to "such matters as hiring

and firing, work rules and discipline, compensation and benefits." *Milner*, 562 U.S. at 570.  The forms relate "solely" to personnel matters, the FBI also suggests, because that is their "sole" use within the agency.  *See* Dkt. 31-1 at 6 (Second Hardy Decl. ¶ 10).

The problem for the FBI is that the Supreme Court's holding in *Rose* remains binding on the Court, and that holding dictates the result in this case.  *Rose*'s holding is that "Exemption 2 is not applicable to matters subject to . . . a genuine and significant public interest."  *See* 425 U.S. at 369.  *Milner* does nothing to overrule or undermine that holding.  Indeed, the *Milner* Court implied that its decision was entirely consistent with *Rose*.  *See* 562 U.S. at 570 (citing with approval *Rose*'s description of a "personnel file").  It is true that *Milner* gives greater weight to the statutory text and less weight to the legislative history than *Rose* did.  Thus, where *Rose* relied in large part on the Senate Report to give meaning to Exemption 2, *see* 425 U.S. at 366–67, *Milner* focused on the meaning of statutory term "personnel" and observed that "[l]egislative history . . . is meant to clear up ambiguity, not create it," *see* 562 U.S. at 574.  But any effort to rely on this difference in approach faces two insurmountable hurdles.

First, and most importantly, unless overruled by the Supreme Court or by Congress, the Supreme Court's holding in *Rose* continues to bind this Court.  That holding, moreover, includes the "genuine and significant public interest" test, which led directly to the Court's disposition of the case.  The modest difference in judicial approaches taken in the *Rose* and *Milner* decisions does not come close to undermining the *Rose* holding, and, even if it hinted at some future modification of the *Rose* rule, it would not be the role of this Court to anticipate a possible shift in Supreme Court precedent.  *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484–5 (1989).  The test articulated in *Rose* thus remains the law, and it excludes

"matters [that are] subject to . . . a genuine and significant public interest" from the reach of Exemption 2.  425 U.S. at 369.

Second, any suggestion that *Rose* adopted an atextual construction of Exemption 2—a construction of Exemption 2 that might not survive *Milner*—overstates the case.  It is true that *Milner* focused on whether the records considered in that case related to "personnel" matters. But the Court did so because, in its view, the word "personnel" resolved the main issue in the case: whether Exemption 2 extended to "High 2" records, which concededly had nothing to do with "personnel" at all.  The Court's focus on the definition of the word "personnel" was not meant to diminish the importance of the remaining words in Exemption 2—particularly, as is relevant here, its requirement that information "relate[e] solely" to personnel rules and practices.[7]  The Supreme Court in *Milner* stated that the word "solely" should be given its "usual" meaning: "exclusive or only."  *Id.* at 570 n.4.  The parties accept that definition.  But the parties diverge on its import to this case.  Does it mean, as the FBI's argument assumes, that so long as the FBI *uses* the FOIA evaluation forms only for purposes of training and evaluation, the forms "relate[e] solely" to personnel practices?  Or does it mean, as more conducive to the

---

[7]  Neither party advances any argument about whether the evaluation forms relate to "personnel *rules and practices.*"  *See, e.g.*, *Schwaner v. Dep't of Air Force*, 898 F.2d 793, 795 (D.C. Cir. 1990) ("We have often applied [Exemption 2] without emphasizing the words 'rules and practices.'").  It is not difficult to imagine arguments on either side.  On the one hand, the forms, like the case summaries in *Rose*, arguably "manifest and implement" the FBI's rules and practices relating to the management of RIDS analysts.  *See id.* ("While case summaries are not 'rules and practices' themselves (as the Honor Code itself would be), they do manifest and implement the rules and practices of the Academy relating to the conduct of cadets.").  On the other hand, the FBI has pointed to no agency "rule" that the case evaluation forms implement, nor even a consistently applied set of policies; indeed, it emphasizes that the case evaluation forms are informal tools that supervisors are not required to use.  *See* Dkt. 31-1 at 7 (Second Hardy Decl. ¶ 11) ("Case Evaluation Forms are not used by all RIDS supervisors and are not completed for every FOIA request.").  In the end, the Court need not decide whether the forms relate to "personnel rules or practices" given its conclusion that they do not "solely" relate to personnel matters in the first place.

38

plaintiffs' argument, that the forms are not related "solely" to personnel practices if (like the case summaries in *Rose*) they contain information of broader interest or application?

In the Court's view, the second of these interpretations better comports with existing precedent and the text and purpose of FOIA. As an initial matter, this reading reconciles any possible conflict between the Supreme Court's *Rose* and *Milner* decisions: If a document is "subject to . . . a genuine and significant public interest," 425 U.S. at 369, it cannot be said to relate "solely" to the kinds of mundane and bureaucratic records that Exemption 2 permits an agency to withhold. *See Milner*, 562 U.S. at 570. It is also consistent with what the Supreme Court described in *Rose* as the goal of Exemption 2: "to relieve agencies of the burden of assembling and maintaining for public inspection matter in which the public could not reasonably be expected to have an interest." *Rose*, 425 U.S. at 369–70. Such an interpretation also makes sense of Exemption 6, which shields "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal property," 5 U.S.C. § 552(b)(6), and which would have little purpose if agencies could simply invoke Exemption 2 to protect any records that are used only for "personnel"-related purposes. *Cf. Milner*, 562 U.S. at 575 (noting that the United States's reading of Exemption 2 would have "render[ed] Exemption 7(E) superfluous"). Finally, such an interpretation is consistent with the repeated admonition from the Supreme Court and from the D.C. Circuit that FOIA exemptions should be construed narrowly. *See, e.g.*, *Rose*, 425 U.S. at 361; *Mink*, 410 U.S. at 79; *Vaughn*, 484 F.2d at 823.

Thus, even if the Court were permitted to discard the "genuine and significant public interest" test, the dictionary definition of "solely" would not salvage the FBI's use of Exemption 2. The FBI relies primarily on the declaration of RIDS director David Hardy, who attests that

the forms are used only for personnel management purposes.  Specifically, Hardy attests that the forms are "used solely as a tool for evaluating employee performance and as a learning tool for employees who may need to focus on improving skills in particular areas.  They exist only for this purpose."  Dkt. 31-1 at 6 (Second Hardy Decl. ¶ 10).  But the fact that the FBI *uses* the forms solely for the purpose of evaluating individual employees does not mean that the forms "relate[] solely" to employee management.  To the contrary, the forms reflect information regarding how the FBI goes about fulfilling its obligations under FOIA and, thus, at least in that sense "relate" to far more than issues of internal management.  Viewed from this perspective, the forms "relate"—at least in part—to how the FBI performs one of its statutory obligations.  Because the records, accordingly, do not relate "exclusively or only" to employee management, it does not matter whether the FBI limits their use to that purpose.  *See Milner*, 562 U.S. at 570 n.4.[8]

The Court, accordingly, concludes that Plaintiffs are correct to argue that Exemption 2 shields from disclosure only "documents that deal with 'trivial administrative matters of no genuine public interest,'" *Elliott*, 596 F.3d at 847 (quoting *Schiller v. NLRB*, 964 F.2d 1205, 1207 (D.C. Cir. 1992)), but are wrong to suggest that this inquiry is distinct from the inquiry into whether documents relate "solely" to personnel matters.  If a record is a matter of public interest, it cannot relate "solely" to personnel matters, because that term is best understood to limit the reach of Exemption 2 to matters that are inherently "minor or trivial," such as rules regarding the "use of parking facilities or regulations of lunch hours."  *Rose*, 425 U.S. at 363, 365.  Thus, if the

---

[8]  It is true that this reading of "solely" is an expansive one.  But the Court explicitly adopted an expansive definition of "solely" in *Milner*.  *See* 562 U.S. at 570 n.4 ("exclusively or only").  It did so fully aware that the D.C. Circuit had previously defined "solely" as "predominantly," on the basis of its concern that the literal reading would be too limiting.  *See id.* at 567 n.1 (citing *Crooker*, 670 F.2d at 1056).

case evaluation forms are the subject of "genuine and significant public interest," they cannot be withheld under Exemption 2.

The plaintiffs argue that the evaluation forms are the subject of public interest because they categorize and track the FOIA requests processed by the FBI and record the errors that FBI analysts make in processing those requests. By reviewing the evaluation forms, the plaintiffs argue, they may better understand the FBI's methods of processing FOIA requests and, where appropriate, may hold the agency accountable for its missteps. They analogize the evaluation forms to the case summaries documenting the "adequacy or inadequacy" of the Air Force's efforts to train and instruct cadets, which the Supreme Court held to be of "undeniabl[e]" public "signifcan[ce]" in *Rose*. *Id.* at 368. Although the plaintiffs may overstate the analogy—the Court's opinion in *Rose* emphasized the "unique role of the military" and the public's interest in military training, *id.*—the comparison is fundamentally sound in light of the language the *Rose* Court used to contrast the case summaries with those materials that *are* shielded by Exemption 2. For the reasons the plaintiffs have identified, the Court cannot conclude that the case evaluation forms relate solely to trivial or minor matters, akin to the use of parking facilities or lunch hours, that are of no public interest. To the contrary, even if any single case evaluation form is unlikely to be newsworthy, FOIA requesters may, through careful review, learn a great deal about how the FBI discharges its FOIA responsibilities. As the plaintiffs correctly observe, dissatisfied FOIA requesters are often required to take the government at its word in FOIA litigation, where the government has access to the disputed records and knowledge of how a search and response was conducted. Information contained in case evaluation forms may allow FOIA requesters to dispute assertions made in particular cases and, more generally, may enlighten the public about how the FBI goes about satisfying its obligations under FOIA. Indeed, it is not difficult to

imagine a FOIA requester writing the same kind of article about the FBI that the plaintiffs in *Rose* were writing about the Air Force. *See Rose*, 425 U.S. at 354–55 & n.1. Accordingly, they cannot be withheld under Exemption 2.

The FBI's motion for summary judgment with respect to the withholding of case evaluation forms is therefore **DENIED**, and the plaintiffs' motion is **GRANTED**.

## B.  Request-by-Request Withholdings

With these two threshold challenges addressed, the Court turns to the issues presented by the FBI's response to each individual FOIA request submitted by the plaintiffs.

### 1.  *NSC's First Request*

NSC's first request, which was submitted in October 2010, sought "all [FBI] records . . . that contain remarks, comments, notes, explanations, etc. made by FBI personnel or contractors about the processing of" seven previous FOIA requests.  Dkt. 21-4 at 3 (Hardy Decl., Ex. A). The FBI produced FDPS case processing notes regarding these requests, but no other documents. *Id.* at 12–13 (Hardy Decl., Ex. C).  When NSC appealed the FBI's initial document production, OIP remanded the matter to the FBI to search for additional documents.  *Id.* at 17 (Hardy Decl., Ex. E).  When the FBI produced the same documents on remand, NSC appealed again.  NSC's executive director explained that he could "point directly to the documents that are missing": search slips.  *Id.* at 32 (Hardy Decl., Ex. G).  OIP again remanded the request for further review, but also "affirm[ed], on modified grounds, the FBI's action."  *Id.* at 41 (Hardy Decl., Ex. I). Specifically, OIP wrote:

> To the extent that you are seeking search slips associated with the processing of the above-referenced requests, please be advised that this information is protected from disclosure under the FOIA pursuant to [Exemption 7(E)].  This provision concerns records or information compiled for law enforcement purposes the release of which would disclose techniques and procedures for law enforcement investigations or prosecutions.  Because any such records responsive to your

> request would be categorically exempt from disclosure, the FBI properly asserted
> Exemption 7(E) and was not required to conduct a search for such records.

*Id.* There is no evidence in the record that the FBI produced additional documents, nor that NSC communicated further with the FBI regarding this request.

NSC argues that the FBI improperly withheld search slips in response to its first request on the basis of Exemption 7(E). Dkt. 27 at 2. The FBI has a wholly different view of the scope of NSC's challenge to its response. It contends that NSC "did not . . . challenge any of the FBI's withholdings of information processed in response to these requests" and therefore has failed to exhaust any challenge to its search slip policy—at least as applied to NSC's first search. Dkt. 31 at 2. According to the FBI, the only issue before the Court is the adequacy of the FBI's search for responsive records. *Id.*; *see also* Dkt. 21-1 at 5–7. NSC explains that its appeals to OIP focused on the adequacy of the FBI's searches for good reason: "[A]t the time there was no evidence that FBI was refusing to search for search slips." Dkt. 27 at 2. NSC argues that "DOJ's confirmation that FBI was refusing to search for these responsive records transformed the controversy into an argument over FBI's *refusal to search*, which is a separate and distinct issue from the adequacy of its search." *Id.* (emphasis in original).

The Court agrees that NSC exhausted its challenge to the FBI's search slip policy. "A FOIA requester is generally required to exhaust administrative appeal remedies before seeking judicial redress." *Citizens for Responsibility & Ethics in Washington v. FEC* ("*CREW*"), 711 F.3d 180, 184 (D.C. Cir. 2013). This requirement exists "so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 61 (D.C. Cir. 1990). The D.C. Circuit has held that "a plaintiff may have exhausted administrative remedies with respect to one aspect of a FOIA request—and thus properly seek judicial review regarding that request—and yet not

have exhausted her remedies with respect to another aspect of a FOIA request." *Dettmann v. U.S. Dep't of Justice*, 802 F.2d 1472, 1477 (D.C. Cir. 1986).  But the exhaustion requirement is "a jurisprudential doctrine," not a jurisdictional rule.  *Hidalgo v. FBI*, 344 F.3d 1256, 1258 (D.C. Cir. 2003).

Here, there is no dispute that NSC exhausted its administrative remedies with respect to its request as a whole:  It awaited the FBI's response to its request, then appealed that response to OIP.  *See generally* 5 U.S.C. § 552(a)(6) (setting out this process).  The question is whether NSC exhausted its remedies with respect to its challenge to the FBI's search slip policy.  According to the FBI, NSC "did not . . . challenge any of the FBI's withholdings of information processed in response to" its original request, "did not challenge the FBI's redactions" in either of its appeals to OIP, and thus exhausted only "the adequacy of the FBI's search."  Dkt. 31 at 2.  The problem with the FBI's position is that the search slip policy was not asserted as a basis for withholding records until after NSC's second appeal, and it was asserted by OIP on appeal.  *See* Dkt. 21-4 at 41 (Hardy Decl., Ex. I).  The FBI's position appears to be that NSC should have waited until the FBI itself asserted the policy—after the second remand—and then appealed the FBI's assertion of the policy to OIP.  But such protracted proceedings would hardly further the purpose of the exhaustion requirement, which is to permit the agency "an opportunity to exercise its discretion and expertise on the matter."  *Oglesby*, 920 F.2d at 61.  OIP, the body designated by the Justice Department to handle FOIA appeals, had already concluded that the FBI "was not required to conduct a search" for search slips because they "would be categorically exempt from disclosure."  Dkt. 21-4 at 41 (Hardy Decl. Ex. I).  NSC could not have been expected to read such a response

to require it to continue to pursue its request before the FBI; indeed, NSC could hardly have read the response as anything but a final decision by the agency regarding the FBI's policy.[9]

The D.C. Circuit's decision in *Dettmann* is not to the contrary. In *Dettmann*, the FOIA requester submitted a request to the FBI for "all documents" that contained her name. 802 F.2d at 1473. The FBI's response described its "general practice" of releasing "only those portions [of documents] containing a reference" to the FOIA requester rather than releasing the documents in their entirety. *Id.* at 1474. The requester replied to the FBI, "contesting various aspects of the FBI's action but raising no objection to the" policy. *Id.* None of the requester's subsequent communications to the FBI raised such an objection. *Id.* On appeal, the D.C. Circuit declined to address the merits of the policy, instead denying the requester's claim on the ground that she had "fail[ed] to exhaust her administrative remedies." *Id.* at 1476. The panel explained that the requester had repeatedly communicated with the FBI after learning about the policy, "but interposed no general objection to the Bureau's processing of her request pursuant to that" policy. *Id.* This case looks nothing like *Dettmann*. In *Dettman*, the FBI explained its policy to the requester in its initial response; the requester then repeatedly declined to present the agency with "an opportunity to exercise its discretion and expertise" regarding the policy. *Oglesby*, 920 F.2d at 61. In this case, by contrast, the challenged policy was asserted for the first time by the agency in a final decision on appeal, and the requesters promptly challenged it in court—the only authority that could overturn OIP's decision.

---

[9]  Moreover, to the extent that NSC failed to exhaust its administrative remedies with respect to its challenge to the search slip policy, the Court would excuse NSC's failure to exhaust on the ground that the agency considered the non-exhausted challenge on the merits. *See Washington Ass'n for Television & Children v. FCC*, 712 F.2d 677, 682 (D.C. Cir. 1983) ("[I]t is not always necessary for a party to raise an issue, so long as the [agency] in fact considered the issue.").

The Court, accordingly, agrees with NSC that it properly exhausted its challenge to the FBI's search slip policy.  The Court therefore **GRANTS** summary judgment to NSC to the extent that it seeks documents withheld on the basis of that policy.  Because NSC does not raise any other challenge to the adequacy of the FBI's search in response to its first request, the Court **GRANTS** summary judgment to the FBI with respect to any records not encompassed by the search slip policy.  The parties' motions for summary judgment are otherwise **DENIED**.

2. *NSC's Second Request and Stein's First Request*

NSC's second request (No. 1174832-000) and Stein's first request (No. 1174507-000) for documents raise an additional issue.  In these requests, NSC and Stein sought all records created by the FBI during the processing of twelve FOIA requests previously submitted by other people.  Dkt. 21-4 at 45 (Hardy Decl., Ex. J); *id.* at 66 (Hardy Decl., Ex. P).  NSC requested these records by FOIA request number.  *See id.* at 45 (Hardy Decl., Ex. J) (requesting records with references to "FOIA requests #955459, 969663," and ten others).  Stein requested the same records by reference to the name and docket number of the lawsuit that each FOIA requester had eventually filed.  *See id.* at 66 (Hardy Decl., Ex. P) (requesting records "relied upon in the Declarations of David Hardy . . . in the following FOIA cases").  The FBI released six "excised" pages that were responsive to one of NSC's requests and denied all the remaining requests.  *Id.* at 53 (Hardy Decl., Ex. L); *id.* at 72 (Hardy Decl., Ex. Q).  It explained that NSC and Stein had "requested records concerning third parties"—the original requesters—which the FBI could not release "absent express authorization and consent of the third parties, proof that the subjects of the request are deceased, or a clear demonstration that the public interest in disclosure outweighs the personal privacy interest[s]."  *Id.*  NSC and Stein appealed the denial of their requests, but OIP

denied their appeals, citing Exemptions 6, 7(C), and 7(E).  *See id.* at 62 (Hardy Decl., Ex. O); *id.* at 80 (Hardy Decl., Ex. T).[10]

The FBI argues, and the plaintiffs do not contest, that information contained in FBI files about private parties (other than the requester) is generally exempt from disclosure under Exemptions 6 and 7(C).  These exemptions "seek to protect the privacy of individuals identified in certain agency records."  *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011).  Under Exemption 6, "personnel and medical files and similar files" may be withheld if disclosure "would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Under Exemption 7(C), "records or information compiled for law enforcement purposes" may be withheld "to the extent that" disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(C).  The D.C. Circuit has long applied a categorical rule, known as the "*SafeCard* rule," "permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.'"  *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) (quoting *SafeCard Servs.*, 926 F.2d at 1206).  The plaintiffs do not dispute that this rule would ordinarily apply to these records.  They argue only that the records fall within the scope of the "official-acknowledgment" doctrine, which if properly invoked requires disclosure even in the face of an otherwise available FOIA exemption.  *See ACLU v. CIA*, 710 F.3d at 426.

---

[10]  OIP denied Stein's appeal only on the ground that the processing documents were protected under Exemption 7(E).  *See* Dkt. 21-4 at 80 (Hardy Decl., Ex. T).  But the FBI now asserts that any responsive documents are protected under Exemptions 6 and 7(C), for the same reason that any documents responsive to NSC's request would be.  *See* Dkt. 21-1 at 9–12, Dkt. 21-3 at 22 (Hardy Decl. ¶ 71).  Stein contests the FBI's response on the merits but does not contest that the FBI should be permitted to assert Exemptions 6 and 7(E) in this case.  *See* Dkt. 27 at 30–32; *see also supra* n.6.

The official-acknowledgment doctrine is a waiver doctrine. It provides that "when an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information." *Id.* But the standards for invoking the doctrine are high. A FOIA requester must show that the information he or she is requesting (1) is "as specific as the information previously released," (2) "match[es]" the information previously disclosed," and (3) was "already . . . made public through an official and documented disclosure." *Wolf*, 473 F.3d at 378 (citation and internal quotation marks omitted). "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Id.*; *see also ACLU*, 710 F.3d at 427.

NSC and Stein argue that the information contained in the search slips and processing notes they requested is already in the public domain because the "FBI filed sworn declarations on the public record explaining in great detail the searches it performed . . . , including what offices and systems were searched, what terms were used, and what file numbers were located." Dkt. 27 at 30–31. The plaintiffs attach the declarations of RIDS Director David Hardy filed by the FBI in each of the lawsuits arising out of the request for which they seek processing records. *See* Dkts. 27-7, 27-8, 27-9, 27-10, 27-11, 27-12. Many of these declarations describe the search conducted by the FBI for responsive records in detail. The Seventh Hardy Declaration filed by the FBI in *Negley v. FBI*, 825 F. Supp. 2d 63, for example, states that the FBI conducted a search for records about the plaintiff "using a six way phonetic breakdown of the name James Lutcher Negley," which "found no main files but did find one cross-reference file, 149A-SF-106204-S-O, containing two serials, 3041 and 3865." Dkt. 27-7 at 64 (Pls.' Mot. Summ. J., Ex. G). Many

other statements in the declarations are just as detailed and appear to reflect information recorded on the search slips and in the notes.

Considered as a whole, however, the Hardy Declarations filed in these cases are neither as specific nor as detailed as the underlying search slips and processing notes.  As the Hardy Declaration in the present case explains, "the information contained in search records is far more detailed and also includes information that may not be reflected in the declarations at all (such as information outside the scope of the request or information otherwise deemed not responsive to the request)."  Dkt. 31-1 at 8 (Second Hardy Decl. ¶ 17).  That is, although the Hardy Declarations filed in these cases contain a significant amount of detailed information about the records responsive to the original requests, as well as the FBI's efforts to locate, identify, and produce those records, the declarations are not a perfect match for the search slips and processing notes created by the FBI during the search.  Indeed, the basic premise behind this action—as the plaintiffs repeatedly stated during oral argument—is that the declarations introduced by the FBI during litigation are often incomplete records of the searches that the FBI in fact conducted.  The mismatch between the two may provide the plaintiffs the impetus to come to court, but it also limits their ability to rely on the official-acknowledgment doctrine.  The FBI has not made public the contents of the search slips, at least not in their entirety, and thus the FBI properly invoked Exemption 7(C) and the *SafeCard* rule with respect to any information *not* reproduced in the Hardy Declarations.[11]

---

[11]  The *SafeCard* rule applies only to "records or information compiled for law enforcement purposes."  *See Schrecker*, 349 F.3d at 661; 5 U.S.C. § 552(b)(7).  That is, it is a rule arising under Exemption 7(C), not Exemption 6.  But where an agency properly withholds a record under Exemption 7(C), there is no need to consider whether withholding would have been appropriate under Exemption 6.  *See ACLU v. U.S. Dep't of Justice*, 655 F.3d at 6.

The conclusion that the FBI properly withheld *some* material under Exemption 7(C) does not, however, end the inquiry.  Under FOIA, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  The fact that the FBI was permitted to withhold information not already disclosed in the prior Hardy Declarations does not resolve the question whether it was required to segregate and produce information that was made public in those declarations.  "It has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) (quoting *Mead Data Ctr.*, 566 F.2d at 260).  In other words, the FBI can withhold the entirety of the search slips and processing notes only if the information in those slips and notes that *was* reproduced in the relevant Hardy Declarations is "inextricably intertwined" with the information that was not reproduced in those declarations. *Mead Data Ctr.*, 566 F.2d at 260; *see also id.* at 261 n.55 (observing that agencies need not "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content").

Neither party, however, has addressed the segregability question, and so the Court lacks a record on which to make a finding regarding segregability.  The D.C. Circuit has made clear that district courts have a duty to "make specific findings of segregability regarding the documents to be withheld . . . even if the requester did not raise the issue of segregability before the court." *Sussman*, 494 F.3d at 1116; *see also Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999) ("[T]he District Court had an affirmative duty to consider the segregability issue *sua sponte*.").  It is the government that bears the burden of justifying the non-disclosure of records, including on the ground that non-exempt records are not reasonably

segregable, however, and that burden cannot be met through conclusory declarations or by merely shifting to the Court responsibility to determine what non-exempt material can be segregated. *See Mead Data Ctr.*, 566 F.2d at 260. Here, although it may be able to do so, the FBI has yet to make the required showing. Accordingly, the Court will **GRANT** the FBI's motion for summary judgment to the extent it invoked Exemption 7(C) to protect information not previously disclosed in the Hardy Declarations but will, in other respects, **DENY** the parties' motions for summary judgment. The FBI may file a renewed motion and declaration addressing segregability, and Plaintiffs may cross-move on the same ground once the record is more fully developed.

### 3. *Stein's Second Request*

The FBI produced a significant quantity of documents in response to only one request—Stein's second request (No. 1182250-000). In that request, Stein sought all records "pertaining to the searches conducted by the [FBI] which was used, referenced, or relied upon" in the Hardy Declaration that the FBI filed in *McGehee v. U.S. Dep't of Justice*, 800 F. Supp. 2d 220.[12] Dkt. 21-4 at 83 (Hardy Decl., Ex. U). The FBI responded to this request in May 2012, informing Stein that it had reviewed 194 pages of documents and released 33 pages with withholdings. *Id.* at 91 (Hardy Decl., Ex. W). Stein appealed "all of the FBI's withholdings," *id.* at 98 (Hardy Decl., Ex. Y), but OIP denied the appeal, Dkt. 21-5 at 6 (Hardy Decl., Ex. CC). The FBI now seeks to justify its withholdings on the basis of Exemptions 5, 6, 7(C), 7(D), and 7(E). Dkt. 21-1 at 17; *see also* Dkt. 21-3 at 30–31 (Hardy Decl. ¶¶ 83–85). Stein does not contest all of the

---

[12]  In fact, Stein sought records relating to two lawsuits: *McGehee* and *Rosenfeld v. U. S. Dep't of Justice*, No. 07-3240, 2010 WL 3448517. But the FBI treated the request as two distinct requests (one, No. 1182250-000, as a request for *McGehee* records, and the other, No. 1182251-000, as a request for *Rosenfeld* records). For simplicity's sake, the Court adopts the FBI's treatment of the records and describes Stein's request for *Rosenfeld* records, below, as his "third" request.

FBI's withholdings.  *See* Dkt. 27 at 12–14.  Indeed, he challenges only four aspects of the FBI's production: (a) the adequacy of the FBI's search; (b) the FBI's assertion of the attorney work product privilege under Exemption 5; (c) the FBI's assertion of Exemptions 6 and 7(C) to cover the names of parties of investigative interest; and (d) the FBI's assertion of Exemption 7(E) to withhold search slips.  *Id.*  at 8–14.  Because the Court has addressed the FBI's search-slip policy above, it will discuss only the three remaining issues below.

    a.  <u>Adequacy</u>

Stein first challenges the adequacy of the FBI's search.  He argues that the FBI's search for the processing records underpinning the *McGehee* suit was inadequate because he believes the FBI "performed a search for the case names and numbers and stopped there"—that is, it did not search its records for any files that did not contain a cross-reference to the lawsuit.  Dkt. 27 at 8.  The FBI argues that Stein did not exhaust his challenge to the adequacy of the FBI's search, and that it would fail on the merits even if he had.  *See* Dkt. 31 at 3–8.  The Court agrees with the FBI.

First, Stein did not exhaust his challenge to the adequacy of the FBI's search.  Stein's appeal was limited to "the FBI's withholdings," Dkt. 21-4 at 98 (Hardy Decl., Ex. Y); he did not argue that the FBI had failed to conduct an adequate search.  Stein does not genuinely contest this conclusion, *see* Dkt. 27 at 6 ("Stein admits that he did not file an administrative appeal of the adequacy of the FBI's search."); instead, he argues that his failure to exhaust should be excused because he "raised an objection to the adequacy of [the] FBI's search as soon as he had reason to believe that it was inadequate"—namely, when the FBI filed its response in this suit.  *Id.* at 7.  He contends that the imposition of an exhaustion requirement in a case like his "will mean that any requester must appeal the adequacy of an agency's search even without reason to believe it

was inadequate . . . , which will result in a drastic increase in unnecessary appeals." *Id.* at 7–8.

But Stein's rule would lead to perverse consequences too. Stein was represented by experienced

FOIA counsel who could have reviewed the records that Stein had received along with the FBI's

stated bases for withholding others, and, based on that information and counsel's knowledge of

the types of records typically generated by RIDS, made an informed judgment about the risk of

an incomplete search. That is exactly what NSC did when the FBI produced only limited records

in response to *its* first search; it appealed the adequacy of the search, "point[ing] . . . to the

documents" that it thought "were missing." Dkt. 21-4 at 32 (Hardy Decl., Ex. G). Even if Stein

had only an inkling that the FBI's search may have been inadequate, it would have been easy

enough for him to apprise OIP of that concern. Only then could OIP have "exercise[d] its

discretion and expertise on the matter and . . . ma[d]e a factual record to support its decision."

*Oglesby*, 920 F.2d at 61.

This is not to say that a FOIA requester can *never* challenge the adequacy of the FBI's

search in court if he or she did not do so below. There may well be times when such a person

learns only in court that an agency's response was inadequate. But this is not such a case. The

basis of Stein's belief that the FBI's search was inadequate is its statement that it "conducted a

search of FDPS using *the referenced litigation case-captions and/or their respective Civil Action

Numbers* to locate material responsive to his request." Dkt. 27 at 8 (quoting Hardy Decl. ¶ 59)

(emphasis Stein's). On the basis of this statement, Stein argues that the FBI failed to search its

records systems for references to the FOIA request numbers at issue in those cases—that is, that

it searched for records based *only* on the case captions and action numbers themselves. *Id.* But

the FBI's subsequent filings make clear that Stein overreads this statement. According to the

Second Hardy Declaration, the FBI used the case captions and numbers as "reference points . . .

to identify the underlying FOIA administrative file." Dkt. 31-1 at 4 (Second Hardy Decl. ¶ 6). The FBI then identified and processed responsive records from the *McGehee* administrative file in response to Stein's request. *Id.* In other words, this is not a case in which later developments illuminate the inadequacy, if any, of an agency's response.

Accordingly, the Court **GRANTS** the FBI's motion for summary judgment with respect to Stein's challenge to the adequacy of the FBI's response to his first request, and **DENIES** the plaintiffs' motion for summary judgment with respect to the same claim.

b. Exemption 5

Stein next argues that the FBI improperly asserted the attorney work product privilege under Exemption 5 with respect to certain documents prepared in connection with the *McGehee* lawsuit. Dkt. 27 at 14–17. Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Supreme Court has construed this language to "exempt those documents, and only those documents [that are] normally privileged in the civil discovery context." *Sears, Roebuck*, 421 U.S. at 149. As relevant here, Exemption 5 permits an agency to withhold documents under the attorney work product privilege, which protects documents and other memoranda prepared by an attorney in anticipation of litigation. *See FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015); *see also Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947) (recognizing work product privilege); Fed. R. Civ. P. 26(b)(3)(A). The purpose of the privilege is to "protect[] the adversary process" by "ensuring that lawyers can prepare for litigation without fear that opponents may obtain their private notes, memoranda, correspondence, and other written materials." *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998).

The FBI invoked the attorney work product privilege to protect documents created by a "legal administrative specialist . . . working under the supervision of an attorney in defending the FBI" in the *McGehee* lawsuit.  Dkt. 21-3 at 32 (Hardy Decl. ¶ 89).  In his first declaration, Hardy attested that the withheld records qualified as work product "because they were created by legal personnel under the supervision of an attorney during civil litigation as part of the attorney's representation of the FBI" during *McGehee*.  *Id.* at 33.  He further explained that the records "reflect[] her research into the processing of the FOIA request at issue in *McGehee* as part of the FBI's preparation of its defense of that FOIA lawsuit."  *Id.* at 32–33.  In his second declaration, Hardy provided additional detail, clarifying that the documents were records that the FBI specialist "and agency counsel relied upon in drafting the search portions of the FBI's *Vaughn* declaration in that case."  Dkt. 31-1 at 5 (Second Hardy Decl. ¶ 8).  Hardy further attested:

> While some searches in the case did not occur until after the *McGehee* lawsuit was initiated, the [specialist] was not involved in the underlying FOIA request at issue in the lawsuit and therefore, the only reason she created these records was in order to respond to the lawsuit; she would not have created any records in relation to the FOIA request itself.  While her research may have informed the FBI's ultimate decisions about what searches were legally required in responding to the lawsuit, these records exist because of her work in assisting [to] defend the FBI in the lawsuit.  They reflect her and by extension FBI counsel's thought processes about, for example, areas where the FBI might be vulnerable to attack in the litigation, which is crucial to crafting an agency defense to a lawsuit.  Despite plaintiffs' supposition, these documents were not created simply to document pre-litigation searches.

*Id.* at 5–6 (Second Hardy Decl. ¶ 8).

Stein's primary argument is that these declarations fail to establish that the documents were prepared "in anticipation of litigation."  When considering whether a document is prepared "in anticipation of litigation," this circuit employs a "because of" test, inquiring "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."

*United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (quoting *In re Sealed Case*,

146 F.3d at 884)).  Although a document that "would have been created 'in substantially similar

form' regardless of the litigation" is not protected by the privilege, *Boehringer*, 778 F.3d at 149

(quoting *Deloitte*, 610 F.3d at 138), a document may be protected by the privilege "even though

it serves multiple purposes, so long as [it] was prepared because of the prospect of litigation."

*Deloitte*, 610 F.3d at 138.  The FBI argues that a straightforward application of this standard to

the withheld material makes clear that it is protected:  Because it was prepared "because of" the

FOIA suit, and indeed was prepared *solely* for that purpose, it is protected by the work product

privilege and was appropriately withheld.

In the Court's view, however, the question is somewhat closer, and it exposes vacuums

both in the record and in the governing precedent.  Stein's argument proceeds from the premise

that the withheld documents are simply the search slips and processing notes that the FBI should

have created, but *did not* create, when the *McGehee* plaintiff submitted his initial FOIA request.

The only thing that permits the FBI to assert the work product privilege, Stein contends, is that

the FBI failed to run adequate searches for records until after the plaintiffs filed suit.  According

to Stein, "[i]f part of the ordinary processing of a FOIA request happens after litigation is filed[,]

. . . the records of that processing do not," or at least should not, become subject to the attorney

work product privilege because a FOIA action has been filed.  Dkt. 27 at 16.  But, as an initial

matter, it is not clear on the current record whether Stein's factual premise—that the withheld

documents are "substantially similar" to the search slips that the FBI should have created when

responding to McGehee's FOIA request—is correct.  The FBI asserts that the withheld records

document an analyst's "research into the processing of the FOIA request" and "reflect her and by

extension FBI counsel's thought processes about . . . areas where the FBI might be vulnerable to

attack in the litigation," Dkt. 31-1 at 5–6 (Second Hardy Decl. ¶ 8), which at least suggests that the withheld records are, in fact, different than the records that the FBI generally creates in responding to a FOIA request.  But the declaration does not rule out the possibility that, as Stein contends, the withheld records might include, among other things, search slips or processing notes that are "substantially similar" to the kinds of records normally created during searches for responsive records.

Even assuming that some or all of the records the FBI withheld under Exemption 5 are "substantially similar" to traditional processing notes, however, it is also far from clear that it would have been inappropriate for the FBI to have withheld them.  Although the work product privilege does not extend to records that "would have been created in 'substantially similar form' regardless of the litigation," *Boehringer*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 138), Stein's argument is not that the search slips and processing records he believes were withheld *would* have been created absent the litigation, but that they *should* have been.  Neither party has identified any caselaw regarding the application of the work product privilege to such records, and to the Court's knowledge it is an open question.  Nevertheless, in the Court's view, there are substantial grounds to conclude that the work product privilege attaches to such records.  One reason for observing the bright-line rule that any records created "because of" litigation are protected—no matter how similar they look to records that should otherwise have been created during the ordinary course of business—is that, once litigation is brought, such records are in fact unlikely to be compiled in precisely the same manner as they might have been before litigation was contemplated.  The advent of litigation (or the reasonable anticipation thereof) can introduce strategic considerations into the compilation of even the most mundane records— strategic considerations that might be revealed to one's adversary were such records to be made

public through discovery, or, as here, through the operation of FOIA.  Once litigation is brought

(or is reasonably anticipated), moreover, it may prove difficult, if not impossible, for a court to

discern which nuances in documents created under the supervision of counsel are the product of

those strategic considerations and which merely reflect business as usual.  The disclosure of

records that *should* have been created before litigation, but *were* not, might therefore prevent

lawyers from "work[ing] with a certain degree of privacy, free from unnecessary intrusion by

opposing parties and their counsel."  *Hickman*, 329 U.S. at 510.  The FBI's argument that the

withheld records were protected by the attorney work product privilege even if they are

"substantially similar" to the kinds of processing records that are ordinarily created in response

to a FOIA request therefore appears to the Court, at first blush, to rest on a reasonable reading of

the law.

Nonetheless, to ensure a more complete record, the Court will **DENY** the pending

motions for summary judgment with respect to the FBI's assertion of the work product privilege

and direct the FBI to file an additional evidentiary submission regarding the nature of the

withheld documents.  If the FBI's supplemental *Vaughn* index (or the equivalent thereof) makes

clear that the records are not "substantially similar" to the processing records that the FBI

ordinarily produces in response to a FOIA request, there will be no need to resolve what appears

to the Court to be a novel question of law.  Regardless, the creation of a more substantial record

may shed light on the dispute between the parties and permit a more nuanced resolution of their

dispute.

c. Exemptions 6 and 7(C)

Finally, Stein challenges the FBI's invocation of Exemptions 6 and 7(C) to redact the

names of parties of investigative interest.  *See* Dkt. 27 at 17–19.  As discussed above, it is well

established in this circuit that an agency may "withhold information identifying private citizens mentioned in law enforcement records" under Exemption 7(C). *See Schrecker*, 349 F.3d at 661. Accordingly, Stein acknowledges that the FBI's withholdings were appropriate "*if* the fact that a person was of investigative interest to [the] FBI is currently unknown." *Id.* at 13–14 (emphasis in original). He argues, however, that any person who is by now publicly known to be (or to have been) of investigative interest to the FBI would not be protected by Exemption 7(C) under the official-acknowledgement doctrine, *see ACLU*, 710 F.3d at 426; that the first Hardy declaration does no more than "restate[] the statutory language for parties of investigative interest without actually stating whether or not the fact that they were of investigative interest [is] publicly known," Dkt. 27 at 18; and that it is unlikely that *all* of the people whose names are redacted are still not known to have been of investigative interest to the FBI, given the notoriety of cult leader Jim Jones, the subject of the *McGehee* FOIA requests, *id.*

The Court concludes that the FBI appropriately withheld the names under Exemption 7(C). To whatever extent the first Hardy declaration was ambiguous regarding the names that the FBI withheld, the second Hardy declaration eliminates the ambiguity. It explains that the FBI withheld the names "of any living third parties related to the Jonestown massacre who were of investigative interest to the FBI in relation to that matter and to third parties "whose names appeared on printouts of searches conducted in responding to the Jim Jones/Jonestown massacre request." Dkt. 31-1 at 6 (Second Hardy Decl. ¶ 9). And it clarifies that "[t]he names the FBI protected have not been previously officially disclosed by the FBI as individuals of investigative interest." *Id.* This declaration is the kind of "relatively detailed and non-conclusory" statement required to support summary judgment for the agency. *SafeCard Servs.*, 926 F.2d at 1200 (quotation marks and citation omitted). The declaration makes clear that the official-

acknowledgment doctrine does not apply to the names that the FBI withheld under Exemptions 6 and 7(C).

The Court, accordingly, **GRANTS** summary judgment to the FBI with respect to Stein's claim regarding the names of third parties of investigative interest, and **DENIES** Stein's motion for summary judgment with respect to that claim.

### 4. *Stein's Third Request*

Stein originally argued that the FBI erred in closing his third FOIA request on the basis of his failure to pay the estimated fees. Stein argued that, even presupposing the validity of the FBI policy limiting its electronic releases to 500 pages per CD, *see Nat'l Sec. Counselors v. Dep't of Justice*, 80 F. Supp. 3d 40, 51 (D.D.C. 2015), and taking into account his stated refusal to pay any fees for the processing of his FOIA request, the FBI erred in not providing him with the CD he was entitled to for free. After oral argument in this matter, however, and without conceding the validity of Stein's argument, the FBI agreed to process Stein's request and provide him with the records to which he is entitled free of charge. Dkt. 46 at 2. The Court therefore **DENIES** the parties' cross-motions with respect to this claim as moot.

### 5. *Truthout's Request*

The final claim in this case concerns Truthout's single FOIA request for processing notes created by FBI analysts in responding to a request about Hesham Abu Zubaydah, the brother of a Guantanamo detainee. *See* Dkt. 21-5 at 22 (Hardy Decl., Ex. II). The FBI denied Truthout's request on the basis of the Exemption 5 deliberative process privilege. *Id.* at 36 (Hardy Decl., Ex. KK). That privilege, as incorporated into FOIA, "allows an agency to withhold 'all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.'" *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 4

(D.C. Cir. 2014) (quoting *Sears, Roebuck*, 421 U.S. at 153). It is "limited to documents that are 'predecisional' and 'deliberative,' meaning 'they reflect[] advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated, [or] the personal opinions of the writer prior to the agency's adoption of a policy.'" *Id.* (quoting *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 875 (D.C. Cir. 2010) (alterations in original)).

As an initial matter, the scope and reach of the FBI's assertion of Exemption 5 has varied over the course of this litigation. The FBI initially appeared to take the position that *all* FDPS processing notes are protected by the deliberative process privilege. *See* Dkt. 21-1 at 17 ("FDPS notes . . . are created by RIDS employees to document the decision-making process undertaken to reach to the final decision on a FOIA request . . . . Accordingly, the notes are both deliberative and predecisional."). In its reply brief, however, the FBI significantly narrowed the scope of its argument, explaining that it does not have "a policy of categorically denying requests for FDPS Notes pursuant to Exemption 5" but rather "determined that the specific FDPS notes responsive to Truthout's FOIA request were privileged deliberative materials compiled in the course of the FBI's decision-making process about the disposition [of] a FOIA request that Truthout submitted for records about Hesham Zubaidah." Dkt. 31 at 12–13. Based on this clarification, the Court will address only the FBI's assertion of the deliberative process privilege with respect to the specific documents that Truthout requested.

Even with this clarification, however, the FBI has yet to demonstrate that it is entitled to prevail on this issue because the Hardy Declarations contain almost no factual material that would explain why the FDPS processing notes compiled in processing Truthout's request are any more "predecisional" or "deliberative" than any other FDPS processing notes. The First Hardy

Declaration argued *generally* that FDPS processing notes qualify for protection under the exemption. *See* Dkt. 21-3 at 28 (Hardy Decl. ¶ 81) (arguing that "case notes are predecisional because they document the process by which a final decision on a FOIA request is made" and "deliberative as they reflect the analysis and back-and-forth of deliberation in determining which information can be withheld or released from FBI records and the basis for such in response to the FOIA request"). It concluded by stating that "the FBI appropriately asserted Exemption 5, in conjunction with the deliberative process privilege, to protect these materials." *Id.* The Second Hardy Declaration is no more helpful. It explained that "the FBI determined that the specific notes responsive to Truthout's request . . . were privileged deliberative materials," Dkt. 31-1 at 11 (Second Hardy Decl. ¶ 26), but it does not explain the basis for that determination.

Because the FBI has abandoned its position that FDPS processing notes are categorically protected by the deliberative process privilege, the Court need not address that issue—other than to note that any attempt to claim categorical protection under the deliberative process privilege would be difficult to maintain given agencies' obligation to segregate factual material from deliberative material when asserting the deliberative process privilege. *See Mink*, 410 U.S. at 91; *Montrose Chem. Corp. v Train*, 491 F.2d 63, 66 (D.C. Cir. 1974). But once the FBI's gestures at a categorical assertion of the deliberative process privilege are set aside, it is clear that the Court cannot resolve the merits of the FBI's assertion of the privilege on the present record, which is devoid of any non-conclusory factual support for the FBI's assertion of Exemption 5 in this case.

Accordingly, the Court **DENIES** the parties' cross-motions for summary judgment on this issue. The FBI may file a renewed motion, along with a supplemental statement by the FBI regarding the factual basis upon which it withheld these documents, and Plaintiffs may renew their cross-motion after receiving those supplemental materials.

**CONCLUSION**

For the foregoing reasons, the plaintiffs' motion for summary judgment is **GRANTED** in part and **DENIED** in part.  The FBI's motion for summary judgment is **GRANTED** in part and **DENIED** in part.  A separate Order will issue following the status conference scheduled for February 3, 2016.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  January 22, 2016

63