**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RYAN NOAH SHAPIRO**, *et al.*, | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **U.S. DEPARTMENT OF JUSTICE,** | ) |
| | ) |
| **Defendant.** | ) |

Civil Action No. 13-0555 (RDM)

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO**</u>
<u>**DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT**</u>

**I.      Exemption 7(E)-3**

Pursuant to Exemption 7(E), an agency may withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . *would disclose techniques and procedures for law enforcement investigations or prosecutions*, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." Mr. Hardy's declaration argues[1] that "the FBI's use of a 'No Records' response to FOIA requests for FBI investigative records is a law enforcement technique and procedure when used to protect the use of an authorized FOIA Exclusion." Accordingly, the FBI withheld virtually the entirety of every page of search slips and all substantive content in the processing notes, where

---

[1] This section of Mr. Hardy's Fifth Declaration (¶¶ 114-129) reads more like a legal brief than a declaration. Declarations are intended to provide facts to the Court and not to make legal argumentation. The Court may disregard the legal argumentation in Mr. Hardy's declaration. *Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985) ("Because legal argumentation is an expression of legal opinion and is not a recitation of a 'fact' to which an affiant is competent to testify, legal argumentation in an affidavit may be disregarded.")

the underlying request resulted in a "no records" response.[2] The FBI uses the code 7(E)-3 to refer

to the use of the exemption in this manner.

The FBI's assertion of Exemption 7(E)-3 fails for several reasons. First, the Court has

already held that the "FBI's exercise of its statutory authority to exclude documents from FOIA's

reach is not the kind of 'technique' or 'procedure' to which Exemption 7(E) refers." [ECF: dkt.

48 at 27.] The law of the case doctrine forecloses the FBI from relitigating this point. Moreover,

even if relitigation of this already-rejected argument were permitted, the FBI does not advance

any persuasive reason why the Court should reach a different conclusion now. The Court's

reasoning and conclusion were correct.

The only new explanation that the FBI gives for why the authorized use of an exclusion

should be considered a law enforcement technique or procedure is that "there is no discernible

difference between using intentional misinformation from an undercover agent or informant and

the authorized use of § 552(c) in response to a FOIA request for investigative records. In both

instances, the subterfuge of misinformation functions as a protective mechanism to protect the

integrity of sensitive FBI criminal and national security investigations." (Fifth Hardy Decl. ¶

119.) This analogy is not persuasive.

---

[2] With respect to one request, "Liberation Collective," the FBI sent Plaintiff Shapiro a "No
Records" response, but nevertheless did not invoke Exemption 7(E)-3. (See Ex. 3.) It is unclear
whether or not this disclosure reflects an intentional decision by the FBI to release this material.
However, it is evident from a review of these search slips and processing notes that the
disclosure has revealed nothing about whether or not an exclusion was employed. (See Ex. 3.)
The FBI is therefore incorrect in arguing that "if the FBI were to only use Exemption 7(E) as a
cover to protect the use of § 552(c) when actually utilized versus in a true 'No Records'
response, it could easily be gleaned by process of elimination by savvy requestors which 'No
Records' cases are connected to exclusions and which are not, thus rendering the use of
Exemption 7(E), and the exclusion provisions themselves, toothless." (Fifth Hardy Decl. ¶ 121.)

The authorized use of 552(c) is not "misinformation," and does not involve the "use of a subterfuge, ruse or a 'cover'" (Fifth Hardy Decl. ¶ 119). Under 5 U.S.C. § 552(c), an excluded record is treated as if it is not subject to FOIA. 5 U.S.C. § 552(c) (agency may "treat the records as not subject to the requirements of this section[.]") Thus, when the FBI employs an exclusion and tells the requester that it could locate no "records responsive to the FOIA," (Ex. 1) it is making a truthful statement – the excluded records are not responsive under FOIA because they are not subject to FOIA. *See Attorney General's Memorandum on the 1986 Amendments to the Freedom of Information Act*, § G.4 (Dec. 1987) ("Where an exclusion is employed, the agency is legally empowered to 'treat' the excluded records as not subject to the FOIA at all. Accordingly, a requester can properly be advised in such a situation that 'there exist no records responsive to your FOIA request.' Such phrasing – as opposed to any more detailed statement that, for example, any records specified in a particular request 'could not be located' – most rationally and fairly implements an exclusion's effect.") Further, the FBI's "no response" letter references 5 U.S.C. § 552(c) and explains that "[t]his response is limited to those records that are subject to the requirements of the FOIA," and that the response "should not be taken as an indication that excluded records do, or do not, exist." (Ex. 1.) A truthful statement made by the FBI in the course of responding to a FOIA request is thus unlike the use of misinformation by an undercover agent.

Moreover, the D.C. Circuit has recognized that the text of Exemption 7 requires an agency to show that the withheld records were "compiled for law enforcement *purposes*." *Pub. Emples. for Envtl. Responsibilty v. United States Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 203 (D.C. Cir. 2014) (emphasis in original). "FBI records are not law enforcement records simply by virtue of the function that the FBI serves." *Vymetalik v. FBI*, 785 F.2d 1090, 1095

(D.C. Cir. 1986). Whereas a record describing an undercover agent's use of a subterfuge during an investigation will most likely relate to a legitimate law enforcement purpose, a FOIA analysts' search slips will most likely not. Processing notes are administrative material and, unless they contain recompilations of investigatory information, bear no rational nexus to any FBI law enforcement purpose. *See Summers v. United States DOJ*, 934 F. Supp. 458, 463 (D.D.C. 1996) (FBI did not establish law enforcement purpose as to administrative material consisting of Hoover's phone logs.)

A second reason why the FBI's assertion of Exemption 7(E)-3 fails is that this Court made clear that the FBI's renewed summary judgment motion would not be "an opportunity for the FBI to advance its new policy regarding search slips. The FBI is free to apply that policy to future FOIA requests (and future FOIA requesters are, in turn, free to challenge it). But this is not the forum for such a proceeding." [ECF: dkt. 53 at 5.] Despite the FBI's claim that its current approach to the assertion of Exemption 7(E)-3 is "specifically tailored to the unique facts and circumstances of this case alone and is not an application of any revised or narrowed FBI policy on FOIA processing notes and search slips connected to 'No Record' or Glomar responses," the FBI is indeed impermissibly advancing its new policy regarding search slips.

The FBI's contention that its application here of Exemption 7(E)-3 to "no records" response search slips and processing notes is "targeted" is not supported by its arguments. The FBI's reason for asserting Exemption 7(E)-3 here is "to protect the law enforcement technique or procedure of the use of § 552(c) as a subterfuge to prevent the disclosure of the existence or non-existence of sensitive law enforcement records." (Hardy Decl. ¶ 116.) This argument, however, would apply to all search slips and processing notes connected to a "no record" response and is an improper attempt to advance a justification for its new policy.

Finally, even if this Court reverses its earlier decision that the authorized use of an exclusion is not a "law enforcement" technique or procedure for purposes of Exemption 7(E) and permits the FBI to advance arguments in support of its new policy, the FBI's assertion of Exemption 7(E)-3 still must fail.

Mr. Hardy's declaration devotes five pages to explaining the purported harm to the FBI's domestic terrorism program that would arise from disclosure of (what would likely be heavily-redacted) FOIA search slips and processing notes to Mr. Shapiro. Mr. Hardy goes so far as to assert that disclosure of these records to Mr. Shapiro would threaten the "national fabric of FBI's DT investigative program[.]" (Fifth Hardy Decl. ¶ 126.) Putting aside Mr. Hardy's alarmism and the question of whether the alleged harm is even remotely plausible, the FBI's argument is contrary to long-settled FOIA jurisprudence holding that the identity of the requester is not a factor to be considered in determining whether release of records is appropriate.

The Supreme Court has made clear that "disclosure does not depend on the identity of the requester[.]" *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). *Accord Students Against Genocide v. Dep't of State*, 257 F.3d 828, 837 n.12 (D.C. Cir. 2001)("the identity of the FOIA requester is immaterial"); *Swan v. SEC*, 96 F.3d 498, 499 (D.C. Cir. 1996)("FOIA does not make distinctions based on who is requesting the information"); *Feinman v. FBI*, 680 F. Supp. 2d 169, 175 (D.D.C. 2010)(noting as "exceptions to th[e] rule" that the "identity of a FOIA requester is typically irrelevant to the request," situations involving fee waivers and "first party" requesters). Therefore, it is irrelevant whether the records at issue in this case (or the underlying requests) were made by Mr. Shapiro or 20 different individuals or *The New York Times* or a hostile foreign analyst. *See Military Audit Project v. Casey*, 656 F.2d 724, 730 n.11, 211 U.S. App. D.C. 135 (D.C. Cir. 1981)(explaining, during the Cold War,

"Under the Freedom of Information Act, the identity of the requester is immaterial; for example, there is no statutory bar to the military attaché of the Soviet embassy filing FOIA requests for information from the CIA and the FBI on the same basis as a United States citizen.") Because a "a disclosure made to any FOIA requester is effectively a disclosure to the world at large," *Students Against Genocide*, 257 F.3d at 836, the FBI's argument for withholding cannot be predicated on any special threat the FBI perceives that Mr. Shapiro poses to national security. Thus, the FBI's fixation on the "Shapiro disclosure puzzle," "Shapiro's universe of domestic terrorism requests," and other "requests by Shapiro juxtaposed against the universe of his requests for domestic terrorism related subjects" is misplaced. (Fifth Hardy Decl. ¶¶ 121, 122.)

The FBI perhaps hopes that by focusing on Mr. Shapiro's universe of requests, it can avoid appearing as if it is improperly advancing arguments in support of its new blanket policy. But the "mosaic theory" argument advanced by the FBI to support its position here would apply in every case because all information is meaningful only when combined with other information. Thus, acting in "true mosaic fashion" (Fifth Hardy Decl. ¶ 122) means that FBI must consider all disclosures to all requesters juxtaposed against all information in the public domain. In sum, the FBI offers no reason cognizable under FOIA why it has properly invoked Exemption 7(E) in connection with the particular search slips and processing notes at issue here.

For similar reasons as those expressed above, the FBI's invocation of this exemption to withhold information from Truthout cannot stand up to scrutiny, since it in effect reduces to, "We withheld law enforcement techniques which we determined to be withholdable, so that we can defeat criminals and terrorists." As laudable a goal as that is, the mere mention of terrorism cannot by itself make something exempt, and the Court should decline to make a determination

solely on testimony and legal argument included in an *in camera* declaration without requiring

the FBI to file a more fulsome public explanation for its withholdings.


## II.      Exemption 7(E)-4, File Numbers

The FBI has withheld what it alleges to be "sensitive" case file and sub-file numbers

pursuant to Exemption 7(E)-4. (Fifth Hardy Decl. ¶ 130.) According to Mr. Hardy's declaration,

"suspects could use these numbers (indicative of investigative priority), in conjunction with other

information known about other individuals and/or techniques, to change their pattern of activity

to avoid detection, apprehension, or create alibis for suspected activities, etc." (Fifth Hardy Decl.

¶ 130.) However, this assertion is misleading both for what it says and what it does not say. As

explained below, Exemption 7(E) was not properly applied here because (1) file numbers are not

"records or information compiled for law enforcement purposes"; (2) the disclosure of the file

numbers would not reveal "techniques and procedures for law enforcement investigations or

prosecutions"; and (3) disclosure could not "reasonably be expected to risk circumvention of the

law." 5 U.S.C. § 552(b)(7)(E).


### a.   Explanation of FBI file numbering system

Before considering any legal analysis, it is important to understand what FBI file numbers

are and what they represent.[3] According to the FBI's Record Management Manual, "The

---

[3] Individual documents within a file are "serialized" and referenced by a serial number.
Individual documents are referenced by appending the serial number to the end of the file
number. For example in 91A-BA-124576-2, the "-2" refers to the second serialized document in
the file. The FBI has only attempted to justify its nondisclosure of case file numbers, as opposed
to individually serialized document numbers. Accordingly, Plaintiffs limit their arguments here
to addressing withholding of case file numbers.

majority of the FBI's mission-related, or program, records are arranged in case files related to a specific investigation or intelligence matter." (Ex. 4.) Case files are assigned a case file number. "A typical case file number consists of a three-digit **classification number**, a one- or two-digit **alpha designation** for subdivisions under that subject, a two-letter **designation for the OO** [Originating Office], and then **a case number** assigned sequentially by the system. (Example: 91A-BA-124576)." (Ex. 4) (emphasis added). In this example, "91" is the classification number, "A" is the alpha designation, "BA" is the originating office, and "124576" is the case number.

"The FBI filing classification numbers relate to particular areas of investigation, law enforcement, intelligence gathering, or other responsibilities of the Bureau. Often, a classification number is tied to the legislation that enacts a particular type of investigation or other Bureau activity." (Ex. 4.) There are hundreds of classification numbers, covering everything from Terrorism Enterprise Investigations (100) to Interstate Transportation of Gambling Device (143) to the Freedom of Information / Privacy Act (190).[4] In the above example, the classification code "91" refers to Bank Robbery.

Lists of FBI classification codes can be found in numerous publicly available sources, including the FBI's website,[5] the Manual of Administrative Operations and Procedures (MAOP),[6] and the National Archives and Records Administration's (NARA's) records disposition schedules.[7] Detailed descriptions of the volume of records, dates, and nature of the

---

[4] *See* https://www.fbi.gov/foia/privacy-act/file-classifications
[5] *Id.*
[6] *See* https://vault.fbi.gov/maop/maop-part-05-of-07/view (list begins at page 144). See also Ex. 5.
[7] *See e.g.*, https://www.archives.gov/records-mgmt/rcs/schedules/departments/department-of-justice/rg-0065/n1-065-10-008_sf115.pdf (Classification code 278); https://www.archives.gov/records-mgmt/rcs/schedules/departments/department-of-justice/rg-0065/n1-065-10-014_sf115.pdf (Classification code 292).

classification codes can be found in the joint NARA/FBI appraisal of the FBI's record systems.[8]

Further, the FBI's Manual of Investigative Operations and Guidelines (MIOG) contain over a

thousand pages of departmental guidance for the many classification codes.[9]

Appended to many of the classification codes is an alpha designation. Alpha designations

"identify more specific types of work within the numeric classification." (Ex. 9.) The

classification code "91," used in the example above, is associated with five alpha designations:

"91A" for bank robbery; "91B" for bank burglary, larceny, $10,000 and over; "91C" for bank

burglary, larceny, under $10,000; "91D" for the bank robbery, burglary, larceny suspect

program; and "91F" for bank extortion. (Ex. 5 at 8.) Whatever priority the FBI may assign to

particular alpha designations in a particular year cannot be discerned from the designations

themselves. For example, in classification code 198 (Indian Country), an alpha designation of

"D" (gaming) does not represent a higher enforcement priority for the FBI than an alpha

designation of "F" (sexual abuse of a child) or "G" (assaulting or killing of a federal officer).

(Ex. 5 at 16-17.) A list of the alpha designators for each classification code is contained in the

MAOP. (Ex. 5.)

The office of origin designation may be "HQ" (for FBI Headquarters), an abbreviation of a

field office, or an abbreviation of a foreign office. The FBI lists on its website all of its field

offices and foreign offices, and a list of abbreviations is available in *Unlocking the Files of the*

*FBI: A Guide to Its Records and Classification System* (G.K. Haines & D.A. Langbart, 1993).

---

[8] *See Appraisal of the Records of the Federal Bureau of Investigation: A Report to Honorable Harold H. Greene, United States District Court for the District of Columbia* (Nov. 9, 1981).
[9] *See* https://vault.fbi.gov/miog

The final component of the file number is the case number. The case numbers does not indicate the enforcement priority of any case, as they are assigned sequentially. In the example above, "91A-BA-124576" the number "124576" is the case number.

b.  FBI file numbers are not "information compiled for law enforcement purposes"

An FBI file number is an item of information generated[10] for administrative, rather than law enforcement purposes, and therefore does not meet the threshold requirement to qualify for withholding under Exemption 7. File numbers are used by the FBI to organize a large volume of records without regard to whether those records are compiled for law enforcement purposes or not. The fact that the FBI's file numbering system is used for such administrative and personnel matters as the FBI's Physical Fitness Program (66E), FOIA operations (190), and payroll records (319A) illustrates that the "purpose" of generating a file number is unrelated to law enforcement. Rather, FBI file numbers are simply a means to facilitate the storage and retrieval of documents of whatever kind or nature. While many (perhaps most) FBI file numbers are assigned to investigative matters, the "purpose" of generating a file number – keeping track of records – is the same regardless of the substance of the records that will be tracked with the file number. Therefore, FBI file numbers cannot be said to have been "compiled for law enforcement purposes[.]"

---

[10] Another reason that the Exemption 7 threshold is not met is that the file numbers cannot be said to have been "compiled" at all. The plain and ordinary meaning of "compile" is to "Produce (something, especially a list, report, or book) by assembling information collected from other sources" or more specifically, to "Collect (information) in order to produce something[.]" Oxford English Dictionary, http://www.oxforddictionaries.com/us/definition/american_english/compile Generating a file number does not require the collection of information from other sources. The originating office simply creates the number by combining its office abbreviation with the next available case number in a given classification code. The FBI does not "compile" a file number any more than an attorney or paralegal "compiles" a Bates number.

c.   Disclosure of the file numbers would not reveal a "technique or procedure"

The FBI does not argue that the withheld file numbers are themselves a technique or procedure, but instead that disclosure of the file numbers would reveal techniques or procedures because file numbers are "indicative of investigative priority[.]" (Fifth Hardy Decl. ¶ 130.) As explained above, there is no factual support for this assertion and there is nothing in the case file number that would reveal the FBI's investigative priorities. The FBI has proffered no other explanation as to how disclosure of file numbers would reveal any law enforcement technique or procedure. Accordingly, Exemption 7(E) does not permit withholding of the file numbers.

d.   Disclosure of the file numbers would not risk circumvention of the law

The FBI argues that disclosure of file numbers would risk circumvention of the law because "suspects could use these numbers (indicative of investigative priority), in conjunction with other information known about other individuals and/or techniques, to change their pattern of activity to avoid detection, apprehension, or create alibis for suspected activities, etc." (Fifth Hardy Decl. ¶ 130.) It is not inconceivable that withholding of a file number relating to an ongoing investigation might cause the kind of harm that is contemplated by Exemption 7(A),[11] but it does not cause the kind of harm contemplated by Exemption 7(E). Whereas Exemption 7(A) protects the government's interest in avoiding interference with "a concrete prospective law enforcement proceeding," Exemption 7(E) protects the government's interest in keeping secret "techniques

---

[11] Plaintiffs do not concede the correctness of the FBI's assertion of Exemption 7(A) as to file numbers of the particular pending cases at issue here. However, Plaintiffs are not challenging redactions of file numbers pursuant to Exemption 7(A), with one exception. Mr. Shapiro challenges the application of Exemption 7(A) to the search slip and processing notes related to his request for records about the murder of Hyram Kitchen. *See infra*, Part III.

and procedures for law enforcement investigations or prosecutions" and "guidelines for law enforcement investigations or prosecutions[.]" Exemption 7(E) serves to prevent future "circumvention of the law." 5 U.S.C. 552(b)(7)(E). Therefore, the focus of Exemption 7(E) is on the "means" of conducting law enforcement operations, not the application of the law enforcement operation to a specific instance. *Hamdan v. United States DOJ*, 797 F.3d 759, 777-78 (9th Cir. 2015).

Consider an individual who learns that the investigative file into his activities is part of the "281D" classification. The disclosure of that information would alert the individual that the FBI is investigating his involvement with a violent gang, potentially jeopardizing a pending or prospective law enforcement proceeding. As Mr. Hardy suggests, the suspect could change his or her activities based on this knowledge in order to avoid apprehension or create an alibi. Mr. Hardy's rationale make little sense, however, with respect to the assertion of Exemption 7(E) here.

Because Plaintiffs are only challenging (with one exception) Exemption 7(E)'s application to file numbers for which Exemption 7(A) is not invoked,[12] the FBI has either determined that there is no pending or prospective law enforcement proceeding or that release of the file numbers would not interfere with any such proceedings. Thus, none of the concerns articulated by Mr. Hardy relating to a suspect changing his or her behavior are implicated.

The FBI has also not established why the particular file numbers withheld here are "sensitive" and would risk circumvention of the law, while other file numbers are not "sensitive" and would not risk circumvention of the law. As explained in the attached declaration from

---

[12] For example, in FBI-690 (FOIA Request 1162667) the FBI has withheld a file number under Exemption 7(E) without asserting Exemption 7(A).

Plaintiff Shapiro, the FBI itself seems to not have any consistent approach to determining which file numbers are sensitive.

Exhibit 6[13] contains five documents that the FBI released to Mr. Shapiro with redactions to file numbers made pursuant to Exemption 7(E). In connection with other requests Mr. Shapiro had made to the FBI, however, the agency released the exact same documents to him without redacting the file number. The release of these file numbers could not reasonably be expected to result in circumvention of the law by the subjects of those requests or anyone else – a point with which the FBI implicitly agreed when it released the file numbers to Mr. Shapiro. Further, the FBI's release of the file numbers was not occasioned by the termination of an earlier-pending investigation. In each set of documents contained in Exhibit 6, it was the later-disclosed document that had the redaction added in.

Simply using the adjective "sensitive" is not sufficient for the FBI to meet its burden of demonstrating that the risk of circumvention of the law is real. "[T]he standard of review of a claimed 7(E) exemption, while highly deferential, is not vacuous. Courts have a responsibility to ensure that an agency is not simply manufacturing an artificial risk and that the agency's proffered risk assessment is rooted in facts." *Long v. Immigration & Customs Enforcement*, 2015 U.S. Dist. LEXIS 166612, at *28 (D.D.C. Dec. 14, 2015). Here, the FBI has not shown that its risk assessment is rooted in facts and therefore has not met its burden to demonstrate that withholding of the file numbers is proper under Exemption 7(E).

  e.  Segregability of file numbers

---

[13] Black boxes in the document reflect redactions made by Plaintiff Shapiro to protect the identity of the third-party mentioned in the documents.

If the Court disagrees with Plaintiffs and finds that case file numbers fall within the ambit of Exemption 7(E), the FBI should still be ordered to release segregable portions of the case file numbers. For example, if the FBI establishes that disclosure of a particular alpha designation unknown to the public will risk circumvention of the law, then the FBI should be permitted only to redact the particular alpha designation, and release the classification code, originating office, and case number. Similarly, if the FBI only establishes that the particular case number can be withheld, it should be required to produce the classification code and originating office.

### III.      Exemption 7(A) as applied to FBI-596, 597, 600

The FBI invoked Exemption 7(A) to withhold "the names of targets and/or file numbers of pending FBI investigations related to underlying records referenced in the case notes and search slips at issue in Count 4 (Shapiro)." (Fifth Hardy Decl. ¶ 96.) Mr. Shapiro challenges the application of Exemption 7(A) solely as it relates to the case notes and search slip connected with his request for records on the murder of Hyram Kitchen (FBI-596, 597, 600) (Ex. 8).

a.  <u>Background</u>

The FBI's Knoxville field office "initiated an investigation into the death of Dr. HYRAM KITCHEN, Dean of UNIVERSITY OF TENNESEE (UT) Veterinary Medicine School and Clinic, Knoxville, Tennessee, after he was murdered on. February 8, 1990, by an unknown assailant. Knoxville investigated the death of Dr. Kitchen under the ALF [Animal Liberation Front] title after the KNOX COUNTY SHERIFF'S OFFICE issued a nationwide teletype broadcast for police departments, detailing the death of Dr. KITCHEN and alluding to possible involvement of militant animal rights group." (Ex. 7.) However, various "leads generated by the

Knoxville investigation . . . were negative regarding any possible animal rights group involvement in this matter." The FBI eventually "determined that there appears to be no ALF or other animal rights group involvement in the death of Dr. KITCHEN. Accordingly, Knoxville is conducting no further investigation in this matter, other than assisting the KNOX COUNTY SHERIFF'S OFFICE as a police cooperation matter in expediting forensic examination of evidence submitted and handling criminal profiling requests." (Ex. 7.)

b. Analysis

A proper invocation of Exemption 7(A) requires "(a) identification of a concrete prospective law enforcement proceeding, and (b) demonstration that releasing the requested documents could reasonably be expected to interfere with such a proceeding." The FBI has done neither of these things here and therefore its assertion of Exemption 7(A) must be rejected.

As to the first criterion, Exemption 7(A) "cannot justify withholding unless the material withheld relates to a concrete prospective law enforcement proceeding." *Carson v. U. S. Dep't of Justice*, 631 F.2d 1008, 1017 (D.C. Cir. 1980) (internal quotation marks omitted). The FBI has not adequately demonstrated the existence of any concrete prospective law enforcement proceeding with respect to the murder of Dr. Kitchen. The only evidence offered by the FBI is Mr. Hardy's generic statement that Exemption 7(A) was applied in connection with "pending FBI investigations." However, as described above, the FBI ceased conducting its investigation into the murder of Dr. Kitchen over 25 years ago. As the D.C. Circuit has observed, "There is no reason to protect yellowing documents contained in long-closed files." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 870 (D.C. Cir. 1980). Given that the FBI has "made no effort whatsoever in the district court to demonstrate that [this] case[ is] still under investigation or

being actively pursued," the government has failed to meet its burden. *Id.*

Even if there was a pending or prospective investigation, however, the assertion of Exemption 7(A) would still not be justified because disclosure of the names and/or file numbers here could not "reasonably be expected to interfere with enforcement proceedings[.]" 5 U.S.C. § 552(b)(7)(A). The FBI has already disclosed substantial information about the nature and scope of the investigation. In response to previous FOIA requests from Mr. Shapiro, the FBI has released dozens of pages of records about its investigation into the murder of Dr. Kitchen which detail the crime; the suspect; the weapon used; the evolution and progression of the investigation; highly specific descriptions of the leading theories of the crime under investigation; detailed information about evidence, leads, and the results of investigation of those leads; specific details of interviews with witnesses and other sources of information about the case; the successes and shortcomings of the investigation; and ultimately the FBI's completion and termination of its investigation. (Ex. 7.) It is simply not reasonable to believe that, in light of these disclosures, the release of a case file number could interfere with any hypothetical prospective law enforcement proceedings.

## IV.    Exemptions 1 and 3

The FBI invoked Exemptions 1 and 3 to withhold various information from Stein and Truthout without any non-conclusory reason for doing so, but the Court need not even consider the merits of the FBI's arguments because the FBI simply has not met the procedural or evidentiary requirements for invoking the exemptions.

Regarding Exemption 1, it is one of the defining rules of this exemption that the information must be "classified in accordance with the procedural criteria of the governing Executive Order

as well as its substantive terms," *Lesar v. DOJ*, 636 F.2d 472, 481 (D.C. Cir. 1980), before it can

be withheld. Executive Order 13,526 sets a higher standard for an agency which seeks to classify

information after it has already received a FOIA request for it, requiring that such retroactive

classification can be performed "only if such classification . . . is accomplished on a document-

by-document basis with the personal participation or under the direction of the agency head, the

deputy agency head, or the senior agency official designated under section 5.4 . . . ."  Exec.

Order 13,526 § 1.7(d). However, the FBI has offered no evidence stating that any of these

allegedly classified documents were classified before it received the FOIA requests in question,

nor has it offered evidence stating that any retroactive classification took place "on a document-

by-document basis with the personal participation or under the direction of the agency head, the

deputy agency head, or the senior agency official designated under section 5.4."[14] In fact, the few

classification markings we *can* see show that the documents were classified in January of this

year. (*See* Ex. 10 at 86-87, 97-98, 149-51.) Until the FBI provides more information than the

conclusory statement, "I made certain that all procedural requirements of E.O. 13,526 set forth

above were followed in order to ensure that the information was properly classified" (Fifth

Hardy Decl. ¶ 39), the Court cannot consider this matter to have no genuine issues of material

fact.

The FBI's invocation of Exemption 3 fares no better. The sole argument for why the

withheld information is "intelligence sources and methods" is the conclusory statement, "the FBI

has determined that intelligence sources and methods would be revealed if any of the withheld

information is disclosed to plaintiffs." (Fifth Hardy Decl. ¶ 63.) Plaintiffs do not necessarily

---

[14] The Assistant Attorney General for Administration ("AAG/A") is officially designated as the "senior agency official" for this purpose.  62 Fed. Reg. 36,984 (Sept. 10, 1997).

dispute the fact that the FBI should protect actual intelligence sources and methods, but it cannot simply say that it is doing so without *some* modicum of evidence that they *are* intelligence sources and methods. Not every piece of information that an agency claims is an "intelligence source or method" is recognized as such by the courts. *See*, *e.g.*, *Berman v. CIA*, 501 F.3d 1136, 1146 (9th Cir. 2007) (Presidential Daily Briefs are not intelligence sources and methods); *Navasky v. CIA*, 499 F. Supp. 269, 275 (S.D.N.Y. 1980) (information regarding authors, publishers, and books involved in clandestine propaganda activities are not intelligence sources and methods). As such, the Court cannot consider the practical value of this assertion until the FBI produces some sort of evidence or testimony which would allow Plaintiffs to intelligently oppose the assertion and the Court to intelligently resolve the dispute.

### V.      Exemption 5

Even though the Court graciously allowed the FBI an opportunity to offer non-conclusory evidence supporting its claim that information was exempt under Exemption 5 and the Attorney Work Product and Deliberative Process Privileges for two sets of documents withheld from Truthout and Stein, the FBI failed completely to do so.  First, Mr. Hardy effectively made Stein's case for him when he admitted that the notes in question "are similar on their faces to the types of records that a FOIA processor would create when processing a FOIPA request [but] are dissimilar in their purpose and function." (Fifth Hardy Decl. ¶ 11.) Mr. Hardy then attempts to demonstrate how these records would not have been created *by this particular Legal Administration Specialist* but for the litigation, but the "purpose and function" of the record does not matter if the *record* would be created in the normal course of business. What Mr. Hardy does not—and cannot—say is that if it were not for the litigation, *notes just like these* would not have

been created during the processing of the plaintiff's FOIA request. And *that* is the defining attribute. Stein concedes that if it were not for the litigation, *that* Legal Administration Specialist would not have created records documenting the ongoing search and processing of the request and would not have worked with the requester on the search and would not have placed the records *in the litigation folder*, but that does not change that fact that if it were not for the litigation, *another* Legal Administration Specialist *would* have created records documenting the ongoing search and processing of the request and *would* have worked with the requester on the search and would have placed the records *in the request folder*. Stein concedes that there may be *some* information in these records which would not have been created but for the litigation, but the FBI has given the Court no way to separate that wheat from the chaff of the entire file.

The FBI's renewed invocation of the Deliberative Process Privilege fails for equally conclusory reasons, but this time the FBI cannot even be allowed to *make* the argument it is currently making. As this Court rightly noted, the FBI first claimed that all notes were covered by the privilege, then it explicitly retreated from that position. *Shapiro v. DOJ*, No. 13-555, 2016 U.S. Dist. LEXIS 68476, at *23-24 (D.D.C. May 25, 2016). It has now returned to that position, arguing "that the deliberative-process privilege attaches to the substance of the search slips [and processing notes] as a categorical matter," *id.*, which it explicitly waived. As such, the Court should find that the FBI squandered its chance to provide additional evidence and rule that all information withheld under the Deliberative Process Privilege is non-exempt.


## VI.     Exemption 6

Lastly,[15] the FBI states that even though a significant amount of information from its notes is publicly available in court filings, it simply cannot segregate that information from its records *at all* without violating some unspecified privacy interests. This argument fails for two reasons. First, whether or not the information is reproduced *exactly* in the declarations is irrelevant to this question. If there is information, for instance, in the declarations which states, "The FBI searched the ACS and located three file numbers," there is no additional privacy invasion by turning over the search slip which identifies the file numbers or the office in which they were located. There may be *other* reasons the FBI might want to withhold this information, but it is not for *privacy* reasons.

Second, it strains the imagination to envision a set of notes or search slips which can be written about in significant detail in a sworn declaration but in which *every single piece of information* in that declaration is "inextricably" intertwined with other exempt information. The FBI could easily just unredact the actual *words* used in the declaration, and that would be sufficient. However, by refusing to segregate, the FBI is reemphasizing its disdain for FOIA and this Court's rulings, and the Court should take appropriate action.

## VII.    Conclusion

For the foregoing reasons, Plaintiffs request that Defendant's motion for summary judgment be denied.

---

[15] The FBI forced the issue of whether Stein is entitled to 100 or 500 pages of records, requiring the filing of a motion to reconsider and devoting a significant part of the Fifth Hardy Declaration and its brief to defending its position, all apparently as an exercise to obtain a litigation advantage in bad faith. As Stein's counsel discovered today, despite FBI's counsel's protestations and claims that it had only produced 107 pages because of the fee issue, it actually accounted for all 572 pages. (*See* Ex. 10.) The Court should consider this as yet more evidence that the FBI seeks only to gain whatever litigation advantages it can, even by arguing something that is not actually representative of its actions. Between this and the knowing failure to inform the Court when its policy changed, in apparent hopes of winning the case despite the change, the Court should seriously consider the availability of sanctions against the FBI and its counsel.

Respectfully submitted,


/s/ Jeffrey L. Light
Jeffrey L. Light, Esq.
D.C. Bar #485360
1712 Eye Street, NW
Suite 915
Washington, DC  20006
202-277-6213
Jeffrey@LawOfficeOfJeffreyLight.com


 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiffs*