# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

RYAN NOAH SHAPIRO, *et al.*

       *Plaintiffs*,

   v.

UNITED STATES DEPARTMENT OF
JUSTICE,

       *Defendant*.

Civil Action No. 13-555 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

This is the fourth in a series of opinions addressing the extent to which the Freedom of
Information Act ("FOIA") requires the Federal Bureau of Investigations ("FBI") to disclose
records relating to the FBI's review and response to *prior* FOIA requests.  Plaintiffs are nonprofit
organizations, advocates, and journalists who filed several FOIA requests seeking processing
documents associated with almost a hundred FOIA requests that they or others had previously
submitted to the FBI.  In an earlier opinion, the Court rejected two categorical non-disclosure
policies adopted by the FBI; resolved the parties' disputes regarding several case-specific
withholdings; concluded that a handful of the exemptions invoked by the FBI were not
adequately supported by the existing record; and granted both parties leave to renew their
respective cross-motions for summary judgment as to those exemptions.  *See Shapiro v. United
States Dep't of Justice*, 153 F. Supp. 3d 253 (D.D.C. 2016) ("*Shapiro I*").

Of the many issues raised in this litigation, the FBI is particularly—and understandably—
concerned about its policy of withholding "search slips" and "processing notes" generated in
response to prior FOIA requests.  As the FBI explains, disclosure of these records "might allow a

savvy FOIA requester to identify the rare" occasions when "the FBI has exercised its discretion

to issue a ['No Records'] response to a FOIA request for records that are 'excludable' under

FOIA, and thus would risk the implicit disclosure of highly sensitive information relating to

ongoing investigations, confidential informants, and classified national security matters." *Id.* at

256–57.   As originally formulated, the relevant FBI policy required the withholding of *all* FOIA

processing records generated within the last twenty-five years in responding to FOIA requests

for investigative files or records.  *See* Dkt. 31-1 at 9 (Second Hardy Decl. ¶ 20).  Although the

Court has rejected that sweeping policy as inconsistent with FOIA, *Shapiro I*, 153 F. Supp. 3d at

270–76, the FBI's conundrum regarding how to protect information relating to its "No Records"

responses while complying with FOIA remains at the core of this case.

In its current motion and opposition to Plaintiffs' cross-motion, the FBI asserts a

"targeted" theory of non-disclosure of its "No Records" responses, which it contends is "tailored

to the specific and unique facts of this case," Dkt. 57-3 at 56 (Fifth Hardy Decl. ¶ 116), and it

defends its withholding of other records and information based on an array of FOIA exemptions.

Plaintiffs, in turn, do not challenge many of the FBI's withholdings,[1] but they do challenge the

---

[1]  As the D.C. Circuit has explained, "a motion for summary judgment cannot be 'conceded' for
want of opposition."  *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016).
This does not mean, however, that the Court must assess the legal sufficiency of each and every
exemption invoked by the government in a FOIA case, regardless of whether the requester
contests the government's invocation of that exemption.  In many FOIA cases, like this one, the
dispute between the parties is not fully defined until the government has provided the FOIA
requester with a *Vaughn* index or its equivalent and the FOIA requester has had the opportunity
to decide which, if any, of the asserted exemptions he or she wants to challenge in the litigation.
Where the FOIA requester responds to the government's motion for summary judgment without
taking issue with the government's decision to withhold or to redact specific documents, the
Court can reasonably infer that the FOIA requester does not seek those specific records or
information and that, as to those records or information, there is no case or controversy sufficient
to sustain the Court's jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).
To the extent the FOIA requester does not seek to compel the release of the withheld

FBI's continued withholding of (1) search slips and processing notes relating to those "parent [FOIA] request[s] [that] resulted in . . . 'No Records' response[s]," Dkt. 57-3 at 56 (Fifth Hardy Decl. ¶ 117); (2) certain case file and sub-file numbers, *see* Dkt. 68 at 8–15; (3) search slips and processing notes relating to the murder of Hyram Kitchen, *see id.* at 15–17; (4) information that Plaintiffs contend is not properly treated as classified or subject to the National Security Act, 50 U.S.C. § 3024(i)(1), *see* Dkt. 67 at 16–18; (5) certain information purportedly subject to the attorney-work-product and deliberative-process privileges, *see id.* at 18–19; and (6) segregable portions of search slips and processing notes that the FBI claims reflect protected personal information but that have been discussed in publicly available declarations, Dkt. 67 at 19–20.  In addition, the FBI seeks leave to submit an *ex parte*, *in camera* declaration in support of its motion for summary judgment and its opposition to Plaintiffs' cross-motion for summary judgment.  Dkt. 75.  Plaintiffs both oppose that motion, Dkt. 79, and move to strike the *ex parte*, *in camera* declaration or to make portions of it public, Dkt. 81.[2]

---

information, moreover, the Court need not—and should not—enter summary judgment in favor of the government.  Rather, unlike in *Winston & Strawn* and similar cases, there is simply no dispute to resolve.

[2]  The parties have spilled considerable ink on the additional question whether Plaintiffs are entitled to receive one CD containing one hundred pages of records or one CD containing 500 pages of records free of charge.  In *Shapiro I*, the Court held that this dispute was mooted by the FBI's agreement to process the records at issue free of charge.  153 F. Supp. 3d at 292.  Subsequently, however, plaintiff Stein moved to modify that holding on the ground that the "FBI released a single CD containing 107 out of 572 pages to Stein."  Dkt. 54 at 2.  The FBI, then, briefed the issue on the merits, arguing that Stein received 107 pages, which—according to the FBI—was in excess of the 100 free pages to which he was entitled.  Dkt. 57-1 at 35–37.  Remarkably, Plaintiffs' responsive brief reports that they have now "discovered [that], despite FBI's counsel's protestations and claims that it had only produced 107 pages because of the fee issue, [the FBI] actually accounted for all 572 pages."  Dkt. 67 at 20 n.15.  The Court will, accordingly, deny plaintiff Stein's motion to modify as moot.

As explained below, the Court will grant the FBI's motion for leave to file an *ex parte*, *in camera* declaration and deny Plaintiffs' motion to strike or make public portions of the FBI's *in camera* declarations; will grant in part and deny in part the FBI's renewed motion for summary judgment; and will grant Plaintiffs' cross-motion for summary judgment with respect to the application of Exemption 7(A) to records relating to the murder of Dr. Hyram Kitchen, and will otherwise deny that motion. The Court will allow further briefing on the remaining issues in the case.

## I. BACKGROUND

Much of the administrative and procedural history of this case is set forth in *Shapiro I*, 153 F. Supp. 3d at 257–68, and the Court will not repeat that background here. The more recent procedural history, however, requires some explication.

**A.    *Shapiro I***

In *Shapiro I*, the Court first rejected two categorical policies adopted by the FBI—a policy of withholding *all* search slips and processing notes generated in the past twenty-five years in responding to "parent" FOIA requests for investigative files or records, *id.* at 276, and a policy of withholding *all* "case evaluation forms" used to track and evaluate the performance of FBI FOIA analysts in processing FOIA and Privacy Act requests, *id.* at 282. The Court also evaluated the adequacy of the FBI's search for certain records and evaluated a number of case-specific withholdings. Based on that request-by-request review, the Court required the release of certain records, sustained the FBI's withholding of others, and concluded that it needed additional information or argument to evaluate yet other withholdings.

Three case-specific withholdings, in particular, required further factual and legal development. As to the first, Plaintiffs sought records created by the FBI when it processed

twelve FOIA requests submitted by other FOIA requesters.  *Shapiro I*, 153 F. Supp. 3d at 284.

The FBI released certain records, but declined to release others on the ground that those records

contained information about private parties (other than the Plaintiffs) and were thus exempt from

disclosure under Exemption 7(C).  *Id.* at 284–85; *see also id*. at 286 n.11 (addressing Exemption

6).  Plaintiffs did not dispute the premise of this argument, but they argued that the FBI had

already placed the relevant information in the public domain, and thereby waived the relevant

exemptions.  *Id*. at 285.  The Court agreed with the FBI that at least *some* of information sought

was protected by Exemption 7(C) but noted that neither party had addressed the issue of

segregability.  Id. at 286–87.  The Court, accordingly, granted the FBI leave to file a renewed

motion for summary judgment addressing segregability.  *Id.* at 287.

    The second and third case-specific withholdings requiring further development both

involved application of FOIA Exemption 5, which permits an agency to withhold records that

"would not be available by law to a party other than an agency in litigation with the agency."  5

U.S.C. § 552(b)(5).  As to one set of records, the FBI asserted the attorney-work-product

privilege, arguing that the requested records were prepared in connection with another FOIA

lawsuit, namely *McGehee v. U.S. Dep't of Justice*, 800 F. Supp.2d 220 (D.D.C. 2011).  *Shapiro

I*, 154 F. Supp. 3d at 289.  In response, Plaintiffs maintained that the records at issue were

"substantially similar" to the search slips that the FBI would have prepared in the absence of the

*McGehee* litigation.  *Id.* at 290.  The Court concluded that the dispute between the parties

"expose[d] vacuums both in the record and in the governing precedent," *id*., and granted the FBI

leave "to file an additional evidentiary submission regarding the nature of the withheld

documents," *id.* at 291.  With respect to the second set of records, the FBI asserted the

deliberative-process privilege, arguing that processing notes prepared by FBI analysts in

responding to a FOIA request for records about Hesham Abu Zubaydah, the brother of a

Guantanamo detainee, were deliberative materials prepared in the course of responding to the

FOIA request.  *Id.* at 292–93.  Noting that the FBI had withdrawn its contention that all

processing notes are protected by the deliberative process privilege, the Court concluded that the

FBI had failed to offer any non-conclusory factual support for its contention that the Zubaydah

notes—in particular—were protected.  The Court, accordingly, granted the FBI leave to file a

renewed motion for summary judgment along with a supplemental factual submission further

addressing that issue.  *Id.* at 293.

**B.**     ***Shapiro II***

After issuing its decision in *Shapiro I*, the Court convened a status conference to address

next steps in the litigation.  At the status conference, the Court directed that the parties meet and

confer and submit a joint report to the Court proposing a schedule (1) for the production of the

records that the Court had, to date, ordered the FBI to release and (2) for further briefing and

evidentiary submissions on the handful of questions left unresolved in *Shapiro I*.   The parties

were unable to reach agreement, but set forth their respective positions in their joint report.  *See*

Dkt. 51.

The FBI, for its part, argued that—in light of the Court's conclusion that its categorical

"No Records" policy was inconsistent with FOIA—it should be permitted to assert an array of

additional FOIA exemptions not presented in its original motion or in opposition to Plaintiffs'

cross-motion.  Dkt. 51 at 2–3; *see also* Dkt 21-3 at 25 (First Hardy Decl. ¶ 75 n.20) (asserting

that "[i]nformation in the documents responsive to [P]laintiffs' requests may also be exempt

pursuant to Exemptions 1, 3, 5, 6, 7(A), 7(C), 7(D) and/or 7(F)").  The FBI asserted, moreover,

that this was "a prudent opportunity to inform the Court that" it had, in fact, abandoned its

twenty-five-year categorical "No Records" policy almost ten months earlier—before the Court

had issued its decision on the legality of that policy and, indeed, before oral argument on the

parties' cross-motions for summary judgment.[3]  Dkt. 51-1 at 2–3 (Fourth Hardy Decl. ¶ 5).

Under its new policy, the FBI explained, it only withholds responses seeking FOIA processing

records where the "parent" FOIA request resulted in either a "No Records" or *Glomar*

response—that is, where either no records were found or the FBI neither admitted nor denied that

any records were found.  The FBI, accordingly, sought leave "to submit further briefing [to]

address[] its new targeted treatment" of "No Records" responses.  Dkt. 51 at 3.

> Plaintiffs disagreed.  In their view, the FBI had a full and fair opportunity to raise any and
all applicable FOIA exemptions.  It did not "reserve" the opportunity to raise additional
exemptions should its categorical defenses fail, and, indeed, it "was cognizant enough about the
nature of the proceedings to have invoked Exemption 6 with respect to the names of third parties
in search records." *Id.* at 6.  As Plaintiffs argued, permitting an agency "to play cat and mouse"
by raising new FOIA defenses each time it fails to persuade the Court on the merits of its
previously asserted defense risks interposing the type of delay that FOIA was designed to avoid.
*Id.* (citation omitted).   Plaintiffs, accordingly, urged the Court to limit further briefing and
evidentiary submissions to the specific issues left open in *Shapiro I*.

---

[3]  At oral argument, the Court asked counsel for the FBI:  "Do you know, has the FBI given thought to whether there are narrower ways to address" the "No Records" issue?"  Dkt. 52 at 30. That is, had the FBI "given thought to ways of addressing the concern that it has raised that don't so categorically foreclose people from obtaining information that itself is not problematic?" *Id.* at 31.  Counsel for the FBI responded:  "The answer is I don't know whether something else has been contemplated." *Id.*  He then added, "agency counsel is here," but "I don't know that we can necessarily tell you, your Honor, if other options have been considered." *Id.* at 32.  Although the Court agreed that counsel need not disclose internal deliberations, it appears that the revised policy was not merely a subject of deliberations at that time but had, in fact, been adopted, Dkt. 51-1 at 2–3 (Fourth Hardy Decl. ¶ 5).

In considering the parties' respective positions, the Court applied the standard set forth by the D.C. Circuit in *Maydak v. U.S. Department of Justice*, 218 F.3d 760 (D.C. Cir. 2000), a case that dealt with the related question whether the Court of Appeals should grant an agency's motion to remand a FOIA case in order to permit the agency to assert a new FOIA exemption "based on changed circumstances." 218 F.3d at 764. Under *Maydak*, the D.C. Circuit will permit a remand for the purposes of asserting a new FOIA exemption (1) based on "a substantial change" in the facts or "an interim development in the applicable law," or (2) "where, from pure human error, the government failed to invoke the correct exemption and will have to release information compromising national security or sensitive, personal, private information unless the court allows it to make an untimely exemption claim." *Id.* at 767. In the Court's view, neither *Maydak* exception was applicable. As to the first, the FBI did not contend that any change in law or fact justified the post-summary judgment assertion of new defenses; indeed, the FBI changed its policy months before the Court issued its decision. And, as to the second, the Court concluded that the FBI's failure to bring its change in policy to the Court's attention was more than "a simple mistake." *Shapiro v. U.S. Dep't of Justice*, 177 F. Supp. 3d 467, 471 (D.D.C. 2016) ("*Shapiro II*").

In light of the significant security and privacy issues raised in this case, however, the Court did not strictly apply the *Maydak* standard and agreed that the FBI could submit further "briefing on whether specific records sought by the plaintiffs should be withheld under a FOIA exemption or exclusion because their disclosure would 'compromis[e] national security or sensitive, personal, private information.'" *Id.* at 471 (citation omitted). But the Court made clear that this additional bite at the apple was a limited one and did not open the door for the FBI to litigate, more generally, the merits of its new categorical "No Records" policy. *Id.* at 473.

The Court also rejected the FBI's contention that it had somehow "reserved" the right to raise a series of new document-by-document exemptions. *Id.* at 472.  The Court, nonetheless, permitted the FBI to raise new defenses to the extent necessary to protect "'national security or sensitive, personal, private information.'"  *Id.* at 472–73 (citation omitted).

**C.**     ***Shapiro III***

The FBI moved for reconsideration, arguing that *Maydak* does not apply to cases still pending in the district court but, rather, applies only to cases pending on appeal.  Dkt. 55.  The Court agreed that neither *Maydak* nor any other D.C. Circuit precedent directly addresses when a district court should consider late-asserted defenses in a FOIA action.  *Shapiro v. U.S. Dep't of Justice*, 13-cv-555, 2016 WL 3023980, at *3 (D.D.C. May 25, 2016) ("*Shapiro III*").  Rather, the case law recognizes that the district courts retain substantial discretion to determine whether an untimely FOIA defense has been forfeited.  *Id.*  As the Court further explained, however, that discretion must be guided by the Court's balancing of "principles of fairness, efficiency, and finality," along with due respect for "FOIA's 'statutory goals [of] efficient, *prompt*, and full disclosure of information.'"  *Id.* at *4 (quoting *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003)).

The parties agreed that, in light of the Court's holding in *Shapiro II*, the FBI would be allowed to assert new defenses based on FOIA Exemptions 1, 3, 6, 7(C), and 7(D), and the FBI agreed, in light of *Shapiro II*, to "specifically tailor[ ]" its "No Records" defense to "the unique facts and circumstances of this case."  *Id.*  Over Plaintiffs' objection, moreover, the Court permitted the FBI to raise new defenses under FOIA Exemptions 7(A) and 7(E) and to assert the attorney-client and attorney-work-product privileges under FOIA Exemption 5.  *Id.* at *5.  With respect to the FBI's request that it be allowed to argue that *all* substantive material contained in

search slips and processing notes is protected by the deliberative-process privilege, however, the Court concluded that the equities tipped in favor of Plaintiffs. *Id.* As the Court explained, the FBI had not simply neglected to make this argument prior to the Court's summary judgment decision, but had explicitly waived the same—or substantially the same—argument in its reply brief in *Shapiro I. Id.* at *6. And, finally, the Court held that, even if the FBI did not intend to assert the deliberative-process privilege with respect to *all* of the search materials, opening the door to this late-asserted defense posed "a substantial risk of expanding the scope and duration of the present litigation," without good cause and to the unfair detriment of Plaintiffs. *Id.* at *7.

Taken together, the Court's decisions in *Shapiro II* and *Shapiro III* foreclosed the FBI from raising defenses based on its new, categorical "No Records" policy or on previously unasserted (or waived) claims that the search slips or processing notes are protected by the deliberative-process privilege. But the Court permitted the FBI to assert a "targeted" version of its "No Records" defense, to assert FOIA Exemptions 1, 3, 6, 7(A), 7(C), 7(D), and 7(E), and to assert the attorney-client and attorney-work-product privileges under Exemption 5. *Id.* at *9. In light of these decisions, the parties have now filed a second set of cross-motions for summary judgment, along with a number of related motions.

## II.  ANALYSIS

### A.    Motion For Leave To File *Ex Parte*, *In Camera* Declaration

As an initial matter, the FBI moves for leave to submit a further declaration of David M. Hardy—his eighth so far in this case—*in camera* and *ex parte* in support of its renewed motion for summary judgment. Dkt. 75. Plaintiffs oppose that motion and have also cross-moved to strike or to make public portions of the declaration. Dkt. 81. They also seek to unseal portions of Hardy's third and sixth declarations. *Id.* Plaintiffs contend that Hardy's eighth declaration is

"highly likely" to "include[] inadmissible legal argument," based on what they view as "blatant legal conclusions" in Hardy's previous declarations.  *Id.* at 3.

Although FOIA expressly contemplates *in camera* review of records "to determine whether" they may be withheld in whole or in part, 5 U.S.C. § 552(a)(4)(B), "the use of *in camera* affidavits has generally been disfavored" in the D.C. Circuit, *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 580 (D.C. Cir. 1996).  This is because *in camera* filings are at odds with the "strong presumption in favor of public access to judicial proceedings," *Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d 1268, 1277 (D.C. Cir. 1991), and because *ex parte* proceedings deprive the Court of the "benefit of criticism and illumination" that comes with the arguments of opposing counsel, *Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976).  To be sure, *in camera*, *ex parte* filings are at times necessary to permit the Court to perform its role of ensuring that the agency has appropriately invoked a FOIA exemption without requiring the agency publicly to disclose the very records or information it seeks to protect.  *See, e.g.*, *Barnard v. Dep't of Homeland Sec.*, 598 F. Supp. 2d 1, 16 (D.D.C. 2009).  But before accepting such a filing, the Court "must both make its reasons for doing so clear and make as much as possible of the *in camera* submission available to the opposing party," *Armstrong*, 97 F.3d at 580, and to the public, *see Mobley v. U.S. Dep't of Justice*, 870 F. Supp.2d 61, 68–69 (D.D.C. 2012).

The Court has reviewed the proposed eighth Hardy declaration, and concludes that it contains sensitive information not appropriate for disclosure and which is necessary for the Court to make a decision on the agency's renewed motion for summary judgment, and that it does not contain impermissible legal argument.  Accordingly, the Court concludes that it is appropriate to permit the government to file the declaration *ex parte* and *in camera*.  *See Light v. Dep't of Justice*, 968 F. Supp. 2d 11, 29–30 (D.D.C. 2013).  Plaintiffs also move to make public portions

of Hardy's third and sixth declarations, which were submitted *in camera* and in redacted public

versions.  *See* Dkt. 31-1 at 14–18 (Third Hardy Decl.); Dkt. 90-1 (Sixth Hardy Decl.).  The Court

has reviewed the redacted portions of those declarations, and concludes that they contain

sensitive material that cannot be made public without thereby disclosing the very information

that the agency withheld in the underlying FOIA requests.

Accordingly, the Court will **GRANT** the government's motion to file the eighth Hardy

declaration *in camera* and *ex parte*, and will **DENY** Plaintiffs' cross-motion to strike or make

public portions of the third, sixth, and eighth Hardy declarations.

**B.    "No Records" Responses**

The challenge that the FBI faces in responding to FOIA requests seeking FOIA

processing records relating to "No Records" responses remains at the core of this case.  As

explained in *Shapiro I*, 153 F. Supp. 3d at 258, FOIA permits the FBI to treat certain particularly

sensitive "records as not subject to the requirements of" FOIA, 5 U.S.C. § 552(c), and thus

permits it to issue a "No Records" or "None Found" response to a request for any such records,

*see ACLU of Mich. v. FBI*, 734 F.3d 460, 469–72 (6th Cir. 2013).  This technique proves useful

because the explicit assertion of a FOIA exemption might permit a FOIA requester or other

member of the public to infer the precise information that the FOIA exclusion is intended to

secure.  To take one hypothetical, a FOIA exclusion permits a criminal law enforcement agency,

like the FBI, to maintain the secrecy of the name or identity of a confidential informant.  *See* 5

U.S.C. § 552(c)(2).  Imagine, then, that a FOIA requester sought to confirm rumors that John

Adams was a confidential informant, and thus submitted a FOIA request seeking all FBI

investigative records including any reference to John Adams.  If the FBI were to respond that it

had responsive records that were subject to a FOIA exemption—such as Exemption 7(A) or

7(C)—John Adams' safety and the FBI's investigation might be put in jeopardy.  But, because the FBI is allowed to treat records that are subject to exclusion as though they did not exist for purposes of FOIA, little can be inferred from a "No Records" response.  The FBI would simply respond that it did not locate any records responsive to the FOIA request.

Plaintiffs' practice of filing FOIA requests for records generated in responding to prior FOIA requests, however, puts this practice to the test.  Because the FBI inevitably generates records, such as search slips and processing notes, when it receives any FOIA request, the FBI faces a conundrum.  It cannot, as the Court previously explained, simply "deny that the search slip exits . . . because search slips are created as a matter of course."  *Shapiro I*, 153 F. Supp. 3d at 270.  It cannot release the search slip, which even in redacted form would likely reveal "the existence of the file that the FBI told the requester did not exist."  *Id.*  And it cannot withhold "the entire search slip under one of the exemptions, because the withholding itself would 'tip off' the requester that the search slip must refer to a file that he or she had previously been told did not exist."  *Id.*

In its original motion for summary judgment and opposition to Plaintiffs' cross-motion, the FBI relied on a sweeping policy to address this problem:  As the Section Chief of the FBI's Records/Information Dissemination Section ("RIDS") explained, "the FBI has determined that the only way for it to protect information that is excludable is to deny access to [all] processing records relating to FOIA/Privacy Act requests related to criminal investigative, national security, counterintelligence, or foreign intelligence information pursuant to Exemption 7(E)" for a period of twenty-five years.  Dkt. 21-3 at 25 (First Hardy Decl. ¶ 75); *see also* Dkt. 31-1 at 9 (Second Hardy Decl. ¶ 20).   The Court concluded in *Shapiro I* that this categorical policy was

unsustainable under Exemption 7(E).  *Shapiro I*, 153 F. Supp. 3d at 270–76.  The Court, in particular, identified three hurdles that the FBI failed to clear:

First, Exemption 7(E) applies only to "records or information compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7).  Although search slips and processing notes might, at times, replicate "records or information compiled for law enforcement purposes," the FBI had failed to show—or even to argue—that "*all* of the withheld search slips in their *entirety*" replicate such records or information.  153 F. Supp. 3d at 272.  Second, Exemption 7(E) applies only where the release of the records at issue "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions" that would "risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  The FBI, however, failed to explain how disclosure of the search slips would reveal a law enforcement technique, procedure or guideline; rather, it merely asserted that "the FBI's use of informants is a law enforcement technique" and that other information contained "on search slips would reveal law enforcement techniques and procedures."  Dkt. 31 at 21–22; see also Dkt, 31-1 at 10 (Second Hardy Decl. ¶ 22).  Third, the Court recognized that discrete pieces of seemingly innocuous information might be subject to protection on a "mosaic" theory, but held that the FBI did not, and could not, defend its categorical "No Records" policy on such a theory.[4]  153 F. Supp. 3d at 274–75.  In short, the FBI's categorical policy did not seek to protect individual mosaic tiles, which when placed together could reveal protected information,

---

[4]  The government's only mention of the "mosaic" theory in its briefing on its initial motion for summary judgment was the argument that search slips relating to criminal investigations or national security information "are compilations of myriad types of information about criminal and/or national security investigations that reveal the size, nature, location(s), sensitivity, classification, and status of FBI investigations" and that "release of such compilations related to multiple subjects could establish a mosaic that would allow individuals to alter their behaviors and/or adopt countermeasures to conceal behaviors or avoid detection."  Dkt. 21-1 at 22.

but rather sought to "amass a haystack in which to hide" the small handful of protected search slips. *Id.* at 275.

In its present motion and opposition brief, the FBI offers both a different policy and a different—or, at least refined—theory. Rather than asserting a blanket policy applicable to *all* search slips and FOIA processing notes generated in response to requests for investigative records or files over the past twenty-five years, the FBI asserts a case-specific exemption applicable to only the forty-two "No Records" responses to the fifty-eight "parent" FOIA requests submitted by Ryan Shapiro. Dkt. 57-3 at 59 (Fifth Hardy Decl. ¶ 121). As to these materials, the FBI asserts that "within the holistic context of Shapiro's universe of inter-related domestic terrorism requests," release of FOIA processing records relating to the forty-two "No Records" responses risks disclosure of confidential techniques and procedures used by the FBI to hide or obscure its use of the FOIA exclusion, 5 U.S.C. § 552(c). *Id.* at 55–63 (Fifth Hardy Decl. ¶¶ 114-129). The FBI posits that—at least in the current context, which involves an array of FOIA requests relating to domestic terrorism investigations—the implicit disclosure of the *existence* or the *nonexistence* of the use of the FOIA exclusion poses a risk of circumvention of the law. Either way, according to the FBI, disclosure of the redacted portions of the search slips and processing notes risks "reveal[ing] the scope of the FBI's [domestic terrorism] program in the United States, the scope and focus of its investigative efforts, and strategies it plans to pursue in preventing and disrupting domestic terrorist activity." *Id.* at 62 (Fifth Hardy Decl. ¶ 128). Disclosure would, as a result, "allow animal extremist terrorists to gauge the FBI's strengths and weaknesses within certain areas of the [domestic terrorism] arena and [to] structure their activities in a manner that avoids detection and disruption by the FBI." *Id.*

The Court concludes that the FBI's case-specific assertion of Exemption 7(E) now clears the hurdles described in *Shapiro I*.   The first of those hurdles requires that the "records or information" at issue have been "compiled for law enforcement purposes."  5 U.S.C. § 552(b)(7). In *Shapiro I*, the Court rejected the FBI's efforts to protect *all* search slips from disclosure, holding that "[i]n the absence of a showing that *all* of the withheld search slips . . . constitute records 'compiled for law enforcement purposes,' the FBI's categorical reliance on Exemption 7 fails at the threshold."  *Shapiro I*, 153 F. Supp. 3d at 272.  That is not the case, however, with respect to the FBI's narrowed assertion of Exemption 7(E), which applies only to those search records that correspond to forty-two "No Records" responses the FBI provided to Shapiro.  To be sure, those search records were not themselves compiled for law enforcement purposes; rather, they were compiled to comply with FOIA.  But to the extent they replicate information that *was* compiled for law enforcement purposes, that distinction is immaterial.  *See FBI v. Abramson*, 456 U.S. 615, 624 (1982) (Exemption 7 applies to records that "contain[] or essentially reproduce[] all or part of a record that was previously compiled for law enforcement reasons").  Nor does it make a difference whether any underlying records exists or not.  Exemption 7 protects "*information* compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7) (emphasis added), and the absence of a record can reflect "information" compiled by the agency just as much as the existence of a record.  To continue the hypothetical started above, a search slip showing that the FBI relied on the § 552(c) exclusion in responding to a request for records containing the name John Adams might support an inference that Adams was a confidential informant, while a search slip showing that, in fact, no records were found might support a contrary inference.  Either way, however, release of the search slip would risk disclosing

information compiled for law enforcement purposes—i.e., the FBI's list of informants in the Continental Congress.

Reliance on Exemption 7(E) also requires that release of the records or information at issue "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions," and would thereby "risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  As the Court has previously explained, the fact that the FBI is permitted to issue "No Records" responses based on the § 552(c) exclusion is not a confidential "technique" or "procedure"—rather, that fact is embodied in the statute and judicial precedent.  *Shapiro I*, 153 F. Supp. 3d at 273.  Although the FBI has now further elaborated on its arguments, it is safe to say that it still has not identified a relevant law enforcement "technique" or "procedure" with crystal clarity.  It appears, however, to make two arguments.  First, it contends that "the use of § 552(c) as a subterfuge to prevent disclosure of the existence or non-existence of sensitive law enforcement records" constitutes a "law enforcement technique" every bit as much as, for example, use  of "intentional misinformation from an undercover agent or informant."  Dkt. 57-3 at 56, 58 (Fifth Hardy Decl. ¶¶ 116, 119).  Although the existence of "the § 552(c) technique . . . is publicly known, its use in connection with any particular FBI 'No Records' response is not."  *Id.* at 58 (Fifth Hardy Decl. ¶ 120).  And, second, it argues that "the FBI's assembling and vetting of . . . investigative information to understand the inter-relation[ship] of varied [domestic terrorism] investigations, targets, and priories—resulting in 'No Records' responses to Shapiro's requests—is itself a protective mechanism, technique, or [procedure] necessary to safeguard the FBI's national [domestic terrorism] investigative program."  *Id.* at 61 (Fifth Hardy Decl. ¶ 126).

The Court in convinced that information contained in the limited universe of search slips now at issue risks disclosing a "technique" or "procedure" that could aid in the "circumvention of the law." 5 U.S.C. § 552(b)(7)(E).  As explained above, there is little meaningful difference between records compiled for law enforcement purposes and information relating to the search of those records.  In both cases, knowledge of the existence or non-existence of an investigation, for example, might assist those seeking to evade detection.  And, more importantly for present purposes, the existence or non-existence of such an investigation would likely reflect important information about the "scope of the FBI's [domestic terrorism] program in the United States, the scope and focus of its investigative efforts, and strategies it plans to pursue in preventing and disrupting domestic terrorist activity."  Dkt. 57-3 at 62 (Fifth Hardy Decl. ¶ 128).

The FBI does not argue that disclosure of any single unredacted search slips, or even disclosure of all of the search slips at issue, would—standing alone—disclose protected law enforcement techniques or procedures.  It does contends, however, that the information that it has withheld under Exemption 7(E) forms part of a mosaic that, when viewed as a whole, would reveal confidential law enforcement techniques and procedures and would risk circumvention of the law.  Dkt. 57-1 at 29.  This "mosaic" theory finds support in both Supreme Court and D.C. Circuit precedent recognizing that "bits and pieces of data 'may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself.'"  *CIA v. Sims*, 471 U.S. 159, 178 (1985) (quoting *Halperin v. CIA*, 629 F.2d 144, 150 (D.C. Cir. 1980)).  As a result, in cases implicating national security, courts have permitted the government to rely on the mosaic theory to justify withholding agency records that form only a small piece of a larger puzzle.  *See, e.g.*, *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 928–29

(D.C. Cir. 2003).  The courts have provided little guidance to date, however, about how the mosaic theory applies in particular contexts.

At one level, there is little or no limit to the scope of the mosaic theory—almost anything a law enforcement agency does could form at least a miniscule piece of a massive mosaic that might reveal confidential information.  In *Shapiro I*, the Court faced a variant of this scenario. There, the FBI argued that *every* search slip and processing note generated in response to a FOIA request for investigative records over the past twenty-five years was subject to protection because "the only way for [the FBI] to protect information that is excludable is to deny access to" all FOIA processing records generated in responding to "parent" FOIA requests for investigative records or files.  Dkt. 21-3 at 25 (First Hardy Decl. ¶ 75).  As the Court explained in *Shapiro I*, that claim of protection was far too broad—rather than seeking to protect "bits and pieces of data" that, when pieced together, formed a mosaic, the FBI simply sought "to amass a haystack in which to hide" the rare use of § 552(c).  153 F. Supp. 3d at 275; *see also id*. at 272 (noting that "[i]n the most recent fiscal year, the Justice Department invoked an exclusion 145 times—or in 0.23% of the over 60,000 requests that it processed").  If the mosaic theory were applicable in that context, it would be difficult to discern what, if any, limits might apply.

As reframed in the FBI's renewed motion for summary judgment, however, the mosaic theory admits of reasonable limits and is well supported by the FBI's declarations and the record. As noted above, the FBI has limited its assertion of Exemption 7(E) to search processing records relating to the forty-two "parent" FOIA requests as to which the FBI provided Shapiro with "No Records" responses.  Dkt. 57-3 at 59 (Fifth Hardy Decl. ¶ 121).  And, importantly, the FBI has explained how these requests fit "within the holistic context of Shapiro's universe of inter-related domestic terrorism requests."  *Id.* (Fifth Hardy Decl. ¶ 122).  Among other things, eleven of the

"parent" requests are subject to ongoing litigation in a case in which Shapiro has sought to compel further responses to eighty-one requests relating to domestic terrorism.  *Id.*  Those requests, in turn, "refer to '64 inter-related individuals, organizations, incidents, and/or publications related to animal rights extremism,'" and, because the "requests all relate to one of the FBI's domestic terrorism priorities, . . . the hundreds of thousands of pages of records requested by [Shapiro] . . . must [themselves] be reviewed for any possible 'mosaic effect'" before they can be released.  *Shapiro v. U.S. Dep't of Justice*, Civ. No. 12-313 (BAH), Dkt. 61 at 1–2.  On top of this, Shapiro has also filed an additional 260 FOIA requests related to animal rights extremism.  Dkt. 57-3 at 60 (Fifth Hardy Decl. ¶ 124).  As explained by a senior official in the FBI's Counterterrorism Division, the release of at least some of the information sought by Shapiro in his "parent" FOIA requests would have "significant deleterious effects . . . on the FBI's on-going efforts to investigate and combat domestic terrorism in the United States."  Dkt. 57-4 at 5.  As the FBI points out, however, the mosaic concern does not turn on the fact that Shapiro is the requester in this case; his extensive history of FOIA requests happens to have created the background of public information against which the risk of disclosing the information at issue here must be assessed, but that analysis would be the same regardless of who requested the records.  Dkt. 74 at 24.

In short, the search slips at issue are part of a complex mosaic relating to on-going FBI operations, involving one of the FBI's domestic terrorism priorities, which has been the subject of a staggering number of FOIA requests seeking information about many specific individuals and organizations.  In this context, the Court concludes that the FBI has met its modest burden of showing "logically how the release of [the processing records] might create a risk of

circumvention of the law." *PHE, Inc. v. U.S. Dep't of Justice*, 983 F.2d 248, 251 (D.C. Cir. 1993).

## C.    File Numbers

The government also seeks to withhold "sensitive case file numbers or sub-files," on the theory that the "release of [the] file numbering convention [would] identif[y] the investigative interest or priority given to such matters." Dkt. 57-3 at 63 (Fifth Hardy Decl. ¶ 130).  As the FBI's Record Management Manual explains, "[a] typical case file number consists of a three-digit classification number, a one- or two-digit alpha designation for subdivisions under that subject, a two-letter designation for the O[riginating] O[ffice], and then a case number assigned sequentially by the system." Dkt. 67-3 at 16.  A typical file number, for example, takes the following form: 91B-BA-124576. *Id.*  In that example, at least according to Plaintiffs, "91" is the classification number, and refers to various types of bank robbery or bank extortion, *id.* at 25; "B" is the alpha designation, which further narrows the classification to "burglary, larceny, $10,000 and over," *id.*; BA indicates the Originating Office, *id.* at 16, which is Baltimore in the example; and 124576 is the case number, *id.*  Although Plaintiffs point to various public sources that define the FBI's classification codes, Hardy attests that these "lists of FBI classification codes are neither current nor complete;" that the "classifications can and do change over the years;" and that "[t]he full list is," in fact, "itself a classified documents because many classification codes are classified." Dkt. 74-2 at 7 (Seventh Hardy Decl. ¶ 14).

The FBI's case for withholding "sensitive" file numbers again rests on the mosaic theory. Specifically, the FBI contends that the release of the file numbers "would allow criminals and other nefarious persons to determine where and what types of investigation the FBI is conducting or what types of activities by particular people may be or have been under FBI scrutiny, and thus

change their patterns of behavior accordingly to avoid FBI scrutiny." Dkt. 74 at 27–28.  File

numbers, the FBI adds, "can show that a particular type of investigation . . . occurs more

regularly with respect to a particular Office of Origin," allowing those subject to investigation to

create a "'heat map' of areas . . . where engaging in anarchist extremism is more or less risky

from a law enforcement standpoint."  *Id.* at 28.  For this reason, the FBI contends, the file

numbers were properly withheld under Exemption 7(E).

Plaintiffs disagree, arguing that the FBI's theory fails at every step of the Exemption 7(E)

analysis: the file numbers, they argue, were not "compiled for law enforcement purposes;" if

they *were* compiled for law enforcement purposes, they do not reveal "techniques or procedures

for law enforcement;" and, in any event, their disclosure would not risk circumvention of the

law.  Dkt. 68 at 11 & n.10, 12.  In addition, Plaintiffs argue that any risk of circumvention can

easily be resolved by segregating the "originating office" designation, leaving the classification

number, alpha designation, and case number.  Dkt. 84 at 22–24.  As explained below, the Court

agrees with the FBI's reading of Exemption 7(E) and is persuaded that the exemption can

apply—at least in theory—to relevant portions of sensitive file numbers.  The Court cannot

determine on the present record, however, whether all or some portion of the 122 pages of

materials at issue pose the type of risk that the FBI posits.

Plaintiffs first argue that FBI file numbers are not "*compiled* for law enforcement

purposes," but rather are *created* "solely for the purpose of tracking and organizing documents

and other ministerial functions."  Dkt. 84 at 17.  To "compile," Plaintiffs insist, is to "[p]roduce

(something, especially a list, report, or book) by assembling information collected from other

sources" or to "[c]ollect (information) in order to produce something."  Dkt. 68 at 11 n.10; *see

also John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 153 (1989).  Applying this definition,

they argue that FBI file numbers are not "compiled" but, instead, are simply "created or generated . . . using a standardized naming convention, much as one would use to create Bates numbers." Dkt. 84 at 17.  And, even if "the FBI could be said to have 'compiled' the file numbers," Plaintiffs further argue, "they were not complied for 'law enforcement purposes;'" rather, FBI file numbers "exist solely for the purpose of tracking and organizing documents and other ministerial functions."  *Id.*

The Court is unconvinced.  Although Plaintiffs are correct that file numbers serve an administrative purpose—permitting the FBI to track and organize documents—they ignore the fact that the tracking system is based on information collected for law enforcement purposes. The relevant file numbers are not generated at random but, rather, incorporate information compiled in the course of enforcing the criminal laws.  A file number may show—or at least suggest—for example, that the Baltimore field office of the FBI has opened a bank robbery investigation and that over $10,000 was stolen from the bank.  As relevant here, moreover, a collection or "mosaic" of FBI file numbers might show—or at least suggestion—whether the FBI devotes a small amount of attention, or a great deal of attention, to animal rights extremism in each relevant region of the country.  That information is, as a matter of ordinary usage, "compiled" in the FBI filing system—that is, it is "collected and assembled from various sources or other documents."  *John Doe Agency*, 493 U.S. at 153.  It is not difficult to conclude, moreover, that a "rational nexus" exists between the compilation of this information and "one of the agency's law enforcement duties."  *Pratt v. Webster*, 673 F.2d 408, 419 (D.C. Cir. 1982); *see also Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 32 (D.C. Cir. 1998).

Plaintiffs' second argument—that disclosure of the file numbers would not reveal a "technique or procedure"—fares no better.  Plaintiffs appear to concede that the FBI's

23

"investigative priorities" qualify as "techniques . . . for law enforcement" for purposes of

Exemption 7(E), *see* Dkt. 68 at 12, but argue that disclosure of the file numbers would not, in

fact, reveal the agency's investigative priorities, Dkt. 84 at 6–9.  The Court agrees, as have other

judges in this district, that file numbers can, at least at times, reveal law enforcement "techniques

or procedures."[5]  Rather than challenge that premise, Plaintiffs contend that a host of

"confounding factors reduce the possibility that any information about a field office['s]

prioritization can be discerned from the file numbers" at issue here.  *Id.* at 8.  Disclosure of

records showing that more "insider trading investigations" originated in the New York field

office than the Anchorage field office would not, according to Plaintiffs, signal a "higher priority

on investigating insider trading in" New York than in Alaska, but would more likely reflect

differences in staffing levels, population and "frequency with which the crime is actually being

committed or reported in these jurisdictions."  *Id.*  In addition, Plaintiffs assert, "[f]ield offices'

priorities change over time, as do the number of case files being opened;" "[a] field office may

also create a file number at the behest of another agency or field office;" and the aggregate

number of files bearing the relevant designation do not reflect "the duration, complexity,

importance, or allocation of resources to an investigation."  *Id.*

None of this, however, undercuts the FBI's contention—at least in theory—that the

particular information Plaintiffs seek could create a "heat map" of the areas of the Country

---

[5]  *See Thelen v. U.S. Dep't of Justice,* 169 F. Supp. 3d 128, 142 (D.D.C. 2016) (Bureau of
Alcohol, Tobacco, Firearms, and Explosives file numbers); *Shapiro v. U.S. Dep't of Justice*, 78
F. Supp. 3d 508, 520 (D.D.C. 2015) (FBI file numbers); *Ortiz v. U.S. Dep't of Justice*, 67 F.
Supp. 3d 109, 123 (D.D.C. 2014) (Drug Enforcement Administration and Immigration and
Customs Enforcement codes); *Adionser v. Dep't of Justice*, 33 F. Supp. 3d 23, 25–26 (D.D.C.
2014) (Drug Enforcement Administration Geographic Drug Enforcement Program codes); *Miller
v. U.S. Dep't of Justice*, 872 F. Supp. 2d 12, 28–29 (D.D.C. 2012) (Drug Enforcement
Administration file numbers).

"where engaging in anarchist extremism is more or less risky from a law enforcement

standpoint." Dkt. 74-2 at 8 (Seventh Hardy Decl. ¶ 15).  As a matter of common sense, one

might assume that more insider trading cases are investigated and brought in the FBI's New

York field office than in its Anchorage office.  It is less obvious that a similar assumption applies

to animal rights extremism.  Moreover, as the FBI observes, although a single file number may

be unilluminating, Plaintiffs' request must be construed as part of a larger mosaic.  Understood

in that manner, aggregate information about the number of files or documents that bear a

designation for domestic terrorism/animal rights extremism may shed considerable light on the

overall resources that a particular office of the FBI has devoted, or is devoting, to investigating

related crimes.  The conclusion that the disclosure of FBI file numbers *can*—in theory—reveal

sensitive law enforcement techniques, however, does not answer the question whether disclosure

of the file numbers at issue here *would*, in fact, do so.  That question, moreover, is closely related

to Plaintiffs' third contention—that disclosure of the file numbers could not reasonably be

expected to "risk circumvention of the law."  Dkt. 68 at 12.

Turning to Plaintiffs' third contention, the parties dispute the threshold question whether

the "risk of circumvention" requirement applies to records that disclose either "guidelines" or

"techniques and procedures," as Plaintiffs contend, Dkt. 84 at 10, or only to records that disclose

"guidelines," as the FBI asserts, Dkt. 74-2 at 9–10 (Seventh Hardy Decl. ¶ 19).[6]  Although this is

---

[6] As Plaintiffs correctly observe, the FBI's multiple declarations contain extensive legal
argument, much of which does not appear in the agency's briefs.  Because Plaintiffs have fully
responded to those arguments, the Court will consider them and will not accept Plaintiffs'
invitation to strike the Seventh Hardy Declaration on that ground.  *See* Dkt. 84 at 10 n.3.  The
FBI should ensure in the future, however, that it includes any legal argument that it wants the
Court to consider in its briefs.

an issue that has divided the circuits, Plaintiffs are correct that the D.C. Circuit applies the "risk of circumvention" requirement "both to records containing guidelines *and* to records containing techniques and procedures." *Pub. Employees for Envt'l Resp. v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 204 n.4 (D.C. Cir. 2014) (emphasis added). The proper resolution of the factual question whether disclosure of the file numbers would reveal a law enforcement technique that a "nefarious" person might then exploit to circumvent the law is, however, far less clear.

As Hardy explains, the FBI has not adopted a blanket policy of exempting all file numbers, but has limited its application of the exemption to certain "sensitive" file numbers. Dkt. 74-2 at 7 (Seventh Hardy Decl. ¶ 14). In particular, he attests that, in the present context, "where broad requests seek information about a large number of cases, releasing file numbers can show that a particular type of investigation—for instance, [d]omestic [t]errorism and/or anarchist extremism—occurs more regularly with respect to a particular [o]ffice of [o]rigin." *Id.* at 8 (Seventh Hardy Decl. ¶ 15). "That information," in turn, "would allow anarchist extremists to focus their attentions [on] other geographical areas where the FBI is not devoting the same resources to that type of criminal activity." *Id.* In other words, according to Hardy, when considered in the aggregate, the file numbers could be used to create "a 'heat map'" that "[a]narchist extremists could then use . . . to circumvent the law by committing criminal acts in the areas where they determine, based on the released FBI file numbers[,] [that] there is less of an FBI investigative focus." *Id.*

Plaintiffs, in response, ask the Court to infer from the fact that the FBI has not invoked Exemption 7(A) that the relevant file numbers do not relate to any ongoing investigations.[7]   Dkt. 68 at 13.   That inference may or may not be correct, and, even if it is correct, it is far from clear that the risk of disclosure of purely historical law enforcement priorities would be insufficient to meet the "relatively low bar" under Exemption 7(E) for "withholding" records that reveal law enforcement techniques.   *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011).   But, even though Exemption 7(E) does not impose "a highly specific burden of showing how the law will be circumvented," it does "require[] that [the agency] 'demonstrate[] logically how the release of [the requested] information might create a risk of circumvention of the law.'"   *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009) (alterations in original) (quoting *PHE, Inc. v. U.S. Dep't of Justice*, 983 F.2d 248, 251 (D.C. Cir. 1993)).   Applying this standard, the Court is not convinced that the mere fact that investigation is closed severs the "logical" link between release of the information and the risk of circumvention; knowing that the FBI has historically focused its enforcement efforts in a particular region, for example, might aid a criminal in circumventing the law.   But, at the same time, the Court cannot discern from the existing record whether the

---

[7]   Plaintiffs contend that the FBI's limitation of its non-disclosure policy to certain "sensitive" file numbers is improper because, where case-by-case analysis is required, the utility of adopting a "workable," categorical rule "evaporates," Dkt. 84 at 13, and because the case-by-case standard accords the FBI "complete discretion over which file numbers will be released," *id.* at 14.   That contention, however, is at odds with the core notion that FOIA encourages the release of more, rather than less, information, and it mistakenly treats "workability" as an all or nothing concept. There is no reason, for example, that the FBI could not reasonably conclude that releasing file numbers showing that most insider trading cases are staffed out of the FBI's New York field office—where the largest U.S. stock exchanges are located—would not pose a risk of circumvention, while also concluding that the principle locus of its domestic counterterrorism efforts should be kept confidential.   Under the prevailing D.C. Circuit law, that is precisely the type of risk assessment to which the courts should ordinarily defer.   *See, e.g.*, *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011).

relevant investigations are open, whether they closed in the past few years, or whether they closed decades ago.

The Court does know, however, that three of the relevant documents relate to the FBI's search for records about the murder of Hyram Kitchen, discussed below, and Plaintiffs contend that the FBI closed its investigation of Kitchen murder "over 25 years ago." Dkt. 68 at 16. If that is true, the FBI needs to do more to explain how its disclosure of information revealing the originating office for that investigation, or any other information, poses a present day threat of circumvention of the law. And, more generally, given the lack of evidence about if, and when, the underlying investigations at issue were closed, the Court cannot grant the FBI's motion for summary judgment without additional evidence and explanation regarding the specific risk posed by disclosure of the file numbers in the 122 documents at issue.

Finally, Plaintiffs contend that the FBI has released many of the file numbers at issue in response to other FOIA requests and thus, under the "official-acknowledgment" doctrine, *see ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013), it has waived any otherwise applicable FOIA exemptions. Dkt. 84 at 22. Because Plaintiffs did not raise this contention until they filed their final reply brief, the Court would ordinarily conclude that Plaintiffs had waived the argument. *See, e.g.*, *Consol. Edison Co. of N.Y. Inc. v. FERC*, 347 F.3d 964, 970 (D.C. Cir. 2003) (finding an argument waived when its proponent "failed to develop it fully until its reply brief"). The concern that the FBI has not had an opportunity to respond to this argument, however, is obviated by the fact that parties will, in any event, need to submit additional briefs addressing whether the age of any or all of the underlying files at issue undercuts the FBI's reliance on Exemption 7(E). The Court, accordingly, will direct that the parties meet and confer regarding Plaintiffs' official acknowledgment argument and, if they are unable to reach agreement, the FBI

may address the issue in its renewed motion for summary judgment.  Finally, the parties should

meet and confer regarding the Plaintiffs' contention that the FBI's concern about circumvention

can be addressed by simply redacting the originating office designation from the relevant file

numbers, and, if necessary, should brief that issue as well.

The Court, accordingly, will deny both the FBI's and Plaintiffs' cross-motions for

summary judgment with respect to the FBI's withholding of the file numbers included in records

described in footnote 54 of the fifth Hardy declaration.  Dkt. 57-3 at 63 n.54.

## D.    Records Relating to the Murder of Hyram Kitchen

FOIA Exemption 7(A) permits a law enforcement agency to withhold "records or

information compiled for law enforcement purposes" to the extent those records or that

information "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C.

§ 552(b)(7)(A).  In response to Plaintiffs' requests, the FBI relies on Exemption 7(A) "in a

limited fashion to protect the names of targets of pending investigations and also file numbers

associated with pending investigations."  Dkt. 57-1 at 21.  In response, Plaintiffs challenge only

one application of Exemption 7(A) to their FOIA requests—the FBI's withholding of "case notes

and [a] search slip connected with [Shapiro's] request for records [relating to] the murder of

Hyram Kitchen."  Dkt. 68 at 15.  In particular, Plaintiffs contend that "the FBI ceased conducting

its investigation into the murder of Dr. Kitchen over 25 years ago."  *Id.* at 16.  The FBI, in turn,

agrees that the investigation of Dr. Kitchen's murder "is closed" and that "Exemption 7(A) is not

applicable."  Dkt. 74-2 at 11 (Seventh Hardy Decl. ¶ 22).  The FBI further explains, however,

that it had separately withheld the file number associated with the murder investigation pursuant

to Exemption 7(E) and that it continues to assert that exemption.  *Id.*  Presumably accepting the

FBI's concession, Plaintiffs did not further address the applicability of Exemption 7(A).

In light of this background, the Court will grant summary judgment in favor of Plaintiffs with respect to the FBI's assertion of Exemption 7(A) as to the FOIA processing records associated with the "parent" FOIA request for records relating to the murder of Dr. Kitchen.  To the extent the FBI seeks to withhold the file numbers referenced in documents 596–97 and 600, the Court will deny both the FBI's and Plaintiffs' cross-motions for summary judgment for the reasons set forth in section C above.

**E.    Classified Records**

*1. Exemption I*

The FBI asserts FOIA Exemption 1 to protect documents classified at the "SECRET" level.  That exemption provides that an agency may withhold records that are:

> (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order.

5 U.S.C. § 552(b)(1).  Executive Order 13,526, in turn, provides that "[i]nformation may be originally classified" if four conditions are satisfied: (1) an original classification authority must classify the information; (2) the information must be "owned, produced by or for, or . . . under the control of the United States Government;" (3) the information must fall within one of several categories specified in the Executive Order; and (4) the original classification authority must determine that the unauthorized disclosure of the information "reasonably could be expected to result in damage to the national security."  75 Fed. Reg. 707 (Dec. 29, 2009).  The Court must afford "*substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record," *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981), and "little proof or explanation is required beyond a plausible assertion that information is properly classified," *Morley v. CIA*, 508 F.3d 1108, 1124 (D.C. Cir. 2007).

In his fifth declaration, Hardy attests that the records at issue were properly classified under the Executive Order.  *See* Dkt. 57-3 at 20 (Fifth Hardy Decl. ¶¶ 37–38).  Plaintiffs, in turn, raise only one argument, asserting that the redacted documents released to them appear to have been classified in January 2016, *after* the FOIA request for those documents was submitted.  *See* Dkt. 67 at 17 (citing Dkt. 67-4 at 86–87, 97–98, 149–51).  In such cases, Executive Order 13,526 provides a heightened standard for classifying documents, allowing previously undisclosed documents that are subject to a FOIA request to be classified "only if such classification meets the requirements of th[e] [Executive] [O]rder *and* is accomplished on a document-by-document basis with the personal participation or under the direction of the agency head, the deputy agency head, or the senior agency official designated under . . . this order."  75 Fed. Reg. at 711 (emphasis added).  Plaintiffs argue that Hardy does not attest that the classifications in this case met that heightened standard.

In his seventh declaration, however, Hardy attests that Plaintiffs have misinterpreted certain markings on the documents and that the relevant records have, in fact, been classified since at least 2007 and were never subsequently declassified.  *See* Dkt. 74-2 at 12 (Seventh Hardy Decl. ¶ 24).  Hardy explains that, when the FBI locates classified records that are responsive to a FOIA request, the Record/Information Dissemination Section ("RIDS") . . . independently reviews the documents to determine whether they remain properly classified and whether it is possible to segregate classified from unclassified information.  *Id.* at 12–13 (Seventh Hardy Decl. ¶ 25).  During that review process, RIDS redacts the segragable classified portions of the requested documents and processes the remainder of the document for other FOIA exemptions.  *Id.*  According to Hardy, "[t]he markings on the documents to which Plaintiffs refer . . . were placed there by RIDS as part of its review;" they "do not demonstrate

that these documents were classified or reclassified after receipt of Plaintiffs' FOIA requests;"

and, in fact, the "documents were classified years before Plaintiffs submitted their FOIA

requests." *Id*.

The Court concludes that the FBI has provided ample evidence that the information in

question was properly classified before Plaintiffs' FOIA requests, and will, accordingly, grant

the FBI's renewed motion for summary judgment as it relates to information exempted under

FOIA Exemption 1.

   2.  *Exemption 3*

Exemption 3 applies to information "specifically exempted from disclosure by statute . . .

if that statute—(A)(i) requires that the matters be withheld from the public in such manner as to

leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to

particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A). In this case, the FBI asserts

Exemption 3 in connection with documents it asserts are protected by the National Security Act

of 1947 ("NSA"), which requires the Director of National Intelligence to "protect intelligence

sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). There is no dispute

that the NSA qualifies as a withholding statute under the terms of Exemption 3. *See, e.g.*, *CIA v.*

*Sims*, 471 U.S. 159, 169 (1985); *Kirkorian v. Dep't of State*, 984 F.2d 461, 465 (D.C. Cir. 1993);

*Goland v. CIA*, 607 F.2d 339, 350 (D.C. Cir. 1978).

The Supreme Court has construed the relevant language of the NSA to protect "all

sources of intelligence that provide, or are engaged to provide, information the [a]gency needs to

perform its statutory duties with respect to foreign intelligence." *Sims*, 471 U.S. at 169–70. As

the D.C. Circuit has explained, moreover, "Exemption 3 differs from other FOIA exemptions in

that its applicability depends less on the detailed factual contents of specific documents; the sole

issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage." *Goland*, 607 F.2d at 350. Nevertheless, an agency invoking Exemption 3 must demonstrate its applicability "in a nonconclusory and detailed fashion," *id*. at 351, and must provide "the kind of detailed, scrupulous description [of the withheld documents] that enables a District Court judge to perform a searching de novo review," *Church of Scientology of Ca., Inc. v. Turner*, 662 F.2d 784, 786 (D.C. Cir. 1980).

Here, the FBI relies on portions of Hardy's fifth and seventh declarations to support its invocation of the NSA as the relevant withholding statute. In his fifth declaration, Hardy attests that "the FBI has determined that intelligence sources and methods would be revealed if any of the withheld information is disclosed to plaintiffs," Dkt. 57-3 at 31 (Fifith Hardy Decl. ¶ 63), and that "disclosure of this information presents a bona fide opportunity for individuals to develop and implement countermeasures, resulting in the loss of significant intelligence information, sources, and methods relied upon by national policymakers and the I[ntelligence] C[ommunity] to safeguard national security," *id*. at 31 n.32. And in his seventh declaration, Hardy elaborates that "[t]he FBI cited Exemption 3 . . . to protect information related to . . . the National Intelligence Program ("NIP")," which "consists of all programs, projects, and activities of the Intelligence Community, as well as any other programs of the Intelligence Community designated jointly by the Director and the head of a United States department or agency or by the President." Dkt 74-2 at 13 (Seventh Hardy Decl. ¶ 26). "The activities of the Intelligence Community," he further explains, "include the strategic use of various sources to obtain intelligence related information and are through a myriad of available methods of intelligence gathering, not all of which are known to the public." *Id.* at 13–14.

Although the FBI's reliance on the NSA is entitled to substantial deference, the declarations it has provided to date are simply too broad and conclusory to allow the Court to perform the type of "searching de novo review" required by the governing precedent.  *Church of Scientology*, 662 F.2d at 786.  As a result, the Court will deny both the FBI's and Plaintiffs' cross-motions for summary judgment as to Exemption 3.  The FBI may file a renewed motion for summary judgment, along with a supplemental declaration providing nonconclusory details in support of its assertion of Exemption 3, and Plaintiffs may renew their cross-motion in response.

**F.      Attorney Work Product and Deliberative Records**

Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  To qualify for this exemption, a document must "satisfy two conditions:  its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  The FBI asserts the deliberative-process and work-product privileges in response to requests from plaintiffs Truthout and Stein.  That privilege protects documents prepared by, or at the direction of, an attorney in anticipation of litigation.  *See*, *e.g.*, *FTC v. Boehringer Ingelheim Pharm., Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015).  To determine whether a document was prepared "in anticipation of litigation," courts in this circuit inquire "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation."  *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010).

34

With respect to "Truthout's single FOIA request for processing notes created by FBI analysts in responding to a request about Hesham Abu Zubaydah, the brother of a Guantanamo detainee," *Shapiro I*, 153 F. Supp. 3d at 292, the FBI initially asserted the deliberative-process privilege, along with other defenses.  In *Shapiro I*, the Court concluded that the FBI had explicitly waived its initial contention that *all* of the agency's FOIA processing notes are protected by the privilege, and that it had failed to offer any "non-conclusory support" for application of the privilege to the "processing notes compiled in processing Truthout's [specific] request." *Id.* at 293.  The Court granted the FBI, however, the opportunity to file a renewed motion, supported by a supplemental declaration explaining why the privilege applies.  *Id.*

The FBI responded to this invitation with two lines of factual support, both contained in the fifth Hardy declaration.  Under the first line of support, Hardy attests that FOIA "[p]rocessing notes and search slips *by their very nature* are considered working papers . . . and recommendations."  Dkt. 57-3 at 35 (Fifth Hardy Decl. ¶ 74) (emphasis added).  Nothing in this factual proffer, however, addresses the specific records that Truthout has requested, and, as explained in *Shapiro I*, the Court has already held that the FBI has waived the (implausible) contention that all FOIA search records are *by their very nature* protected by the deliberative process privilege.  153 F. Supp. 3d at 293; Dkt. 65 at 16.  Under the second line of support, however, Hardy attests that at least some of the records at issue were "prepared in responding to other FOIA lawsuits filed by [P]laintiffs," and that those records "reflect[] deliberations" about the cases and the FBI's "litigation strategy and defense."  *Id.* at 36 (Fifth Hardy Decl. ¶ 76).  The Court, accordingly, will grant the FBI's motions for summary judgment with respect to its reliance on the deliberative-process privilege to withhold records in response to the Truthout FOIA request, but only to the extent those records fall within the second factual justification.

35

Moreover, even as to those records, the FBI is obligated to segregate factual material from deliberative material, *see EPA v. Mink*, 410 U.S. 73, 91 (1973); *Montrose Chem. Corp. v. Train*, 491 F.2d 63, 66 (D.C. Cir. 1974), unless the records are also subject to the attorney-client privilege.

With respect to Stein's FOIA request, the FBI withheld several documents relating to the *McGehee v. Department of Justice* litigation, *see* 800 F. Supp. 2d 220 (D.D.C. 2011), based on the deliberative-process privileged.  As the Court explained in *Shapiro I*, 153 F. Supp. 3d at 290, a document that "would have been created 'in substantially similar form' regardless of the litigation" is not protected by the privilege, *Boehringer*, 778 F.3d at 149 (quoting *Deloitte*, 610 F.3d at 138), but the privilege does shield a document "even though it serves multiple purposes, so long as [it] was prepared because of the prospect of litigation," *Deloitte*, 610 F.3d at 138. Here, Stein's contention is not that the search slips he has requested *would* have been created absent the *McGehee* litigation, but rather that they *should* have been.  *See Shapiro I*, 153 F. Supp. 3d at 290.  In *Shapiro I*, the Court noted that Stein's argument raised a "novel question of law," but added that the argument was seemingly at odds with the need to permit lawyers to "work[] with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Id.* at 291 (quoting *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)).   But, given the lack of detail in the second Hardy declaration, and the absence of any controlling legal precedent, the Court denied the FBI's motion for summary judgment in order to permit more complete development of the record.  *Id.*

Hardy's fifth declaration resolves the question.  As Plaintiffs stress, Dkt. 67 at 18–19, Hardy avers that the "records created by the litigation paralegal are similar on their faces to the types of records that a FOIA processor would create when processing" a FOIA request.  Dkt. 57-

3 at 7 (Fifth Hardy Decl. ¶ 11) (footnote omitted).  But Hardy also identifies significant ways in

which the litigation paralegal's search and accompanying records differed from that of an

ordinary FOIA processor:

> These printouts [of searches performed by the paralegal] represent a more
> expansive search than actually required by the FOIA and include information later
> eliminated as not responsive or outside the scope of the request.  Handwritten notes
> appear on several of the pages reflecting a joint analysis between litigation counsel
> and the litigation paralegal of each and every search "hit" and the basis for
> including or eliminating the item from the potentially responsive materials.  Notes
> on the page reflect comparisons between the FOIA processor's search and the
> paralegal's searches.  The paralegal's search was conducted in response to the
> litigation attorney's request for specific facts for use in the development of
> litigation strategy, negotiations, and litigation risk assessment.  The results of the
> paralegal's search were reviewed by both she and the litigation attorney for the
> above-described purposes.

*Id.* at 9 (Fifth Hardy Decl. ¶ 18).  Similarly, Hardy attests that printouts from the FBI's File

Automated Control System "and analytical notes taken on them were . . . created and compiled

by the litigation paralegal at the direction of the litigation attorney, and were relied up on by the

attorney to refine litigation and negotiation strategy and responses."  *Id.* at 10 (Fifth Hardy Decl.

¶ 20).

Plaintiffs "concede[] that there may be *some* information in these records which would

not have been created but for the litigation," but they argue that "the FBI has given the Court no

way to separate that wheat from the chaff of the entire file."  Dkt. 67 at 19.  That is precisely the

concern the Court flagged for the parties in *Shapiro I*.  As Court explained, "[o]ne reason for

observing the bright-line rule that any records created 'because of' litigation are protected—no

matter how similar they look to records that should otherwise have been created during the

ordinary course of business—is that, once litigation is brought, such records are in fact unlikely

to be compiled in precisely the same manner as they might have been before litigation was

contemplated."  *Shapiro I*, 153 F. Supp. 3d at 291.  That is, the prospect of litigation "can

introduce strategic considerations into the compilation of even the most mundane records—

strategic considerations that might be revealed to one's adversary were such records to be made

public through discovery, or, as here, through the operation of FOIA." *Id.*  In short, the difficulty

in separating the "wheat from the chaff" is not a product of the FBI's lack of diligence, but the

inherent difficulty in determining whether and how records prepared *because of* litigation differ

from records that might have been created in the absence of litigation.

   Given that the records at issue were created "because of" the *McGehee* litigation; the

evidence that those records differ in at least certain material respects from the records that would

have been generated in the absence of the litigation; and the inherent difficulty in determining

how the pendency of the litigation affected each specific entry, the Court will grant the FBI's

motion for summary judgment as to the records requested by plaintiff Stein relating to the

*McGehee* litigation.

**G.      Official-Acknowledgment Doctrine**

   The parties also dispute one final issue left unresolved in *Shapiro I*.   In particular,

plaintiffs National Security Counselors ("NSC") and Stein sought records created by the FBI in

processing twelve FOIA requests submitted by other people.  *Shapiro I*, 153 F. Supp. 3d at 284.

The FBI released six redacted pages but otherwise denied the requests pursuant to FOIA

Exemptions 6 and 7(C).  According to the FBI, the FOIA requests sought records about third

parties—the original requesters—and that information could not be released without the express

consent of those third parties, evidence that the third parties were deceased, "or a clear

demonstration that the public interest in disclosure outweigh[ed] the personal privacy interest[s]"

at stake.  *Id.* at 284–85.  Plaintiffs did not, at least in general, dispute the applicability of

Exemptions 6 and 7(C), but instead argued that the FBI had waived any protection when it

disclosed the content of the records at issue in "sworn declarations" submitted in litigation

relating to the FBI's responses to the "parent" FOIA requests. *Id.* at 285. Applying the "official-

acknowledgment" doctrine, the Court concluded that the FBI "properly withheld *some* material

under Exemption 7(C)," because the declarations filed in these earlier cases were "neither as

specific nor as detailed as the underlying search slips and processing notes." *Id.* at 286. But that

did not resolve the issue because it is settled law in this circuit that an agency must disclose any

"non-exempt portions of a document . . . unless they are inextricably intertwined with exempt

portions," *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) (citation

omitted), and "[n]either party . . . ha[d] addressed the segregability question." *Shapiro I*, 153 F.

Supp. 3d at 286. The Court, accordingly, denied the parties' cross-motion, but granted the FBI

leave to supplement the record with a further declaration addressing segregability. *Id.* at 287.

Hardy now represents that the FBI has "conducted a detailed segregability review of the

processing notes and search slips withheld in full in response to the" relevant NSC and Stein

requests. Dkt. 57-3 at 5 (Fifth Hardy Decl. ¶ 8). Based on this review, he attests "that the

information contained in the processing notes and search slips was more detailed and specific

than the summaries of such information included in the declarations;" "that any similar non-

exempt information in the processing notes and search slips was so inextricably intertwined with

exempt material not reproduced in the relevant declarations that no information could reasonably

be segregated for release without invading the third parties' privacy interests;" and that "[a]ny

attempt to segregate this intertwined material would only produce disjointed words, phrases, or

sentences that taken separately or together would have minimal or no informational content." *Id.*

Plaintiffs, in turn, respond that the FBI could easily segregate and turn over information in the

underlying search slips corresponding to information contained in the publicly available

declarations.  They argue that if, for example, a declaration reveals that a search located three file numbers, there would be no additional privacy problem with turning over the search slips identifying the file numbers or the office in which they were located.  Dkt. 67 at 20.  And, they assert that "it strains the imagination to envision a set of notes or search slips which can be written about in significant detail in a sworn declaration but in which *every single piece of information* in that declaration is 'inextricably' intertwined with other exempt information," and that the FBI "could easily just unredact the actual *words* used in the declaration."  *Id.*

The FBI's most recent submission goes a long way toward addressing the Court's question regarding segregability.  The Court agrees that, to the extent the redacted records would reveal no more than "disjointed words, phrases, or even sentences which taken separately or together have minimal or no information[al] content," the FBI need not "commit significant time and resources to" redacting the protected information.  *Mead Data Cent. v. U.S. Dep't of the Air Force,* 566 F.2d 242, 261 n.55 (D.C. Cir. 1977).  But, in light of Plaintiffs' colorable contention that the declarations submitted in the prior litigation revealed significant details about the searches and that the FBI has waived any right to object to the disclosure of that *information*, and given the potential value to Plaintiffs and the public of an ability to look behind the types of agency declarations that typically dominate FOIA litigation, the Court will require the FBI to file copies of the search slips from one randomly selected FOIA request, from which only the non-public information has been redacted.  To avoid any dispute between the parties regarding the selection of this sample, the Court has randomly selected FOIA request number 1146761, one of the twelve cases NSC sought records from in FOIA request number 1174832-000.  *See* Dkt. 21-4 at 45.

The Court will, accordingly, deny the parties' cross-motions for summary judgment relating to the segregability of non-public information contained in the records responsive to the NSC's second FOIA request and Stein's first FOIA request.  After the FBI submits the sample, redacted records described above, the parties may renew their respective motions for summary judgment regarding this issue.

**CONCLUSION**

For the reasons stated above, the FBI's motion for leave to file Hardy's eighth declaration *ex parte* and *in camera* is hereby **GRANTED**; Plaintiffs' motion to strike the eighth Hardy declaration and to make public portions of the third and sixth Hardy declarations is hereby **DENIED**. The FBI's motion for summary judgment is hereby **GRANTED** as to the application of Exemption 7(E) to the search processing records relating to the forty-two "parent" FOIA requests for which Shapiro received "No Records" responses; as to the application of FOIA Exemption 1; and as to the application of Exemption 5 to the *McGehee* litigation documents, and to the Zubaydah documents to the extent that they reflect deliberations about the FBI's litigation strategy and defense; and the motion is otherwise **DENIED**. Plaintiffs' cross-motion for summary judgment is hereby **GRANTED** as to the application of Exemption 7(A) to records relating to the murder of Dr. Hyram Kitchen, and the motion is otherwise **DENIED**.

The parties are hereby **ORDERED** to appear for a status conference at 10:00 a.m. on April 5, 2017, in Courtroom 21.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  March 6, 2017