**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RYAN NOAH SHAPIRO, *et al.*,     )<br>   )<br>Plaintiffs    )<br>   )<br>v.    )<br>   )<br>U.S. DEPARTMENT OF JUSTICE,    )<br>   )<br>Defendant.    )<br>   ) | Civil Action No. 13-0555 (RDM) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The FBI has now gotten its third bite at the apple, but despite a number of opportunities, it has failed to provide adequate justifications for its withholdings. Nine declarations from the agency have been submitted, but not a single one of them details the basis for the continued withholdings. Instead, the FBI merely reiterates the conclusory statements that this Court has already found to be deficient. Having failed to meet its burden after multiple rounds of briefing, summary judgment should be denied to the FBI and granted to Plaintiffs as to the remaining withholdings in the case. Additionally, because the FBI has not yet conducted an adequate search and the Court has not adjudicated the adequacy of the search, summary judgment should be denied to the FBI and granted to Plaintiffs on this issue as well.

## I.       File Numbers Withheld Only Pursuant to Exemption 7(E)

The Court expressed concern about the applicability of Exemption 7(E) to purportedly sensitive file numbers because it "cannot discern from the existing record whether the relevant investigations are open, whether they closed in the past few years, or whether they closed decades ago." (Slip op. at 27-28.) The FBI has now clarified that as to the approximately 36

pages for which the FBI cited solely FOIA Exemption 7(E)-4, the file numbers "were not related to pending investigations[.]" (Ninth Hardy Decl. ¶ 11.) However, the FBI has refused to supplement the record with any information from which the Court can discern whether the investigations "closed in the past few years, or whether they closed decades ago." (Slip op. at 28.) The Court's analysis need proceed no further. As the FBI bears the burden of proof on the applicability of exemptions and has been given a fair opportunity to come forward with facts to meet this burden, the Court must deny the FBI's motion for summary judgment as to the file numbers on the 36 pages withheld only pursuant to Exemption 7(E)-4 and grant Plaintiffs' cross motion as to these withholdings.[1]

However, the FBI's argument as to the propriety of withholding these file numbers fails for two additional and related reasons—disclosure of the file numbers at issue here would not reveal sensitive law enforcement techniques, and disclosure could not reasonably be expected to risk circumvention of the law. As this Court explained, "The conclusion that the disclosure of FBI file numbers *can*—in theory—reveal sensitive law enforcement techniques, however, does not answer the question whether disclosure of the file numbers at issue here *would*, in fact, do so. That question, moreover, is closely related to Plaintiffs' third contention—that disclosure of the file numbers could not reasonably be expected to 'risk circumvention of the law.'" (Slip op. 25.)

---

[1] As to the remaining file numbers on 86 pages for which the FBI asserted both Exemption 7(E) and Exemption 7(A), Plaintiffs do not concede that the withholding of these file numbers is proper. However, given that the Court already granted summary judgment to the FBI with respect to its assertion of Exemption 7(A) in every instance except for the Hyram Kitchen murder, no useful purpose would be served by a ruling from the Court as to whether Exemption 7(E) also applies to these file numbers. Plaintiffs reserve the right to challenge both the Exemption 7(A) and Exemption 7(E) issue in any appeal, as well as any Exemption 1 and/or Exemption 3 justifications for withholding the same material. This does not apply to the 5 pages for which the FBI asserted Exemption 7(E) and Exemption 3 but not Exemption 7(A), as discussed below.

The Ninth Hardy Declaration provides no new evidence from which the Court might answer the "factual question [of] whether disclosure of the file numbers would reveal a law enforcement technique that a 'nefarious' person might then exploit to circumvent the law is[.]" (Slip op. 26.) Indeed, on this issue the Ninth Hardy Declaration does little more than quote from an earlier declaration filed in this case. (Ninth Hardy Decl. ¶ 7, citing Seventh Hardy Decl.) Again, after being given an opportunity to create a proper factual record, the FBI has refused to do so and has therefore not met its burden of showing that disclosure of the file numbers at issue here would reveal a law enforcement technique that could reasonably be expected to lead to circumvention of the law.

Even if the Court were to find the existing factual record sufficient to support an invocation of Exemption 7(E) as to entire file numbers, the FBI has not come forward with a persuasive justification as to why it could not segregate the file number. The FBI previously argued that disclosure of many file numbers could reveal a "heat map" of the areas of the country "where engaging in anarchist extremist is more or less risky from a law enforcement standpoint." (Seventh Hardy Decl. ¶ 15.) As Plaintiffs noted, however, this concern would be mooted if the FBI redacted the office of origin portion of the file number and released the remainder.

The FBI has now changed gears and takes the position that "disclosure of *any* part of the file number within the context of the file itself provides a requester the framework necessary to essentially determine the exact matter which prompted the FBI to open an investigation." (Ninth Hardy Decl. ¶ 9) (emphasis added). Yet, beyond stating that suspects could "apply[] a mosaic analysis," (Ninth Hardy Decl. ¶ 10) the FBI provides no explanation of how the disclosure of *any* part of the file number would permit a suspect to determine the "exact matter"[2] which prompted

---

[2] In using the term "matter," the FBI appears to be referring to the type of investigation (e.g.,

the FBI to open an investigation. Nor does the FBI explain how an individual who learns about the "exact matter" which prompted the FBI to open an investigation could reasonably be expected to use that information to circumvent law enforcement.

Further, the remaining file numbers at issue all pertain to closed investigations. While the Court found this fact not to be dispositive under the FBI's "heat map" theory, the Court should find the closed nature of the investigation severs the logical link between the (segregated) file number and the risk of circumvention of law enforcement under the FBI's new "exact matter" theory. The Court's previous opinion hypothesized that even file numbers for closed investigations might be exempt because "knowing that the FBI has historically focused its enforcement efforts in a particular region, for example, might aid a criminal in circumventing the law." (Slip op. at 27.) In contrast, virtually nothing about the FBI's "focus" would be revealed by disclosure of redacted file numbers for closed cases, at least not in any way that would aid a criminal in circumventing the law.

The FBI also complains that segregating the file numbers "would require a substantial amount of resources to sift through the entirety of the records at issue here and re-conduct the exhaustive analysis it conducts when determining if it will release a file number." (Ninth Hardy Decl. ¶ 10.) This argument is without merit.

First, the FBI will not need to sift through the "entirety of the records" at issue here, but only the 36 pages which remain in dispute. Second, even if there were a larger volume of records at issue, the resources required to reprocess the file numbers would be minimal. There would be no need to conduct any "exhaustive analysis," as the FBI would simply need to adjust its redactions so that the redaction box covered only the office of origin, not the entire file number. The small

_____

anarchist extremist) as opposed to the particular event that resulted in the opening of the investigation.

effort required to modify logically grouped redactions does not come anywhere near the "high standard of proof" that is required of an agency claiming that segregation is too burdensome. *Mead Data Cent., Inc. v. United States Dep't of the Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977) ("On the other extreme, if a large proportion of the information in a document is non-exempt, and it is distributed in logically related groupings, the courts should require a high standard of proof for an agency claim that the burden of separation justifies nondisclosure or that disclosure of the non-exempt material would indirectly reveal the exempt information.") The D.C. Circuit has also explained that while re-processing might in some cases be time-consuming, it is a cost the agency has brought on itself by refusing to disclose in the first instance the nonexempt information. *Id.* at 261.

Finally, the law of segregability in this Circuit does not support the FBI's position, even if a substantial amount of resources were involved in re-processing. The D.C. Circuit has explained that "it should be legitimate to consider the information content of the non-exempt material which a FOIA plaintiff seeks to have segregated and disclosed," and therefore "a court may decline to order an agency to commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together *have minimal or no information content*." *Id.* at 261 n.55 (emphasis added). The D.C. Circuit has never held that an agency need not "commit significant time and resources to the separation of" portions of a document which have *more* than "minimal or no information content." Here, the FBI does not claim that the file numbers, absent the office of origin, convey "minimal or no information content." To the contrary, the FBI takes the position that disclosure of any portion of the file number would convey too *much* information.

5

## II.       File Numbers Withheld Pursuant to Exemptions 7(E) and 3

Like its purported justification for Exemption 7(E) above, the Ninth Hardy Declaration is conspicuously devoid of any new information regarding the reasons for withholding information under the National Security Act ("NSA") and Exemption 3 in conjunction with Exemption 7(E). Because, as noted above, the Court has already granted summary judgment to the FBI on virtually all of its Exemption 7(A) assertions, and the Court has already granted summary judgment to the FBI on all of its Exemption 1 assertions, the only Exemption 3 issues in play pertain to five pages: Stein-108-109, 133, and 138-39. (Ninth Hardy Decl. at 4 n.4.) However, the FBI's argument for why this material meets the definition of "intelligence sources and methods" is just as *ipse dixit* as its argument for why it meet the definition of a law enforcement technique. As discussed herein and in numerous other filings, a simple unadorned claim that file or sub-file numbers are "sensitive" without any particularized justification for that designation does not render them automatically exempt under Exemption 7(E). Nor does it mean that the numbers are "unclassified intelligence sources and methods employed as law enforcement techniques, procedures or guidelines." (*Id.* ¶ 6.)

Despite being given specific instructions by the Court to justify its Exemption 3 withholdings with greater particularity, the FBI offers merely this "new" evidence regarding these admittedly unclassified file numbers:

> [T]he FBI cited FOIA Exemption 3 in conjunction with . . . FOIA Exemption 7(E) on 11 pages to protect unclassified intelligence sources and methods employed as law enforcement techniques, procedures or guidelines and thus would qualify as both an intelligence source and method under Exemption 3 an a law enforcement technique under Exemption 7(E), in this case, sensitive file numbers or sub files. The nexus to the NSA of 1947 lies in the investigative and/or foreign intelligence information . . . gathered within FBI files (and by extension their respective file numbers). The FBI routinely cites FOIA Exemption 3 pursuant to the NSA of 1947 to protect not only certain unclassified intelligence sources and methods in the form of law enforcement techniques, procedures or guidelines, but also classified sources and methods because

the nature of FBI information is investigative intelligence the FBI uses to gather evidence in pursuit of its mission.

When the FBI applies FOIA Exemption 3 pursuant to the NSA of 1947, context matters in determining the applicability of this particular statutory authority. . . . [In one instance involving different pages] the FBI determined 266A classification files could be released following its file vetting process outlined in the Seventh Hardy Declaration at ¶ 19. Accordingly, the FBI determined that the redacted file numbers on these pages and similarly on others of the total pages withheld pursuant to FOIA Exemption 3, warranted protection as their release would reveal classified intelligence sources in the form of a file number, and other instances would reveal unclassified intelligence sources and methods in the form of file numbers.

(*Id.* ¶¶ 6-7.)

This explanation falls far short of any reasonable expectation the Court might have enjoyed about what new evidence the FBI would bring back to it. When dissected, this testimony merely asserts that: (a) the FBI withheld unclassified intelligence sources and methods which qualify as intelligence sources; (b) these unclassified intelligence sources and methods are file or sub-file numbers; (c) the nature of FBI information is investigative intelligence the FBI uses to gather evidence in pursuit of its mission; (d) context matters; and (e) the FBI determined that the withheld file numbers would reveal unclassified intelligence sources and methods. Despite asserting that "context matters," the FBI provides *no* context for its determination either that the file numbers withheld from these five pages constitute either intelligence sources and methods or law enforcement techniques, let alone "sensitive" ones.

When considering this declaration, not only for purposes of this argument but in its entirety, the Court might be guided by the musings of the judge in Truthout's other FOIA case against the FBI:

Nonetheless, the court must state that Hardy's unredacted declaration is the quintessence of bureaucratic obfuscation. While attempting to decipher its meaning, I recalled one of Orwell's observations when confronted with such writing:

> As soon as certain topics are raised, the concrete melts into the abstract and no one seems able to think of turns of speech that are not hackneyed: prose consists less and less of words chosen for the sake of their meaning, and more and more of phrases tacked together like the sections of a prefabricated henhouse.

George Orwell, "Politics and the English Language," *in* A Collection of Essays 162, 165 (Anchor Books 1954). Which begs the question, why did the government resort to hackwork here? Orwell again:

> The inflated style is itself a kind of euphemism. A mass of Latin words falls upon the facts like soft snow, blurring the outlines and covering up all the details. The great enemy of clear language is insincerity. When there is a gap between one's real and one's declared aims, [the writer] turns, as it were, instinctively to long words and exhausted idioms, like a cuttlefish squirting out ink.

*Truthout v. DOJ*, 20 F. Supp. 3d 760, 768-69 (E.D. Cal. 2014).

## III.    File Numbers Associated with Hyram Kitchen Murder

Specifically with respect to the file numbers associated with the Hyram Kitchen murder, it is hard to imagine what information might be revealed by disclosure of the file numbers being withheld that has not already been revealed by disclosure of the underlying document. The Memorandum produced to Plaintiff regarding the Hyram Kitchen murder already discloses the nature of the investigation ("Full domestic security/terrorism investigation"), the date on which the investigation was initiated ("March 28, 1988"), the originating office ("OO: LA" [Los Angeles]), the subject of the investigation ("Subject: Animal Liberation Front (ALF")), the file number assigned by the originating office ("100A-LA-87472"), and the reason the investigation was initiated ("KNOX COUNTY SHERIFF'S OFFICE issued a nationwide teletype broadcast for police departments, detailing the death of Dr. KICTHEN and alluding to possible involvement of militant animal rights groups.") (Ex. 2.) Thus, there is no reason to believe that disclosure of the withheld file numbers could reasonably be expected to risk circumvention of the law.

## IV.   File Number Inconsistencies

The FBI concedes that inconsistencies exist relating to the agency's processing of purportedly sensitive file numbers, but claims that such inconsistencies are "inadvertent," and argues that "the justification for withholding them still stands." (Ninth Hardy Decl. ¶ 12.) However, this argument largely misses the point as to the significance of the inconsistencies.

Assuming *arguendo* that the inconsistent redactions of file numbers are indeed "inadvertent," the inconsistencies in redacting file numbers are so numerous as so suggest a general sloppiness in the FBI's overall handling of file numbers. Plaintiffs have submitted more than four dozen examples (and can submit many more upon request), and the frequency with which these inconsistencies arise cautions against conferring substantial weight to the FBI's declarations. *Cf. Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 169, 181 (D.D.C. 2013) (finding that withholding a small number of previously disclosed pieces of information and names of 12 non-employees "does not rise to the level of 'general sloppiness' that would caution against conferring substantial weight to the CIA's declarations.")

Due to the absence of the full adversarial process in FOIA cases, Plaintiffs and the Court must rely upon the accuracy of the *Vaughn* declaration provided by the agency. Even "inadvertent" inconsistencies in redacting file numbers are unacceptable. As the D.C. Circuit has explained, "FOIA litigants are entitled to assume that the agency's *Vaughn* index is accurate in every detail. And so is the court. There is no excuse for submitting a *Vaughn* index that contains errors, even minor ones. We expect agencies to ensure that their submissions in FOIA cases are absolutely accurate." *Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992).

Sloppiness in handling purportedly "sensitive" information also suggests that the information may not really be as sensitive as claimed. If the release of "sensitive" file numbers was truly as

harmful to law enforcement as the FBI suggests, one would not expect the FBI to inadvertently release dozens of such file numbers in so many different files. The FBI can only reasonably expect a measure of deference on its predictive judgment about the harm which would flow from disclosure of file numbers where it consistently withholds those file numbers. When the FBI repeatedly *releases* purportedly "sensitive" file numbers, it is reasonable for the Court to infer that disclosure of sensitive file numbers would *not* pose harm.

Ultimately, the inconsistencies in redaction of file numbers underscore the importance of a detailed, non-conclusory *Vaughn* index. The FBI already claims to "determine on a case-by-case basis if a file number can be released without harm or must be redacted[.]" (Ninth Hardy Decl. ¶ 12.) If the FBI articulated in its *Vaughn* index "on a case-by-case basis" how it reached each determination, the Court and Plaintiffs could understand the basis for the FBI's decision, and the FBI would likely catch many improper redactions in the process of preparing its explanations. To the extent that for a particular case the disclosure of this information cannot be revealed on the public record, the FBI might submit such factual information in appropriate situations to the Court *ex parte* for *in camera* review.

On the current state of the record, it is impossible for the Court to determine which file numbers were properly withheld as "sensitive" and which ones were not. The FBI appears to believe that withholding of file numbers under Exemption 7(E) is justified by the agency simply declaring that the file numbers are sensitive. The inconsistencies in the FBI's redaction of supposedly "sensitive" file numbers call for closer judicial scrutiny of the withholdings in this category.

## V.        File Numbers Officially Acknowledged

"For information to qualify as 'officially acknowledged,' it must satisfy three criteria: (1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure." *ACLU v. United States DOD*, 628 F.3d 612, 621-22 (D.C. Cir. 2011). Here, the FBI has previously released to Plaintiff Shapiro myriad file numbers in response to his animal rights-related FOIA requests, including but not limited to the parent requests for the search slips at issue here. These previously released file numbers are "as specific as" the file numbers in the search slips, "match the information previously disclosed," and were made public through an official disclosure (i.e., a previous FOIA release). Plaintiff Shapiro has therefore clearly satisfied his initial burden of proof of "pointing" to specific information in the public domain. *See Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983) ("a plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld.")

Attached as Exhibit 1 to this brief is a list of animal rights-related file numbers previously officially disclosed to Plaintiff Shapiro. This list is admissible under Fed. R. Evid. Rule 1006 as substantive evidence that prior disclosure of the file numbers in fact occurred. The content of the documents from which the file numbers were extracted are too voluminous to be conveniently examined in court. Pursuant to Fed. R. Evid. Rule 1006, duplicates of the underlying documents from which the list was produced have been made available to the FBI on a CD.[3] Additionally,

---

[3] The CD was mailed to the FBI at the time Plaintiffs filed their reply in support of their cross-motion for summary judgment in October 2016.

by way of example, Plaintiff Shapiro is filing as exhibits two such underlying documents containing previously released file numbers. (Ex. 3; Ex. 4.)

Plaintiff Shapiro has accordingly met his burden of production, but the FBI has not met its ultimate burden of persuasion. *See Davis v. United States Dep't of Justice*, 968 F.2d 1276, 1279 (D.C. Cir. 1992) ("The ultimate burden of persuasion, to be sure, remains with the government, but a party who asserts that material is publicly available carries the burden of *production* on that issue") (emphasis in original). Although the FBI "compil[ed] a list of all file numbers previously released to Plaintiff Shapiro in the underlying 58 FOIA requests at issue for him in this litigation," (Ninth Hardy Decl. ¶ 13) such a list constitutes only a fraction of the file numbers officially disclosed to Plaintiff Shapiro and contained in Appendix A. The FBI has therefore not met its burden of persuasion.[4]

## VI.      Withholdings Under Exemption 5 Previously Rejected by the Court

The Court was very explicit when it adjudicated the FBI's previous motion regarding Truthout's request. First it once again rejected the FBI's claim that processing notes and search slips were inherently exempt under the deliberative process privilege. (Slip op. at 35.) Then it endorsed the FBI's second, more limited argument that "at least some of the records at issue were 'prepared in responding to other FOIA lawsuits filed by [P]laintiffs,' and that those records 'reflect[] deliberations' about the cases and the FBI's 'litigation strategy and defense.'" (*Id.*) It ordered: "The Court, accordingly, will grant the FBI's motions for summary judgment with respect to its reliance on the deliberative-process privilege to withhold records in response to the

---

[4] The FBI claims that after comparing the list of file numbers it prepared to the file numbers in the case notes and search slips, it "released those previously released file numbers to Plaintiff." (Ninth Hardy Decl. ¶ 13.) However, it is unclear when this comparison was conducted. No release has been made to Plaintiff Shapiro recently.

Truthout FOIA request, *but only to the extent those records fall within the second factual justification*." (*Id.* at 35-36 (citation omitted) (emphasis added).)

Despite this unambiguous order, when the FBI reluctantly released redacted copies of the records previously withheld in full, it redacted a significant amount of information under Exemption 5 and the deliberative process privilege (coded as "b5-2") which does not fall under this narrow description, for one simple reason: the information was created before the *Truthout* lawsuit was even *filed*, sometimes by over a year. The complaint in *Truthout v. Department of Justice* was filed in the Eastern District of California on October 18, 2012. (Ex. 5.) All of the redactions made pursuant to the deliberative process privilege on pages FBI-214-245 were entries in the FBI FOIA Data Processing System ("FDPS") created between April 15, 2011 and October 5, 2012, before the FBI ever *knew it was being sued*. (*See* Ex. 6 at 8-40.)[5] Therefore, there is no possibility that these FDPS entries were "prepared in responding to [the] other FOIA lawsuit[] filed by" Truthout. (Slip op. at 35.) Accordingly, since the Court has already adjudicated this issue, it must order the FBI to release all information improperly redacted under the deliberative process privilege on these thirty-two pages.[6]

## VII.     Withholdings Under Exemption 7(E) Previously Rejected by the Court

Similarly, the FBI withheld a significant amount of information under Exemption 7(E) from the Truthout records (Ex. 6 *passim*), despite the fact that its previous motion to withhold that

---

[5] The pagination for this exhibit is according to the page numbers assigned by the ECF system.

[6] Moreover, the Court should refer the FBI to the Office of Special Counsel for these arbitrary and capricious withholdings pursuant to 5 U.S.C. § 552(a)(4)(F)(i), since it is difficult to imagine a more fitting case than an agency withholding information in direct violation of an explicit Court order. To clarify, the Court does not have to find *that* FBI personnel acted arbitrarily and capriciously to trigger OSC review; the statute only requires it to find that the circumstances of the denial *raise questions* as to whether FBI personnel acted arbitrarily and capriciously, which these circumstances clearly do.

information was expressly denied by the Court. The Court concluded its last opinion with the

unequivocal statement, "The FBI's motion for summary judgment is hereby **GRANTED** as to

the application of Exemption 7(E) to the search processing records relating to the forty-two

'parent' FOIA requests for which Shapiro received 'No Records' responses; as to the application

of FOIA Exemption 1; and as to the application of Exemption 5 to the *McGehee* litigation

documents, and to the Zubaydah documents to the extent that they reflect deliberations about the

FBI's litigation strategy and defense; and the motion is otherwise **DENIED**." (Slip op. at 42.)

The FBI had sought summary judgment on its Exemption 7(E) withholdings in the Truthout

records as well, going so far as to file an *in camera* declaration purporting to justify them (Sixth

Hardy Decl. ¶¶ 4-6), and the Court expressly limited its grant of summary judgment on

Exemption 7(E) to "the search processing records relating to the forty-two 'parent' FOIA

requests for which Shapiro received 'No Records' responses" and just as expressly *denied*

summary judgment to the FBI on all other issues not listed, which included its assertion of

Exemption 7(E) to withhold information from the Truthout records. Accordingly, as above, since

the Court has already adjudicated this issue, it must order the FBI to release all information

improperly redacted under Exemption 7(E) and not exempt under another approved exemption in

the Truthout records.[7]

---

[7] Insofar as the Court may consider that a denial of summary judgment regarding a withholding
is subtly different from an order to release the information, any such distinction would not make
a difference in this case. Even charitably interpreting the Court's previous opinion as giving the
FBI another chance to prove its case regarding these withholdings, as it did with Exemption 3,
the FBI conspicuously failed to do so. Neither its motion nor the Ninth Hardy Declaration even
*mentions* the Exemption 7(E) withholdings from the Truthout records which were the subject of
the Sixth Hardy Declaration. It has accordingly waived its opportunity to do so.

## VIII.   Failure to Segregate Non-Exempt Information

In its last opinion, the Court expressed doubt regarding the FBI's assertion that "[a]ny attempt to segregate [non-exempt] intertwined material" from the records responsive to NSC's and Stein's requests "would only produce disjointed words, phrases, or sentences that taken separately or together would have minimal or no informational content." (Slip op. at 39.) Accordingly it ordered the FBI to provide it with an *in camera* copy of the records responsive to one of NSC's requests. (*Id.* at 40.) As agreed during a later conference, the FBI provided a redacted copy of this document to NSC, which is attached as Ex. 7.

As with the Exemption 7(E) issue above, the FBI has completely waived its argument regarding the alleged non-segregability of the records responsive to the twelve requests in question. None of its filings even *mentions* this issue, despite the fact that the undersigned expressly advised the FBI's counsel in August that this was still a point of controversy. However, in this case, it is difficult to imagine any reasonable argument the FBI could make. A simple review of the extensive information available in these four pages shows that the FBI was materially misrepresenting the nature of these records to the Court, and the Court should respond appropriately. Accordingly, Plaintiffs will not belabor this point further in this brief.

## IX.   Inadequate Searches

Despite the extensive procedural history of this case, the Court has never actually adjudicated the adequacy of the FBI's searches for records responsive to many of these requests. In its first dispositive motion, the FBI only sought summary judgment on the adequacy of its search for NSC's first request and argued in reply to Stein's argument regarding his second request that Stein had not exhausted his administrative remedies. The Court granted summary judgment to the FBI on the former issue, *Shapiro v. United States Dep't of Justice*, 153 F. Supp. 3d 253, 284

(D.D.C. 2016), and similarly agreed with the FBI on the latter issue, *id.* at 288. However, these were the only search issues raised in that briefing, because the FBI issued categorical denials for the remainder of the requests, which the Court rejected. *Id.* at 276, 287, 292-93. Despite being required to conduct searches and produce records responsive to the remaining requests, the FBI has never subsequently moved for summary judgment regarding these searches,[8] and Plaintiffs accordingly do so to resolve this dangling controversy.

"[A]n agency responding to a FOIA request must conduct a search reasonably calculated to uncover all relevant documents, and, if challenged, must demonstrate beyond material doubt that the search was reasonable." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990); *see also Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) ("[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*."). However, an agency may not "ignore what it cannot help but know" when faced with "a lead so apparent that the [agency] cannot in good faith fail to pursue it." *Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996).

A search must be conducted in good faith using methods that are likely to produce the information requested. *See Campbell v. DOJ,* 164 F.3d 20, 27 (D.C. Cir. 1998). "While there is no requirement that an agency search every record system, the agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested." *Jefferson v. DOJ*, 168 F. App'x 448, 450 (D.C. Cir. 2005) (internal quotation and alteration omitted) (quoting *Oglesby*, 920 F.2d at 68). Agencies have a duty to construe the subject material of FOIA requests liberally to ensure responsive records are not overlooked. *See Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995). An agency

---

[8] The undersigned informed Defendant's counsel of this discrepancy in May and again in August, well before the FBI filed its motion.

may not "read [a] request so strictly that the requester is denied information the agency well knows exists in its files, albeit in a different form from that anticipated by the requester." *Hemenway v. Hughes*, 601 F. Supp. 1002, 1005 (D.D.C. 1985). "[A]ll federal agencies should go as far as they reasonably can to ensure that they include what requesters want to have included within the scopes of their FOIA requests." Department of Justice, Office of Information & Privacy, *OIP Guidance: Determining the Scope of a FOIA Request*, FOIA Update, Vol. XVI, No. 3, at 4 (1995). *See also Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 499 (S.D.N.Y. 2010) (rejecting CIA's argument that its search for records about the "attention shake" interrogation technique was adequate because it located no records due to the technique being called the "attention grasp"). Further, while Plaintiffs concede that the current case law states that an agency's "failure to turn up a particular document, or mere speculation that as yet uncovered documents might exist, does not undermine the determination that the agency conducted an adequate search for the records," *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004) (per curiam), this does not mean that a court cannot find an agency's search to be inadequate based in part on its failure to locate certain records. "Evidence that relevant records have not been released may shed light on whether the agency's search was indeed inadequate." *Weisberg*, 705 F.2d at 1351. In other words, not all "claims about the existence and discoverability of other documents" are "purely speculative." *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981). For instance, "[w]here specific records . . . are referenced in [agency] documents, it is no longer 'mere speculation' that the files exist." *Hall v. CIA*, 881 F. Supp. 2d 38, 61-62 (D.D.C. Aug. 3, 2012).

NSC's second request (No. 1174832-000), Truthout's request (No. 1196979-000) and Shapiro's requests warrant special attention in this context. Each of these requests was

deliberately broadly scoped to encompass any records generated during the processing of the "parent" requests. However, the FBI has clearly interpreted these requests improperly narrowly or otherwise performed inadequate searches, as shown by two simple examples.

First, Plaintiffs discovered this year that the FBI regularly creates a document called a "PIO Routing Slip" for its Public Information Officers, copies of which are attached as Ex. 8. Despite the fact that the undersigned brought this specific document to the attention of the FBI's counsel several months ago, the FBI has not addressed this discrepancy or performed a supplemental search for responsive records. The Court should require the FBI to explain the absence of these records from its FOIA responses in this case.

Second, and more egregious, is the fact that there are numerous references in the released Truthout records to other documents in the administrative processing file in FDPS, yet no such documents were released, nor were any documents withheld in full. To wit::

· "Integrity Policy summary was previously scanned into FDPS on the Admin side." (Ex. 6 at 6.)[9]

· "Integrity Policy Summary . . . Scanned into FDPS on the Admin side." (*Id.* at 9.)

· "[Integrity] Personal Policy summary has been printed and given to Integrity POC to be admin scanned into case." (*Id.*)

· "Integrity Policy Summary has been scanned into FDPS." (*Id.* at 48.)

· "CU Review Request form was generated and scanned into FDPS on the Admin side." (*Id.* at 56.)

· "Search slip scanned into case." (*Id.* at 67.)

· "ELSUR SEARCH . . . RESULTS ADMIN SCANNED." (*Id.*)

---

[9] Integrity is the name of the system the FBI uses to conduct security reviews of records before release according to specifically programmed "policies."

In short, there is no reason to believe that the FBI conducted adequate searches for records responsive to these requests, and the above examples definitively demonstrate that it did *not* for at least one request, if not more. Accordingly, the Court should grant summary judgment to Plaintiffs regarding the adequacy of the FBI's searches on all remaining requests except the two previously adjudicated.

**X.      Conclusion**

For the foregoing reasons, Plaintiffs request that their cross- motion for summary judgment be granted and that the FBI's motion for summary judgment be denied.

Respectfully submitted,

/s/ Jeffrey L. Light
Jeffrey L. Light, Esq.
D.C. Bar #485360
1712 Eye Street, NW
Suite 915
Washington, DC 20006
202-277-6213
Jeffrey@LawOfficeOfJeffreyLight.com

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.
D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD 20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **RYAN NOAH SHAPIRO,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 13-0555 (RDM)** |
| | ) | |
| **U.S. DEPARTMENT OF JUSTICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXISTS NO GENUINE DISPUTE

1.  Not disputed.

2.  Not disputed that the Court issued an opinion and order earlier this year. Plaintiffs object to the remainder of the statement as asserting a legal conclusion rather than a statement of fact.

3.  Plaintiffs object to the statement as asserting a legal conclusion rather than a statement of fact.

4.  Plaintiffs object to the statement as asserting a legal conclusion rather than a statement of fact.

5.  Not disputed.

6.  Not disputed that the FBI has asserted Exemption 3 in conjunction with Exemptions 1 and 7(E). Plaintiffs object to the remainder of the statement as asserting legal conclusions rather than statements of fact.

7.  Plaintiffs object to the statement as asserting a legal conclusion rather than a statement of fact.

8.  Not disputed that the FBI has, at times, cited FOIA Exemption 3 pursuant to the NSA to

withhold both classified and unclassified records. Plaintiffs object to the remainder of the statement as asserting legal conclusions rather than statements of fact.

9.   Plaintiffs object to the statement as asserting a legal conclusion rather than a statement of fact.

10. Plaintiffs object that the cited portion of the record (Seventh Hardy Declaration at ¶ 19) does not support the asserted fact. The cited portion of the record does not reference 266A files or files being released following a "vetting" process.

11. Not disputed that the FBI made a determination to redact file numbers. Plaintiffs object to the remainder of the statement as asserting legal conclusions rather than statements of fact.

12. Plaintiffs object to the statement as asserting a legal conclusion rather than a statement of fact.

13. Not disputed.

14. Not disputed that the FBI made a determination to redact file numbers.

15. Not disputed, except that the FBI initially and wrongfully asserted Exemption 7(A) as to the Hyram Kitchen records.

16. The cited portion of the record does not establish the existence of a pending investigation being conducted by another agency. Plaintiffs object that the cited portion of the record is hearsay and not based on the declarant's personal knowledge.  Plaintiffs object to the remainder of the statement as asserting legal conclusions rather than statements of fact. Plaintiffs dispute that the file number is sensitive and note that significant details about the Hyram Kitchen murder investigation have already been disclosed. Ex. 2; Shapiro Decl. ¶ 11 [ECF dkt: 67-5].

17. Plaintiffs object to the statement as asserting a legal conclusion rather than a statement of fact.

2

18. Plaintiffs object to the statement as asserting a legal conclusion rather than a statement of fact.

19. Not disputed that the FBI does not segregate file numbers. Plaintiffs object to the remainder of the statement as asserting legal conclusions rather than statements of fact.

20. Plaintiffs object to the statement as asserting a legal conclusion rather than a statement of fact.

21. Plaintiffs object to the statement as asserting a legal conclusion rather than a statement of fact.

22. Plaintiffs object to the statement as asserting a legal conclusion rather than a statement of fact.

23. Not disputed that the FBI makes a determination about whether to release a file number and that it considers different factors in making the determination.

24. Not disputed that the FBI released some file numbers and not others.

Respectfully submitted,

/s/ Jeffrey L. Light
Jeffrey L. Light, Esq.
D.C. Bar #485360
1712 Eye Street, NW
Suite 915
Washington, DC  20006
202-277-6213
Jeffrey@LawOfficeOfJeffreyLight.com

 /s/ Kelly B. McClanahan
Kelly B. McClanahan, Esq.

3

D.C. Bar #984704
National Security Counselors
4702 Levada Terrace
Rockville, MD  20853
301-728-5908
240-681-2189 fax
Kel@NationalSecurityLaw.org

*Counsel for Plaintiffs*