## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RYAN NOAH SHAPIRO *et al.*,<br><br>                *Plaintiffs*,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>                *Defendant.* | Civil Action No. 13-555 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

This long-running case raises an ever-growing array of questions about the application of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to FOIA itself.  Plaintiffs submitted various FOIA requests to the Federal Bureau of Investigation ("FBI") seeking records related to its processing of nearly a hundred previous (or "parent") FOIA requests from Plaintiffs and others.  Plaintiffs' claims thus raise novel issues of how FOIA, along with its exemptions and exclusions, applies to the documents that an agency generates when discharging its responsibilities under FOIA.  The Court resolved many of the most difficult questions in the case in a series of previous decisions.  The case has now been pending for more than seven years. Cognizant that FOIA embodies a goal of "efficient, prompt, and full disclosure of information," *see Maydak v. U.S. Dep't of Justice*, 218 F.3d 760, 764 (D.C. Cir. 2000), the Court resolved several remaining issues at a hearing on May 2, 2019, *see* Minute Entry (May 2, 2019); Minute Order (May 2, 2019).  At the hearing, the Court teed up a small number of remaining issues for what it emphasized, repeatedly, would be the final round of summary judgment briefing in this case.  For various reasons explained below, that renewed summary judgment briefing took more

than a year to complete, and, despite the Court's admonition, the issues in dispute have

proliferated once again.  They roughly fall into four (slightly overlapping) buckets: (1) issues left

open by the Court's rulings from the bench and the accompanying Minute Order on May 2,

2019; (2) issues that Plaintiffs raise related to the FBI's compliance with the Court's prior orders;

(3) new issues presented by the FBI's release of a fresh round of documents, with numerous

disputed withholdings;  and (4) Plaintiffs' motion for a permanent injunction to enforce the

Court's first opinion.

> This is, by the Court's count, its seventh ruling in this case.  If left to their own devices,
the parties might claim additional exemptions and assert additional objections to withholdings *ad
infinitum*.  The Court has already resolved several of the issues about which the parties continue
to disagree and, despite this repetition, the Court sees no reason to revisit what it has already
decided.  As to other issues, the FBI has carried its burden in its latest set of briefs and
supporting declarations and is entitled to summary judgment.  And as to yet others, the FBI has
still failed to justify the exemptions it claims, despite submitting fifteen declarations over the life
of this case, and the Court cannot—consistent with the purposes of FOIA and Federal Rule of
Civil Procedure 1—justify providing the FBI with a sixteenth chance.[1]

> The Court will therefore **GRANT** in part and **DENY** in part Plaintiffs' motion for
summary judgment and will **GRANT** in part and **DENY** in part the FBI's motion for summary
judgment.  It is now time to bring this case to a close.

---

[1] Rule 1 provides:  "These rules . . . should be construed, administered, and employed by the
court and the parties to secure the just, speedy, and inexpensive determination of every action
and proceeding."  Fed. R. Civ. P. 1.

## I. BACKGROUND

The Court has previously explained the administrative and procedural history of this case

at length, *see, e.g.*, *Shapiro v. U.S. Dep't of Justice*, 153 F. Supp. 3d 253, 267–68 (D.D.C. 2016)

("*Shapiro I*"), and has also previously summarized its initial rulings, *see Shapiro v. U.S. Dep't of*

*Justice*, 239 F. Supp. 3d 100, 107–10 (D.D.C. 2017) ("*Shapiro IV*"). For present purposes, the

Court will provide a brief synopsis of the history of the case, with an emphasis on *Shapiro IV*

and its aftermath, which set up (some of) the issues that remain.

### A.      *Shapiro I*

In its first opinion, the Court considered and rejected two categorical withholding policies

of the FBI. First, the FBI had adopted a policy of withholding all FOIA search slips and

processing notes generated in the past 25 years in response to parent requests seeking

investigative files. *Shapiro I*, 153 F. Supp. 3d at 269–70. Although this policy applied broadly

to all search slips and processing notes related to parent requests for investigative files, the FBI

justified it on somewhat narrower grounds, arguing that these materials may contain references

to documents that are "excludable" under FOIA. *Id.* at 270. That is, the search slips and

processing notes might reference certain law enforcement documents that FOIA recognizes as so

sensitive that the FBI is permitted to deny their very existence. *Id.*; *see* 5 U.S.C. § 552(c).

As an example of how the exclusions operate, imagine that the FBI is working with a

confidential informant, John Jones, to investigate Susan Smith. Susan does not know about the

investigation, but she suspects John might be working with the authorities, so she submits a

FOIA request to the FBI seeking all records related to John Jones. Of course, if the FBI released

the records, that would alert Susan to the existence of the investigation and could put John in

danger. But, crucially, if the FBI were to withhold the records and cite FOIA Exemption 7(A),

3

which protects ongoing enforcement proceedings, *see* 5 U.S.C. § 552(b)(7)(A), that would tip

Susan off almost as surely as releasing the records.  To account for that scenario, FOIA permits

"criminal law enforcement agenc[ies]" to treat "informant records" "as not subject to the

requirements of this section."  *Id.* § 552(c).  When asked, the FBI can then treat the records as

non-existent for purposes of FOIA, sending a "No Records" response.  *See ACLU of Michigan v.*

*FBI*, 734 F.3d 460, 469–72 (6th Cir. 2013).

Now imagine that after receiving a "No Records" response, Susan changes tack.  She

files a new FOIA request seeking the search slips and processing notes from the FBI's response

to her first request.  Now the FBI is in a bind.  It cannot plausibly issue another "No Records"

response, because everyone knows that the FBI creates search slips and processing notes for each

FOIA request as a matter of course.  The FBI cannot release the records in their entirety, because

they include internal notes about John Jones's status as an informant.  And the FBI cannot

release redacted search slips and processing notes, because its invocation of Exemption 7(A)

would once again give away the existence of the ongoing investigation.  The FBI thus argued in

*Shapiro I* "that the only option available to it is to withhold all search slips and processing notes

that it has created in responding to FOIA requests for investigative files in the last 25 years."

*Shapiro I*, 153 F. Supp. 3d at 271.

The Court did "not doubt that the problem the FBI describe[d] is a serious one," *id.*, but

concluded that the resulting categorical policy swept too broadly, *id.* at 271–76.  The FBI

justified this policy under Exemption 7(E), which applies to records that (1) are "compiled for

law enforcement purposes" and (2) would disclose either "techniques and procedures for law

enforcement investigations or prosecutions" or "guidelines for law enforcement investigations or

prosecutions," so long as (3) "such disclosure could reasonably be expected to risk

4

circumvention of the law." 5 U.S.C. § 552(b)(7)(E).  But because the policy applied to search slips and processing notes not only from "No Records" responses, but also from *any* parent FOIA request seeking investigative records, even when those records were not themselves protected by FOIA, the Court held that the policy could not be justified based on either the exclusions of Subsection 552(c) or Exemption 7(E).  *Shapiro I*, 153 F. Supp. 3d at 271–76.  As the Court explained, the FBI sought to withhold *all* search slips, even those the FBI admitted are "*not* protected by FOIA" exemptions or exclusions, just so "it can amass a haystack in which to hide the search slips that *are* protected."  *Id.* at 275 (emphasis in original).  Because the FBI's asserted policy sought to withhold at least some records that Congress did not exempt from FOIA, the Court rejected the policy and granted summary judgment to Plaintiffs on that issue. *Id.* at 276.

Second, the FBI sought categorically to withhold "case evaluation forms," which are "used to track and evaluate the performance of FBI employees engaged in processing FOIA requests," *id.* at 257, under Exemptions 2 and 6, *id.* at 276.  Plaintiffs conceded that the names of the FBI's FOIA analysts could "be withheld under Exemption 6, which shields private personnel information."  *Id.*; 5 U.S.C. § 552(b)(6).  But Plaintiffs disputed whether the rest of those forms could properly be withheld under Exemption 2, *Shapiro I*, 153 F. Supp. 3d at 277, which covers records "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2).  Based on the text of Exemption 2 and Supreme Court precedent interpreting it, the Court held that the FBI's policy could not be sustained under that exemption because, although case evaluation forms relate to personnel practices, they do not do so "solely."  *Shapiro I*, 153 F. Supp. 3d at 281.  Rather, the forms also "may enlighten the public about how the FBI goes about satisfying its obligations under FOIA," meaning the public has an interest in their

disclosure, and they are therefore not protected by Exemption 2. *Id.* The Court, accordingly, granted Plaintiffs' motion for summary judgment as to this second categorical policy. *Id.* at 282.

The Court also ruled on several case-specific issues, including the adequacy of the FBI's search for certain records and the propriety of certain withholdings. The Court recounts each of those holdings in some detail because the parties' most recent round of briefing reveals some confusion about what has already been decided in the case and what remains in dispute. With respect to the first request from Plaintiff National Security Counselors ("NSC"), submitted in October 2010, the Court held that NSC had exhausted its administrative remedies and could therefore challenge the FBI's withholding of search slips. *Id.* at 282–84. The Court, accordingly, granted summary judgment to NSC to the extent that it sought documents withheld based on the FBI's categorical withholding policy, but granted summary judgment to the FBI with respect to any records withheld for any other reason, because the NSC challenged only the categorical policy. *Id.* at 284.

Next, the Court considered withholdings related to NSC's second request and Plaintiff Jeffrey Stein's first request. *Id.* at 284–87. Those requests raised an additional issue because they sought records that the FBI created in processing parent FOIA requests submitted by other people, thus potentially implicating third-party privacy interests. *Id.* at 284. Plaintiffs acknowledged that in applying Exemptions 6 and 7(C), both of which protect privacy interests, the D.C. Circuit had created a categorical rule "permitting an agency to withhold information identifying private citizens mentioned in law enforcement records." *Id.* at 285 (quoting *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003)) (internal quotation marks omitted). But Plaintiffs argued that the records should be disclosed anyway under the "official-acknowledgment doctrine," which provides that "when an agency has officially acknowledged

otherwise exempt information through prior disclosure, the agency has waived its right to claim

an exemption with respect to that information." *Id.* (quoting *ACLU v. CIA*, 710 F.3d 422, 426

(D.C. Cir. 2013)).  Relying on that doctrine, Plaintiffs argued that the FBI had publicly

acknowledged the information in the search slips and processing notes they sought when

defending litigation arising from the parent requests.  *Id.*  The Court disagreed, noting that the

search slips and processing notes included more specific and more detailed information than the

declarations submitted in that separate litigation and, accordingly, granted the FBI's motion for

summary judgment insofar as it sought to protect information not previously disclosed in

litigation.  *Id*. at 286.  But because neither party had addressed whether previously released

information within the requested records could be segregated from the information that had not

previously been acknowledged, the Court denied the parties' motions for summary judgment to

provide an opportunity for them to address segregability.  *Id*. at 286–87.

 The Court then addressed three issues related to Stein's second request.  First, the Court

held that Stein had not exhausted administrative remedies for his challenge to the adequacy of

the FBI's search and therefore granted summary judgment to the FBI on that claim.  *Id.* at 288.

Second, the Court denied both parties' pending motions for summary judgment with respect to

the FBI's invocation of the attorney work-product privilege under Exemption 5 to withhold

certain documents related to *McGehee v. U.S. Dep't of Justice*, 800 F. Supp. 2d 220 (D.D.C.

2011).  *Id.* at 289–91.  The Court largely agreed with the FBI on the legal arguments but denied

the motions for summary judgment because, as a factual matter, the nature of the withheld

documents remained unclear.  *Shapiro I*, 153 F. Supp. 3d at 291.  Third, the Court granted

summary judgment to the FBI as to the redaction of names of third parties of investigative

interest, in connection with cult leader Jim Jones and the Jonestown Massacre.  *Id.* at 292.  The

Court also held that the parties' motions were moot as to Stein's refusal to pay fees associated

with his third request, because the FBI agreed to provide Stein with the portion of the records to

which he was entitled for free. *Id.* Finally, the Court denied both parties' cross-motions with

respect to the FBI's invocation of the deliberative-process privilege under Exemption 5 to

withhold records responsive to Plaintiff Truthout's single FOIA request for processing notes

created by FBI analysts in responding to a parent FOIA request about Hesham Abu Zubaydah,

the brother of a Guantanamo detainee. *Id.* at 292–93. The Court concluded that the declaration

supporting the FBI's motion contained too little factual material to meet the FBI's burden on

summary judgment. *Id.* at 293.

**B.**     ***Shapiro II***

On March 11, 2016, the parties submitted a joint status report proposing next steps for

implementing the Court's decision in *Shapiro I*, but they disagreed on the proper path forward.

Dkt. 51. Plaintiffs argued that because the Court in *Shapiro I* granted summary judgment to

Plaintiffs as to the FBI's categorical withholding policy, and because the FBI did not assert any

alternate grounds for withholding those records, all search slips and processing records should be

immediately disclosed "in unredacted form." *Id.* at 5. The FBI, however, sought another bite at

the apple in two respects. First, it asserted a new, narrower categorical policy that withheld all

search slips and processing notes only when the parent FOIA request resulted in a "No Records"

response. *Id.* at 2–3. The FBI sought to "submit further briefing" to support withholdings based

on this narrower categorical policy. *Id.* at 3. Second, the FBI sought to protect information

within its FOIA processing records using case-by-case FOIA exemptions. *Id.* at 2. The FBI

argued that it had reserved the right to later assert these exemptions, albeit not in its briefs, by

referencing the possibility in a footnote in one of its declarations. *Id.* (citing Dkt. 21-3 at 25 n.20

(First Hardy Decl. ¶ 75 n.20) ("Information in the documents responsive to plaintiffs' requests may also be exempt pursuant to FOIA Exemptions 1, 3, 5, 6, 7(A), 7(C), 7(D), and/or 7(F).")). Plaintiffs countered that nothing prevented the FBI in the first instance from asserting individual FOIA exemptions along with its categorical policy and that the Court should not permit the FBI to play "cat and mouse."  Dkt. 51 at 6 (quoting *Senate of P.R. ex rel. Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 580 (D.C. Cir. 1987)).

In its second opinion in the case, the Court took up the question of whether the FBI had waived its new arguments by not asserting them from the outset.  *See Shapiro v. U.S. Dep't of Justice*, 177 F. Supp. 3d 467 (D.D.C. 2016) ("*Shapiro II*").  For guidance, the Court looked to the standard that the D.C. Circuit established in *Maydak v. U.S. Department of Justice*, a case in which the government sought a remand to the district court so that it could assert new FOIA exemptions for the first time.  *Shapiro II*, 177 F. Supp. 3d at 469.  Under *Maydak*, the D.C. Circuit may consider the tardy assertion of additional FOIA exemption claims (1) "where, from pure human error, the government failed to invoke the correct exemption and will have to release information compromising national security or sensitive, personal, private information unless the court allows it to make an untimely exemption claim," or (2) based on "a substantial change" in the facts or "an interim development in the applicable law."  *Maydak*, 218 F.3d at 767.

The Court first held that the FBI's delay in asserting its new, narrower categorical policy resulted from neither a change in the facts nor a simple human error.  *Shapiro II*, 177 F. Supp. 3d at 470–71.  In a declaration attached to the joint status report, the FBI claimed that it had switched to its new "more balanced, narrowly-tailored approach" in May 2015.  Dkt. 51-1 at 2–3 (Fourth Hardy Decl. ¶ 5).  That is, the FBI had changed its policy *before* the Court held oral argument on the first set of cross-motions for summary judgment and some eight months before

the Court issued its opinion in *Shapiro I*.  But no one at the FBI saw fit to alert Plaintiffs or the Court to the change in policy, even though the Court was about to issue an opinion directed at a defunct categorical withholding policy.  The FBI had several opportunities to notify the Court of its change in policy but failed to do so.  On December 4, 2015, the FBI submitted a supplemental brief and neglected to mention any change in policy.  Dkt. 43.  Even more egregious, at oral argument on December 7, 2015, the Court specifically asked the FBI's counsel whether the FBI had considered (or could consider) adopting a narrower policy regarding search slips and processing notes.  Dkt. 52 at 30–32.  But even though the FBI had already switched to its narrowed policy several months earlier, and even though agency counsel was also present at the argument, counsel for the FBI professed ignorance as to whether any narrower policy would be possible.  *Id*.  The Court thus concluded that "[i]t would be difficult—perhaps impossible—for the FBI to represent that its failure to advance its new policy sooner was the result of 'pure human error.'"  *Shapiro II*, 177 F. Supp. 3d at 471 (quoting *Maydak*, 218 F.3d at 767).

Notwithstanding these troubling circumstances, in its discretion and "in light of the security and privacy interests implicated by this case," the Court permitted the FBI "to submit briefing on whether specific records sought by [Plaintiffs] should be withheld under a FOIA exemption or exclusion because their disclosure would 'compromis[e] national security or sensitive, personal, private information.'"  *Id.* (second alteration in original) (quoting *Maydak*, 218 F.3d at 767).  But the Court made clear that this opportunity was a limited one and did not open the door for the FBI to litigate, more generally, the merits of its new narrower categorical policy covering only parent requests that received "No Records" responses.  *Id.* at 471.  The Court reached the same conclusion, moreover, with respect to additional case-by-case FOIA exemptions that the FBI argued it had erred in failing to assert earlier in the litigation.  *Id.* at

10

471–73.  The Court held that permitting the FBI to claim any and all FOIA exemptions would be inconsistent with *Maydak* but nevertheless allowed the FBI to "assert untimely exemptions to the extent that it can show that the disclosure of such records will 'compromis[e] national security or sensitive, personal, private information.'"  *Id.* at 472–73 (emphasis removed) (alteration in original) (quoting *Maydak*, 218 F.3d at 767).  Finally, the Court required that the parties provide additional briefing on Plaintiffs' motion for a permanent injunction preventing the FBI from returning to its original, broader categorical policy, and it denied Shapiro's request for entry of final judgment as to his claims, which, in light of the Court's holding, were not yet finally resolved.  *Id.* at 473.

**C.**     ***Shapiro III***

The FBI then filed a motion for reconsideration, arguing that the waiver rule announced in *Maydak* does not apply to cases still pending in the district court but, rather, applies only on appeal.  Dkt. 55.  In its third opinion in this case, the Court agreed that neither *Maydak* nor any other D.C. Circuit precedent directly governed the late assertion of FOIA exemptions during the pendency of district court proceedings but reasoned that similar considerations as those animating *Maydak* apply in the district court as well.  *Shapiro v. U.S. Dep't of Justice*, No. 13-cv-555, 2016 WL 3023980, at *4 (D.D.C. May 25, 2016) ("*Shapiro III*").  "Basic principles of fairness, efficiency, and finality, moreover—principles inherent in the rules of civil procedure that apply with extra force in the context of FOIA litigation—counsel in favor of requiring the government to make some threshold showing of good cause to avoid a finding of forfeiture."  *Id.*

With that somewhat more forgiving formulation of the *Maydak* rule as its guide, the Court turned to reconsidering its holdings in *Shapiro II*, a task made easier by certain concessions from both sides.  The FBI, consistent with *Shapiro II*, "abandoned its initial

11

argument that it should be permitted to rely upon its modified search-slip policy at this stage of the action." *Id.* And Plaintiffs, for their part, read *Shapiro II* as granting the FBI permission to raise new defenses based on Exemptions 1, 3, 6, 7(C), and 7(D), which Plaintiffs acknowledged implicate privacy and/or national security. *Id.* From that starting point, the Court further approved new assertions under Exemptions 7(A) and 7(E), which the Court held also implicate privacy and national security interests and therefore fell within the ambit of its opinion in *Shapiro II. Id.* at \*5.

The Court's opinion in *Shapiro II*, however, could not be read to approve the FBI's tardy invocation of Exemption 5, which protects records "that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). It was on this score that the FBI sought the Court's reconsideration, so that the FBI would be free to withhold records pursuant to three Exemption 5 privileges—the attorney work-product privilege, the attorney-client privilege, and the deliberative-process privilege. *Shapiro III*, 2016 WL 3023980, at \*5. With respect to those privileges under Exemption 5, the Court issued a split decision and granted the motion for reconsideration in part. The Court "agree[d] that the FBI's assertion of the attorney work-product privilege and attorney-client privilege are substantially similar to issues already raised in the renewed motion for summary judgment and impact sufficiently few records that the risk of unduly prolonging this litigation is minimal." *Id.* at \*6. The Court also noted that "the FBI's counsel repeatedly stated during oral argument . . . that the FBI will assert no *additional* exemptions, even if the Court were to conclude that Exemption 5 does not apply, and thus the FBI could be seen to have committed to ensuring the prompt resolution of this litigation." *Id.* (emphasis in original). With that assurance in hand, the Court permitted the FBI to make additional assertions under the attorney work-product and attorney-client privileges. *Id.*

The balance of equities was different, however, with respect to the deliberative-process privilege.  As an initial matter, the FBI sought to protect search slips and processing notes responsive to Shapiro's requests as a class using the deliberative-process privilege, an argument that the Court in *Shapiro I* understood the FBI to have "explicitly waived."  *Id*. at *6–7.  And because the FBI would use the deliberative-process privilege to withhold more than 450 pages of records, its argument "present[ed] a substantial risk of expanding the scope and duration of the present litigation."  *Id.* at *7.  The Court thus held that the FBI had not shown good cause sufficient to overcome its waiver of the deliberative-process privilege.  *Id*.

Putting *Shapiro II* and *Shapiro III* together, the Court had set the following rules of engagement for further proceedings: the FBI could not rely on its new categorical policy of withholding search slips and processing notes associated with "No Records" parent FOIA responses or assert any new defenses based on the deliberative-process privilege, but the FBI could raise additional claims under Exemptions 1, 3, 6, 7(A), 7(C), 7(D), and 7(E).  As explained below, the parties have not always stayed within these boundaries, and, inexplicably, the FBI attempts to rely on its new categorical policy in the current round of briefing.  But there are several more steps between here and there.

**D.**     ***Shapiro IV***

Following *Shapiro III*, the parties filed a second set of cross-motions for summary judgment, along with other related motions.  Both parties made new arguments, with the FBI claiming new exemptions and Plaintiffs contesting additional withholdings and redactions.  In its fourth opinion in this case, issued on March 6, 2017, the Court began by granting the FBI's motion, over Plaintiffs' objection, for leave to file the eighth declaration from David M. Hardy *in camera* and *ex parte* in support of the FBI's renewed motion for summary judgment.  *Shapiro*

*IV*, 239 F. Supp. 3d. at 111. *In camera*, *ex parte* treatment was appropriate because the declaration contained "sensitive information not appropriate for disclosure and which is necessary for the Court to make a decision on the agency's renewed motion for summary judgment." *Id.* Likewise, the Court rejected Plaintiffs' motion to make public redacted portions of Hardy's third and sixth declarations, because "they contain sensitive material that cannot be made public without thereby disclosing the very information that the agency withheld in the underlying FOIA requests." *Id.*

From there, the Court moved to address the substance of the parties' contentions. The Court first took up the FBI's more "targeted" effort to protect the search slips and processing notes associated with "No Records" responses to parent FOIA requests under Exemption 7(E). As explained above, the FBI faces a conundrum in responding to FOIA-on-FOIA requests related to "No Records" responses, and the Court explained that this issue "remains at the core of this case." *Id.* at 111. Rather than the broad categorical policy that the Court rejected in *Shapiro I* or the narrower categorical policy that the Court deemed forfeited in *Shapiro II* and that the FBI waived in *Shapiro III*, the FBI retreated to a fallback position by "assert[ing] a case-specific exemption applicable to only the forty-two 'No Records' responses to the fifty-eight 'parent' FOIA requests submitted by Ryan Shapiro." *Shapiro IV*, 239 F. Supp. 3d at 113 (citing Dkt. 57-3 at 59 (Fifth Hardy Decl. ¶ 121)). With respect to that subset of the records involved in the case, the FBI argued that "'within the holistic context of Shapiro's universe of inter-related domestic terrorism requests,' release of FOIA processing records relating to the forty-two 'No Records' responses risks disclosure of confidential techniques and procedures used by the FBI to hide or obscure its use of the FOIA exclusion, 5 U.S.C. § 552(c)." *Id.* (quoting Dkt. 57-3 at 55–63 (Fifth Hardy Decl. ¶¶ 114–29)). According to the FBI, disclosure of those search slips and

processing notes would "'allow animal extremist terrorists to gauge the FBI's strengths and weaknesses within certain areas of the [domestic terrorism] arena and [to] structure their activities in a manner that avoids detection and disruption by the FBI.'" *Id.* (alterations in original) (quoting Dkt. 57-3 at 62 (Fifth Hardy Decl. ¶ 128)).

Applying the three-part test for withholdings under Exemption 7(E), the Court held that the FBI had met its burden to withhold records related to the forty-two "No Records" responses to Shapiro's parent FOIA requests. *Id.* First, the Court concluded that the search slips and processing notes were "'compiled for law enforcement purposes.'" *Id.* (quoting 5 U.S.C. § 552(b)(7)). Even if the FOIA processing records themselves were compiled for the purpose of complying with FOIA, they replicated information that was compiled for law enforcement purposes, which is sufficient. *Id.* at 113. Second, the Court concluded that "information contained in the limited universe of search slips now at issue risks disclosing a 'technique' or 'procedure' that could aid in the 'circumvention of the law'" within the meaning of 5 U.S.C. § 552(b)(7)(E). *Id.* at 114–16. Any single "No Records" search slip would not reveal a confidential technique or procedure, given that the mere use of FOIA exclusions by the FBI is publicly known and, indeed, explained in the statutory text. *See* 5 U.S.C § 552(c). But when taken together, a group of search slips and processing notes could form a "mosaic" that, "when viewed as a whole, would reveal confidential law enforcement techniques and procedures and would risk circumvention of the law." *Shapiro IV*, 239 F. Supp. 3d at 115. Although the Court rejected a similar mosaic argument when considering the FBI's sweeping, categorical policy in *Shapiro I*, the Court concluded that the mosaic argument was persuasive when limited to Shapiro's forty-two "No Records" parent requests. Because Shapiro had submitted both parent and FOIA-on-FOIA requests covering hundreds of thousands of pages, and was simultaneously

litigating his parent requests, "the search slips at issue are part of a complex mosaic relating to on-going FBI operations, involving one of the FBI's domestic terrorism priorities, which has been the subject of a staggering number of FOIA requests seeking information about many specific individuals and organizations." *Id.* at 116.  The Court thus granted summary judgment to the FBI as to FOIA processing records related to those forty-two parent requests.  *Id.*

Next, the Court considered the FBI's withholding of "sensitive case file numbers" under Exemption 7(E), again pursuant to a mosaic theory.  *Id.* at 116–17.  The FBI's file numbers include numbers and letters that correspond to the classification of the investigation and the originating field office.  *Id.* at 116.  The FBI argued that if someone were to obtain numerous file numbers associated with investigations into a particular type of crime, that person could create a "heat map" showing where the FBI has concentrated its enforcement priorities and resources and could then use that information to circumvent the law.  *Id.* at 116–17.  Citing to several cases from this District holding that law enforcement agencies can redact file numbers, *see id.* at 118 n.5 (collecting cases), the Court held "that file numbers can, at least at times, reveal law enforcement techniques or procedures," *id.* at 118 (internal quotation marks omitted).

As to potential circumvention of the law, however, the Court needed more information. Plaintiffs argued that because the FBI was invoking Exemption 7(E), rather than Exemption 7(A), which covers ongoing investigations, the case numbers at issue were associated with closed cases, rather than ongoing ones.  *Id.* at 119.  The Court observed that "it is far from clear that the risk of disclosure of purely historical law enforcement priorities would be insufficient to meet the 'relatively low bar' under Exemption 7(E) for 'withholding' records that reveal law enforcement techniques."  *Id.* at 119–20 (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)).  But "given the lack of evidence about if, and when, the underlying investigations at

issue were closed, the Court [declined to] grant the FBI's motion for summary judgment without additional evidence and explanation regarding the specific risk posed by disclosure of the file numbers in the 122 documents at issue." *Id.* at 120. The Court, accordingly, denied the cross-motions for summary judgment as to the file numbers and requested that the FBI provide more information about the age of the investigations in question. *Id.*

From there, the Court turned to the FBI's withholdings under Exemption 7(A), which covers "records or information compiled for law enforcement purposes" to the extent those records or that information "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). The FBI had relied on Exemption 7(A) for the limited purpose of redacting the names of targets of pending investigations and the file numbers associated with pending investigations. *Shapiro IV*, 239 F. Supp. 3d at 121. Plaintiffs challenged the FBI's assertion of Exemption 7(A) only with respect to a single FOIA request—Shapiro's effort to obtain search slips and processing notes associated with his parent request for records related to the murder of Hyram Kitchen, the investigation of which Plaintiffs alleged the FBI had closed more than 25 years earlier. *Id.* The FBI acknowledged that the investigation into Kitchen's murder was closed and that Exemption 7(A) was inapplicable but argued that the file number could still be withheld under Exemption 7(E). *Id.* The Court thus granted Plaintiffs summary judgment as to the Exemption 7(A) withholdings related to the murder of Hyram Kitchen, but denied both parties' motions for summary judgment as to the withholding of the file number under Exemption 7(E), which the FBI would need to explain further along with its other file number withholdings discussed above. *Id.*

The Court then upheld the FBI's withholdings under Exemption 1 of documents classified at the "secret" level, *id.* at 121–22, but denied the parties' cross-motions for summary

judgment with respect to the FBI's withholdings under Exemption 3, *id.* at 122–24.  That

exemption covers, in relevant part, records "specifically exempted from disclosure by statute" so

long as the statute in question "requires that the matters be withheld from the public in such a

manner as to leave no discretion on the issue."  5 U.S.C. § 552(b)(3)(A)(i).  The FBI asserted

Exemption 3 in connection with documents it withheld under the National Security Act of 1947

("NSA"), which requires the Director of National Intelligence to "protect intelligence sources

and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).  "Although the FBI's

reliance on the NSA is entitled to substantial deference," the Court concluded that "the

declarations [the FBI had] provided to date [were] simply too broad and conclusory to allow the

Court to perform" its *de novo* review of the withholdings.  *Shapiro IV*, 239 F. Supp. 3d at 123.

Next, the Court addressed the FBI's withholdings pursuant to the deliberative-process

privilege and attorney work-product privilege under Exemption 5.  In *Shapiro I*, the Court had

denied the parties' cross-motions with respect to the FBI's invocation of the deliberative-process

privilege to withhold records responsive to Truthout's FOIA request for processing notes created

by FBI analysts in responding to a parent request about Hesham Abu Zubaydah.  *Shapiro I*, 153

F. Supp. 3d at 292–93.  The Court concluded that the declaration supporting the FBI's motion

contained too little factual material to meet the FBI's burden on summary judgment.  *Id.* at 293.

Based on a new declaration from the FBI, the Court held in *Shapiro IV* that the FBI was entitled

to summary judgment "with respect to its reliance on the deliberative-process privilege to

withhold records in response to the Truthout FOIA request, but only to the extent those records"

were "'prepared in responding to other FOIA lawsuits filed by [P]laintiffs,' and . . . 'reflect[]

deliberations' about the cases and the FBI's 'litigation strategy and defense.'"  *Shapiro IV*, 239

F. Supp. 3d at 124 (alterations in original) (quoting Dkt. 57-3 at 36 (Fifth Hardy Decl. ¶ 76)).

Likewise, after rejecting the cross-motions in *Shapiro I* as to Stein's request for FOIA processing records created in responding to a parent request related to the *McGehee* litigation, the Court granted the FBI's motion for summary judgment as to those records in *Shapiro IV*. *Id.* at 124–26.

Finally, the Court dealt with another issue left open in *Shapiro I*. The FBI had invoked Exemptions 6 and 7(C) to withhold information about third parties when responding to requests from NSC and Stein seeking FOIA processing records related to parent FOIA requests submitted by other people. *Id.* at 126. In *Shapiro I*, Plaintiffs argued that the FBI had already publicly acknowledged much of this information in declarations that it filed in litigation over the parent FOIA requests. *Id.* In *Shapiro IV*, the FBI argued that the information contained in the FOIA processing records was much more specific than the information disclosed in the prior litigation and that any previously disclosed information was not segregable from information that could still properly be withheld. *Id.* The Court noted that "FBI's most recent submission goes a long way toward addressing" the concern about segregability. *Id.* at 127. But given the public interest in the records at issue, the Court denied the cross-motions for summary judgment and ordered the FBI "to file copies of the search slips from one randomly selected FOIA request, from which only the nonpublic information has been redacted" for the Court's review. *Id.*

## E.     *Shapiro V*

Following the Court's ruling in *Shapiro IV*, the parties filed numerous motions and briefs. Between October 2017 and January 2018, they filed a third set of cross-motions for summary judgment. *See* Dkt. 97; Dkt. 99. Before briefing on those motions was complete, Plaintiffs filed a motion to strike improper legal arguments from one of the FBI's declarations, Dkt. 107, and a motion to stay briefing, Dkt. 108. The Court granted in part and denied in part the motion to

strike, assuring Plaintiffs that it would disregard legal arguments in the declarations, and denied the motion to stay briefing as moot, *see* Minute Order (Jan. 30, 2018).  Meanwhile, in November 2017, the FBI voluntarily dismissed its appeal of certain aspects of *Shapiro I*.  Dkt. 102-1.  On August 10, 2018, the parties filed a joint status report proposing a fourth set of summary judgment briefs (even though the Court had not yet decided the third set of motions), so that they could address the FBI's withholdings from new interim releases and Plaintiffs' request for a permanent injunction.  Dkt. 113.  On October 19, 2018, Plaintiffs filed a motion for sanctions related to representations made by the FBI's counsel about his efforts to obtain authorization from the Solicitor General to file an interlocutory appeal of the Court's decision in *Shapiro I*.  Dkt. 114.  The parties then filed their fourth motions for summary judgment, *see* Dkt. 123; Dkt. 126, and Plaintiffs filed a motion for a declaratory judgment, Dkt. 124.  On April 17, 2019, in the course of seeking an extension of time to file its reply brief, the FBI explained that, "after reviewing Plaintiffs' pleadings, Defendant believes that it will have to take another look at its production and determine whether there are additional records to be lawfully produced," Dkt. 128 at 1.  At that point, the Court ordered that the parties appear for a hearing on May 2, 2019, so that the Court could sort out "the scope of issues remaining" for resolution.  Minute Order (April 22, 2019).

At that hearing, the Court ruled from the bench as to several of the remaining issues.  The Court started that decision, *Shapiro V*, with file numbers.  Counsel for the FBI began by explaining that the 122 file numbers previously in dispute had been whittled down to thirty-six remaining numbers, Hrg. Tr. (Rough at 4), that the FBI withheld under Exemption 7(E) alone, as well as five additional file numbers that the FBI withheld under both Exemption 7(E) and Exemption 3, Minute Order (May 5, 2019).  With respect to the thirty-six file numbers withheld

under Exemption 7(E) alone, Plaintiffs had submitted an eleven-page list of file numbers that the FBI had already publicly acknowledged, Dkt. 99-1, and the Court asked whether the FBI had compared the numbers it was still withholding to the list of numbers that Plaintiffs alleged it had previously disclosed publicly, to determine whether any of those case numbers should be disclosed under the official-acknowledgment doctrine.  Hrg. Tr. (Rough at 7).  Because there was some confusion as to whether the FBI had made the relevant comparison, the Court ordered that it do so.  *Id.* at 14.

Continuing on the topic of file numbers, the Court then turned to whether the FBI had properly invoked Exemption 7(E) as to those file numbers that had not previously been disclosed.  The Court explained that it needed to know how long the investigations in question had been closed, and what about the particular case numbers made them especially sensitive, in order to determine whether disclosure of the file numbers might give rise to a risk of circumvention of the law, as required under Exemption 7(E).  *Id.* at 15–23.  Because it lacked this information, the Court denied the FBI's motion for summary judgment with respect to the case numbers withheld under Exemption 7(E).  *Id.* at 23.

Plaintiffs' counsel then asked whether the Court would grant their cross-motion on this issue.  *Id.* at 26.  The Court explained that, given the sensitive law enforcement information *potentially* at stake, it would give the FBI one more chance; but the Court cautioned the FBI that, if it failed to take advantage of that opportunity to offer the type of detailed information described by the Court, the Court would consider granting summary judgment to Plaintiffs.  *Id*.  To emphasize the point, the Court added that it was "putting the FBI on warning here that if you don't come forward and meet your burden at that point, [the Court is] not going to have any choice but to grant [] [P]laintiffs' motion . . . because there are only so many bites at the apple

21

that are in any way consistent with the need for expeditious disclosure under FOIA[,] when we're now six years into this litigation." *Id.* at 26–27.

The Court also considered the FBI's withholding of five additional file numbers responsive to Stein's requests (separate from the thirty-six) under Exemption 3 and the NSA and under Exemption 7(E). As in *Shapiro IV*, the Court once again concluded that the FBI had not provided enough information for the Court to assess the validity of its Exemption 3 withholdings. *Id.* at 32. So the Court directed that the FBI submit additional support for its assertions of Exemption 3 and requested that the FBI address not only each file number as a whole, but also the "subcomponents" of the file numbers and whether those components might be segregable. *Id.* at 38. That is, the Court directed the FBI to treat each file number as three components, including the classification, the originating office, and the unique identifier number, and justify the withholdings as to each component. *Id.* at 38–39.

Next, the Court turned to whether publicly acknowledged information could be segregated from private information and then released in the FOIA processing records related to third-parties' parent FOIA requests that NSC and Stein had requested. In *Shapiro IV*, the Court had ordered the FBI to redact private information from a sample record and submit it to the Court, so the Court could determine whether the redacted records would reveal any useful information. *Shapiro IV*, 239 F. Supp. 3d at 127. After reviewing that sample, the Court concluded that "it's not the mother [lode], but it's not mumbo jumbo either." Hrg. Tr. (Rough at 40). The Court, accordingly, held that the records were segregable, granted summary judgment to Plaintiffs on that issue, and ordered that the FBI produce segregated versions of those records. *Id.* at 40–41.

22

Having moved through the issues left open in *Shapiro IV*, the Court turned to several new issues that Plaintiffs raised in the third round of summary judgment briefing, including arguments about the FBI's compliance with the Court's earlier decisions.  In *Shapiro IV*, the FBI had moved for summary judgment with respect to information that it withheld from the Truthout records pursuant to Exemption 7(E).  Although the Court in that opinion approved the *in camera, ex parte* filing of the Sixth Hardy declaration in support of the FBI's argument, *Shapiro IV*, 239 F. Supp. 3d at 111, the Court neglected to return to that issue on the merits.  Because the conclusion section of the opinion indicated that the FBI's motion was "otherwise denied," *id.* at 127, Plaintiffs argued that the Court had rejected these withholdings from the Truthout records, Dkt. 99 at 15–16.  At the hearing, the Court explained that it did not intend to rule against the FBI on these redactions and, instead, had simply failed to resolve that one issue.  Hrg. Tr. (Rough at 42).  The Court thus directed that the FBI refile the Sixth Hardy Declaration *in camera* and *ex parte* so that the Court could address the Exemption 7(E) withholdings from the Truthout records on the merits.  *Id*.

The Court next took up Plaintiffs' allegations that the FBI had withheld more information from Truthout under the deliberative-process privilege than the Court had approved in its prior opinions.  In *Shapiro IV*, the Court held that the FBI could withhold information from the records sought by Truthout to the extent that those records were "prepared in responding to other FOIA lawsuits filed by [P]laintiffs" and "reflect[] deliberations" about those cases and the FBI's "litigation strategy and defense."  *Shapiro IV*, 239 F. Supp. 3d at 124 (alterations in original) (internal quotation marks omitted).  Plaintiffs argued at the *Shapiro V* hearing that the FBI's withholdings appeared to exceed the scope of records created in preparation for litigation, because the relevant case, *Leopold v. CIA*, No. 12-cv-245 (D.D.C.), concerned the narrow issue

of whether the FBI was required to provide an estimated date of completion, and thus records

pertaining to the substance of the FOIA request at issue in that case would not have been related

to the subject matter of the litigation.  Hrg. Tr. (Rough at 44).  The FBI, in response, argued that

the records were created in preparation not only for the *Leopold* case but also for a separate case

involving Truthout, *see Truthout v. Dep't of Justice*, 20 F. Supp. 3d 760 (E.D. Cal. 2014).  Hrg.

Tr. (Rough at 45).  Plaintiffs, in turn, responded that several of the records were created before

the *Truthout* litigation was filed or even contemplated, so the FBI could have created those

records in preparation for only the *Leopold* case.  *Id.* at 47.  In order to give the FBI a final

chance to meet its burden with respect to those records, the Court denied Plaintiffs' motion for

summary judgment on that issue, while emphasizing that the FBI's next chance would be its last.

*Id.* at 49–50.

From there, the Court proceeded to address claims that Plaintiffs raised in their third

motion for summary judgment as to the adequacy of the FBI's searches for records responsive to

all of the FOIA-on-FOIA requests in the case other than the searches that the Court had already

upheld in *Shapiro I*.  *See* Dkt. 99 at 17–21.  But in their reply brief, Plaintiffs withdrew their

challenge to the adequacy of most of those searches in light of ongoing efforts from the FBI to

conduct additional searches and to process additional records in its effort to comply with the

Court's earlier opinions.  Dkt. 109 at 11.  Plaintiffs instead challenged the searches as to only

two requests, Nos. 1182250-000 and 1182251-000.  *Id.*  With respect to those two searches,

however, the Court had already granted summary judgment to the FBI.  *See Shapiro I*, 153

F. Supp. 3d at 287 n.12, 287–89.  At the hearing, given the FBI's additional ongoing searches,

the Court held that challenges to any searches on which it had not already ruled were unripe.

Hrg. Tr. (Rough at 56).  Likewise, the Court deferred judgment on an additional argument that

24

Plaintiffs raised for the first time in their reply brief regarding certain columns of information on search slips that the FBI had redacted under Exemption 7(E).  *Id.* at 57.

The hearing then turned to a lengthy (and circuitous) discussion of whether the FBI was still employing a categorical policy of withholding all search slips and processing notes associated with certain types of parent FOIA requests, and, if so, what the scope of that policy was, as relevant to Plaintiffs' motion for declaratory and injunctive relief.  *See id.* at 58–84.  The Court ordered the FBI's counsel to file a notice if he learned that the FBI had changed in any way the narrower categorical withholding policy that it adopted without notifying the Court before *Shapiro I* and attempted to rely on in *Shapiro II*, especially if the FBI returned to the broader policy that the Court rejected in *Shapiro I*.  *Id.* at 82.  Finally, the Court denied Plaintiffs' motion for sanctions.  *Id.* at 85.  That motion applied primarily to representations made in the court of appeals, and, in any event, the Court determined that the conduct at issue (which concerned representations regarding the Solicitor General's authorization for filing the interlocutory appeal) did not rise to the level of being sanctionable.  *Id.* at 85–86.

The Court concluded the hearing by permitting "one last omnibus round of briefing that then brings this case to closure," *id.* at 87, with briefing on the permanent injunction folded into that final round, *id.* at 95.  The Court reiterated, more than once, that its goal was to "narrow things rather than expand them" and that this final round of briefing should bring the case to a close.  *Id.* at 100.  Following the hearing, the Court entered a lengthy Minute Order explaining which issues it had resolved from the bench and which remained to be decided in the final set of cross-motions for summary judgment.  *See* Minute Order (May 2, 2019).

F.     ***Shapiro VI***

The fifth and final round of summary judgment briefing got off to a rocky start.  The

FBI's motion for summary judgment was originally due on August 2, 2019.  That same day, the

FBI filed a motion for extension of time, Dkt. 129, which the Court granted, extending the

deadline to September 4, 2019, *see* Minute Order (August 5, 2019).  On the new due date, the

FBI filed another extension request.  Dkt. 130.  Although the FBI labeled its motion as

unopposed, Plaintiffs filed an opposition, explaining that they had consented to a one-day

extension, rather than the two-day extension that the FBI requested in its motion.  Dkt. 131.  The

Court again extended the deadline to 3:00 p.m. on September 6, 2019.  Minute Order (Sept. 5,

2020).  The FBI then filed its brief at 12:31 a.m. on September 7, 2019, roughly nine-and-a-half

hours after the deadline.  Dkt. 132.  Because of the missed deadline, Plaintiffs filed a motion to

strike the FBI's motion for summary judgment, Dkt. 134, and a motion to stay briefing pending

the Court's resolution of the motion to strike, Dkt. 135.  The FBI then filed a motion for

extension of time to file their motion for summary judgment *nunc pro tunc*.  Dkt. 137.

On June 23, 2020, the Court issued its sixth opinion in this case, resolving the parties'

dispute about the missed deadline.  *Shapiro v. Dep't of Justice*, No. 13-cv-555, 2020 WL

3447987 (D.D.C. June 23, 2020).  The Court held that the FBI's missed deadline was attributable

to "excusable neglect" and did not have any appreciable effect on the proceedings.  *Id.* at *1–2.

The Court, accordingly, granted the FBI's tardy motion for extension, denied Plaintiffs' motions

to strike the FBI's motion for summary judgment and to stay the case, and entered a new

schedule for concluding summary judgment briefing.  *Id.* at *2.  The Court also cautioned the

parties that "further extensions will be granted only if sought at least three business days before

the relevant deadline [as required in the Court's standing order] and if supported by

extraordinary circumstances." *Id.*  Plaintiffs filed their cross-motion for summary judgment on

July 2, 2020, Dkt. 143, and briefing concluded on August 18, 2020.  At the Court's request, the

FBI filed a supplemental notice on December 8, 2020, addressing several gaps in the factual

record; Plaintiffs filed a brief response on December 9, 2020; and the FBI followed with its

fifteenth and final declaration on December 11, 2020.  The cross-motions are now ripe

for decision.

## II.  ANALYSIS

As noted above, the remaining issues in the case fall into four categories: (1) issues left

open by *Shapiro V*; (2) issues that Plaintiffs raise related to the FBI's compliance with the

Court's prior orders; (3) new issues presented by the FBI's release of a fresh round of

documents, with numerous disputed withholdings; and (4) Plaintiffs' motion for a permanent

injunction to enforce *Shapiro I*.  The Court will address each of these categories in turn but must

first address a threshold issue that Plaintiffs raise in their final reply brief regarding the

sufficiency of the FBI's counter statement of material facts.

## A.      Failure to Support Assertions of Fact

Along with their cross-motion for summary judgment, Dkt. 143, Plaintiffs submitted their

statement of material facts as to which there is no genuine dispute, Dkt. 143-4 (Pl.'s SUMF).

Plaintiffs' factual assertions span a variety of topics, including information about different types

of forms that the FBI generates, or generated in the past, when responding to FOIA requests;

Plaintiffs' interpretations of certain abbreviations and columns of information on certain FOIA

processing records; various inconsistencies between the withholdings in different sets of releases

to Plaintiffs; and information about the FBI's policies and practices in responding to Plaintiffs'

FOIA-on-FOIA requests.  *Id.*  The FBI filed its counter statement of material facts, Dkt. 149-1, a

day after filing its opposition to Plaintiffs' fifth motion for summary judgment, Dkt. 148.  In a notice accompanying the FBI's statement of facts, counsel explained that he "could not and still has not found the final version of Defendant's Counter Statement of Material Facts where he had saved it for filing when he filed Defendant's Opposition/Reply and is now compelled to file a penultimate version."  Dkt. 149 at 1.

In Plaintiffs' view, the FBI's counter statement of facts fails to comply with Rule 56 or Local Civil Rule 7(h), and the Court agrees.  Under Rule 56(c)(1), a party seeking to dispute a fact supported by competent evidence must either show that the proffered evidence "do[es] not establish the absence . . . of a genuine dispute" or "cit[e] to particular parts of materials in the record" controverting the proffered evidence.  Fed. R. Civ. P. 65(c)(1).  Local Civil Rule 7(h), in turn, requires that "[a]n opposition to [a motion for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."  Local Civ. R. 7(h).

Here, the FBI failed to comply with these well-established requirements.  Most notably, rather than seriously addressing the substance of each asserted fact, the FBI responded to every point in paragraphs nine through eighty-five with "[d]isputed and not material."  Dkt. 149-1 at 2–14 (Def.'s SUMF ¶¶ 9–85).  Indeed, the FBI "disputed" a quote from one of its own declarations, Dkt. 149-1 at 3 (Def.'s SUMF ¶ 14), and "disputed" that "Shapiro routinely files FOIA requests for search slips and processing materials," *id.* at 14 (Def.'s SUMF ¶ 85), a proposition that the FBI has itself invoked in support of its "mosaic" and "heat map" theories for withholding records.  Beyond that, the FBI's counter statement makes no effort to explain why Plaintiffs' asserted facts are unsupported and fails to cite to any controverting evidence.

Both Rule 56 and this Court's Local Civil Rules address the consequences of a party's failure to controvert a moving party's statement of material facts.  Under Rule 56(e)(2), when "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the [C]ourt may . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2).  And likewise, under Local Civil Rule 7(h), "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  Plaintiffs add that "[t]he remedy of deeming Plaintiffs' assertion[s] as true is proportionate and not unfairly prejudicial to the FBI because Plaintiffs' assertions are not dispositive and all are well-supported by the record."  Dkt. 151 at 2.

The Court agrees that the FBI's counter statement of material facts demonstrates so little care and is so devoid of evidentiary support that it is properly treated as a nullity.  The Court is not persuaded that a computer glitch can be blamed for the FBI's failure.  Over three months have now passed since the FBI filed its "penultimate" draft of the counter statement, Dkt. 149-1, and the FBI has made no effort to supplement or correct its filing with a statement that complies with the requirements of Rule 56 or Local Civil Rule 7(h).  It is apparent that the FBI is content to rest on its "penultimate" draft, and that draft fails meaningfully to controvert any of the factual statements upon which Plaintiffs rely.  Finally, with the exception of paragraph seventy-seven, the Court agrees with Plaintiffs that none of the factual assertions at issue are controversial or likely to tilt the outcome of the Court's legal analysis in material respects.

The Court will therefore consider the facts as stated by Plaintiffs to be true, except for the assertion in paragraph seventy-seven, which is unduly speculative.  *See* Dkt. 143-4 at 9 (Pl.'s SUMF ¶ 77).

**B.**      **Remaining Issues from *Shapiro V***

    1.      *Case Numbers*

As of *Shapiro IV*, Plaintiffs challenged the FBI's withholding of file numbers on 122 pages pursuant to Exemption 7.  Thereafter, the FBI submitted a further declaration from David M. Hardy, his ninth in this litigation, explaining that, of those 122 pages, "the FBI cited FOIA Exemption 7(A) in conjunction with FOIA Exemption 7(E) . . . on approximately 86 pages to withhold file numbers associated with on-going investigations," while citing Exemption 7(E) alone "on approximately 36 pages because they were not related to pending investigations[] but were nonetheless sensitive."  Dkt. 97-3 at 8 (Ninth Hardy Decl. ¶ 11).  In the third round of summary judgment briefing, leading up to the *Shapiro V* hearing, Plaintiffs dropped their challenge to the FBI's withholding of the file numbers on eighty-six pages relating to ongoing investigations under both Exemption 7(A) and Exemption 7(E), "given that the Court already granted summary judgment to the FBI with respect to its assertion of Exemption 7(A) in every instance except for the Hyram Kitchen murder."  Dkt. 99 at 4 n.1.  But Plaintiffs still contested the redaction of the file numbers on the other thirty-six pages, as to which the FBI invoked Exemption 7(E) alone.  In addition, as Plaintiffs explained in their *Shapiro V* briefing, they contested the redaction of file numbers on an additional five pages pursuant to both Exemption 7(E) and Exemption 3.  Dkt. 99 at 8.  Because the Court denied both parties' motions for summary judgment with respect to the withholding of file numbers on those forty-one pages in *Shapiro V*, those withholdings remain in dispute.

The Court will first address the lawfulness of the FBI's withholdings under Exemption 7(E) and Exemption 3 and then, to the extent necessary, will consider Plaintiffs' invocation of the official-acknowledgement doctrine.

a.      Exemption 7(E)

Plaintiffs challenge the FBI's withholding of sensitive file numbers under Exemption

7(E).  To rely on Exemption 7(E), the FBI must show that the file numbers in question are

"records or information compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7), and that

release of the records at issue "would disclose techniques and procedures for law enforcement

investigations or prosecutions, or would disclose guidelines for law enforcement investigations

or prosecutions" that would "risk circumvention of the law," *id.* § 552(b)(7)(E).  In *Shapiro IV*,

the Court agreed with that FBI that sensitive file numbers could, at least in certain circumstances,

meet that standard.  *See Shapiro IV*, 239 F. Supp. 3d at 118–19; *see also id.* at 118 n.5 (collecting

cases permitting law enforcement agencies to withhold file numbers under Exemption 7(E)).  But

the Court's "conclusion that the disclosure of FBI file numbers *can*—in theory—reveal sensitive

law enforcement techniques . . . does not answer the question whether disclosure of the file

numbers at issue here would, in fact, do so."  *Id.* at 118.  The Court was unconvinced, on the

unique facts of the case, that the FBI had carried its burden as to the third part of the Exemption

7(E) test—that disclosure of the file numbers could reasonably be expected to "risk

circumvention of the law."  5 U.S.C. § 552(b)(7)(E).

The FBI had posited that, "where broad requests seek information about a large number

of cases, releasing file numbers can show that a particular type of investigation—for instance,

[d]omestic [t]errorism and/or anarchist extremism—occurs more regularly with respect to a

particular [o]ffice of [o]rigin."  Dkt. 74-2 at 8 (Seventh Hardy Decl. ¶ 15).  A savvy FOIA

requester, the FBI continued, could thus use an assembled mosaic of file numbers to create "a

'heat map'" that "[a]narchist extremists could then use . . .  to circumvent the law by committing

criminal acts in the areas where they determine, based on the released FBI file numbers[,] [that] there is less of an FBI investigative focus." *Id*.

Although Exemption 7(E) does not impose "a highly specific burden of showing how the law will be circumvented," it does "require[ ] that [the agency] 'demonstrate[ ] logically how the release of [the requested] information might create a risk of circumvention of the law.'" *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194 (D.C. Cir. 2009) (alterations in original) (quoting *PHE, Inc. v. U.S. Dep't of Justice*, 983 F.2d 248, 251 (D.C. Cir. 1993)). The Court held that the FBI had failed to carry its burden of establishing that logical connection. Because the FBI separately invoked Exemption 7(A) to withhold file numbers associated with ongoing investigations, the file numbers as to which the FBI invoked Exemption 7(E) alone all—at least presumably— corresponded to closed investigations. Even so, the Court was satisfied that the disclosure of historical file numbers could risk circumvention of the law in certain contexts, because "knowing that the FBI has historically focused its enforcement efforts in a particular region, for example, might aid a criminal in circumventing the law." *Shapiro IV*, 239 F. Supp. 3d at 120. But the Court also concluded that at least three of the relevant documents pertained to the murder of Hyram Kitchen, and the FBI closed its investigation into that murder more than 25 years earlier. *Id*. The link between decades-old files and modern-day circumvention of the law was far from clear. *Id*. The Court, accordingly, denied both Plaintiffs' and the FBI's cross motions for summary judgment as to those file numbers to permit the FBI to clarify the link, if any.

In so doing, the Court gave the FBI specific guidance on what information the Court would need in order to conclude that the FBI had met its burden. The Court observed, for example, that it could not "discern from the existing record whether [any of] the relevant investigations [were] open, whether they [were] closed in the past few years, or whether they

[were] closed decades ago." *Id.* It thus urged the FBI to offer "evidence about if, and when, the underlying investigations at issue were closed." *Id.* The Court addressed this issue again at the *Shapiro V* hearing, where it concluded that the FBI still had failed to meet its burden. Given that repeated failure, the Court "put[] the FBI on warning . . . that if [it did not] come forward and meet [its] burden at th[is] point, [the Court would] have [no] choice but to grant the Plaintiffs' motion." May 2, 2019 Hrg. Tr. (Rough at 27). In short, "there are only so many bites at the apple that are in any way consistent with the need for expeditious disclosure under FOIA, when we're now six years into this litigation." *Id.*

Notwithstanding this warning, the FBI's opening brief in support of its pending motion for summary judgment does not include any specific arguments in support of its withholding of sensitive file numbers under Exemption 7(E). The FBI does address this topic in an additional declaration, its twelfth overall and the second from Michael G. Seidel, the Assistant Section Chief of the FBI's Record/Information Dissemination Section ("RIDS"), submitted in conjunction with its renewed motion for summary judgment.[2] In that declaration, the FBI "amplifies its prior justifications" for withholding file numbers under Exemption 7(E). Dkt. 132-2 at 11–12 (Second Seidel Decl. ¶ 19). The declaration asserts that, in general, the release of file numbers can lead to circumvention of the law. According to Seidel, "[r]elease of sensitive investigative file numbers over time in response to FOIA or other information requests would allow criminals and adversaries to piece together how FBI investigations may be interrelated and when, why, and how the FBI pursued different investigative targets and strategies." *Id.* at 15 (Second Seidel Decl. ¶ 28). He further contends that disclosing the file numbers could reveal

---

[2] The Court has warned the FBI repeatedly in this litigation that its legal arguments must be presented in its briefs, not in its declarations. *See, e.g.*, *Shapiro IV*, 239 F. Supp. 3d at 119 n.6. That is yet another warning from the Court that has gone unheeded.

such information as "where the FBI allocates its limited investigative resources and/or is prioritizing its investigative and [] intelligence-gathering efforts regarding particular threat areas" and "what the FBI likely knows about a particular crime or threat, when/how it obtained that knowledge, and if there are knowledge gaps." *Id.*  As to the particular file numbers at issue here, Seidel contends that the "risk of circumvention is particularly acute in this case, as [Shapiro] sought information about multiple subjects within the animal rights extremist genre." *Id.*

The Seidel declaration sets out a number of factors that the FBI used to distinguish the file numbers it withheld from those it disclosed: "file classifications and functionality (i.e., bank robbery vs. foreign intelligence and source related files), age of the records, status of the investigation documented in a particular file (pending vs. closed), context in which particular file numbers are mentioned, and the interrelation of file numbers to other investigations in terms of investigative scale, scope, and impact on enforcement efforts." *Id.* at 14 (Second Seidel Decl. ¶ 25).  Yet, despite the Court's appeal for evidence related to the age of the relevant file numbers, the Seidel declaration fails entirely to explain how the boilerplate factors it invokes apply here.  The FBI has already acknowledged that all of the disputed file numbers pertain to closed investigations, so the Court can assume that the "pending vs. closed" factor weighed in favor of disclosure.  But the Court is yet again left to guess as to the "age of the records" and cannot, on the present record, discern whether the investigations were closed in the past few years or decades ago.

In their motion for summary judgment, Plaintiffs argue that the FBI "has steadfastly refused to provide this Court with the information it needs to make a *de novo* determination as to the applicability of Exemption 7(E) to the specific file numbers at issue here."  Dkt. 143 at 10.

Instead of providing the evidence that the Court ordered it to provide, "the FBI simply enumerates the vague and subjective criteria the agency relies on." *Id.* at 11.

The FBI takes a final shot in its reply brief, which is accompanied by a fourteenth declaration, this one the first from Joseph E. Bender Jr., the Acting Assistant Section Chief of RIDS, *see* Dkt. 148-1 (Bender Decl.), and which merely quotes lengthy passages from that declaration, *see* Dkt. 148 at 6–9. The new declaration, however, is much like the old declarations. It states, yet again, that the FBI "does not use a blanket approach or policy to withhold all file numbers." Dkt. 148-1 at 6 (Bender Decl. ¶ 8). The FBI "maintains its position" that the exempted file numbers meet the three-part standard for withholdings under Exemption 7(E). *Id.* (Bender Decl. ¶ 10). The declaration then explains the ways in which file numbers can, in theory, be used to circumvent the law—which the Court already accepted, in the abstract, in *Shapiro IV*. *Id.* at 6–7 (Bender Decl. ¶ 10). The declaration then sets forth the same list of factors that the FBI considered as part of its "harm analysis" in determining which numbers to release and which to redact. *Id.* at 7–8 (Bender Decl. ¶ 11). The declaration, however, says nothing about *how* those factors apply here.

The Court has asked the FBI, repeatedly, how long the investigations in question have been closed and what implication the age of the closed investigations has for the FBI's theory of potential harm. At the *Shapiro V* hearing, the Court invited the FBI to provide these details *in camera* and *ex parte* if they were too sensitive to reveal on the public docket. But despite filing fifteen declarations, the FBI has persistently failed to give the Court a straight answer—or any answer at all. The FBI's burden under Exemption 7(E) is not a heavy one. "[T]he exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or

35

universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." *Mayer Brown*, 562 F.3d at 1193.  Here, the FBI need demonstrate only some logical connection between the file numbers at issue in this case—rather than file numbers as a class in the abstract—and a risk of circumvention of the law.  But (1) because the FBI has failed to provide *any* information about the specific file numbers at issue here, despite the Court's explicit request for that information and offer to consider any sensitive information *in camera* and *ex parte*; (2) because the Hyram Kitchen investigation shows that at least some of the investigations at issue in this case closed decades ago; and (3) because the Court has a duty to review the agency's withholdings *de novo*, even if based on the agency's declarations, 5 U.S.C. § 552(a)(4)(B), the Court must conclude that the FBI has failed to carry its burden with respect to its invocation of Exemption 7(E) to withhold the remaining file numbers.

In arguing that its representations about the risk of disclosure are sufficient, the FBI points to a recent decision from Chief Judge Howell in the litigation over Shapiro's parent FOIA requests.  Distinguishing both *Shapiro IV* and *Shapiro v. CIA*, 247 F. Supp. 3d 53, 73 (D.D.C. 2017), which had adopted the same reasoning applied here, Chief Judge Howell "determined that the FBI has adequately described that present-day threat." *Shapiro v. Dep't of Justice*,  No. 12-cv-313, 2020 WL 3615511, at *37 (D.D.C. July 2, 2020), *reconsideration denied*, No. 12-cv-313, 2020 WL 5970640 (D.D.C. Oct. 8, 2020).  She then quoted language from declarations, which appear to contain assertions identical to those that the FBI offers here, about the factors that the FBI considers in withholding file numbers.  *Id.*  Finally, Chief Judge Howell concluded that "[t]he FBI ha[d] thus shown how file numbers, even those marking closed investigations, might help individuals evade current law enforcement activities." *Id.*

This Court agrees that the FBI's declarations show how some file numbers might help people circumvent the law.  But, on the facts of this case, the Court is unpersuaded that a description of the FBI's general methodology is sufficient to carry its burden.  Particularly given evidence that the FBI is invoking Exemption 7(E) to protect a file number from an investigation that closed well over twenty-five years ago and given the FBI's repeated failures to provide the Court with the more specific evidence it sought for *in camera*, *ex parte* review, the Court is left with significant doubt that disclosure of each of the file numbers still at issue "could reasonably be expected to risk circumvention of the law," 5 U.S.C. § 552(b)(7)(E).  Although the standard is not a demanding one, neither is it an invitation for an agency to rely on a boilerplate justification that contains no information about the specific withholdings at issue, even after a district court concludes that more is needed and repeatedly orders that the agency offer *some* case-specific justification.

The Court will, accordingly, grant summary judgment to Plaintiffs with respect to the file numbers on the thirty-six pages that the FBI withheld under Exemption 7(E) alone.  The FBI must therefore disclose those file numbers, including file numbers in the records pertaining to the Hyram Kitchen murder.  The Court rejected the FBI's effort to withhold the Hyram Kitchen records under Exemption 7(A) in *Shapiro IV*, 239 F. Supp. 3d at 120–121, and now rejects its Exemption 7(E) argument as to those records as well.

b.   <u>Exemption 3</u>

Plaintiffs also challenge the FBI's withholding of file numbers on five pages pursuant to Exemption 3, which applies to information "specifically exempted from disclosure by statute," so long as the statute in question (i) "requires that matters be withheld from the public in such a manner as to leave no discretion on the issue" or (ii) "established particular criteria for

withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).  Here, the FBI withheld file numbers under the NSA, which requires the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1).  There is no dispute, among either the parties or the courts, that the NSA qualifies as a withholding statute under the terms of Exemption 3.  *See Shapiro IV*, 239 F. Supp. 3d at 122 (collecting cases).  The Supreme Court has construed the relevant language of the NSA to protect "all sources of intelligence that provide, or are engaged to provide, information the [a]gency needs to perform its statutory duties with respect to foreign intelligence."  *CIA v. Sims*, 471 U.S. 159, 169–70 (1985).  As the D.C. Circuit has explained, moreover, "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage."  *Goland v. CIA*, 607 F.2d 339, 350 (D.C. Cir. 1978).  Still, an agency invoking Exemption 3 must demonstrate its applicability "in a nonconclusory and detailed fashion," *id.* at 351, and must provide "the kind of detailed, scrupulous description [of the withheld documents] that enables a District Court judge to perform a searching de novo review," *Church of Scientology of Ca., Inc. v. Turner*, 662 F.2d 784, 786 (D.C. Cir. 1980).

In *Shapiro IV*, the Court held that the declarations the FBI had provided to that point were "simply too broad and conclusory to allow the Court to perform the type of 'de novo review' required by the governing precedent."  *Shapiro IV*, 239 F. Supp. 3d at 123.  The Court again reached the same conclusion in *Shapiro V*, concluding that the FBI had not provided enough information for the Court to assess the validity of its Exemption 3 withholdings.  May 2, 2019 Hrg. Tr. (Rough at 32).  Here, the FBI's new declarations largely "amplif[y] its prior

justifications" for its withholdings under Exemption 3.  But unlike with Exemption 7(E), the

Court concludes that the FBI has done just enough to support its withholdings under Exemption

3, particularly in light of the "substantial deference" due.  *Shapiro IV*, 239 F. Supp. 3d at 123.

The FBI provides three additional justifications for Exemption 3 withholdings.

First, the FBI explains that each file number includes four distinct elements: (1) a

classification number signifying the type of investigation or type of crime; (2) an "alpha"

designator for subcategorizations that provide more specific information about the type of case;

(3) letters designating the originating field office; and (4) a six-digit unique number identifying

the individual investigation.  Dkt. 148-1 at 6 (Bender Decl. ¶ 9).  To further elucidate how the

file numbers work, the FBI provides a hypothetical file number of 123B-WF-123456, in which

"123" indicates a classification of "criminal enterprise," "B" means "Mexican Organizations,"

"WF" stands for the "Washington field office," and "123456" is the unique file number.  *Id.*  The

FBI applied Exemption 3 where the first part of the file number, the classification, was "created

with the functional purpose of compiling records/information pertaining solely to intelligence

sources, methods, and activity," such that "the file number itself is linked with an intelligence

source, method, or activity."  Dkt. 132-2 at 12 (Second Seidel Decl. ¶ 20).

Second, "the file number is," therefore, "fused with the agenc[y's] non-discretionary

mandate to protect intelligence sources and methods because disclosure of the file number would

in and of itself reveal the functional intelligence source and method designation and/or provide a

singular, distinctive pointer to FBI national security tradecraft."  *Id.* at 13 (Second Seidel Decl.

¶ 21).

Third, this risk of disclosure "is specifically magnified in this case, as the information is

not a mere listing of file numbers; they are listed in direct association with several subjects."  *Id.*

(Second Seidel Decl. ¶ 22). The connection between the file classification for a particular intelligence source and the subject of the investigation could also reveal intelligence-source-and-method activity. *Id.*

Although the FBI's declarations are difficult to parse, the Court credits the FBI's contention that certain file number classifications are themselves sensitive because they could give away that files with that classification are associated with a particular intelligence method or source. Plaintiffs counter that the FBI's reasoning skips a step. They provide their own hypothetical classification code, 950, which for purposes of the hypothetical represents the intelligence method of "infecting foreign terrorists' computers with a specific piece of malware." Dkt. 143 at 16. They argue that revealing a case number with 950 in it could reveal that the information in the file was obtained using that method, "*but only if it was already known* what intelligence source or method a '950' file pertained to." *Id.* Plaintiffs contend that it is only the meaning of the classification code, rather than the classification code itself or its association with a particular file, that "might plausibly be an intelligence source or method protected under Exemption 3." *Id.*

The Court is unconvinced. Plaintiffs are correct that deducing intelligence sources and methods requires knowing not only the codes but also what they mean. But just because the FBI's system of protecting intelligence sources and methods is a puzzle with multiple pieces does not prevent the FBI from protecting each piece of the puzzle—particularly where it will be known that the code refers to *some* "intelligence method." As the Court explained in *Shapiro IV*, Shapiro's "universe of inter-related domestic terrorism requests," *Shapiro IV*, 239 F. Supp. 3d at 115 (citing Dkt. 57-3 at 59 (Fifth Hardy Decl. ¶ 122)), has produced hundreds of thousands of pages and creates a mosaic within which individual pieces of otherwise opaque information can

take on meaning.  Publicly disclosing the classification codes that signify particular intelligence sources, methods, or activities increases the possibility that someone (not necessarily Plaintiffs) will put the puzzle pieces together to figure out what those sources, methods, or activities are and in which files they were used—or will at least be able to deduce that one of a range of possible intelligence methods was used.  The NSA prohibits the FBI from releasing such information.

The Court will therefore grant summary judgment to the FBI with respect to the file numbers it withheld under Exemption 3.

c.      Official Acknowledgment

Plaintiffs argued in their *Shapiro V* briefing that—regardless what exemptions might otherwise apply—the FBI had "officially acknowledged" many of the disputed file numbers through prior disclosures and thus cannot withhold them now.  *See* Dkt. 99 at 13–14.  In *Shapiro V*, the Court ordered the FBI to compare the file numbers it was still withholding to a list of file numbers Plaintiffs claimed had been officially acknowledged and, "upon receipt of evidence substantiating any such acknowledgment, [to] disclose any identical file numbers withheld in this litigation."  *See* Minute Order (May 2, 2019).

"When information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."  *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)).  But the test for official acknowledgment is a "strict" one.  *Id.* (quoting *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009)).  "To be officially disclosed: '(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure.'"  *Id.* (quoting *Am. Civil Liberties Union v. U.S.*

*Dep't of Def.*, 628 F.3d 612, 620–21 (D.C. Cir. 2011)).  "'[A] plaintiff asserting a claim of prior

disclosure must bear the initial burden of pointing to specific information in the public domain

that appears to duplicate that being withheld.'"  *Id.* (quoting *Afshar v. Dep't of State*, 702 F.2d

1125, 1130 (D.C. Cir. 1983)).  "The ultimate burden of persuasion," however, "remains with the

government."  *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1279 (D.C. Cir. 1992).

      The second Seidel declaration explains the FBI's efforts to disclose file numbers that it

had previously acknowledged.  *See* Dkt. 132-2 at 10–11 (Second Seidel Decl. ¶¶ 16–17).  The

Court's inartful phrasing in its Minute Order, which referred to "36 file numbers" rather than

pages, caused Seidel some confusion, but he eventually put his finger on the correct thirty-six

pages on which the FBI had withheld file numbers under Exemption 7(E) alone.  *Id.*  According

to Seidel, the FBI compared the file numbers on those thirty-six pages to the list of previously

disclosed numbers that Plaintiffs provided and conducted "additional research" to determine

whether any of the disputed file numbers had been officially acknowledged elsewhere.  *Id.* at 10

(Second Seidel Decl. ¶ 17).  As a result of this process, the FBI reprocessed thirty-one of the

thirty-six pages to release additional file numbers.  *Id.* at 11 n.4 (Second Seidel Decl. ¶ 17 n.4).

      Plaintiffs note that the FBI's supplemental release in July 2019 included some

inconsistencies.  Dkt. 143 at 14.  The FBI, for instance, released two different versions of the

same search slips for request No. 1169691-000 with inconsistent redactions.  *Id.*  As Plaintiffs

explain, although the underlying records are identical, "there are 19 instances in which a file

number is redacted in Version A, but unredacted in Version B, while there are four instances in

which a file number is redacted in Version B, but unredacted in Version A."  *Id.* at 14–15; Dkt.

143-1 at 9–18 (Ex. 5, Version A); *id.* at 19–28 (Ex 5, Version B).  Plaintiffs point out these

inconsistencies, in part, as proof that the FBI's remaining withholdings under Exemption 7(E)

are irrational.  Dkt. 143 at 14–15.  As explained above, the FBI has not met its burden to justify

withholding file numbers under Exemption 7(E) irrespective of these inconsistencies.

But Plaintiffs also contend that "[u]nder the doctrine of official disclosure, the FBI should

be required to reprocess and release all file numbers or portions of file numbers that it has

already disclosed."  *Id.* at 30.  In the example above, Plaintiffs want the FBI to produce another

version of the relevant search slip that reveals every file number that had previously been

disclosed in either Version A or Version B.  As another example, on Bates page FBI-4458, the

FBI redacted two file numbers from search notes, but the same list of file numbers appears again

on FBI-4465, and there only one of those file numbers is redacted.  *Id.* at 31.  Plaintiffs argue

that all references to the file number that is redacted in one place but not the other—266A-LA-

227426—should be released.  *Id.* at 31.  And, in a third example, Plaintiffs identify several

redactions contained in two search slips and the analyst's search notes for request No. 117150-

001 and contend that "at least some of the withheld information" was released in other

documents.  *Id.* at 31–32.

Plaintiffs argue that the FBI should not be permitted to release "several versions of a

document, each of which contains different improper redactions, on the theory that the reader can

piece together the relevant information by combining documents."  Dkt. 151 at 7.  Allowing such

a practice would, in Plaintiffs' view, "set a dangerous precedent because when journalists go to

publish the documents, they would either need to copy and paste portions of documents on top of

each other, or else risk confusing the reader by providing multiple copies of the same document

with different portions redacted."  *Id.*

Because the Court has granted Plaintiffs' motion for summary judgment with respect to

all the file numbers withheld under Exemption 7(E), Plaintiffs' arguments that a subset of these

numbers should be released under the official acknowledgment doctrine are moot.  But when the FBI reprocesses and releases the records to disclose the relevant file numbers, the FBI should provide those records to Plaintiffs in such a form that the disclosures in a given record appear together in a single version of that record.

> 2.    *Segregability of the NSC and Stein Records*

In *Shapiro I*, the Court denied the parties' cross-motions with respect segregability of information in processing records for twelve parent FOIA requests submitted by third-parties. *Shapiro I*, 153 F.Supp.3d at 287.  In *Shapiro IV*, to ascertain the feasibility of segregating this material, the Court "require[d] the FBI to file copies of the search slips from one randomly selected FOIA request, from which only the nonpublic information has been redacted."  *Shapiro IV*, 239 F. Supp. 3d at 127.  In *Shapiro V*, after reviewing the sample search slip, the Court concluded that "it's not the mother [lode], but it's not mumbo jumbo either."  Hrg. Tr. (Rough at 40).  The Court therefore granted summary judgment to Plaintiffs and ordered that the FBI produce segregated versions of those records.  *Id.* at 40–41.

The FBI produced these records but in reprocessing them claimed "the full panoply of applicable exemptions," Dkt. 148 at 13, despite the Court's prior warnings against "assert[ing] additional claims *seriatim* in the district court."  *Shapiro III*, 2016 WL 3023980, at *2.  Plaintiffs challenge only the redactions under Exemption 3.  In their motion, Plaintiffs argue that "[t]he FBI has categorically failed to justify the vast majority of its Exemption 3 withholdings from the records previously categorically withheld" from the FOIA requesters, NSC and Stein.  Dkt. 143 at 19.  The FBI responds that it withheld information from the NSC and Stein records pursuant to Exemption 3 on only three pages. Dkt. 148 at 13.  To justify these new withholdings, the FBI points to the Bender declaration, *id.*, which states only that "[t]he FBI explained that it is relying

on the same coded categories previously described in" the Fifth and Eleventh Hardy declarations.

Dkt. 148-1 at 11 (Bender Decl. ¶ 16).  Bender thus directs the Court to consult the Fifth and

Eleventh Hardy declarations for "the FBI's justifications for the Exemption 3 withholdings on

these pages." *Id*.

The FBI's reliance on these old declarations to support its new withholdings is both

confounding and disappointing, especially when matters as serious as the protection of

intelligence sources and methods are concerned.  The Fifth Hardy Declaration was filed on May

10, 2016, more than three years before the FBI invoked Exemption 3 to redact information from

its July 2019 release.  *See* Dkt. 57-3 (Fifth Hardy Decl.).  That old declaration could not possibly

provide a reasoned justification for these new redactions, other than standard boilerplate that the

FBI could include in any declaration supporting Exemption 3 withholdings in any case.  FOIA,

however, requires the FBI to provide "the kind of detailed, scrupulous description [of the

withheld documents] that enables a District Court judge to perform a searching de novo review."

*Church of Scientology*, 662 F.2d at 786.  Moreover, the Court already considered the relevant

passages from the Fifth Hardy Declaration when assessing other withholdings under Exemption

3 in *Shapiro IV* and concluded that "the declarations [the FBI] has provided to date are simply

too broad and conclusory to allow the Court to perform the type of 'searching de novo review'

required by the governing precedent."  *Shapiro IV*, 239 F. Supp. 3d at 123 (quoting *Church of

Scientology*, 662 F.2d at 786).  Tellingly, in the Ninth Hardy Declaration, which the Court

deemed too conclusory to support other Exemption 3 withholdings in *Shapiro V*, the FBI

acknowledged that, "[w]hen the FBI applies FOIA Exemption 3 pursuant to the NSA of 1947,

*context matters* in determining the applicability of this particular statutory authority."  Dkt. 97-3

at 5 (Ninth Hardy Decl. ¶ 7) (emphasis added).  The Fifth Hardy Declaration does not provide the context for the Exemption 3 withholdings at issue here.

The Eleventh Hardy declaration fares no better than the Fifth, perhaps even worse.  That declaration was filed on December 17, 2018, several months before the FBI made the withholdings in question.  Like the Fifth Hardy Declaration, it too could not possibly have provided any analysis unique to the records released in July 2019.  In any event, the Eleventh Hardy Declaration includes only a single paragraph about Exemption 3, composed of two sentences, which simply parrot the statutory text with no analysis.  Dkt. 123-3 at 9 (Eleventh Hardy Decl. ¶ 18).

To be sure, courts must give "special deference . . . to agency affidavits on national security matters."  *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007).  And as explained above, "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage," *Goland*, 607 F.2d at 350.   But an agency invoking Exemption 3 must demonstrate its applicability "in [a] nonconclusory and detailed fashion."  *Id.* at 351; *see also Morley*, 508 F.3d at 1125–26  (providing that declarations must "provide[] the kind of detailed, scrupulous description that enables a District Court judge to perform a searching de novo review") (quotation marks and citation omitted); *Schoenman v. FBI*, No. 04-cv-2202, 2009 WL 763065, at *24 (D.D.C. Mar. 19, 2009) (upholding Exemption 3 withholdings where agency gave explanation that was "at a minimum, plausible") (quotation marks and citation omitted).

This is not a difficult standard.  Indeed, the Court concludes above that the FBI has met its burden to justify the withholding of case numbers under Exemption 3 by explaining the nexus

46

between the case numbers in question, which include classification codes related to intelligence sources and methods, and the FBI's statutory mandate under the NSA. Here, the FBI has not done so; indeed, it has failed to offer *any* evidence or analysis respecting the applicability of the NSA to the specific records currently at issue. The Court will, accordingly, grant Plaintiffs' motion for summary judgment with respect to the Exemption 3 withholdings from three pages of the records responsive to NSC and Stein.

The Court remains concerned, however—as it has through much of this litigation—that the government's inattention to its obligations in this case could lead to the disclosure of information that might harm national security. The Court will, accordingly, permit the FBI to move for reconsideration on this issue on or before December 28, 2020, but only if it can provide the Court with a reasonably detailed, supplemental declaration showing that the "withheld material" falls "within the [NSA's] coverage," *Morley*, 508 F.3d at 1126 (citation and quotation marks omitted). The FBI may file such a supplemental declaration *in camera* and *ex parte*, if necessary. The FBI is cautioned, however, that the Court will not further delay resolution of this long-pending case by extending the time for any such motion for reconsideration and will provide Plaintiffs with appropriate relief if the FBI, yet again, files a motion that fails to include a declaration sufficient to permit the Court "'to perform a searching *de novo* review,'" *id.*, of the asserted exemption.

      3.    *Truthout Records*

        a.   <u>Exemption 7(E) Withholdings</u>

In *Shapiro IV*, the Court permitted the FBI to submit the Sixth Hardy Declaration *in camera* and *ex parte*, *Shapiro IV*, 239 F. Supp. 3d at 111, in support of the FBI's withholdings under Exemption 7(E) from certain FOIA processing records that Truthout sought related to its

parent requests concerning Hesham Abu Zubaydah, *Shapiro I*, 153 F. Supp. 3d at 292–93.  But the Court neglected to return to that issue on the merits, and the Conclusion section of the opinion indicated that the FBI's motion was "otherwise denied."  *Shapiro IV*, 239 F. Supp. 3d at 127.  Plaintiffs thus argued in their third motion for summary judgment that the Court had rejected these withholdings from the Truthout records.  Dkt. 99 at 15–16.  At the *Shapiro V* hearing, the Court explained that the omission was unintentional.  In the present round of summary judgment briefing, it appears that Plaintiffs may have dropped this issue, *see generally* Dkt. 143, and the FBI does not address it, *see generally* Dkt. 132.  In any event, the FBI has resubmitted the Sixth Hardy Declaration *in camera* and *ex parte*.  Dkt. 133.  The Court has reviewed that declaration and concludes that the FBI's withholdings from the records concerning Hesham Abu Zubaydah under Exemption 7(E) are justified.

The Court will therefore grant the FBI's motion for summary judgment as to those records.

> b.    Exemption 5 Withholdings

The FBI also withheld material from the FOIA processing records related to Truthout's parent request concerning Abu Zubaydah "on the basis of the Exemption 5 deliberative process privilege."  *Shapiro I*, 153 F. Supp. 3d at 292.  As the Court explained in *Shapiro I*, "[t]he FBI initially appeared to take the position that all [Freedom of Information and Privacy Act Document Processing System ("FDPS")] processing notes are protected by the deliberative process privilege," but, in its reply brief, the FBI "significantly narrowed the scope of its argument."  *Id.* at 293 (emphasis omitted).  The FBI conceded that "it does not have 'a policy of categorically denying requests for FDPS [processing] [n]otes pursuant to Exemption 5,'" and argued, instead, that the specific records at issue were deliberative.  *Id.*; *see also* Dkt. 31 at 12–

13; Dkt. 31-1 at 11 (Second Hardy Decl. ¶ 26).  Even narrowed in that manner, however, the

Court concluded that "the FBI ha[d] yet to demonstrate that it [was] entitled to prevail on this

issue because the Hardy Declarations contain[ed] almost no factual material that would explain

why the FDPS processing notes compiled in processing Truthout's request [were] any more

'predecisional' or 'deliberative' than any other FDPS processing notes."  *Shapiro I*, 153 F. Supp.

3d at 293.  In short, to the extent the FBI maintained that the specific processing notes that

Truthout sought, as opposed to all processing notes in general, contained material that was either

deliberative or inextricably intertwined with deliberative information, the FBI's factual

submissions were entirely conclusory and unpersuasive.

In *Shapiro IV*, the Court returned to the issue and considered whether the Fifth Hardy

Declaration filled the evidentiary lacuna left in *Shapiro I*.  Hardy offered "two lines of factual

support" for the FBI's assertion of the deliberative process privilege.  *Shapiro IV*, 239

F. Supp. 3d at 124.  He first asserted that the privilege applied because "[p]rocessing notes and

search slips *by their very natu*re are considered working papers . . . and recommendations."  Dkt.

57-3 at 35 (Fifth Hardy Decl. ¶ 74) (emphasis added).  The Court rejected that justification

because it returned to the position that the Court previously held that the FBI had abandoned in

*Shapiro I*—that is, that *all* processing notes and search slips are inherently deliberative.  *Shapiro*

*IV*, 239 F. Supp. 3d at 124. [3]  Second, Hardy attested that "the FBI protected information

contained within specific working papers prepared in responding to other FOIA lawsuits filed by

---

[3]  Hardy's assertion (in the context of this general discussion about the "nature" of processing
records) that "[t]he FBI only protected those discussions that are not routine administrative
matters and do not reflect the final determination of a decision-maker regarding the disposition
of a FOIA request" bears no evident connection to the specific records that Truthout sought.
Dkt. 57-3 at 36 (Fifth Hardy Decl. ¶ 75).  And, in any event, this lone assertion is far too vague
and conclusory to support the withholding of these specific processing notes.

[P]laintiffs," where those records "reflected deliberations that formed an integral part of the process by which decisions about the final content of various documents at issue in the pending lawsuits were made, in addition to the overall decision-making process regarding the litigation strategy and defense of the FBI and other defendants in [P]laintiffs' other FOIA lawsuits."  Dkt. 57-3 at 36 (Fifth Hardy Decl. ¶ 76).  Hardy further explained that, although these processing records are "structurally similar" to those compiled when responding to any FOIA request not in litigation, "these materials related to active civil lawsuits," and, "as such, disclosure of privileged material would have inhibited the government's decision-making processes in responding to those pending lawsuits."  *Id.* at 36–37 (Fifth Hardy Decl. ¶ 76).  On this basis, the Court was convinced that the deliberative-process privilege applied to this subset of the records.  The Court, accordingly, granted "the FBI's motions for summary judgment with respect to its reliance on the deliberative-process privilege to withhold records in response to the Truthout FOIA request, but only to the extent those records fall within the second factual justification."  *Shapiro IV*, 239 F. Supp. 3d at 124.  The Court cautioned, however, that "even as to those records, the FBI [was] obligated to segregate factual material from deliberative material," as required by the Supreme Court in *EPA v. Mink*, 410 U.S. 73, 91 (1973).  *Id.*

At the *Shapiro V* hearing, Plaintiffs voiced skepticism that the records that the FBI has now withheld pursuant to the Court's holding in *Shapiro IV* could have been created in preparation for either of the cases potentially involved, *Leopold v. CIA*, No. 12-cv-245 (D.D.C. filed Feb. 14, 2012), or *Truthout v. Dep't of Justice*, 20 F. Supp. 3d 760 (E.D. Cal. 2014).  May 2, 2019 Hrg. Tr. (Rough at 47).  The *Leopold* case concerned the narrow issue of whether the FBI was required to provide an estimated date of completion, and the *Truthout* case was filed months later, after many of the relevant records were created.  *Id*.  Given this uncertainty, the

Court denied the FBI's motion for summary judgment with respect to "the 32 pages of records related to the *Leopold* litigation," but permitted the FBI to "renew its motion to the extent it can show that the withheld material relates to the issue raised in the *Leopold* litigation.  To the extent the FBI cannot establish such a nexus, it shall release the previously withheld records."  Minute Order (May 2, 2019).

Seidel's second declaration discusses the FBI's efforts to limit its withholdings to those records compiled in preparation for litigation.  He avers that "[t]he FBI has conducted" a review of "the 32 pages the FBI deemed related to the *Leopold* litigation," and has now "released information" from those records that, in the FBI's view, does "not fall under the purview of the deliberative process privilege as it directly relate[s] to the *Leopold* case."  Dkt. 132-2 at 17 (Second Seidel Decl. ¶ 32).   As Seidel further explains, the FBI first "determined when the complaints were filed for both the *Truthout* and *Leopold* cases."  *Id.* (Second Seidel Decl. ¶ 33). It then "examined these case notes to determine if any notes were entered into the underlying FOIA request . . . denoting that the case was in litigation and determined this applied to" a range of thirty-two pages, Bates numbers FBI-214 through FBI-245, as the Court had identified in its minute order.  *Id.* at 17–18 (Second Seidel Decl. ¶ 33).  Finally, the FBI "analyzed the actions denoted in each note to determine if they [were] related [to] or were completed in relation to either litigation case."  *Id*. at 18 (Second Seidel Decl. ¶ 33).  Based on this analysis, the FBI determined that its litigation-based privilege applied only to a subset of the previously identified pages: FBI-215–19, 225–30, 234, 236–37; 239–43.  *Id*.

Plaintiffs argue that this still does not withstand scrutiny.  They challenge two aspects of the FBI's most recent analysis.  First, Plaintiffs contend that "by [the FBI's] own admission, every note between" pages FBI-230 and FBI-245 "predated the filing of the complaint in"

*Leopold*. Dkt. 143 at 22.[4]  As such, according to Plaintiffs, "even generously evaluating the

FBI's assertions, it improperly withheld information from pages" in that range.  *Id*.  Second,

Plaintiffs argue that the FBI still fails to appreciate the nature of the *Leopold* litigation.  *Id*.

Although that lawsuit pertained only to whether the FBI must provide requesters an estimated

date of completion, Plaintiffs surmise that some of the withheld pages were "about *the*

*processing of the request* and not *the estimated date of completion for the request*."  *Id*.

(emphasis in original).

 In its reply and the accompanying Bender declaration, the FBI takes a broad view of what

it means for FOIA processing records to be compiled in preparation for litigation.  The Bender

declaration explains:

> Per normal progression of most FOIA cases, the FBI had opened and was
> handling the request prior to the litigation.  There were internal deliberations on
> the handling of the request prior to and after the litigation was filed.  The pre-
> litigation case notes of a FOIA request, as a whole, are in fact relevant and
> inherently tied to any subsequent or potential litigation.  For example, [FBI-234
> –43] are internal deliberations concerning a possible lead to/from Chief Division
> Counsel and other reviews for sensitivities and coordination the FBI performs
> for potentially responsive records. These communications comprise deliberative
> "give and take" that were an integral part of the decision-making process that
> was ultimately subject to litigation.

Dkt. 148-1 at 12–13 (Bender Decl. ¶ 19).

 Because any FOIA request might result in litigation, this broader formulation reads like a

return to the FBI's prior position that all FOIA processing notes are protected by the deliberative

---

[4]  The Court is uncertain whether the FBI has made the admission that Plaintiffs suggest.  As
evidence of this concession, Plaintiffs cite to the Second Seidel Declaration, Dkt. 132-2 at 18
(Second Seidel Decl. ¶ 33), but nothing in that paragraph indicates exactly when the FBI created
the records on pages FBI-230 through FBI-245.  The Bender Declaration, however, filed with the
FBI's reply, does seem to acknowledge that at least the records between FBI-234 and FBI-243
were compiled before the litigation in *Leopold* commenced.  Dkt. 148-1 at 13 (Bender Decl.
¶ 19).  The FBI is now withholding information pursuant to the deliberative-process privilege on
eight of these pages: FBI-234, 236–37, and 239–43.

process privilege.  The Court held in *Shapiro I* and reaffirmed in *Shapiro IV* that the FBI had abandoned the contention that "all FOIA search records are *by their very nature* protected by the deliberative process privilege."  *Shapiro IV*, 239 F. Supp. 3d at 124 (citing *Shapiro I*, 153 F. Supp. 3d at 293).  To the extent the FBI seeks to rely on a narrower rationale, it bears the burden of explaining why the particular records at issue or particular portions of the records at issue reflect internal FBI deliberations.  Communications about how to handle a FOIA request in light of existing (or even impending) litigation would suffice.  Predecisional and deliberative communications unrelated to any litigation might also suffice in certain circumstances.  But the problem here is that the FBI bears the burden of proof, and it has offered only two justifications for the withholdings.

As to the first—the inherently deliberative nature of processing notes—the FBI abandoned that justification years ago.  And, as to the second—deliberations reflected in "specific working papers prepared in responding to other FOIA lawsuits filed by [P]laintiffs"— the FBI now seeks to withhold records that do not fit within that rationale.  When the Court granted summary judgment to the FBI in *Shapiro IV* as to deliberative-process records responsive to Truthout's FOIA request, *id.*, the Court's ruling covered only those records that were prepared as part of the FBI's preparation or response to litigation.  But the FBI now argues that holding would also apply to run-of-the-mill FOIA processing records prepared in the usual course, so long as the FOIA request was subsequently the subject of litigation.  Here, at least as to eight pages of the records, all that the FBI has shown is that these records related to the processing of a FOIA request that later became "subject to litigation."  Dkt. 148-1 at 13 (Bender Decl. ¶ 19).  That is not enough to sustain an assertion of the deliberative process privilege.

To be sure, the FBI might have justified the withholdings without relying on litigation at all.  Records can be predecisional and deliberative in a variety of contexts.  Now, however, seven years into this case and after multiple missed opportunities, it is too late for the FBI to present any possible third rationale for these withholdings.

The Court is cognizant that it already granted summary judgment to the FBI on this issue in *Shapiro IV*, 239 F. Supp. 3d at 124, and recognizes the good faith effort to segregate the records that Seidel describes.  On the other hand, the FBI's argument for protecting the records that preceded both the *Leopold* and *Truthout* litigation is too broad—at least without some further explanation, such as the FBI's documented anticipation that litigation was coming.  The Court credits Plaintiffs' uncontroverted assertion that the records between Bates page numbers FBI-230 and FBI-245 preceded the *Leopold* and *Truthout* litigation.  According to Seidel, the FBI has already released several pages in that range and is now withholding only pages FBI-234, 236–37, and 239–43.  Dkt. 132-2 at 18 (Second Seidel Decl. ¶ 33).  The Court will, accordingly, grant Plaintiffs' motion for summary judgment as to those pages—FBI-234, 236–37, and 239–43—but grant the FBI's motion for summary judgment as to the other Exemption 5 withholdings from the Truthout records.

## C.    Plaintiffs' Claims Related to Compliance with Prior Opinions

In the fourth set of summary judgment briefs, which the parties filed before the Court ruled on the third set in *Shapiro V*, Plaintiffs raised several arguments related to the FBI's withholdings from various search slips and whether they were consistent with the Court's first four opinions in this case.  *See* Dkt. 126.  Most significantly, Plaintiffs argued that the FBI had misstated the number of Shapiro's parent requests that had received a "No Records" response.  In *Shapiro IV*, the Court upheld the FBI's withholding of search slips and processing notes related

to forty-two "No Records" parent responses to Shapiro on a mosaic theory under Exemption

7(E). *Shapiro IV*, 239 F. Supp. 3d at 113. According to Plaintiffs, however, as to nine of those

parent requests, the FBI actually did release records to Shapiro. Dkt. 126 at 7. And as to eight

others, "the FBI released information about the subjects of the requests in connection with other

requests submitted by Shapiro." *Id*. As such, Plaintiffs argued that the Court's holding in

*Shapiro IV*, which was specific to "No Records" parent requests, did not apply to seventeen of

the forty-two parent requests in question.

Thereafter, in a motion for extension of time to file one of its briefs, the FBI explained

that, "after reviewing Plaintiffs' pleadings, [the FBI] believes that it will have to take another

look at its production and determine whether there are additional records to be lawfully

produced." Dkt. 128 at 1. The FBI then reconsidered its handling of FOIA processing records

related to the forty-two "No Records" parent responses to Shapiro and "now concedes that

thirteen of them are Non-No Records cases." *See* Dkt. 132-1 at 5. The FBI therefore

reprocessed the FOIA search slips and processing notes associated with those thirteen parent

requests and released records, with a substantial number of new redactions. *Id*. at 5–6. As to the

other arguments in Plaintiffs' fourth motion for summary judgment related to the processing of

specific types of search slips, however, the FBI stood by its previous withholdings. *Id*. at 5–8.

This has yielded two sets of arguments from Plaintiffs in the current, fifth round of

summary judgment briefing. First, Plaintiffs again raise several of the arguments that they first

presented in their fourth motion for summary judgment and on which the FBI has not retreated.

Second, Plaintiffs challenge new exemption claims in the records that the FBI reprocessed. The

Court here deals with the former, before turning to the latter below.

1.    *Form 0-63*

Plaintiffs first challenge the FBI's withholding of certain search slips known as Form 0-

63.  As the parties seem to agree, a Form 0-63 is "essentially [a] search slip[] that document[s]

[the] result[] of [a] search[] of ELSUR or Electronic Surveillance records."  Dkt. 148 at 3; *see*

*also* Dkt. 143 at 2; Dkt. 143-4 at 1 (Pl.'s SUMF ¶¶ 1–5); Dkt. 148-1 at 3 (Bender Decl. ¶ 5).

Those forms are now obsolete, because the FBI "no longer searches separately for ELSUR

records since such records would not exist without an investigative file."  Dkt. 148-1 at 3

(Bender Decl. ¶ 5).  Plaintiffs seek the release of the Form 0-63 records in their entirety, except

for the "Complete and Return to:" and "Signature" fields.  Dkt. 143 at 2.

According to Plaintiffs, before the July 2019 supplemental release, the FBI had disclosed

twenty-nine Form 0-63 records with a redaction box covering nearly the entire form, while

withholding completely an unknown number of Form 0-63 records.  *Id.* at 3.  In the July 2019

production, the FBI released twenty pages of Form 0-63 records with only the "Complete and

Return to:" and "Signature" fields redacted.  *Id*.  Of those twenty forms, some were among the

twenty-nine previously released with heavy redactions, while others had previously been

withheld in their entirety.  *Id*.  The FBI later released one more Form 0-63, acknowledging that it

had been withheld inappropriately, bringing the total of released Form 0-63 records to twenty-

one.  Dkt. 132-2 at 4 (Second Seidel Decl. ¶ 5).  Plaintiffs are thus unsure how many pages of

Form 0-63 records remain at issue and which of those forms correspond to "No Records" parent

requests, but they argue that, in any event, the FBI has failed to justify its withholdings of these

forms under Exemption 5 and Exemption 7(E).  Dkt. 143 at 3.

Plaintiffs argue that, unlike other search slips, a Form 0-63 does not include information

that could give away when the FBI has used a FOIA exclusion in giving a "No Records"

response to a parent FOIA request.  They spin out various hypothetical situations in which an

ELSUR search could yield results but then the FBI would nevertheless issue a "No Records"

response, even when it is not using a FOIA exclusion.  First, Plaintiffs contend that these forms

"only memorialize the search for, and results of, a small and tentative part of the search for

responsive records" and note only the existence of "possible" intercepts.  *Id.* at 5–6.  Perhaps

upon further review, Plaintiffs continue, the FBI might determine that there were no such

intercepts and then issue a true "No Records" response.  Second, Plaintiffs point out that "the

FBI affirmatively communicates to requesters the results of ELSUR searches only for the 'target'

of electronic surveillance."  *Id.* at 6.  Thus, if an ELSUR search turned up results for third parties

other than the target of the surveillance, the FBI might issue a "No Records" response in the

absence of an exclusion.  Beyond these examples, Plaintiffs offer several other possibilities.

The FBI, for its part, argues that Form 0-63 is a search slip like any other search slip and

that the Court's prior rulings regarding search slips thus apply equally to Form 0-63 records.

Dkt. 132-2 at 5; Dkt. 148 at 3.  The Court agrees.  Plaintiffs' various hypotheticals for how

matches to an ELSUR search might produce a "No Records" parent response even in the absence

of a FOIA exclusion are at least possible.  But as the FBI points out, the release of a Form 0-63

showing possible intercepts when the parent FOIA request yielded a "No Records" response

"would call into question whether an exclusion was . . . employed."  *Id.* at 3–4.  And, even more

to the point, the release of information from a Form 0-63 associated with one of Shapiro's "No

Records" parent requests would add more tiles to his overall mosaic, which the Court held

supported withholding search slips in *Shapiro IV*, 239 F. Supp. 3d at 116.  The Court thus agrees

with the FBI that its withholding of Form 0-63 records is governed by the Court's prior opinions.

The problem for the FBI is that it misstates the nature of the Court's earlier opinions in this case.

In *Shapiro I*, the Court rejected the FBI's categorical policy of withholding all FOIA processing records generated within the last twenty-five years in responding to FOIA requests for investigative files or records. *Shapiro I*, 153 F. Supp. 3d at 270–76. Later in the litigation, the FBI attempted to assert a narrower policy, in which it withheld all FOIA processing records generated within the last twenty-five years only when the parent FOIA request produced a "No Records" response. Dkt. 51 at 2–3. At the same time, the FBI revealed that it had actually adopted this narrower policy, without notifying Plaintiffs or the Court, months before the Court issued its lengthy opinion in *Shapiro I* striking down the broader policy. Dkt. 51-1 at 2–3 (Fourth Hardy Decl. ¶ 5). And, indeed, when asked at oral argument in *Shapiro I* whether the FBI had considered (or could consider) adopting a narrower policy regarding search slips and processing notes, counsel for the FBI (accompanied by agency counsel) professed ignorance as to whether a narrower policy would be possible, even though such a policy had already been adopted. Dkt. 52 at 30–32. Based on the FBI's failure to timely notify the Court that it had, in fact, adopted a narrower policy, the Court held in *Shapiro II* that the FBI had forfeited its ability to rely on the new (and previously undisclosed) policy. *Shapiro II*, 177 F. Supp. 3d at 471.

Although the FBI sought reconsideration in *Shapiro III*, it "abandoned its initial argument that it should be permitted to rely upon its modified search-slip policy at this stage of the action." *Shapiro III*, 2016 WL 3023980, at *4. The Court in *Shapiro III* also held that the FBI could not rely on the deliberative-process privilege to withhold records under Exemption 5, where it had not previously asserted that privilege. *Id.* at *7. As the Court explained in *Shapiro IV*, "[t]aken together, the Court's decisions in *Shapiro II* and *Shapiro III* foreclosed the FBI from raising defenses based on its new, categorical 'No Records' policy or on previously unasserted (or waived) claims that the search slips or processing notes are protected by the deliberative-process

privilege." *Shapiro IV*, 239 F. Supp. 3d at 110.   In *Shapiro IV*, the Court went on to uphold "a case-specific exemption applicable to only the forty-two 'No Records' responses to the fifty-eight 'parent' FOIA requests submitted by Ryan Shapiro," which the FBI asserted in lieu of its foreclosed categorical policy.  *Id.* at 113.

Given that background, the Court was—to put it mildly—surprised to read in the FBI's brief that the "FBI's handling of [Form 0-63] fall[s] within its revised policy regarding the handling of 'No Records' and 'Non[-]No Records' cases that this Court has already upheld." Dkt. 148 at 2.  Or to read in the FBI's supporting declaration that its withholding of Form 0-63 records should be upheld because the FBI followed its "modified search slip/FOIPA processing records policy which the FBI relied on in processing the responsive material at issue in this case." Dkt. 132-2 at 4 (Second Seidel Decl. ¶ 5).  In addition to its reliance on the modified policy, which the Court explicitly foreclosed in *Shapiro II* and *Shapiro III*, the FBI also withheld information from the Form 0-63 records pursuant to the deliberative-process privilege, which the Court also foreclosed in *Shapiro II* and *Shapiro III*.  To explain these deliberative-process privilege claims, the FBI states that "[t]he variability of the application of the deliberative process privilege and therefore the withholding of certain seemingly duplicate information does lie in the underlying disposition of the FOIA request at issue." *Id.* at 5 (Second Seidel Decl. ¶ 5). Although that sentence is hard to parse, the Court understands Seidel to be saying that the FBI also applied the deliberative-process privilege based on its categorical "No Records" versus "Non-No Records" policy.

To clear up any confusion, the Court now restates its earlier holdings and will apply those holdings to the Form 0-63 withholdings.  In doing so, the Court will grant in part and deny in

part the FBI's motion for summary judgment and grant in part and deny in part Plaintiffs' motion

for summary judgment.  In *Shapiro IV*, the Court wrote as follows:

> As reframed in the FBI's renewed motion for summary judgment, . . . the mosaic
> theory admits of reasonable limits and is well supported by the FBI's
> declarations and the record.  As noted above, the FBI has limited its assertion of
> Exemption 7(E) to search processing records relating to the forty-two "parent"
> FOIA requests as to which the FBI provided Shapiro with "No Records"
> responses.  Dkt. 57–3 at 59 (Fifth Hardy Decl. ¶ 121).  And, importantly, the
> FBI has explained how these requests fit "within the holistic context of Shapiro's
> universe of inter-related domestic terrorism requests." *Id.* (Fifth Hardy Decl.
> ¶ 122).  Among other things, eleven of the "parent" requests are subject to
> ongoing litigation in a case in which Shapiro has sought to compel further
> responses to eighty-one requests relating to domestic terrorism.  *Id.*  Those
> requests, in turn, "refer to '64 inter-related individuals, organizations, incidents,
> and/or publications related to animal rights extremism,'" and, because the
> "requests all relate to one of the FBI's domestic terrorism priorities, . . . the
> hundreds of thousands of pages of records requested by [Shapiro] . . . must
> [themselves] be reviewed for any possible 'mosaic effect'" before they can be
> released.  *Shapiro v. U.S. Dep't of Justice*, [No. 12-cv-313], Dkt. 61 at 1–2.  On
> top of this, Shapiro has also filed an additional 260 FOIA requests related to
> animal rights extremism. Dkt. 57–3 at 60 (Fifth Hardy Decl. ¶ 124).  As
> explained by a senior official in the FBI's Counterterrorism Division, the release
> of at least some of the information sought by Shapiro in his "parent" FOIA
> requests would have "significant deleterious effects . . . on the FBI's on-going
> efforts to investigate and combat domestic terrorism in the United States."  Dkt.
> 57–4 at 5.  As the FBI points out, however, the mosaic concern does not turn on
> the fact that Shapiro is the requester in this case; his extensive history of FOIA
> requests happens to have created the background of public information against
> which the risk of disclosing the information at issue here must be assessed, but
> that analysis would be the same regardless of who requested the records.  Dkt.
> 74 at 24.

*Shapiro IV*, 239 F. Supp. 3d at 115–16.

In order to apply that reasoning here, the Court needed more information about the nature

of the withheld Form 0-63 records.  The Court thus directed the FBI to file a supplemental notice

clarifying how many Form 0-63 records had been withheld and which of those records related to

parent "No Records" responses to Shapiro.  In the FBI's filing, it explained that there were 139

total Form 0-63 records that were released in part or withheld in full.  Dkt. 153 at 2.  Of those,

forty-two relate to "No Records" responses to Shapiro and thirty-seven relate to "No Records" responses to other requesters.  *Id.*  Presumably, this means that the other sixty Form 0-63 records related to "Non-No Records" responses to Shapiro or others.

Based on those representations, the Court now holds that the FBI may, in accordance with *Shapiro IV*, withhold Form 0-63 records under Exemption 7(E) if those records correspond to a parent FOIA request from Ryan Shapiro that received a "No Records" response.  Although the FBI represents that there are forty-two such Form 0-63 records, the FBI should ensure that it is not counting among those the thirteen parent requests from Shapiro that the FBI acknowledged in the July 2019 release are not in fact "No Records" parent requests.  As noted above, that reclassification of thirteen parent requests brought the total number of "No Records" parent requests from Shapiro at issue in this litigation down from forty-two to twenty-nine.  With respect to that subset of withholdings under Exemption 7(E) from Form 0-63 records, the FBI's motion for summary judgment is granted.

But, to the extent the FBI now seeks to invoke Exemption 7(E) more broadly, it cannot— for the reasons explained above and in the Court's prior opinions—rely on its "revised policy regarding the handling of 'No Records' and 'Non[-]No Records' cases."  Dkt. 148 at 2 (discussing prior opinions).  And unlike in *Shapiro IV*, the FBI here has failed to offer any rationale or evidence that would support a case-specific assertion of Exemption 7(E).  Accordingly, Plaintiffs' motion for summary judgment is granted with respect to Exemption 7(E) withholdings from any Form 0-63 that does not correspond to one of Shapiro's "No Records" parent requests.  That is, Plaintiffs' motion is granted as to Exemption 7(E) withholdings from the thirty-seven Form 0-63 records that correspond to "No Records" parent requests from parties other than Shapiro.  Plaintiffs are also entitled to any Form 0-63 record that corresponds to a

"Non-No Records" parent request.  The FBI initially indicated that it did not withhold any such records, consistent with its modified policy, *see* Dkt. 132-2 at 4–5 (Second Seidel Decl. ¶ 5), but it now appears that at least some "Non-No Records" Form 0-63 records were withheld.  Plaintiffs have received only twenty-one such forms, Dkt. 154 at 4, but the FBI now indicates that there are sixty at issue, Dkt. 153 at 2.  The FBI must therefore release any Form 0-63 records associated with "Non-No Records" parent requests that it has withheld under Exemption 7(E).  Finally, it is now too late for the FBI to raise a new assertion of the deliberative-process privilege under Exemption 5, and, thus, Plaintiffs' motion for summary judgment is granted with respect to all Exemption 5 withholdings from Form 0-63 records.

Here too, the Court is concerned about the possible release of highly sensitive and potentially damaging information based on the FBI's multiple missteps in litigating this case.  The FBI may therefore file a motion for reconsideration with the Court on or before December 28, 2020, but only if it can provide the Court with a reasonably detailed, supplemental declaration explaining any potential harm to national security, ongoing investigations, or significant third-party privacy interests and the basis for the asserted exemption.  The FBI is once again cautioned, however, that the Court will not extend this deadline and will provide Plaintiffs with appropriate relief if the FBI files a motion that fails to include a declaration sufficient to permit the Court "'to perform a searching *de novo* review,'" *Morley*, 508 F.3d at 1126, of any asserted exemption.

2.   *Form 4-22*

Plaintiffs raise a similar objection to the FBI's withholding of a single, one-page Form 4-22.  Dkt. 143 at 7–8.  The parties agree that Form 4-22 is "'an obsolete type of search slip' which contains 'a listing of all the files located as a result of searching the Indices checked in the

"Scope of Search" section of the form.'"  Dkt. 143-4 at 2 (Pl.'s SUMF ¶ 14) (quoting Dkt. 132-2 at 5 (Second Seidel Decl. ¶ 6.)).  As with the Form 0-63 records, the FBI states that it withheld this Form 4-22 pursuant to "its modified search slip/FOIPA processing records policy for No Records/Non-No Records requests."  Dkt. 148-1 at 5 (Bender Decl. ¶ 6).  The FBI thus redacted this page pursuant to Exemption 5 and Exemption 7(E).

The Court's analysis with respect to the withholding of this form is essentially identical to the analysis for the Form 0-63 records.  The Court interpreted the FBI's declarations, which generally use "Plaintiff" in the singular to refer to Shapiro, to imply that the Form 4-22 search slip was associated with one of Shapiro's "No Records" parent requests.  Dkt. 132-2 at 6 (Second Seidel Decl. ¶ 7) ("Here, this request . . . ultimately resulted in a ['No Records'] response to Plaintiff, and the FBI therefore heavily redacted this page pursuant to" Exemption 5 and Exemption 7(E).  And the FBI confirmed the Court's impression in its supplemental filing, explaining that this page relates to a "No Records" parent response to Shapiro.  Dkt. 153 at 2.  As such, the FBI's motion for summary judgment is granted with respect to the Exemption 7(E) withholdings, consistent with *Shapiro IV*, and Plaintiffs' motion for summary judgment is granted with respect to the Exemption 5 withholdings, consistent with *Shapiro III*.

      3.    *Segregability of Search Slips*

Plaintiffs further contend that certain non-file number information on search slips, including Form 0-63 and Form 4-22 search slips, should be segregated and released.

As to Form 0-63, Plaintiffs argue that the FBI could redact the search results but disclose fields that list the title of the FOIA request, the FOIA request number (as opposed to the investigative file number), and the search terms (as opposed to the search results).  Dkt. 143 at 4.  On Form 4-22, Plaintiffs argue that the FBI could disclose "the search terms used, the databases

searched, the scope of the search, and any special instructions." *Id.* at 7.  Plaintiffs argue that

this type of information would usually be described in a *Vaughn* index.  Above, the Court limited

the FBI's withholding of Form 0-63 or Form 4-22 records to instances in which those forms

correspond to one of Shapiro's "No Records" parent FOIA requests.  In the context of only the

remaining "No Records" parent requests from Shapiro, the Court is satisfied that the FBI need

not segregate that information.  Within the mosaic of records that Shapiro has acquired,

comprising hundreds of thousands of pages, even the disclosure of search terms or which

databases were searched might give clues as to whether the FBI has employed a FOIA exclusion,

which in turn could give away aspects of the FBI's techniques and procedures, such as the

existence of an investigation into a certain subject, that risk circumvention of the law.  *See

Shapiro IV*, 239 F. Supp. 3d at 114.

    Matters are more complicated with respect to the segregability of material on search slips

not associated with Shapiro's No Records parent requests.  Plaintiffs argue that the FBI withheld

"non-file number portions of the search slip listed under columns with the header 'BB,' 'ID,'

'C/P,' and a fourth column which is variously 'Year,' 'Year Closed,' and 'Year Retrieved.'"

Dkt. 143 at 8.  Plaintiffs suggest and the FBI acknowledges that these headings respectively

stand for "blackballing," "ident," "Closed/Pending," and, more obviously, the year. *Id.* at 9; *see

also* Dkt. 148-1 at 5 (Bender Decl. ¶ 7) ("As Plaintiffs point out, they are aware of what these

headers mean.").  Although it may sound nefarious, the FBI has stated publicly that "blackball"

refers to "a file (not a request) that initially looked responsive but upon review [the FBI] find[s]

it's for a different guy or event. It can also be used to describe a file that [the FBI] won't process

because, i.e., a guy makes a request for his 'FBI file' in 2005 and [we] process it for him. When

he makes another request for his 'FBI file' in 2011, we will only process his 'records' but will

not process the file that was created to respond to the 2005 FOIA request . . . ." See Dkt. 143 at 9

n.7 (citing Jason Leopold, "Revealed: The FBI's Secretive Practice of 'Blackballing' Files,"

Truthout (Jan. 17, 2012) (quoting email from RIDS Assistant Section Chief Dennis Argall)).  As

for "ident," Plaintiffs explain that it "is a term used by the FBI which means that a file or

document matches the requested topic."  Dkt. 143 at 9.  That is, if the FBI searches for files

related to John Jones, "ident" means that a given search result corresponds to the correct John

Jones and not somebody else with the same name.  When the FBI withheld a file number, it often

withheld "the entire row" next to the file number, including the information in those various

columns.  Dkt. 151 at 3–4.  The FBI also frequently withheld boxes at the top corners of the

search slips.  At the top left, it withheld the words "Cross-References" and "Main Files" and the

check boxes next to each, and at the top right, it withheld designations related to whether the

search pertained to files at headquarters or a field office.  Dkt. 143 at 9–10.

    The FBI claims that it withheld that information under Exemption 7(E) because

disclosing it would reveal "Specific Investigative Techniques and Procedures."  Dkt. 148-1 at 5

(Bender Decl. ¶ 7).  But the FBI does not elaborate.  Instead, it gestures toward its many previous

declarations, asserting that it "provided justification for these withholdings in previous

declarations in this matter in the First, Fifth, Seventh, Ninth, [and] Eleventh [Hardy], and Second

Seidel declarations."  Dkt. 148 at 5.  The FBI does not even bother to cite particular page

numbers or paragraphs within those many lengthy declarations.  Plaintiffs in reply explain that

they "have reviewed these declarations in an attempt to locate the basis for the FBI's claims" but

came up empty.  Dkt. 151 at 5.  The Court's review of those declarations suggests that most of

them include at least some discussion of Exemption 7(E) and/or the FBI's investigative

techniques or procedures.  But, as far as the Court can tell, none even hint at a justification for

withholding the check boxes at the top of search slips or the non-file number columns associated

with the search.  Adding to the Court's confusion, unlike the withholdings from Form 0-63 and

Form 4-22 records, which the FBI attempted to justify using its modified policy, the FBI

redacted this information with respect to both "No Records" and "Non-No Records" parent

responses alike.  The FBI technique or procedure in question thus cannot be the FBI's use of

FOIA exclusions.  The Court is stumped.

In the absence of any discernible justification from the FBI, the Court is once again left to

fall back on its prior opinions.  At a minimum, consistent with *Shapiro IV*, the FBI may redact

the information at issue as to Shapiro's twenty-nine "No Records" parent requests.  As to those

FOIA processing records, this information falls "'within the holistic context of Shapiro's

universe of inter-related domestic terrorism requests.'"  *Shapiro IV*, 239 F. Supp. 3d at 115

(quoting Dkt.  57-3 at 59 (Fifth Hardy Decl. ¶ 122)).  In that context, release of even seemingly

innocuous information related to FOIA processing could reveal "the existence or non-existence

of an investigation" and thereby "important information about the 'scope of the FBI's [domestic

terrorism] program in the United States, the scope and focus of its investigative efforts, and

strategies it plans to pursue in preventing and disrupting domestic terrorist activity.'" *Id.* at 114

(quoting Dkt. 57-3 at 62 (Fifth Hardy Decl. ¶ 128)).  With respect to those records, the Court will

grant the FBI's motion for summary judgment.

But as to the withholding of these columns and boxes on other FOIA processing records,

the FBI has failed to carry its burden—or to even attempt to carry its burden.  The Court will

therefore grant summary judgment to Plaintiffs as to those redactions.  For "No Record" parent

requests submitted by any Plaintiff other than Shapiro and for all "Non-No Records" parent

requests, the FBI must release the contents of the BB, ID, C/P, and year columns, as well as the

boxes in the top corners of the search slips.  Here again, if the FBI concludes that this release

would jeopardize national security, ongoing investigations, or significant third-party privacy

interests, it may file a motion for reconsideration with the Court on or before December 28,

2020, but only if it can provide the Court with a reasonably detailed, supplemental declaration

explaining the harm to national security, ongoing investigations, or significant third-party

privacy interests and the basis for the asserted exemption.  The FBI is once again cautioned,

however, that the Court will not extend this deadline and will provide Plaintiffs with appropriate

relief if the FBI files a motion that fails to include a declaration sufficient to permit the Court

"'to perform a searching *de novo* review,'" *Morley*, 508 F.3d at 1126, of any asserted exemption.

## D.      FBI's Additional Exemption Claims

As explained above, the FBI reprocessed FOIA processing records related to thirteen of

Shapiro's parent FOIA requests that the FBI had incorrectly categorized as "No Records"

requests.  In all, the FBI reprocessed 250 pages of additional records related to those thirteen

parent requests.  Dkt. 132-2 at 18 (Second Seidel Decl. ¶ 34).  In reprocessing this material, the

FBI once again withheld records pursuant to the full range of FOIA Exemptions.  Dkt. 132-1 at

1–2.  The FBI disclosed the remaining records to Plaintiffs in a supplemental release in July

2019.[5]  This fresh round of redactions treats this seven-year-old case as though it had just been

filed, illustrating the perils of permitting an agency to assert additional exemption claims

---

[5] That supplemental release also contained the records that the FBI disclosed in compliance with
*Shapiro V*, including pages bearing file numbers that matched the list of officially acknowledged
file numbers Plaintiffs submitted; records responsive to the Truthout request that were not
compiled in preparation for litigation; and records responsive to the NSC and Stein requests that
contained information about third-parties that had previously been disclosed in other litigation.
The FBI made additional withholdings from those records as well, which the Court has already
addressed above, in the section dealing with the issues left open by *Shapiro V*.  In all, the
supplemental release totaled 482 pages, of which the FBI released 140 pages in full and 341
pages in part and withheld one page in its entirety.  Dkt. 132-1 at 1.

*seriatim* in the district court up until the day the court enters final judgment. *See Shapiro III*, 2016 WL 3023980, at *2. There are nine FOIA exemptions, but FOIA plaintiffs should not have to move for summary judgment nine times—or even five times—while an agency auditions the exemptions one by one, refining its position along the way.

The Court's holding in *Shapiro III*, which requires "some showing of good cause," *id.* at *2, was aimed at forestalling a parade of exemptions or theories from undermining FOIA's goal of promoting the "prompt . . . disclosure of information," *id.* at *4 (emphasis and quotation marks omitted). At oral argument for *Shapiro III*, the FBI's counsel, in seeking to raise late exemptions based on the attorney-client privilege and the attorney work-product privilege, "repeatedly stated . . . that the FBI will assert no *additional* exemptions, even if the Court were to conclude that Exemption 5 does not apply, and thus the FBI could be seen to have committed to ensuring the prompt resolution of this litigation." *Id.* at *6. That was more than four years ago. FOIA sets a 20-day deadline for responding to FOIA requests, 5 U.S.C. § 552(a)(6)(A)(i), but here the parties are—more than seven years after this lawsuit was filed—with the FBI asserting new exemptions in its fifth motion for summary judgment.

The FBI knew from the very start how to assert exemptions in the alternative, but for the processing records related to these thirteen parent requests from Shapiro, it has changed its story repeatedly over time. The FBI first asserted a blanket policy of withholding all FOIA processing records from the past 25 years related to parent requests for investigative files, which the Court rejected in *Shapiro I*. Next, the FBI attempted to assert a narrowed categorical withholding policy that applied only to parent requests receiving a "No Records" response, but the FBI forfeited that argument by failing to raise it until 10 months after the policy was implemented (notwithstanding the Court's direct question at oral argument, Dkt. 52 at 30–32)—an

inexplicable delay that left the Court to issue an opinion addressing a policy that was no longer

in place, *Shapiro I*, 153 F. Supp. 3d at 257 (Plaintiffs "bring a facial challenge to the FBI's

policy of declining to provide any processing records for FOIA requests made within the last 25

years that sought material from FBI investigative files").  Then, the FBI asserted a case-specific

Exemption 7(E) argument to protect the processing records related to these thirteen requests

(along with twenty-nine others), on the theory that the release of processing records related to

Shapiro's "No Records" parent requests could reveal law enforcement techniques and risk

circumvention of the law.  But the FBI had erred again.  Turns out, these thirteen parent requests

had not received "No Records" responses after all.  So, the FBI now reprocesses the records and

claims a full array of new exemptions, effectively starting from the beginning.

Because this case involves classified information, other sensitive information related to

both national security and ongoing law enforcement investigations, and information that

implicates third-party privacy interests, the Court will entertain the FBI's latest round of

exemption claims, consistent with both the limitations imposed by *Shapiro III* and with the

Court's repeated admonishments that this case must come to an end.

    1.    *Outside the Scope*

The FBI released eight pages of records covered with large redaction boxes labeled

"outside the scope."  Dkt. 143 at 18.  The FBI explains that it set a search cutoff date of October

2015 for records responsive to Plaintiffs' requests, but that its computer system cannot gather

and print only a subset of the case notes for a given FOIA request.  Dkt. 132-2 at 42–43 (Second

Seidel Decl. ¶ 87).  The FBI therefore printed the entire file but then redacted the records that fell

outside the selected date range.  Plaintiffs argue that this is not the typical way in which agencies

use search cutoff dates.  According to Plaintiffs, "[t]he essential flaw in the FBI's argument is

that it mistakes the concept of a search cutoff date with the concept of withholding records due to nonresponsiveness." Dkt. 143 at 19.  That is, Plaintiffs argue that an agency may properly use a specific date range to confine its search, but if its search returns responsive records outside the chosen date range, those records must be produced.  The FBI in reply argues that "the use of cutoff dates is evaluated on a case-by-case basis and the D.C. Circuit sanctions their use when reasonable under the circumstances of the case."  Dkt. 148 at 12.

Plaintiffs have the better of this argument.  The cases cited by both Plaintiffs and the FBI stand for the proposition that an agency may properly stop searching at a date certain so that it may prepare its response without having to execute further searches in an infinite loop.  *See Bonner v. Dep't of State*, 928 F.2d 1148, 1152 (D.C. Cir. 1991) ("To require an agency to adjust or modify its FOIA responses based on post-response occurrences could create an endless cycle of judicially mandated reprocessing."); *Edmonds Inst. v. Dep't of Interior*, 383 F. Supp. 2d 105, 111 (D.D.C. 2005) (holding that the plaintiff's contention that the agency should "use[] the date the documents were released as the cut-off date . . . is inherently flawed, leading as it would to an ever-moving target for the production of documents under FOIA").  But the cutoffs that those cases approved were at the time of the agency's search or production, not at an arbitrarily selected earlier date.  Other cases, moreover, recognize that "a time-of-request cut-off date" may be "reasonable," but only if the agency can show that such a policy is necessary to avoid "an 'administrative nightmare'" or is supported by some other good reason.  *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 643–44 (D.C. Cir. 2002) (quoting *McGehee v. CIA*, 697 F.2d 1095, 1103 (D.C. Cir. 1983)).

Here, the FBI conducted its additional searches in 2019.  Its own computer system did not permit it to search for records within a certain date range, so the agency saved no time or resources by editing out the search results from after October 2015.  In fact, it appears to have required extra work for the FBI to print these pages and then redact them, instead of just producing them.  As

70

Plaintiffs argue, the FBI could have set a reasonable cutoff date for its search, but once it located responsive records through "a search reasonably calculated to uncover all relevant documents," *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (quotation marks omitted), the FBI could redact responsive material from those records only pursuant to one of the enumerated FOIA exemptions, *Am. Immigr. Laws. Ass'n v. Exec. Office for Immigr. Rev.*, 830 F.3d 667, 670 (D.C. Cir. 2016) ("Under the statutory framework, once the government concludes that a particular record is responsive to a disclosure request, the sole basis on which it may withhold particular information within that record is if the information falls within one of the statutory exemptions from FOIA's disclosure mandate.").

The Court, accordingly, grants summary judgment to Plaintiffs with respect to those eight pages.

## 2.   *Attachments*

Plaintiffs also contend that in several places throughout the July 2019 supplemental release, the disclosed records reference attachments—including, in one instance, an Excel spreadsheet—that were not provided to Plaintiffs.  Dkt. 143 at 33.  The FBI argues that Plaintiffs have waived this argument by not challenging the adequacy of the FBI's searches earlier in the litigation and by focusing their FOIA requests on search slips, rather than the attachments to search slips.  *See* Dkt. 148 at 26; Dkt. 148-1 at 22 (Bender Decl. ¶ 34).  It is unclear when the FBI wanted Plaintiffs to challenge the failure to provide these attachments.  The records referencing the existence of those separate files were disclosed to Plaintiffs in the FBI's July 2019 supplemental release.  Dkt. 143 at 33.  Plaintiffs then raised the issue in the next brief that they filed, which was their cross-motion for summary judgment.  *Id.*  Nor is the FBI correct that Plaintiffs needed to request attachments expressly.  In the related context of emails, courts have consistently held that a request for all documents pertaining to a certain subject encompasses

both emails and their attachments. *See Am. Oversight v. U.S. Gen. Servs. Admin.*, 311 F. Supp.
3d 327, 340 (D.D.C. 2018) (collecting cases).

The Court will therefore grant summary judgment to Plaintiffs with respect to the
attachments to search slips that Plaintiffs reference in their brief, Dkt. 143 at 33.

3.      *Exemption 5: Attorney-Client Privilege*

Plaintiffs argue that the FBI has waived its assertion of the attorney-client privilege
because, although the Second Seidel Declaration addresses the topic, the FBI's motion for
summary judgment "never mentions the attorney-client privilege, much less attempts to justify
its assertion." *Id.* at 20. As Plaintiffs note, the Court has previously warned that "[t]he FBI
should ensure in the future . . . that it includes any legal argument that it wants the Court to
consider in its briefs." *Shapiro IV*, 239 F. Supp. 3d at 119 n.6. In the FBI's reply brief, counsel
acknowledges this "inadvertent oversight" but contends that it was "not wholly unreasonable" in
light of the complexity of the case. Dkt. 148 at 14. The FBI also cites *Shapiro III*, which
permitted the FBI to assert tardy attorney-client privilege claims under Exemption 5, as proof of
the Court's "preference to adjudicate Attorney-Client exemption claims on the merits." *Id.*

The FBI withheld information on more than twenty pages based on the attorney-client
privilege. *See* Dkt. 132-2 at 34 n.18 (Second Seidel Decl.). But Plaintiffs challenge these
withholdings on only two pages, numbered FBI-4535 and FBI-4206. As such, it would be
disproportionately punitive to deny the FBI's motion for summary judgment as to all twenty-plus
pages based on an oversight in the FBI's brief. The Court will therefore consider the parties'
arguments on the merits.

With respect to FBI-4535, "the FBI has withdrawn its Attorney-Client exemption claim
regarding Bates No. FBI-4535." Dkt. 148 at 14. The FBI did not release the record, however,

because "all redacted information therein is still exempt from release pursuant to Exemptions 6 and 7(E)."  Dkt. 148-1 at 12 (Bender Decl. ¶ 18).  In their reply, Plaintiffs then "rest on the arguments presented in their [c]ross-[m]otion" with respect to Exemption 5 withholdings.  Dkt. 151 at 13.  As such, the Court holds that the parties' dispute as to the Exemption 5 withholdings on FBI-4535 are now moot.

That leaves FBI-4206, on which "the FBI protected communication from the [FBI Office of General Counsel] to a[] [Litigation Support Unit] analyst regarding the application of (b)(5) in the processing in the *Negley* litigation."  Dkt. 132-2 at 35 (Second Seidel Decl. ¶ 68).  Plaintiffs argue that "there is no evidence" that this communication "had anything to do with legal advice." Dkt. 143 at 21.  The Bender declaration, however, clarifies that an Office of General Counsel attorney, acting in that capacity, was providing legal advice about the application of Exemption 5 to certain records.  Dkt. 148-1 at 11 (Bender Decl. ¶ 17).  "[T]he communication was made in confidence and for the sole purpose of securing legal advice."  *Id.* at 11–12 (Bender Decl. ¶ 17).

A communication is protected by the attorney-client privilege when it was made to or by a lawyer confidentially in order to receive or provide legal advice.  *See Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253 (D.C. Cir. 1977).  As described by Seidel and Bender, the communication at issue between the Litigation Support Unit analyst and the FBI lawyer meets this standard.  Dkt. 148-1 at 11–12 (Bender Decl. ¶ 17); Dkt. 132-2 at 35 (Second Seidel Decl. ¶ 68).  The Court will therefore grant summary judgment to the FBI with respect to its withholdings under Exemption 5 based on the attorney-client privilege.

4.    *Exemption 7(A)*

Plaintiffs challenge eleven pages of withholdings premised on Exemption 7(A).  Dkt. 143 at 23.  As Plaintiffs correctly observe, the declaration accompanying the FBI's renewed motion

73

for summary judgment lacked any meaningful detail about the Exemption 7(A) withholdings in the July 2019 supplemental release.  *See* Dkt. 132-2 at 37–38 (Second Seidel Decl. ¶¶ 72–73).

The declaration merely quotes the statutory standard and in a footnote states that the FBI withheld information on eleven pages to "protect pending law enforcement information."  *Id.* at 38 n.23 (Second Seidel Decl. ¶ 73 n.23).  In addition to attacking the lack of specificity in the FBI's declaration, Plaintiffs also argue that context suggests the investigation referenced on the pages in question is closed.  Dkt. 143 at 23.  The FBI invoked Exemption 7(A) with respect to communications between Records Management Division staff and an agent in the Jacksonville Field Office, but in one of the messages, from June 9, 2015, an agent from the field office says that the "file is closed and not part of any pending file."  *Id.* (quotation marks and brackets omitted); *see also* Dkt. 148-1 at 14–15 (Bender Decl. ¶ 21).  That matters because "Exemption 7(A) is temporal in nature" and does not apply to proceedings that are "closed—not pending or contemplated—and therefore" not subject to "interfere[nce]."  *Citizens for Resp. & Ethics in Wash. v. Dep't of Justice*, 746 F.3d 1082, 1097 (D.C. Cir. 2014) ("*CREW*"); *see also* 5 U.S.C. § 552(b)(7)(A) (protecting "records or information compiled for law enforcement purposes . . . to the extent that the production of such law enforcement records or information . . . *could reasonably be expected to interfere with enforcement proceedings*") (emphasis added).

Bender, however, takes issue with Plaintiffs' inference, explaining that later in the day on June 9, 2015, a FOIA analyst sent the file to the FBI's domestic terrorism experts for their review to ensure that the file was appropriate for processing.  Dkt. 148-1 at 14–15 (Bender Decl. ¶ 21).  On July 1, 2015, the terrorism expert wrote back, and although the FBI redacted the contents of that communication as well, "the FBI attests that [the expert] advised that the file and the information therein is, in fact, being used in other related ongoing law enforcement

proceedings." *Id.* at 14 (Bender Decl. ¶ 21).  Based on that input, RIDS withheld the file under

Exemption 7(A).  *Id.* at 14–15 (Bender Decl. ¶ 21).

In reply, Plaintiffs argue that the FBI's declaration, even taken on its own terms, says

only that the relevant investigation was open as of five years ago, not that it remains open now.

Dkt. 151 at 14.  In a similar circumstance, the D.C. Circuit observed that the combination of "the

passage of time" (in that case, "over 30 months") and the "vague nature of the [agency's]

mention of ongoing investigations" left the court of appeals with "considerable uncertainty about

whether a criminal investigation in fact continues to this day."  *CREW*, 746 F.3d at 1098.  The

FBI has now clarified in its supplemental filing, however, that "the file, and the information

therein, is still being used in other related open and ongoing law enforcement proceedings."  Dkt.

153 at 3.  And at the Court's request, the FBI submitted an additional declaration attesting that

RIDS consulted the FBI's domestic terrorism experts and determined that the relevant

investigative file "is still being used in other related ongoing law enforcement proceedings."

Dkt. 155-1 at 3 (Fourth Seidel Decl. ¶ 7).

Based on the FBI's representations, the Court is now satisfied that the FBI has met its

burden, given the deferential standard that applies with withholdings under Exemption 7(A).

The Court will therefore grant summary judgment to the FBI with respect to its Exemption 7(A)

withholdings on these eleven pages.[6]

---

[6]  The FBI's supplemental filing also explains that some of the records that the FBI withheld earlier in this litigation pursuant to Exemption 7(A) relate to investigations that have subsequently closed, given the passage of time.  Dkt. 153 at 2.  The FBI argues that its earlier Exemption 7(A) withholdings should be judged at the time that the Exemption was asserted, *id.*, while Plaintiffs argue that, given the temporal nature of Exemption 7(A), what matters is whether the law enforcement proceeding remains pending at the time of the Court's decision, Dkt. 154 at 2 (citing *CREW*, 746 F.3d at 1097).  But even assuming Plaintiffs are correct, the Court has already ruled on the FBI's prior Exemption 7(A) withholdings in *Shapiro IV*, 239 F. Supp. 3d at

5.      *Exemption 6 and Exemption 7(C)*

Plaintiffs also challenge the FBI's use of Exemption 6 and Exemption 7(C) to protect the

names and identifying information of FBI support personnel.  Dkt. 143 at 23–25.  By way of

example of the FBI's overbroad withholding, Plaintiffs point out that on one page, the FBI

redacted the name of former Public Liaison Officer Dennis Argall, even though the FBI lists the

name and phone number of its current Public Liaison Officer on its website.  *Id.* at 24.  The FBI

counters that it "routinely protects the names and identifying information of all lower ranking

employees as their status of an FBI employee, on its own, may subject them to harassment by

criminals seeking access to FBI information or retribution, violent acts of terrorists who advocate

bodily harm against U.S. law enforcement and military personnel in furtherance of ideology, or

recruitment by foreign agents intent on espionage."  Dkt. 148 at 19.  Plaintiffs argue that the FBI

overstates the privacy interest at issue by not considering differences between different types of

employees.  Dkt. 151 at 15–16.  Plaintiffs argue that an employee doing administrative tasks has

less of a privacy interest than "personnel who might be directly involved in a particular

investigation and against whom a criminal might bear a grudge."  *Id.* at 16.  As for the public

interest, Plaintiffs allege that the FBI underappreciates the "strong public interest in information

which would shed light on the FBI's compliance with its FOIA obligations."  Dkt. 143 at 24.

For support, Plaintiffs rely on a body of caselaw addressing the withholding of agency

employee names.  In *Baez v. United States Department of Justice*, 647 F.2d 1328, 1339 (D.C.

Cir. 1980), for example, the D.C. Circuit reaffirmed that government officials have an "interest

in preserving the secrecy of matters that conceivably could subject them to annoyance or

---

120–21, and those withholdings were thus proper so long as the investigations remained open at
that time.  The Court sees no reason to revisit that ruling now.

harassment in either their official or private lives."  But the court of appeals cautioned that it did

"not mean to imply a blanket exemption for the names of all FBI agents in all documents."  *Id.*

The balance between private and public interests, the court explained, might tip in favor of

revealing names where "the agent is called upon to testify concerning his activities" or where

"the performance of a particular agent otherwise is called into question."  *Id.*

Although the public surely has an interest in the FBI's compliance with its FOIA

obligations, that interest does not extend to disclosure of the names of the lower level employees

responsible for processing FOIA requests.  The public interest in those names is minimal, and the

employees' privacy interests are strong.  In *Shaipro I*, the Court "ha[d] no difficulty concluding

that the FBI appropriately relied on Exemption 6 in withholding the names of individual analysts

on . . . case evaluation forms," which were used to review employees' performance.  *Shapiro I*,

153 F. Supp. 3d at 277.  Insofar as Plaintiffs seek individual employees' names to evaluate "their

performance in complying with" FOIA, Dkt. 151 at 17, they are essentially aiming to conduct an

informal employee performance review of their own, which is a task best left to a private

conversation with an employee's manager, rather than a public airing of grievances after seven

years of bitter litigation.  As for the public face of the FBI's FOIA compliance, its Public Liaison

Officer, the Court agrees with Plaintiffs that redacting his name, which is listed on the FBI's

website, would likely be impermissible.  But that is now a moot point, because "[a]fter further

review, the FBI determined to release [Public Liaison Officer Dennis Argall's] name."  Dkt. 148-

1 at 15 (Bender Decl. ¶ 22).

The Court will, accordingly, grant the FBI's motion for summary judgment as to its

withholding of the names and identifying information of FBI support personnel under

Exemption 6.

6.      *Exemption 7(E)*

Finally, Plaintiffs challenge three types of withholdings under Exemption 7(E).  The

Court considers each in turn.

a.      Database information and printouts

In its supplemental release, the FBI cited Exemption 7(E) to withhold "database

information and/or printouts" on one page, labeled FBI-4560.  Dkt. 132-2 at 41 (Second Seidel

Decl. ¶ 84).  In prior releases, the FBI protected similar database information on numerous other

pages.  Dkt. 123-3 at 16 n.20 (Eleventh Hardy Decl. ¶ 31 n.20).  "The FBI protects names of

sensitive non-publicly known databases, names of publicly known databases when their use in a

particular investigation is not known, as well as search results in both of the prior circumstances

when release of this information triggers risk of circumvention of law."  Dkt. 148-1 at 16–17

(Bender Decl. ¶ 26).  Hardy explains that these databases "are essentially 'one-stop' shops that

allow law enforcement and RIDS personnel to query information and develop legal and statutory

strategy from a variety of source data using state-of-the-art analytical tools."  Dkt. 123-3 at 16

(Eleventh Hardy Decl. ¶ 31).  Further, "[d]isclosure of the printouts or information compiled

from these search results could enable criminals to employ countermeasures to avoid detection,

thus jeopardizing the FBI's investigative mission."  *Id.*  The Second Seidel Declaration adds that

the database in question, which is used in processing FOIA requests, "acts as a recompilation

(and sometimes exact copies) of . . . law enforcement records."  Dkt. 132-2 at 7 (Second Seidel

Decl. ¶ 12).  The FBI contends that "even if this database may also contain administrative data

RIDS uses to manage and organize information to respond to FOIA requests, this does not negate

the overall purpose of the database—that is, to house recompiled FBI law enforcement information." *Id.*

Plaintiffs counter that none of this explains how disclosing either the name of the database or printouts from it would create a risk of circumvention of the law.  The Bender declaration indicates that the FBI withholds the names of publicly known databases when the connection between that database and a particular investigation is unknown, but Plaintiffs argue that the publicly known database at issue in this case "does not relate to any particular investigation."  Dkt. 151 at 17.  In short, according to Plaintiffs, "the FBI provides nothing more than a conclusory statement to support its assertion that disclosure of the association of a FOIA request with the name of a publicly-known database 'RIDS uses to manage and organize information to respond to FOIA requests' would risk circumvention of the law."  *Id.* (quoting Dkt. 132-2 at 7 (Second Seidel Decl. ¶ 12)).

Exemption 7(E) sets a low bar for an agency to justify withholding.  As noted above, it permits withholdings "not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." *Mayer Brown*, 562 F.3d at 1193.  And several prior opinions of this Court have held that the names and contents of confidential databases may be withheld under Exemption 7(E), albeit generally based on declarations that provide more specifics about the risk of circumvention than the ones the FBI has provided here.  *See, e.g.*, *McClanahan v. U.S. Dep't of Justice*, 204 F. Supp. 3d 30, 54–55 (D.D.C. 2016), *aff'd sub nom. McClanahan v. Dep't of Justice*, 712 F. App'x 6 (D.C. Cir. 2018);

*Stein v. U.S. Dep't of Justice*, 134 F. Supp. 3d 457, 474–75 (D.D.C. 2015); *McRae v. U.S. Dep't of Justice*, 869 F. Supp. 2d 151, 168–69 (D.D.C.2012).

It is unclear whether the database information that the FBI seeks to protect here relates to a confidential or a publicly known database and whether the information revealed in the printout is related to FOIA processing or, instead, is substantive law-enforcement information related to investigations.  The Second Seidel Declaration, however, explains that FBI gathered "law enforcement information into investigative files and then RIDS recompile[ed] . . . that information into this database," and the "overall purpose of the database" is "to house recompiled FBI law enforcement information."  Dkt. 132-2 at 7 (Second Seidel Decl. ¶ 12).  In short, according to Seidel, the record at issue relates to a database used by RIDS that contains law-enforcement information from investigative files.

In *Shapiro IV*, the Court held that at least some FOIA processing records can qualify as "records . . . compiled for law enforcement purposes" that "would disclose techniques and procedures for law enforcement investigations."  5 U.S.C. § 552(b)(7)(E).  Although FOIA processing records are "not themselves compiled for law enforcement purposes," but rather "to comply with FOIA," that distinction is immaterial to the extent that those records "replicate information that *was* compiled for law enforcement purposes."  *Shapiro IV*, 239 F. Supp. 3d at 113.  That appears to be the case here.  And, although the final element of the Exemption 7(E) standard—that "disclosure could reasonably be expected to risk circumvention of the law," 5 U.S.C. § 552(b)(7)(E)—presents a closer question, the Court is persuaded that the multiple declarations offered by the FBI in this action are sufficient to clear Exemption 7(E)'s low bar .  *See Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 204–05 (D.C. Cir. 2014).  In particular, as explained in other decisions from this Court, access to

information about FBI databases could give criminals and adversaries information about the

FBI's programs that, in turn, could aid them in avoiding detection or gaining access to the FBI's

systems. *See*, *e.g.*, *McClanahan*, 204 F. Supp. 3d at 54–55; *see also* Dkt. 123-3 at 16 (Eleventh

Hardy Decl. ¶ 31) (attesting that "[d]isclosure of the printouts or information compiled from

these search results could enable criminals to employ countermeasures to avoid detection, thus

jeopardizing the FBI's investigative mission").

The Court will, accordingly, grant the FBI's motion for summary judgment as to its

withholdings of database information under Exemption 7(E).

> b.     Investigative Focus

Plaintiffs also challenge the FBI's invocation of Exemption 7(E) to protect the "focus of

investigations." Dkt. 132-2 at 8 (Second Seidel Decl. ¶ 13). In support of these withholdings,

the FBI points by analogy to "how the FBI considers how to withhold or release information as

to file numbers" under Exemption 7(E) and attests that "a similar analysis was undertaken" when

the FBI invoked Exemption 7(E) to protect the focus of investigations. *Id.* The second Seidel

declaration addresses the potential criticism that "the FBI has not provided any information

related to the status of each investigation in terms of whether they were pending, closed and how

long ago they may have been closed," asserting that the Ninth Hardy declaration "described this

process." *Id.*

The FBI's analogy to file numbers is unavailing, given the Court's holding above that the

FBI has not met its burden to justify the withholding of file numbers under Exemption 7(E).

And the FBI's explanations about the age of the relevant investigations are likewise unpersuasive

for the same reasons discussed above with respect to file numbers. To briefly recap: Without

knowing how long the relevant investigations had been closed, the Court could not assess

whether disclosure of the file numbers would raise a reasonable risk of present-day circumvention of the law.  The Court thus ordered the FBI to divulge the age of the closed investigations as to which it was withholding file numbers.  If the age of the closed investigations was itself sensitive for some reason, the Court even invited the FBI to provide its answer *in camera* and *ex parte*.  The FBI declined to do so, and the Court granted summary judgment to Plaintiffs on that issue.

As to these records that the FBI withheld related to "investigative focus," a similar logic arguably applies.  How long a group of files has been closed is relevant to whether disclosing information about those investigations could reasonably be expected to risk alerting the public of the FBI's modern-day priorities and investigative focus, and the FBI has again failed to provide the necessary information.  The FBI has, however, provided greater explanation of its withholding of records that implicate its "investigative focus" than it provided for its file number withholdings.  The FBI explains that it "protected the focus of specific domestic and/or international interconnected investigations in the universe of responsive material in this case." *Id.*  And revealing the nexus between those "interconnected" investigations would, in turn, "reveal the scope of the FBI's programs and the strategies it plans to pursue in preventing and disrupting criminal activity, thus allowing criminals to gauge the FBI's strengths and weaknesses across the criminal domain to structure their activities in a manner that avoids detection and disruption by the FBI."  *Id.*  Crucially, unlike with respect to file numbers, the FBI goes on to explain how revealing the focus on these closed investigations could lead to present-day circumvention of the law:  "Criminals armed with such knowledge would be aware that their activities had not only been detected in relation to current matters but also in relation to another matter under investigation and thus provide an opportunity for them to change their behaviors to

avoid further detection or prosecution." *Id.* Although the FBI's representations are still less clear than the Court would hope, the Exemption 7(E) standard is forgiving, and the Court concludes that the FBI has (barely) carried its burden by showing how disclosure of these records could risk present-day circumvention of the law, based on connections between past investigations and ongoing ones.

The Court will therefore grant the FBI's motion for summary judgment with respect to its withholdings under Exemption 7(E) related to the focus of investigations.

c.   Collection and Analysis of Information

Finally, the FBI invoked Exemption 7(E) under the heading of "Collection and Analysis of Information" in two separate ways. First, the FBI "protected the manner in which it identifies and vettes [sic] information for classification purposes." *Id.* (Second Seidel Decl. ¶ 14). When a FOIA request is submitted, "RIDS Classification Unit personnel . . . conducts their review, research and analysis of the information for classification purposes to determine if any underlying investigative information, file number, or associated case file data may remain classified, must be downgraded to a lower classification level, or be declassified altogether." *Id.* at 9 (Second Seidel Decl. ¶ 14). Once this process is completed, "[t]his collection of information is then memorialized onto specific process forms describing the analysis these Classification Unit personnel undertake." *Id.* Although the declaration explains how this information relates to "techniques and procedures for law enforcement investigations or prosecutions," it says nothing about how "disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Given this omission, the Court ordered the FBI to address whether release of these records could risk circumvention of the law in its supplemental filing. The FBI then explained that "upon further review," the release of these records from the RIDS Classification

Unit "could not reasonably be expected to risk circumvention of the law."  Dkt. 153 at 3.  The Court will, accordingly, grant summary judgment to Plaintiffs with respect to records from the RIDS Classification Unit that the FBI withheld under Exemption 7(E).

Second, as part of the supplemental release, the FBI also used Exemption 7(E) to withhold "information about techniques and procedures used by the FBI in conducting Domestic Terrorism investigations into extremist activities, including information that would reveal what types of techniques and procedures are routinely used in such investigations, and non-public details about when, how, and under what circumstances they are used."  Dkt. 132-2 at 9 (Second Seidel Decl. ¶ 15).  Revealing those techniques, the FBI asserts, "would enable the targets of these techniques to avoid detection or develop countermeasures to circumvent" the ability of the FBI to use those "important law enforcement techniques in future investigations."  *Id.* at 10 (Second Seidel Decl. ¶ 15).  Although this explanation is vague, the FBI contends that "[t]o describe this information in further detail on the public record would identify the very information that the FBI seeks to protect pursuant to this exemption."  *Id.* at 9–10 (Second Seidel Decl. ¶ 15).  Plaintiffs argue that, given these vague representations, the Court should require the FBI to submit these documents *in camera* and *ex parte* for the Court's review.

The Court suspects that these withholdings are likely proper.  Whereas FOIA processing records are often one step removed from law enforcement techniques or procedures, these records allegedly refer to those techniques or procedures directly, raising a significantly greater risk that disclosure could lead to circumvention of the law.  But the Court agrees with Plaintiffs that the declarations submitted on the public record are simply too vague, broad, and conclusory for the Court to grant summary judgment to the FBI.  The Court will therefore order the FBI to submit the relevant documents from the supplemental release for the Court's *in camera* and *ex*

*parte* review on or before December 18, 2020.  The Court will reserve its decision on this one

issue until it reviews those additional materials and will rule on this matter when entering final

judgment.

**E.     Injunctive and Declaratory Relief**

Plaintiffs also move for a declaratory judgment and a permanent injunction prohibiting

the FBI from returning to the broad categorical withholding policy that the Court struck down in

*Shapiro I*.  As a threshold matter, the Court notes that only that older policy is at issue in this

case.  Just as the Court precluded the FBI from relying on its narrower modified policy in this

litigation, Plaintiffs may not challenge that modified policy here either.  If Plaintiffs seek to

litigate over that new policy, they may file a different lawsuit to do so.  With that in mind, the

Court will first address whether Plaintiffs are entitled to declaratory relief, before turning to the

appropriateness of a permanent injunction.

Courts in this circuit grant declaratory relief when they find that an agency has a policy or

practice that violates FOIA, so long as there is at least some chance that the agency might continue to

apply the policy in the future.  *See Payne Enters., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir.

1988); *see also Middle E. Forum v. U.S. Dep't of the Treasury*, 317 F. Supp. 3d 257, 265 (D.D.C.

2018) ("Courts will grant declaratory judgments in the FOIA context for 'policy or practice'

violations, where agencies engage in patterns or have policies of denying FOIA requests.").  "To

support a claim for declaratory relief, 'the plaintiff is only required to put forth a plausible, more than

nebulous assertion of the existence of an ongoing pattern or practice."  *Id.* (quoting *Nat'l Sec. Couns.*

*v. CIA*, 898 F. Supp. 2d 233, 260) (D.D.C. 2012) (internal punctuation omitted).

The FBI argues that Plaintiffs are not entitled to equitable relief because their challenge

to its broader categorical withholding policy is moot, now that the FBI has abandoned that

policy.  Dkt. 148 at 27–30.  As Plaintiffs point out, a party seeking to show mootness based on

its voluntary cessation of a challenged policy faces a heavy burden. "[T]he standard for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 189 (2000). That general rule, however, "must be read in light of the 'presumption of legitimacy accorded to the Government's official conduct,' to which the Supreme Court has referred in the FOIA context." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. & Animal & Plant Health Inspection Serv.*, 918 F.3d 151, 157 (D.C. Cir. 2019) ("*PETA*") (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004)). And as the D.C. Circuit recognized in the *PETA* case, several other circuits "have been ready to give declarations by (or on behalf of) government officials—public servants sworn to uphold the law—somewhat higher credence than statements made by private parties." *Id.* (collecting cases).

Here, given the FBI's previous omissions in explaining the evolution of its policies, *see* Dkt. 52 at 30–32, the presumption of regularity on the part of government officials is weaker than it might otherwise be. Indeed, in light of the frequent changes in the FBI's position throughout this litigation, the Court cannot be "absolutely" certain that the FBI will not revert to its original categorical policy in the future. Plaintiffs' claim for declaratory relief is thus not moot.

Turning to the merits, Plaintiffs' entitlement to a declaratory judgment is straightforward. Plaintiffs have done much more than "put forth a plausible, more than nebulous assertion" that the FBI employs a categorical policy of denying FOIA requests. *Middle E. Forum*, 317 F. Supp. 3d at 265 (internal quotation marks and punctuation omitted). Indeed, the FBI asserted its broader categorical policy in this case, and the Court rejected that policy in *Shapiro I*, 153 F. Supp. 3d at 276. Plaintiffs are thus entitled to declaratory relief. The Court will therefore enter

a judgment declaring unlawful the FBI's policy of categorically withholding all FOIA processing

records associated with parent requests for investigative files within the past 25 years.

Matters are more complicated with respect to a permanent injunction. To obtain a

permanent injunction, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable

injury; (2) that remedies available at law, such as monetary damages, are inadequate to

compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391

(2006). "An injunction is an exceptional form of relief." *Salazar by Salazar v. District of

Columbia*, 896 F.3d 489, 497 (D.C. Cir. 2018) (citation omitted). And injunctions are even more

exceptional "when the judicial branch undertakes to restructure the operations of an executive

branch of government and to superintend its operations on an ongoing basis." *Id.* (citation

omitted). Indeed, "[a]n injunction is a drastic and extraordinary remedy, which should not be

granted as a matter of course," especially where "a less drastic remedy . . . [is] sufficient to

redress [the plaintiffs'] injury." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165

(2010).

Here, a declaratory judgment should be sufficient to protect Plaintiffs from any

recurrence of the FBI's broad categorical policy, and a permanent injunction is thus not

warranted at this stage. If the FBI reverts to its former policy, however, Plaintiffs are free to

return to this Court to seek a permanent injunction under appropriate circumstances and at an

appropriate time. Plaintiffs argue that an injunction is necessary now because the FBI has

continued to apply its old policy by withholding certain search slips in their entirety under Exemption

5 and Exemption 7. Dkt. 143 at 40. But withholding records based on individual exemption claims,

even if it leads to the same result as to a categorical policy for certain records, is still logically

87

distinct from a categorical policy.  Plaintiffs can challenge each asserted exemption on a case-by-case basis.  And in any event, the Court cannot enjoin the FBI from making individual exemption claims. Plaintiffs' motion for a permanent injunction will, accordingly, be denied.

## CONCLUSION

For the foregoing reasons, the FBI's motion for summary judgment, Dkt. 132, is **GRANTED** in part and **DENIED** in part, and Plaintiffs' motion for summary judgment, Dkt. 143, is **GRANTED** in part and **DENIED** in part.  To avoid any additional confusion as to the Court's holdings in this case, its disposition as to each issue is as follows:

- Plaintiffs' motion is **GRANTED** as to file numbers withheld on 36 pages pursuant to Exemption 7(E), which includes file numbers in the records related to the murder of Hyram Kitchen.

- The FBI's motion is **GRANTED** as to file numbers withheld on five pages pursuant to Exemption 3.

- Plaintiffs' motion is **GRANTED** as to Exemption 3 withholdings from three pages of the records responsive to the NSC and Stein requests.  The FBI may, however, move for reconsideration on this issue on or before December 28, 2020.

- The FBI's motion is **GRANTED** as to Exemption 7(E) withholdings from records that Truthout sought related to parent requests concerning Hesham Abu Zubaydah.

- The parties' cross-motions are **GRANTED** in part and **DENIED** in part as to Exemption 5 withholdings from the Truthout records.  Plaintiffs' motion is **GRANTED** as to any withheld records that were created before the *Leopold* litigation began, which based on the parties' filings appear to be the records on

Bates pages FBI-234, 236–37, and 239–43.  The FBI's motion is **GRANTED** as to Exemption 5 withholdings from those records on other pages.

- The parties' cross-motions are **GRANTED** in part and **DENIED** in part as to Exemption 7(E) withholdings from Form 0-63 records.  The FBI's motion is **GRANTED** as to Exemption 7(E) withholdings from any Form 0-63 records compiled in responding to "No Records" parent FOIA requests from Ryan Shapiro.  Plaintiffs' motion is **GRANTED** as to Exemption 7(E) withholdings from any other Form 0-63 records, including "No Records" parent responses to other parties and "Non-No Records" parent responses to anyone.  Plaintiffs' motion is also **GRANTED** as to any Exemption 5 withholdings from Form 0-63 records.  The FBI may, however, move for reconsideration on this issue on or before December 28, 2020.

- The parties' cross-motions are **GRANTED** in part and **DENIED** in part as to Exemption 7(E) withholdings from a single Form 4-22 record.  The FBI's motion is **GRANTED** as to Exemption 7(E) withholdings on that page.  Plaintiffs' motion is **GRANTED** as to Exemption 5 withholdings on that page, insofar as any of those withholdings are not also covered by Exemption 7(E).

- The parties' cross-motions are **GRANTED** in part and **DENIED** in part as to the segregability of certain columns of information listed on search slips.  The FBI's motion is **GRANTED** as to search slips related to Shapiro's "No Records" parent requests.  Plaintiffs' motion is **GRANTED** as to any other search slips—that is, "Non-No Records" parent requests from Shapiro and all parent requests from

others.  The FBI may, however, move for reconsideration on this issue on or before December 28, 2020.

- Plaintiffs' motion is **GRANTED** as to eight pages of records that the FBI withheld because they were outside the FBI's chosen search cutoff dates.

- Plaintiffs' motion is **GRANTED** as to attachments referenced but not disclosed in the July 2019 supplemental release.

- The FBI's motion is **GRANTED** as to twenty pages of records withheld under Exemption 5 based on the attorney-client privilege.

- The FBI's motion is **GRANTED** as to eleven pages of records withheld under Exemption 7(A).

- The FBI's motion is **GRANTED** as to the names of FBI staff withheld under Exemptions 6 and 7(C).

- The FBI's motion is **GRANTED** as to database information and printouts withheld under Exemption 7(E).

- The FBI's motion is **GRANTED** as to records withheld under Exemption 7(E) to protect the FBI's "investigative focus."

- Plaintiffs' motion is **GRANTED** as to the FBI's withholdings of RIDS Classification Unit records related to the "collection and analysis of information" under Exemption 7(E).

- The Court reserves judgment as to the FBI's other withholdings of records related to the "collection and analysis of information" under Exemption 7(E).  It is hereby **ORDERED** that the FBI shall submit, on or before December 18, 2020, records

implicating the FBI's investigative techniques, which cannot be described on the public record, for the Court's *in camera* and *ex parte* review.

- Finally, Plaintiffs' motion for declaratory and injunctive relief is **GRANTED** in part and **DENIED** in part.  The Court **DECLARES** the FBI's original categorical policy of withholding all FOIA search slips and processing records from the past 25 years unlawful under FOIA.  The Court will not, however, enter an injunction at this juncture.  But should the FBI return to its former policy, Plaintiffs are free to renew their motion for a permanent injunction at that time.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  December 11, 2020