UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RYAN NOAH SHAPIRO, et al.
     Plaintiff,

          v.

DEPARTMENT OF JUSTICE,

     Defendant.

Civil Action No. 13-cv-0555 (RDM)

## TWENTY-SEVENTH OVERALL AND
## SIXTEENTH DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

1.      I am the Section Chief of the Record/Information Dissemination Section (RIDS),

Information Management Division (IMD), Federal Bureau of Investigation (FBI), Winchester,

Virginia. I joined the FBI in September 2011, and prior to my current position, I was the

Assistant Section Chief of RIDS from June 2016 to July 2020; Unit Chief, RIDS Litigation

Support Unit, from November 2012 to June 2016; and an Assistant General Counsel, FBI Office

of the General Counsel, Freedom of Information Act (FOIA) Litigation Unit, from September

2011 to November 2012. In those capacities, I had management oversight or agency counsel

responsibility for FBI FOIA and Privacy Act (FOIPA) litigation cases nationwide. Prior to my

joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration (DEA)

from September 2006 to September 2011, where among myriad legal responsibilities, I advised

on FOIPA matters and served as agency counsel representing the DEA in FOIPA suits

nationwide. I also served as a U.S. Army Judge Advocate General's Corps Officer in various

1

assignments from 1994 to September 2006 culminating in my assignment as Chief, General Litigation Branch, U.S. Army Litigation Division where I oversaw FOIPA litigation for the U.S. Army. I am an attorney licensed in the State of Ohio and the District of Columbia.

2.      In my official capacity as Section Chief of RIDS, I supervise approximately 241 FBI employees, supported by approximately 104 contractors, who staff a total of nine (9) Federal Bureau of Investigation Headquarters (FBIHQ) units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974; Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009); Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based on my personal knowledge, information provided to me in my official capacity, and conclusions and determinations reached and made in accordance therewith.

3.      Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552 and the Privacy Act, 5 U.S.C. § 552a. Specifically, I am aware of the FBI's handling of Plaintiffs' FOIA request in this litigation.

4.      In response to the Court's Minute Order, dated October 16, 2023 (October 16 Order), the FBI processed a total of 855 pages of FDPS Screenshots subject to the FOIA. Of these pages, the FBI released 518 pages in full, released 337 pages in part.

5.      The FBI submits this declaration in response to the Court's October 16 Order. Part I describes the procedures used to create, review, and process the screenshots as ordered by

the Court; Part II, in accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), explains

the FBI's justification for withholding information in part or in full pursuant to FOIA

Exemptions 3, 6, 7(A), 7(C), 7(D), and 7(E), 5 U.S.C. §§ 552 (b)(3), (b)(6), (b)(7)(A),

(b)(7)(C),(b)(7)(D), and (b)(7)(E).[1]

### PART I:  PROCEDURES USED TO CREATE AND PROCESS SCREENSHOTS OF THE FOIPA DOCUMENT PROCESSING SYSTEM (FDPS)

6.      Throughout this litigation, the FBI has provided multiple declarations in an

attempt to describe FDPS, its role in the processing of FOIA requests, and the information that is

available in each section of FDPS. *See e.g.* ECF No. 171, 179, 180, 184, 188, 191. However, it is

clear that despite the FBI's best efforts to describe FDPS and the information at issue, questions

remain. Specifically, the October 16 Order states that the "Court remains concerned regarding

the inconsistencies in the Defendant's representations to the Court as to the content of the FDPS

and whether it contains records responsive to Plaintiffs' FOIA requests." *See* October 16 Order.

The Court also ordered the FBI to "file a supplement on the public record containing screenshots

of each of the tabs of FDPS that are populated from the FBI's search for records responsive to

each of these 20 FOIA requests, with any redactions necessary to protect exempt material and a

*Vaughn* index explaining in detail the bases for any such redactions." *Id*.

7.      FDPS is unique due to its role as a workflow management tool used to process

responses to FOIA and Privacy Act requests. The FBI has previously acknowledged that parts of

FDPS contain already-extant records that can be exported or extracted per the normal functions

---

[1] This screenshot sample was created in order to demonstrate the contents of FDPS, and the FBI
reserves the right to address the issue of whether FDPS itself is a record under the meaning of
FOIA.

of FDPS. All of these records have been exported and processed and provided to Plaintiffs, including:

    a. Case notes
    b. Electronic search slips
    c. Records stored within the Documents tab

8.    Currently at issue are the remaining tabs within FDPS that have not been processed, which include:

    a. Case Summary
    b. Status
    c. Expedite
    d. Fee Waiver
    e. Case Searches
    f. Case Files
    g. OGA Case Files
    h. Work Items
    i. OGA Coordination
    j. Ready Work Items
    k. Requester Releases
    l. OGA Releases
    m. Case Fees
    n. Case History

9.    These tabs are the only parts of FDPS remaining at issue in this litigation. In contrast to the exportable portions of FDPS described above in ¶ 7, the purpose of these remaining tabs is to facilitate the workflow of processing FOIA/Privacy Act requests, rather than to store records. The information that appears within the tabs is not static and is constantly updating to reflect the status and workflow of a request. Specifically, these FDPS tabs function as workflow management tools, and include nothing more than administrative data of the case that changes, or in some cases may be overwritten, as the workflow of a request progresses.

10.    Because the purpose of these tabs is to provide users with tools and information needed to manage the workflow of the relevant FOIA request, FDPS does not have a function

that enables RIDS to print, extract, or export this information beyond what has already been located and provided to Plaintiffs. These tabs are not records, beyond the notes section, the electronic search slip, and the records stored in the documents tab. The only options to completely review these tabs are to view and use the system in-person, or to create a new record by the process described in ¶ 11 *infra*. The FBI maintains the position that creating such screenshots is the equivalent of creating a new record which is not required under the FOIA[2]

THE FBI'S CREATION OF THE SCREENSHOTS AT ISSUE

11.     Nevertheless, in compliance with the Court's October 16 Order, and to provide the Court with the information it has requested, the FBI created the screenshots. As described in the Fifteenth Seidel Declaration (ECF 202-1), on October 18, 2023, Plaintiffs provided the FBI with the list of 20 selected FOIA requests for which to provide screenshots. The FBI reviewed the 20 requests and determined that in order to create the screenshots at issue, it must access 57 individual case shells[3], each iteration of which contains 15 tabs per case shell, which resulted in the creation of 855 pages of screenshots. The process by which the FBI created the screenshots was by opening and displaying each tab of FDPS, generating a screenshot of each displayed tab, and copying that screenshot to a PowerPoint slide where all the images for each tab in each iterative case shell were organized by the relevant FOIA number. The PowerPoint document was

---

[2] See 13th Seidel Declaration (ECF No. 191).

[3] A new case shell is created when a request needs to be re-opened after a case was closed. There are various reasons why a case might be reopened, including if a requester provides additional information, resubmits their request with a privacy waiver, pays fees, or if an appeal is filed, amongst other possible reasons.

then converted to an Adobe PDF and imported into FDPS to be reviewed for applicable exemptions.

12.     These screenshots are limited to the information immediately displayed on each tab. FDPS contains numerous additional fields that cannot be displayed on a single screenshot. This includes information boxes that cannot be expanded in a static screenshot and requires the use of a scroll bar while using the program to view the full contents, drop down menus with various selections, and further information that is only visible once you click into a particular item. For example, on the Requester Releases tab[4], each release made to a requester is listed in the informational field titled "Releases." This field cannot be expanded. When there are more entries than can be immediately shown in the field to display, a GIS must scroll down the field to show the remaining entries. Additionally, when a GIS clicks on one of the entries in the Releases field, information populates in the Releases Item(s) and Release Letter fields to display the component work items[5] of that particular release. This information is only visible if each release is clicked on and would require multiple screenshots of the same tab to capture all this information. To effectively capture all the information present in FDPS with screenshots, the FBI would need to create innumerable screenshots to capture the various permutations of each tab, with each drop down or item selected that displays further information.

_____

[4] *See* **Ex. A**, Bates Page "Screenshot Sample-297" for an example of the Requester Releases tab with multiple releases.

[5] A work item is the FDPS method of creating and administratively tracking a task within a case in FDPS, such as letters, versions of the documents to be processed, and the finalized releases that are moved through the workflow. The work items are not documents; rather, they link to, and track with, the corresponding processed files or outgoing letters in the Case Files tab, the Documents tab, etc.

13.     Additionally, once created, each screenshot was ingested into FDPS to be reviewed for applicable exemptions. As previously explained, in addition to the classified information[6] within FDPS, the system also contains records and information protected by statute or exempt pursuant to other FOIA Exemptions. See Defendant's Motion for An Ex Parte, In Camera Hearing, p. 4, fn. 1 (ECF No. 198). The FBI reviewed the screenshots for all applicable exemptions and protected all exempt information pursuant to the FOIA and have attached those reviewed screenshots hereto as **Exhibit A**. The FBI's review for exempt information and justification for nondisclosure of some information is described in depth in Part II, *infra*.

THE FBI'S REQUEST FOR AN FDPS DEMONSTRATION BEFORE THE COURT

14.     In the process of creating and processing the screenshots at issue, the FBI determined that screenshots do not adequately demonstrate the scope of the dynamic information contained within the FDPS tabs. Previously, the Court issued an order instructing the FBI to provide the Court with a demonstration of the FDPS system, which would be conducted by a "technical expert from the FBI who is familiar with the FDPS system and who can answer the Court's questions regarding the system and the material at issue." *See* August 8, 2023 Minute Order.

---

[6] The FBI did not need to assert Exemption (b)(1) to the screenshots in the 20 sample cases as none of the information on the face of these particular screenshots is classified. However, these screenshots only show the appearance of each tab, not necessarily all information contained within. For example, FBI investigative records stored in the Case Files could contain classified records, and some documents in the Documents Tab could contain classified information, such as records concerning classification review of responsive records in those cases. To the extent that those records were responsive to Plaintiffs' requests, they have already been reviewed for applicable exemptions and processed with segregable portions released to Plaintiffs.

15.     Despite the FBI's best efforts to describe FDPS and the tabs at issue, the Court

may still have outstanding questions. As such, the FBI is still prepared to provide an *in camera*

and *ex parte* demonstration of FDPS as described in the 14th Seidel Declaration. (ECF 198-1).

Due to the nature of the classified and exempt information maintained in FDPS, providing a

public demonstration of FDPS could result in an unauthorized disclosure of classified or exempt

information, as there is no way to redact or remove this information from the active system while

still including the actual material currently in dispute per the Court's request. (*Id.* ¶ 6.) As such,

the FBI maintains that a demonstration of FDPS is best suited to provide the Court with

comprehensive information about the system and what each portion of it contains. Such a

demonstration would be a good faith effort to resolve any of the Court's outstanding questions

and would support the FBI's position that it has processed any records within FDPS subject to

the FOIA, and that FDPS is not in and of itself a record.

16.     Alternatively, the FBI is also prepared to address any of the Court's outstanding

questions in a public hearing. A public hearing would not be as informative as an *in camera* and

*ex parte* hearing because the discussion would be limited to unclassified and nonexempt

information and could not include a demonstration of FDPS. However, a public hearing would

provide the Court an opportunity to resolve any outstanding questions it has regarding the

system, address any inconsistent statements, and clarify what information exists in the relevant

tabs at issue.

### PART II:  JUSTIFICATION FOR NONDISCLOSURE UNDER THE FOIA

17.     The FBI processed all screenshots created in response to the Court's October 16

Order in order to provide information about the contents of FDPS and processed the records

consistent with the access provisions of the FOIA. Every effort was made to provide Plaintiffs

with all information in the public domain and with all reasonably segregable, non-exempt information. The FBI did not withhold any reasonably segregable, nonexempt portions from Plaintiffs. Further description of the information withheld, beyond what is provided in this declaration, could identify the actual exempt information.

18.   <u>Bates Numbering & Index:</u> The FBI numbered all pages of this sample production consecutively as "Screenshot Sample-1" through "Screenshot Sample-855." On the pages released in full and in part, these numbers are typically located at the bottom of each page. Additionally, included as an exhibit to this declaration is an index that identifies the pages reviewed and indicates the specific FOIA exemptions asserted on each page and its bases for doing so. **(Ex. B.)**

19.   <u>Justification Codes:</u> On the Bates-numbered pages included as **Exhibit A**, the FBI further categorized its application of exemptions to better explain the nature of the information withheld pursuant to the provisions of the FOIA. Specifically, the FBI applied numerical codes that coincide with specific categories of exempt information. This declaration and index demonstrate that all information withheld by the FBI is exempt from disclosure pursuant to the cited FOIA exemptions or is so intertwined with non-exempt information that segregation is not possible without revealing the underlying exempt information.

20.   Each instance of information withheld pursuant to a FOIA exemption is accompanied by a coded designation that corresponds to one of the categories listed below. For example, if "(b)(7)(C)-1" appears on a page, the "(b)(7)(C)" designation refers to FOIA Exemption 7(C) protecting against unwarranted invasions of personal privacy. The numerical designation "1" following "(b)(7)(C)" narrows the main category into a more specific

subcategory, such as "Names of FBI Professional Staff." Not all codes are applicable in each

FOIA litigation; therefore, the codes may not be sequential if not relevant to the records at issue.

| SUMMARY OF EXEMPTION JUSTIFICATION CATEGORIES | |
|---|---|
| CODED CATEGORIES | INFORMATION WITHHELD |
| Exemption 3 | Information Protected by Statute |
| (b)(3)-1 | Protection of Intelligence Sources and Methods – 50 U.S.C. § 3024(i)(1) |
| Exemptions 6 & 7(C) | Clearly Unwarranted/Unwarranted Invasion of Personal Privacy |
| (b)(6)-1 & (b)(7)(C)-1 | Names of FBI Professional Staff |
| (b)(6)-2 & (b)(7)(C)-2 | Identifying Information of a Third Party Merely Mentioned |
| (b)(6)-4 & (b)(7)(C)-4 | Names of Third Parties of Investigative Interest |
| (b)(6)-5 & (b)(7)(C)-5 | Names of Non-FBI Federal Government Personnel |
| Exemption 7(A) | Pending Enforcement Proceedings |
| (b)(7)(A)-1 | Information, the Disclosure of which Could Reasonably be Expected to Interfere with Pending Enforcement Proceedings |
| Exemption 7(D) | Confidential Source Information |
| (b)(7)(D)-1 | Confidential Source File Number |
| Exemption 7(E) | Law Enforcement Techniques and Procedures |
| (b)(7)(E)-3 | Specific Investigative Techniques and Procedures |
| (b)(7)(E)-4 | Sensitive Investigative File Numbers |
| (b)(7)(E)-7 | Investigative Focus of Specific Investigations |

EXEMPTION 3 – INFORMATION PROTECTED BY STATUTE

21.     FOIA Exemption 3 exempts from disclosure information which is:

> specifically exempted from disclosure by statute . . . if that statute (A)(i)
> requires that the matters be withheld from the public in such a manner as
> to leave no discretion on the issue; or (A)(ii) establishes particular criteria
> from withholding or refers to particular types of matters to be withheld;
> and (B) if enacted after the date of enactment of the Open FOIA Act of
> 2009, specifically cites to this paragraph.

5 U.S.C. § 552 (b)(3).

22.     (b)(3)-1: Protection of Intelligence Sources and Methods – 50 U.S.C. §

3024(i)(1). The FBI asserted Exemption 3 to withhold information pursuant to Section

102A(i)(1) of the National Security Act of 1947 (NSA), as amended by the Intelligence Reform

and Terrorism Prevention Act of 2004 (IRTPA). This statute provides that the Director of

National Intelligence (DNI) "shall protect from unauthorized disclosure intelligence sources and

methods."[7] As relevant to U.S.C. § 552(b)(3)(B), the National Security Act of 1947 was enacted

before the date of enactment of the OPEN FOIA Act of 2009. On its face, this federal statute

leaves no discretion to agencies about withholding from the public information about intelligence

sources and methods. Thus, the protection afforded to intelligence sources and methods by 50

U.S.C. § 3024(i)(1) is absolute. *See CIA v. Sims*, 471 U.S. 159 (1985).

23.     In order to fulfill its obligation of protecting intelligence sources and methods, the

DNI is authorized to establish and implement guidelines for the Intelligence Community (IC) for

the classification of information under applicable laws, Executive Orders, and other Presidential

Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(i)(1). In

implementing this authority, the DNI promulgated Intelligence Community Directive 700, which

provides that IC elements shall protect "national intelligence and intelligence sources and

methods and activities from unauthorized disclosure."[8] The FBI is one of 18 member agencies

comprising the IC, and as such must protect intelligence sources and methods.

24.     Specifically, within this sample, the FBI utilized Exemption 3 to withhold

sensitive file numbers where disclosure could reveal intelligence sources and methods, consistent

with the FBI's assertion of Exemption 3 to protect the same information on records already

provided to Plaintiffs. As described in the First Bender Declaration, "individual file numbers

---

[7] Section 102A(i)(1) of the National Security Act was previously codified at 50 U.S.C. §
403(i)(1).  As a result of the reorganization of Title 50 of the U.S. Code, Section 102A(i)(1) is
now codified at 50 U.S.C. § 3024(i)(1).

[8] Intelligence Community Directive (ICD) 700, dated June 7 2012, at ¶ E.2.a.

contain the classification identifying the type of investigation/crime, an alpha associated to a specific investigative focus, the geographical prefix identifying the originating office, and the unique case number. Release of intelligence file numbers would lead to exposure of the particular intelligence activity and method at issue and its nexus to a specific FBI intelligence program or sub-program. Furthermore, disclosure of intelligence file numbers in the aggregate will enable an adversary to attribute any information released from the document to the particular file. An adversary could then identify the specific intelligence activity applying a mosaic by supplying further missing pieces. Hence, a particular mosaic of the activity begins to appear as more information is identified with the particular intelligence file leading to exposure of actual intelligence activities or methods." (ECF 148, ¶ 14). Additionally, this Court previously ruled that "the NSA prohibits the FBI from releasing such information" (Memorandum Opinion and Order, ECF 156, pg. 41).

25.     Given the plain Congressional mandate to protect the IC's sources and methods of gathering intelligence, the FBI has determined that intelligence sources and methods would be revealed if any of the withheld information is disclosed to Plaintiffs. Therefore, the FBI is prohibited from disclosing such information under 50 U.S.C. § 3024 (i)(1).[9]

26.     The FBI is asserting Exemption 3 in this case, at times in conjunction with Exemption 7(E) to protect information that would reveal intelligence sources and methods. In some instances, information was protected under Exemption 7(E) because unclassified

---

[9] Although 50 U.S.C. § 3024 (i)(1) does not impose a requirement to articulate harm, disclosure of this information presents a bona fide opportunity for individuals to develop and implement countermeasures, resulting in the loss of significant intelligence information, sources, and methods relied upon by national policymakers and the IC to safeguard national security.

intelligence sources and methods were employed as law enforcement techniques, procedures, or

guidelines, and thus would qualify as both an intelligence source and method under Exemption 3

and a law enforcement technique under Exemption 7(E). Notably, § 3024 (i)(1) protects sources

and methods regardless of whether they are classified. *See Sims*, 471 U.S. at 176.

EXEMPTION 7 THRESHOLD

27.     Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it

must first demonstrate that the records or information at issue were compiled for law

enforcement purposes. Pursuant to 28 USC §§ 533, 534, and Executive Order 12,333 as

implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM)

and 28 CFR § 0.85, the FBI is the primary investigative agency of the federal government with

authority and responsibility to investigate all violations of federal law not exclusively assigned to

another agency, to conduct investigations and activities to protect the United States and its

people from terrorism and threats to national security, and further the foreign intelligence

objectives of the United States. Under this investigative authority, the responsive records herein

were compiled for the following specific law enforcement purpose.

28.     Under these investigative authorities and in furtherance of its law enforcement

mandate, the FBI compiled the information contained within the 20 selected FOIA requests at

issue in this sample. When the FBI processed those FOIA requests, it re-compiled law

enforcement information into the FOIA processing records, including for example file numbers,

targets/subjects, types and nature of the investigations, scope and focus of the investigations. The

information contained within FDPS displays information concerning various subjects of FBI

investigations and details about those investigations. Additionally, the information contained

within FDPS also demonstrates the provisions under the FOIA, such as exclusions, used by the

13

FBI to protect sensitive information that if disclosed could harm the FBI's ability to conduct its

law enforcement or national security missions.

EXEMPTION (B)(7)(A)

PENDING LAW ENFORCEMENT PROCEEDINGS

29.     FOIA Exemption 7(A) exempts from disclosure:

> records or information compiled for law enforcement purposes, but only
> to the extent that the production of such law enforcement records or
> information…could reasonably be expected to interfere with enforcement
> proceedings.

5 U.S.C. § 552 (b)(7)(A).

30.     Application of this exemption requires: the existence of law enforcement records;

a pending or prospective law enforcement proceeding; and a determination that release of the

information could reasonably be expected to interfere with the enforcement proceeding. Often,

the FBI asserts Exemption 7(A) categorically to withhold a variety of different documents in an

investigative file, which the FBI then groups into functional categories and describes in greater

detail. In this case, however, the FBI asserted Exemption 7(A) in a limited fashion to protect the

FBI case file numbers located in portions of the screenshots of the FDPS tabs for cases that were

still pending at the time of the FBI's review. For the file numbers the FBI previously withheld

under Exemption 7(A) in prior release to Plaintiffs the FBI took the steps to confirm that those

cases were still pending, and if they were no longer pending, the FBI discontinued the use of

Exemption 7(A) to withhold those file numbers. The release of this information would reveal

unknown information concerning pending enforcement procedures, to possibly include the

existence of unknown investigations/and proceedings. The file numbers withheld pursuant to

Exemption 7(A) are associated to pending investigations and release of these file numbers would

provide details such as the location and investigative focus of that pending investigation, which

could alert criminals to the existence of these investigations, and they may subsequently change their strategies to avoid detection. The FBI determined release of any of this material would provide criminals with information about the government's investigation/enforcement strategies in ongoing matters, allow them to predict and potentially thwart these strategies, and/or allow them to discover/tamper with witnesses and/or destroy evidence. As such, revealing this information could reasonably be expected to interfere with pending enforcement proceedings. Thus, the FBI has applied Exemption 7(A) to protect this information.

EXEMPTIONS (B)(6) AND (B)(7)(C)

CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY AND

UNWARRANTED INVASION OF PERSONAL PRIVACY

31.    FOIA Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). All information that applies to a particular person falls within the scope of Exemption 6.

32.    FOIA Exemption 7(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[10]

----

[10] The practice of the FBI is to assert Exemption 6 in conjunction with Exemption 7(C). Although the balancing test for Exemption 6 uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption 7(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under both exemptions.

33.     When withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure. In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the documents at issue. When withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure. For purposes of these exemptions, a public interest exists only when information about an individual, their name, or their identifying information would shed light on the FBI's performance of its mission to protect the American people and uphold the Constitution of the United States, and its function to: protect the United States from terrorist attack; protect the United States against foreign intelligence, espionage, and nefarious cyber operations; combat significant criminal cyber activity, public corruption, transnational criminal enterprises, white-collar crime, and violent crime; and protect civil rights. In each instance wherein information was withheld pursuant to Exemptions 6 and 7(C), the FBI determined that the individuals' privacy interests outweighed any public interest in disclosure.

34.     (b)(6)-1 and (b)(7)(C)-1: Names of FBI Professional Staff. Within Exemption category (b)(6)-1 and (b)(7)(C)-1 for this sample, the FBI withheld the names of FBI professional staff pursuant to Exemptions 6 and 7(C). These FBI professional staff were assigned to handle tasks related to the handling of FOIA or Privacy Act requests submitted to the FBI. These FBI professional staff were or are in positions of access to information regarding official law enforcement investigations, and therefore could become targets of harassing inquiries for unauthorized access to investigations if their identities were released. As described in the First Bender Declaration, "Positive identification as an FBI employee, regardless of role, is of genuine

interest to criminal elements, terrorists, and foreign intelligence services. As a result, the FBI

routinely protects the names and identifying information of all lower ranking employees as their

status of an FBI employee, on its own, may subject them to harassment by criminals seeking

access to FBI information or retribution, violent acts of terrorists who advocate bodily harm

against U.S. law enforcement and military personnel in furtherance of ideology, or recruitment

by foreign agents intent on espionage. As such, all FBI employees have identifiable privacy

interests in protection from the harms above as well as unnecessary, unofficial questioning as to

the conduct of investigations or the law enforcement activities they support." (First Bender

Declaration ECF 148-1, ¶23) Thus, these individuals maintain substantial privacy interests in not

having their identities disclosed. In contrast, the FBI concluded that no public interest would be

served by disclosing the identities of these FBI professional staff to the general public because

their identities would not, themselves, significantly increase the public's understanding of the

FBI's operations and activities. Accordingly, after balancing these profession staff employees'

substantial privacy interests against the non-existent public interest, the FBI determined

disclosure of their identities would constitute a clearly unwarranted invasion of their personal

privacy. Therefore, the FBI properly withheld the names and identifying information of FBI

professional staff pursuant to Exemptions 6 and 7(C).

    35.    <u>(b)(6)-2 and (b)(7)(C)-2: Identifying Information of a Third Party Merely</u>

<u>Mentioned.</u> In Exemption category (b)(6)-2 and (b)(7)(C)-2, the FBI withheld the identifying

information of a third party who were merely mentioned in the sample of screenshots ordered by

the Court. In the sample at issue, the FBI withheld an investigative file number on Bates page

"Screenshot Sample-215" that was initially thought responsive to the request in FOIPA Request

No. 1133487-000 but after further examination the FBI determined that the file was not actually

identifiable to the subject of that request and related to a different third party. That file was not processed in response to that FOIA request, but the file number remains on the Case Searches Tab. Release of this file number could lead to other parties seeking records concerning this individual that is only mentioned in this matter by happenstance. The FBI has information about this third party in the screenshots at hand because this individual's records were inadvertently considered responsive before they were eventually correctly treated as nonresponsive. This individual has no association to the issues in this particular case. This third party maintains substantial and legitimate privacy interests in not having this information disclosed and thus, being connected with an FBI law enforcement matter. Considering the FBI is an investigative and intelligence agency, disclosure of any third parties' names and/or identifying information in connection with an FBI record carries an extremely negative connotation. Disclosure of this individuals identifying information would subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. The FBI considered whether there was any public interest that would override the privacy interest of this individual and concluded that disclosing information about this individual who was merely mentioned in the sample at issue would not significantly increase the public's understanding of the operations and activities of the FBI. Accordingly, the FBI properly protected this individual's privacy interests pursuant to FOIA Exemptions 6 and 7(C).

      36.    <u>(b)(6)-4 and (b)(7)(C)-4: Names of Third Parties of Investigative Interest.</u> In Exemption category (b)(6)-4 and (b)(7)(C)-4, the FBI protected the names of third parties who were of investigative interest to the FBI. In the sample at issue on Bates page "Screenshot Sample-441", the FBI withheld the names of two subfiles of an investigative case file that were named after individuals of investigative interest. Other subfile names related to this file, and the

file number itself, were released because they either did not disclose any law enforcement techniques or Plaintiff had already provided privacy waivers for the names of other third parties in one of his other FOIA requests. Being identified as a subject of FBI investigative interest carries a strong negative connotation and a stigma, whether or not these individuals ever committed criminal acts. Release of the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. Furthermore, it could result in professional and social repercussions, due to resulting negative stigmas. Accordingly, the FBI determined these individuals maintain substantial privacy interests in not having their identities disclosed. In contrast, disclosing personal information about these individuals would not significantly increase the public's understanding of the FBI's performance of its mission and so the FBI concluded that there was no public interest here sufficient to override these individuals' substantial privacy interests. For these reasons, the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

37.     (b)(6)-5 and (b)(7)(C)-5: Names of Personnel from Non-FBI, Federal Agencies. In Category (b)(6)-5 and (b)(7)(C)-5, the FBI withheld the names of personnel from non-FBI, federal, government agencies who provided information to or otherwise assisted the FBI in administrative functions associated with the handling of FOIA and Privacy Act Requests. In this instance, the FBI withheld the names of personnel assigned to the DOJ Office of Information Policy that were coordinating with the FBI concerning appeals to FOIA requests. The rationale for protecting the identities of other government employees is the same as the rationale for protecting the identities of FBI employees. *See* ¶ 34 *supra*. Publicity, adverse or otherwise, concerning the assistance of these other agency employees to the FBI would seriously impair their effectiveness in assisting the FBI in the future. Therefore, these employees maintain

substantial privacy interests in not having their identities disclosed in this context. In contrast,

there is no public interest to be served by the disclosure of these employees' names because their

identities, by themselves, would not demonstrate how the FBI performed its statutory mission

and thus, would not significantly increase the public's understanding of the FBI's operations and

activities. Accordingly, the FBI properly protected these employees' privacy interests pursuant to

FOIA Exemptions 6 and 7(C).

EXEMPTION 7(D) – CONFIDENTIAL SOURCE INFORMATION

38.    Exemption 7(D) exempts "records or information compiled for law enforcement

purposes" when disclosure:

> could reasonably be expected to disclose the identity of a confidential source,
> including a State, local or foreign agency or authority or any private institution
> which furnished information on a confidential basis, and, in the case of a record or
> information compiled by a criminal law enforcement authority in the course of a
> criminal investigation or by an agency conducting a lawful national security
> intelligence investigation, information furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D).

39.    Numerous confidential sources report to the FBI on a regular basis; they provide

information under express assurances of confidentiality and are "informants" within the common

meaning of the term. Others are interviewed and/or provide information under implied

assurances of confidentiality (*i.e.*, under circumstances from which assurances of confidentiality

may be inferred). In either situation, these sources are considered to be confidential because they

furnish information only with the understanding that their identities and the information they

provided will not be divulged outside the FBI. Information provided by these sources is singular

in nature, and if released, could reveal their identities. The FBI has learned through experience

that sources assisting, cooperating with, and providing information to the FBI must be free to do

so without fear of reprisal. The FBI has also learned that sources must be free to furnish information to the FBI with complete candor and without the understandable tendency to hedge or withhold information because of fear that their cooperation with the FBI will later be made public. Sources providing information to the FBI should be secure in the knowledge that their assistance and their identities will be held in confidence.

40.     The release of a source's identity would forever eliminate that source as a future means of obtaining information. In addition, when the identity of one source is revealed, that revelation has a chilling effect on the activities and cooperation of other sources. Such a result undermines one of the FBI's most important means of collecting information and could thereby severely hamper law enforcement efforts to detect and apprehend individuals engaged in the violation of federal criminal laws.

41.     (b)(7)(D)-1: Confidential Source File Number. In Exemption category (b)(7)(D)-1, the FBI protected the confidential source file number of permanent confidential human source (CHS). Confidential source file numbers are administrative tools that facilitate the retrieval and storage of information supplied by CHSs. Similar in use to confidential source symbol numbers, these confidential source file numbers are assigned in sequential order to CHSs who report information to the FBI on a regular basis under express assurances of confidentiality. Confidential source files are unique to particular confidential informants. These numbers are typically recorded in an investigative record, whenever information provided by a CHS is memorialized in the investigative record, but is also copied into the informant's assigned confidential source file number.

42.     Disclosure of confidential source file numbers at various times and in various documents could ultimately identify these sources because it would reveal the connections of

confidential informants to the information they provided. Repeated release of confidential source file numbers along with the information provided by CHSs would narrow the possibilities of the informants' true identities. This is especially true because each confidential source file number is assigned to only one CHS. The revelation of an individual CHS's identity would expose the CHS and their family to potential retaliation by those on whom they provided information, those sympathetic to the targets of the FBI's investigative efforts, or those suspicious/hostile to law enforcement. Such retaliation could include defamation of the source's character among their peers/family; economic reprisal (deprivation of employment/business opportunities); violent threats aimed at instilling fear and doubt; or even violence itself (physical harm/murder). Globally, revealing an informant's identity could dissuade current or future CHSs from cooperating with the FBI, and from providing the FBI critical, timely intelligence needed to prevent/investigate violations of federal laws. Being able to provide credible assurances of complete confidentiality, and in course uphold such assurances, enables the FBI to enlist and maintain the cooperation of such CHSs. Accordingly, the disclosure of a confidential source file number could reasonably be expected to identify FBI CHS and could harm the FBI's ability to recruit and maintain valuable CHSs. Thus, the FBI properly withheld this information pursuant to Exemption 7(D).

## EXEMPTION (B)(7)(E)

### INVESTIGATIVE TECHNIQUES AND PROCEDURES

43.     FOIA Exemption 7(E) provides protection for:

> law enforcement records [which]…would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

22

5 U.S.C. § 552(b)(7)(E).

44.     Exemption (b)(7)(E) has been asserted to protect information from these screenshots, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

45.     Within the responsive documents, the FBI applied Exemption (b)(7)(E) to non-public investigative techniques and procedures utilized by the FBI to pursue its law enforcement mission, and also to non-public details about techniques and procedures that are otherwise known to the public. Specifically, the FBI asserted Exemption 7(E) to protect the following categories of information.

46.     (b)(7)(E)-3: Specific Investigative Techniques and Procedures. In Exemption category (b)(7)(E)-3, the FBI protected several types of information, or portions of information on the tabs displayed in the screenshots of FDPS that could reveal the pattern and practice of the FBI's use of provisions under the FOIA that allow the FBI to protect sensitive law enforcement or national security information. Disclosure of the information described below could reveal circumstances where the FBI may have employed a FOIA exclusion under 5 U.S.C. § 552(c) or reveal the scope of information withheld under a categorical denial, amongst other provisions of the FOIA. If the FBI were to only withhold information on these tab display areas in those instances where a FOIA exclusion or other sensitive law enforcement or national security information appear, it would undermine the very information the FBI has consistently protected in this case. Specifically, it would reveal in which cases the FBI did and did not apply

23

exclusions, or where sensitive law enforcement or national security information was or was not associated with a particular case. Such an approach would reveal in mosaic fashion, the FBI's investigative landscape in this domestic terrorism setting, thereby risking circumvention of the law. Accordingly, the FBI consistently protected these tab display areas in Exemption category (b)(7)(E)-3 as follows:

47. *The Case Searches and Case Files tabs for Shapiro requests that resulted in a No Records Response:* As described in the Fifth Hardy Declaration (ECF 57-3, ¶¶ 114-129), The FBI asserted Exemption Category (b)(7)(E)-3 to "protect the subterfuge of § 552(c) use and further to protect overall the national FBI's [Domestic Terrorism (DT)] program and investigative scheme." (*Id.* ¶ 129). The FBI previously utilized this exemption category to withhold the FOIA processing notes and search slips where the parent FOIPA request resulted in a "No Records" response. In the Fifth Hardy Declaration, the FBI previously explained "[t]he use of subterfuge, ruse, or a 'cover' is a fundamental law enforcement tool, technique, or procedure whereby an investigative agency employs a form of cover to cloak the true nature and scope of investigative efforts to detect criminal activity and safeguard national security. Functionally, there is no discernible difference between using intentional misinformation from an undercover agent or informant and the authorized use of § 552(c) in response to a FOIA request for investigative records. In both instances, the subterfuge of misinformation functions as a protective mechanism to protect the integrity of sensitive FBI criminal and national security investigations." (*Id.* ¶ 119)

48. In this sample, the Case Searches and Case Files tabs display functionally the same or similar information as the information which would be revealed on the search slips already processed in this case. The justification for using Exemption 7(E) to withhold this

information on the search slips and processing notes is described in detail in the Fifth Hardy Declaration (*id.*) and in this context this Court found that "the FBI has met its modest burden of showing 'logically how the release of [the processing records] might create a risk of circumvention of the law.' *PHE, Inc. v. U.S. Dep't of Justice, 983 F.2d 248, 251 (D.C. Cir. 1993).*" (Court's Memorandum and Opinion, ECF 92, pg. 20-21) For similar reasons described in the Fifth Hardy Declaration, the FBI must also apply that same mosaic theory to the processing on the Case Searches and Case Files tabs in the Shapiro requests that resulted in "No Records" responses. The Case Searches tab displays the results of RIDS search efforts including a list of records located. The Case Files tab is where copies of the responsive records are stored and eventually processed in response to the FOIA or Privacy Act request. The revelation that any files were located or considered potentially responsive when a "No Records" response was issued could potentially reveal the application of the use of a FOIA exclusion under § 552(c). If the FBI only utilized exemption category (b)(7)(E)-3 in circumstances where the FBI located files but issued a "No Records" response, it would essentially reveal the cases where an exclusion might have been used.

49.     Specifically concerning this information, and as previously stated in the Fifth Hardy Declaration, "[d]isclosure of this material in the notes and search slips would reveal the scope of the FBI's DT program in the United States, the scope and focus of its investigative efforts, and strategies it plans to pursue in preventing and disrupting domestic terrorist activity. Release would allow animal extremist terrorists to gauge the FBI's strengths and weakness within certain areas of the DT arena and structure their activities in a manner that avoids detection and disruption by the FBI." (*Id.* ¶ 128) As such, the FBI withheld the totality of the information field where file numbers would be listed in all instances of a "No Records" response

25

in order to not reveal in which cases an exclusion might have been used and to protect the FBI's future use of the technique. Accordingly, the FBI categorically withheld the information in the Case Searches and Case Files boxes on the tabs under Exemption 7(E). The FBI released all other portions of those tabs, except for the fields where the exempt information could be displayed. However, if the FBI had previously processed and released a search slip in a particular case, it did not apply this mosaic theory to the cases searches or case files tabs in those cases, but rather reviewed for any segregable information and applied other exemptions as appropriate.

50.     *The Case Size field on the Case Summary tab:* The FBI protected the information contained within the Case Size field in Exemption category (b)(7)(E)-3 because the information in this field would reveal the volume of records imported into the FOIA case in FDPS. This field displays the size of the case as related to the number of pages imported into the FDPS case and categorizes each case as small, medium, large, or extra-large. Revealing the size of the case could allow an individual to compare the case size against the number of pages the FBI acknowledged it reviewed in its releases, and infer whether additional pages might have been imported and not reviewed, potentially because those records were eventually treated as not subject to the FOIA under § 552(c) or could reveal the volume of records at issue in a categorical denial where disclosure of the volume of records itself could reveal exempt information. The FBI must apply this processing strategy in all FDPS cases, both "No Records" responses and responses that acknowledged responsive records, because if the FBI only withheld this information when it differed from the FBI's final determination, it would reveal the possible use of an exclusion, or reveal the use of other provisions under the FOIA to protect sensitive law enforcement or national security records, and could reveal the FBI's pattern and practice of using these provisions.

51.     *The Info Flags & Info Flags Applied fields on the Status tab:* The FBI protected

the information contained within the Info Flags and Info Flags Applied fields within Exemption

category (b)(7)(E)-3 because the information in these fields could reveal the use of exclusions or

other provisions under the FOIA that allow for the protecting of sensitive law enforcement and

national security records. These informational fields are used to provide a snapshot to a GIS

about a case and are used to track certain data about each request as it moves through the

workflow, as flags are applied or removed from a case depending on the details of the request

and the FBI actions taken. These flags could be as simple as identifying that the case is

associated to a litigation or that the case was negotiated while other flags identify that an

exclusion was sought, denied, or granted. When a flag is selected from the Info Flags field,

which represents a list of all available flags, and added to the Info Flags Applied field, which

represents a list of all flags applied to a particular request, it is then removed from the list in the

Info Flags Field. Since the flags lists are connected in this way, both fields must be withheld.

Disclosing the information in these fields could reveal the use of an exclusion, negating the use

of these techniques and revealing the very exempt information the FBI is trying to protect. The

FBI must protect the information in these fields in every instance because only withholding those

fields when an exclusion is used, or other sensitive law enforcement or national security

information appears, would reveal the FBI's pattern and practice of using those provisions under

the FOIA to protect sensitive law enforcement and national security records.

52.     *The Page Count fields on the Status tab:* The FBI protected the information

contained within the Page Count fields in Exemption category (b)(7)(E)-3 because the

information in this box would reveal the total volume of records imported into the FOIA case in

FDPS. The justification for withholding this information is similar to the justification for

withholding the information in the Case Size field on the Case Summary tab as described in ¶ 50 *supra*. Revealing the number of pages imported into the case could allow an individual to compare that page count against the number of pages the FBI acknowledged it reviewed in its releases, and infer whether additional pages might have been imported and not reviewed, potentially because those records were eventually treated as not subject to the FOIA under § 552(c), or could reveal the volume of records at issue in a Categorical Denial where disclosure of the volume of records itself could reveal exempt information. The FBI must apply this processing strategy in all FDPS cases, both "No Records" responses and responses that acknowledged responsive records, because if the FBI only withheld this information when it differed from the FBI's final determination, it would reveal the possible use of an exclusion, or other provisions under the FOIA used to protect sensitive law enforcement or national security records, and could reveal the FBI's pattern and practice of using these techniques.

53.        *The Date Ready and Assigned FOIPA Date fields on the Status tab in cases where the FBI issued a no records response:* The Date Ready and Assigned FOIPA Date fields show the date a FDPS case was ready to be placed in the backlog for assignment to a GIS for FOIA processing and the date the FDPS case was assigned to a GIS for FOIA processing, respectively. Typically, if no responsive records are identified in a request, and the case is closed with a "No Records" response, these fields are not populated. However, it is possible that a request could have initially identified records, forwarded the case to the backlog for assignment, and a GIS later determined all responsive records are in fact not subject to the FOIA pursuant to an exclusion. The acknowledgement that records were identified, but not disclosed, could potentially reveal the use of those provisions. As such, the FBI protected the information contained within these two fields where the FBI issued a "No Records" response because

revealing that this information was populated could reveal that a file was located for processing but was later determined to be not subject to the FOIA under § 552(c).

54.     *The list of work items on the Work Items tab:* The Work Items tab displays administrative information concerning all work items in the case. Revealing the totality of the information within the work items field would reveal the scope of responsive material located by the FBI in a particular case. This could potentially include work items that were later determined to not be subject to the FOIA under § 552(c) or could show the scope of material reviewed in a case where the FBI issued a Categorical Denial where disclosure of the volume of responsive records could reveal exempt information. In instances where the scope of the responsive material in the work items field, and the records acknowledged by the FBI, if any, differ, an individual could infer that the FBI used an exclusion to protect sensitive law enforcement or national security records. The FBI must apply this processing strategy in all FDPS cases, both "No Records" responses and responses that acknowledged responsive records, because if the FBI only withheld this information when it differed from the FBI's final determination, it would in the end reveal the possible use of an exclusion, or other provision under the FOIA to protect sensitive law enforcement or national security records, and could reveal the FBI's pattern and practice of using these techniques.

55.     *The Information in the Case History tab:* The Case History tab displays the history of interactions with the case and associated work items. Some of the information it tracks and logs includes the creation of the case, creation of work items, reassignment of the case or work items, creation of case notes, importing of case files or administrative documents, etc. Release of this information would reveal the scope of work conducted in a case and the scope of the responsive material, as well as contain references to the use of provisions of the FOIA such

29

as 5 U.S.C. § 552(c). For reasons similar those described concerning the FBI's withholding of information on the Work Items tab in ¶ 54 *supra*, the FBI must also withhold information on the Case History tab pursuant to Exemption 7(E). In instances where the scope of responsive material as indicated by the information in the Case History field, and the records acknowledged by the FBI, if any, differ, an individual could infer that the FBI used an exclusion or other provision that allows it to protect sensitive law enforcement or national security records. The FBI must apply this processing strategy in all FDPS cases, both "No Records" responses and responses that acknowledged responsive records, because if the FBI only withheld this information when it differed from the FBI's final determination, it would reveal the possible use of an exclusion, or other provision under the FOIA to protect sensitive law enforcement or national security records, and could reveal the FBI's pattern and practice of using these techniques.

56.     *Risk of Circumvention of the Law:* Overall, the FBI must protect the types of information enumerated above because disclosure could reveal the pattern and practice of the FBI's use of provisions under the FOIA that allow for the protection of sensitive law enforcement and national security information, such as exclusions or categorical denials. Disclosure of these types of information could allow individuals engaged in criminal activities to utilize FOIA or Privacy Act requests to attempt to determine the status, focus, or scope of FBI investigations, what techniques or strategies are being used in those investigations, and if the FBI is aware of any potential criminal activities. Revealing the inner workings of how the FBI employs techniques such as exclusions would weaken their applicability and weaken the FBI's ability to protect sensitive law enforcement or national security information. If these types of information were disclosed, in aggregate, criminals or foreign adversaries could utilize this

information to conceal their activities or avoid detection by law enforcement. They could further

use the information to modify their strategies to negate the FBI's use of particular law

enforcement or national security techniques and hinder the FBI's investigations in furtherance of

its law enforcement and national security missions. The mosaic approach is likewise applicable

here where pieces of seemingly innocuous information, that viewed in isolation may not seem

exempt, must be considered in concert with the larger universe of FBI records. Accordingly, the

FBI has asserted Exemption 7(E) to protect the categories of information described above.

57.     (b)(7)(E)-4: Sensitive Investigative File Numbers: In Exemption category

(b)(7)(E)-4, the FBI protected sensitive investigative file numbers. The FBI determined this

exemption is appropriate for protecting these file numbers as the release of file numbering

convention identifies the investigative interest or priority given to such matters. The file numbers

the FBI protected are not known to the general public. These file numbers contain three separate

portions. The first portions of these file numbers consist of FBI file classification numbers which

indicate the types of investigative/intelligence gathering programs to which these files pertain.

Many of the FBI's classification numbers are public, which makes disclosure of this information

even more telling. Release of known file classification numbers in the context of investigative

records would immediately reveal the types of investigations being pursued, and thus the types

of investigative techniques and procedures available to FBI investigators, and/or non-public

facets of the FBI's investigative strategies. For example, revealing the FBI has a money

laundering investigative file on a subject who was only known to be investigated for crimes

related to public corruption, would reveal key non-public information about the FBI's

investigative strategies and gathered evidence. Additionally, releasing non-public FBI file

classification numbers would reveal critical information about non-public investigative

techniques and procedures, and provide criminals and foreign adversaries the ability to discern the types of highly sensitive investigative strategies the FBI is pursuing whenever such file classification numbers are present within these and other sensitive FBI investigative records.

58.     The protected investigative file numbers also contain two letter office of origin codes, indicating which FBI field office or overseas FBI legal attaché originated the investigations at issue. Providing this information, in many instances, would provide critical information about where and how the FBI detected particular criminal behaviors or national security threats, and reveal key pieces about the FBI's non-public FBI investigations or intelligence/evidence gathering sources and methods. Revealing this information could also risk disclosing unknown FBI investigations or intelligence gathering initiatives, by revealing interests in varying areas of FBI investigative responsibility. Releasing this information could also possibly provide significant information about the FBI's failure to detect certain types of criminal behavior. For example, a criminal operating out of San Francisco, California with ties to a criminal organization under investigation in the FBI's Seattle Field Office, could request the FBI's Seattle Field Office's investigative file. If the FBI were to reveal all of the originating office codes in the investigative files present in Seattle's file, and there was no indication the FBI ever pursued an investigation in San Francisco, the criminal could reasonably assume the FBI failed to locate any evidence of their wrongdoing, emboldening them to continue their activities, undeterred.

59.     The third portion of these investigative files consists of the numbers given to the unique investigative initiatives these files were created to memorialize. Releasing these singular file numbers would provide criminals and foreign adversaries with a tracking mechanism by which they can place particular files/investigations within the context of larger FBI investigative

efforts. Continued release of sensitive investigative file numbers would provide criminal with an idea of how FBI investigations may be interrelated and when, why, and how the FBI pursued different investigative strategies. This would provide criminals with a means of judging where the FBI allocates its limited investigative resources, how the FBI responds to different investigative circumstances, what the FBI knows and when/how they obtained the knowledge, and if there are knowledge-gaps in the FBI's gathered intelligence.

60.     As described in the First Bender Declaration, "the risk of circumvention is particularly critical in this case, as Plaintiffs sought the FBI's processing notes and search slips for underlying FOIA requests about a large number of subjects, of which many related to the animal rights extremist arena. Release of the file numbers exempted in this case is tantamount to handing them the composite "list" of cases within this genre whereby subjects can connect and/or cross-correlate other investigative pieces of information to map out the investigative landscape. Applying a mosaic, in conjunction with other information known about other individuals/matters, suspects can use these numbers to put together a comprehensive picture of enforcement landscape to include allocation of resources, investigative avenues and strategies pursued, investigative gaps, and how the FBI collects intelligence. This, in turn, would allow subjects to discern information that would risk circumvention of the law. Furthermore, assembling the sum of the parts of a file number would provide criminals with an idea of how FBI investigations may be interrelated, thereby creating a "heat map" for specific areas, thus showing those engaging in criminal acts where such activity is less risky from a law enforcement standpoint; and how or why the FBI pursued different investigative strategies; thus creating a bona fide risk of circumvention." (ECF 148-1, ¶ 10).

61.     In summary, repeatedly releasing sensitive FBI investigative file numbers would allow determined criminals and foreign adversaries to obtain an exceptional understanding of the body of investigative intelligence available to the FBI; and where, who, what and how it is investigating certain detected activities. Release of this information would enable these criminals and foreign adversaries to predict FBI investigations and structure their behavior to avoid detection and disruption by FBI investigators, enabling them to circumvent the law. Accordingly, the FBI properly asserted FOIA Exemption 7(E), at times with FOIA Exemption 3 and 7(D), to protect this type of information.

62.     (b)(7)(E)-7: Investigative Focus of Specific Investigations. In Exemption category (b)(7)(E)-7, the FBI protected the focuses of specific FBI interconnected investigations in the universe of responsive material in this case. Revealing the specific nexus between interconnected investigations would reveal the scope of the FBI's programs and the strategies it plans to pursue in preventing and disrupting criminal activity, thus allowing criminals to gauge the FBI's strengths and weaknesses across the criminal domain to structure their activities in a manner that avoids detection and disruption by the FBI. Revealing this information to investigative targets would alert them to the FBI's interest in their activities, allowing them to take active measures to conceal/destroy evidence or modify their behavior to avoid future investigative scrutiny. Additionally, revealing the broader investigative focuses of the interconnected investigations in the universe of responsive records in this case would reveal the scope of the FBI's gathered evidence/intelligence on these particular subjects, connections it has discovered between different criminal elements, and the strategies it plans to pursue to prevent or disrupt further criminal activities or national security threats. This would allow these criminal elements to predict the FBI's investigative strategies and modify their activities or operation security

measures to thwart FBI investigative efforts. Additionally, release of this information in the context of the investigative records at issue would provide criminal elements a preview of how the FBI will respond to similar investigative situations, allowing them to preemptively deploy countermeasures to disrupt FBI investigative efforts of their own, unrelated activities.

63.     Release of this type of information would also reveal key information about FBI intelligence gathering capabilities. Revealing when and why the FBI pursues or shifts investigative focuses would reveal key information about the types of investigative intelligence the FBI possessed at particular points in time, and possibly when and how such information was obtained. This could enable criminal elements to discover non-public details about FBI intelligence/evidence gathering methods and help them determine how they might modify their operational security to deprive the FBI of such critical intelligence and/or evidence.

64.     In summary, releasing the focus of these specific interconnected FBI investigations would allow targets of these investigations to thwart FBI efforts to investigative/disrupt their activities; stunt the FBI's broader strategies for pursuing interrelated investigations; provide key information about FBI investigative strategies for pursuing the types of investigations at issue in Plaintiffs' requests; and reveal key information about the FBI's intelligence/evidence gathering capabilities. Therefore, as release of this information would enable criminals to circumvent the law, the FBI withheld this information pursuant to Exemption 7(E).

## FORESEEABLE HARM STANDARD

65.     The FOIA Improvement Act of 2016 generally adopted the foreseeable harm standard and made it statutory, advising that agencies shall withhold information under the FOIA only if the agency reasonably foresees that disclosure would harm an interest protected by an

exemption or disclosure is prohibited by law. Accordingly, the FBI's analysis of the sample at issue in this case was a two-part process. First, the FBI determined whether a portion of a screenshot is exempt pursuant to one or more FOIA exemptions. Second, if a portion is exempt pursuant to one or more FOIA exemptions, the FBI then considered whether foreseeable harm would result from disclosure of that portion. In each of the withheld portions of the sample screenshots, the FBI conducted this two-part analysis and only withheld portions of screenshots where it determined the withheld portion met both of these criteria. The foreseeable harm is more fully described under each exemption justification.

## SEGREGABILITY

66.     As discussed in ¶ 4 supra, the FBI identified a total of 855 pages of screenshots: 518 Released in Full (RIF) and 337 Released in Part (RIP). Each of these categories is discussed below to further address segregability.

a. Pages RIF. Following its segregability review, RIDS determined 518 pages could be released in full without redaction as there was no foreseeable harm to an interest protected by a FOIA exemption.

b. Pages RIP. Following its segregability review, RIDS determined 337 pages could be released in part with redactions per the identified FOIA exemptions herein. These pages comprise a mixture of material that could be segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions on these pages.

**CONCLUSION**

67.    In response to the Court's October 16 Order, the FBI created 855 pages of screenshots of each tab in each iteration of the 20 FOIPA requests selected by Plaintiffs; processed all such screenshots and released all reasonably segregable non-exempt information from the screenshots of the FDPS tabs that are subject to FOIA. The FBI processed the screenshots under the access provisions of the FOIA to achieve maximum disclosure. Information was properly withheld pursuant to FOIA Exemptions 3, 6, 7(A), 7(C), 7(D) and 7(E). The FBI carefully examined the screenshots and determined the information withheld from Plaintiffs in this case, if disclosed would reveal statutorily protected information; could reasonably be expected to interfere with pending or prospective enforcement proceedings; would cause a clearly unwarranted invasion of the personal privacy, or could reasonably be expected to constitute an unwarranted invasion of personal privacy; could reasonably be expected to disclose the identities of confidential sources and the information they provided; and/or would disclose techniques and procedures for law enforcement investigations. After extensive review of the screenshots at issue, the FBI determined that there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through B attached hereto are true and correct copies.

Executed this _____ day of November 2023.

MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia